# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

In re:

RMS TITANIC, INC., *et al.*,[1]

                Debtors.

Case No. 3:16-bk-02230-PMG
Chapter 11 (Jointly Administered)

**[Hearing Time Requested:  Four (4) Hours]**

## DEBTORS' MOTION FOR ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 105 AND 363 AND BANKRUPTCY RULES 6003, 6004, AND 9014 AUTHORIZING THE DEBTORS TO MARKET AND SELL CERTAIN TITANIC ARTIFACTS FREE AND <u>CLEAR OF LIENS, CLAIMS, AND INTERESTS</u>

RMS Titanic, Inc. and certain of its affiliates, as Debtors and Debtors in possession in the above-captioned case (collectively, the "Debtors"), move this Court for an order pursuant to sections 105 and 363 of title 11 of the United States Code (11 U.S.C. § 101, et seq., as amended the "Bankruptcy Code") and Rule 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for the entry of an order authorizing the Debtors to market and sell certain Titanic Artifacts free and clear of liens, claims, and interests, and state as follows:

---

[1] The Debtors in the chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include: RMS Titanic, Inc. (3162); Premier Exhibitions, Inc. (4922); Premier Exhibitions Management, LLC (3101); Arts and Exhibitions International, LLC (3101); Premier Exhibitions International, LLC (5075); Premier Exhibitions NYC, Inc. (9246); Premier Merchandising, LLC (3867), and Dinosaurs Unearthed Corp. (7309).  The Debtors' service address is 3045 Kingston Court, Suite I, Peachtree Corners, Georgia 30071.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this Motion under 28 U. S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue for this case and this Motion in this District are proper under 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief requested herein are Bankruptcy Code sections 105 and 363 and Bankruptcy Rules 6003, 6004, and 9014.

## BACKGROUND

3.      On the date hereof (the "Petition Date"), the Debtors filed a voluntary petition in this Court for relief under chapter 11 of the Bankruptcy Code.  The factual background regarding the Debtors, including its business operations, its capital and debt structure, and the events leading to the filing of this bankruptcy case, are set forth in detail in the Case Summary.

4.      The Debtors continue to manage and operate their business as a debtor in possession under Bankruptcy Code sections 1107 and 1108.

5.      No trustee or examiner has been appointed in this chapter 11 case, and no committee has yet been appointed.

## RELIEF REQUESTED

6.      By this Motion, the Debtors request entry of an order authorizing the Debtors to market and sell, after notice and hearing, certain assets of the Debtors, specifically certain artifacts of the Titanic.

## TITANIC ARTIFACTS

### I.     The French Collection and the American Collection.

7.      Titanic Ventures Limited Partnership, a predecessor in interest to RMS Titanic, Inc. (collectively "RMST" or the "Company"), with the assistance of Institut Francais de Recherche Pour l'Exploitation de la Mer, the French government's oceanographic institute, conducted a joint expedition to the wreck of the RMS TITANIC in 1987.  Over the course of 32 dives during that expedition, the Company recovered approximately 2100 artifacts from the Titanic wreck site (the "French Artifacts" or the "French Collection").  The Company took the French Artifacts to France for conservation and restoration.  On October 20, 1993, an Administrator in the French Office of Maritime Affairs (Ministry of Equipment, Transportation and Tourism) awarded the Company title to the French Artifacts.  See, R.M.S. Titanic, Inc. v. The Wrecked and Abandoned Vessel, 435 F.3d 521, 524 (4th Cir. 2006).  The Administrator's decision noted assurances made by the Company that it "agreed to make use of such objects in conformity with the respect due the memory of their initial owners and to not carry out any commercial transaction concerning such objects nor any sale of any one of them nor any transaction entailing their dispersion, if not for the purposes of an exhibition."  See, id. at 528.

8.      In 1993, RMST conducted an additional research and recovery expedition to the wreck of the Titanic, and on August 26, 1993, commenced an *in rem* action in United States District Court for the Eastern District of Virginia (the "EDVA Court") against the artifacts recovered in the 1993 expedition, and the wreck itself.  Id.

A few months later, the EDVA Court entered an Order which assumed in rem jurisdiction over the artifacts recovered by the Company in 1993, as well as the wreck itself, and declared the Company to be the salvor-in-possession of the wreck and wreck site.  Id.  RMST remains salvor-in-possession of the Titanic wreck site today.

9.    RMST conducted further salvage operations at the Titanic wreck site in 1994, 1996, 1998, 2000, and 2004 and recovered over 3000 additional artifacts (the artifacts recovered in 1993, 1994, 1996, 1998, 2000, and 2004 shall be referred to as the "American Artifacts" or the "American Collection").  RMST conducted an additional research expedition to the wreck in 2010, but did not recover any artifacts.

10.    In 2004, RMST filed a "Motion for Salvage and/or Finds Award" with the EDVA Court.  Id. at 525.  The motion sought an award of title to the American Artifacts; the motion excluded any requests for compensation as to the French Artifacts, for which title had already transferred to the Company pursuant to the French administrator's 1993 award.  Id.  By Order dated July 2, 2004, the EDVA Court refused to recognize the previous decision by the French Administrator, effectively stripping the Company of title to the French Artifacts.  R.M.S. Titanic, Inc. v Wrecked & Abandoned Vessel, 323 F. Supp. 2d 724 (E.D. Va. 2004).  In refusing to recognize the French Administrator's decision to award the French Artifacts to RMST, the EDVA Court concluded that an application of the principles of comity did not justify the EDVA Court's recognition of the French administrative proceeding.  Id. at 733.  The EDVA Court directed RMST to prepare a motion for salvage award on the entire collection of Titanic artifacts – the French Artifacts and the American artifacts.

11.     RMST appealed the July 2, 2004 Order to the United States Court of Appeals for the Fourth Circuit.  On January 31, 2006, the Fourth Circuit vacated the EDVA Court Order with respect to the ownership of the French Artifacts, holding that the EDVA Court "does not have in rem jurisdiction over the French artifacts, or, absent in rem jurisdiction, any other jurisdictional basis upon which to issue a declaratory judgment" and remanded the case to the EDVA Court for administration of the American Artifacts.  R.M.S. Titanic, Inc., 435 F.3d at 528.  This decision effectively reconfirmed the French Administrator's transfer of title to RMST of the French Artifacts, and established as the law of the case that the EDVA Court's subject matter jurisdiction extends only to the American Artifacts and the wreck itself, but not to the French Artifacts.

12.     In August 2010, the EDVA Court granted RMST a salvage award for its efforts in recovering and restoring the  American Artifacts, and determined the award to be 100% of the fair market value of the American Artifacts, or approximately $110 million.  R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel, 742 F. Supp. 2d 784, 809 (E.D. Va. 2010).  In that Order, the EDVA Court reserved the right to determine the manner in which to pay the award (i.e. by judicial sale of the artifacts, or by an in specie award of title).  Id.  In keeping with prior Orders of the EDVA Court, RMST and the United States Government, through the United States Attorney, negotiated and drafted "Covenants and Conditions for the Future Disposition of Objects Recovered from the RMS TITANIC by RMS Titanic, Inc.  Pursuant to an In Specie Salvage Award Granted by the United States District Court for the Eastern District of Virginia"

(the "Covenants"). The Covenants are attached as Exhibit A to the 2010 Order. See R.M.S. Titanic, Inc., 742 F. Supp. 2d at 809-824.

13.    In August 2011, the EDVA Court granted the Company an *in specie* salvage award, which conveyed to RMST title to the American Artifacts. R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel, 804 F. Supp. 2d 508 at 509 (E.D. Va. 2011). Title to the American Artifacts is "fully subject to" the Covenants. Id. Following this Order, RMST has full title to both the French Artifacts and to the American Artifacts.

## II.    The Covenants.

14.    By including the Covenants as a condition of the *in specie* award, the EDVA Court sought to ensure that: (i) the collection is maintained as an intact collection that joins the French Artifacts together with the American Artifacts; (ii) the artifacts are managed according to professional standards; (iii) ongoing oversight by NOAA is implemented to protect the United States' interests; (iv) the artifacts are protected in perpetuity; and (v) the artifacts are protected in the event of insolvency or bankruptcy. R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel, No. 2:93-cv-902, at 4-5 (E.D. Va. April 15, 2008).

15.    At the time they were negotiated and finalized, counsel for RMST, with extensive input from the United States Government, methodically drafted the Covenants so that, to the extent possible, they encompassed the EDVA Court's objective to maintain and conserve the two Titanic artifact collections together, but without impinging the Fourth Circuit's decision which held, in pertinent part, that the EDVA

Court lacks jurisdiction over the French Collection.  <u>R.M.S. Titanic, Inc.</u>, 435 at 528. The Covenants themselves confirm that they do not extend to the Court subject matter jurisdiction over the French Artifacts ("it is the intent to grant RMST an <u>in specie</u> salvage award in the form of title to the artifacts that RMST has recovered and which are within the Court's jurisdiction" (emphasis added); "[t]he Court shall be deemed to have continuing jurisdiction over the [American  Artifacts]" with no similar reference to the 1987 Artifacts; the Covenants "shall apply to the present and future disposition, care, conservation, and management of the [American  Artifacts]" (emphasis added); the Covenants are "intended to govern the . . . [AmericanArtifacts]" (emphasis added)).

16.   Under this framework, it is evident that the Covenants provide a distinct set of guidelines and rules with respect to the two collections.  In some respects, the Covenants attempt to join the two collections (the French Artifacts and the American Artifacts), and treat them as one collection.  For example, the Covenants require both collections to be available to present and future generations for public display, exhibition and educational purposes.  In this respect, the Covenants require the two collections "to the maximum extent possible and consistent with reasonable collections management practices, to be conserved and curated together by the Trustee."[2] Similarly, the Covenants require both collections to be maintained pursuant to recognized museum standards, and require RMST to fund a reserve account for the

---

[2] The current Trustee is the Company.

protection of both collections.  The provisions related to default by RMST for failure to comply with the Covenants apply to both collections.

17.     In many key sections, however, including with respect to treatment of the artifacts in the event of a bankruptcy, the Covenants only apply to the American Artifacts, and not the French Artifacts.  The Covenants provide strict rules and the requirement of court approval in the event of a sale of the American Artifacts.  But the Covenants provide no rules governing the sale of the French Artifacts.  Similarly, the Covenants "run in perpetuity" for the American Artifacts, but make no similar reference with respect to the French Artifacts.  The Covenants provide specific guidance with respect to the deaccessioning of American Artifacts from their collection, but do not impose any restrictions as to the deaccessioning of French Artifacts.  See Section III(C) "Deaccessioning of Objects within the Subject TITANIC Artifact Collection (STAC)."

18.     Section VII of the Covenants seeks to protect the American Artifacts in the event of a Bankruptcy.[3]  The entirety of Section VII.A is as follows:

> VII. PROTECTION OF THE SUBJECT TITANIC ARTIFACT COLLECTION IN THE EVENT OF A TRUSTEE'S BANKRUPTCY [U.S. Amicus Br. 16; Court 4/15/2008 Order, at 5]
>
> A.     Having been declared that any Trustee's title to and possession and use of the Subject TITANIC Artifact Collection (STAC) pursuant to the *in specie* salvage award is subject to a trust to further the public interest in the historical, archeological, scientific, or cultural aspects of the wreck and its artifacts, any Trustee of the STAC that is organized as a business association (whether for-profit, or not-for-profit), shall be

---

[3]  The Covenants refer to the 1987 Artifacts as the French Titanic Artifact Collection, and the American Artifacts as the Subject Titanic Artifact Collection or the STAC.

required to take all appropriate measures to ensure that these Covenants and Conditions will continue to apply to the STAC for the benefit of the public interest even in the event of a Trustee's bankruptcy, insolvency, dissolution, winding-up, or similar event.

B.     To the extent allowed by federal law, the beneficial interests to the STAC, including the public beneficial interest in the historical, archeological, scientific, or cultural aspects of the wreck and its artifacts, shall not be considered as part of the bankruptcy estate of the Trustee in the event of bankruptcy, insolvency, dissolution, winding up, or similar event, and all measures taken by a trustee, debtor-in-possession or similar agent of the Trustee shall be subject to review by the United States District Court for the Eastern District of Virginia to protect the unity and integrity of the STAC under these Covenants and Conditions; provided, however, nothing in this subparagraph shall be construed to deprive the Trustee of any economic benefits relating to the *in specie* salvage award and its title to the STAC consistent with these Covenants and Conditions.

C.     Deleted.

D.     Procedures in the Event of a Trustee's Bankruptcy.

1.     In the event of a Trustee's bankruptcy, insolvency, dissolution, winding-up, or similar event, the Court may take all appropriate action, within its jurisdiction, to enforce these Covenants and Conditions;

2.     The Court may request information from the Trustee and/or may convene and conduct a hearing in order to ascertain whether the Trustee's insolvency bond should be forfeited and recommend the modalities under which the funds will be applied to protect the TITANIC Collections;

3.     Deleted.

4.     Deleted.

5.     NOAA shall have the right to make submissions in the foregoing proceedings and represent the public interest.

6.     As set forth in V.F.1, jurisdiction over this matter shall remain in the United States District Court for the Eastern District of Virginia. If, however, another bankruptcy court attempts to exercise jurisdiction over the STAC artifacts, the district court in which the bankruptcy case is

pending may have the reference withdrawn under *28 U.S.C. § 157*, or transfer venue to this Court under *28 U.S.C. § 1412*.

19.    Section VII.A. requires RMST, "to take all appropriate measures to ensure that these Covenants and Conditions will continue to apply to the [American Artifacts] for the benefit of the public interest even in the event of a Trustee's bankruptcy, insolvency, dissolution, winding up, or similar event." RMST will continue to protect and preserve the American Artifacts as it has steadfastly done for the last 29 years; no similar judicial mandate exists with respect to the French Artifacts in the event of a bankruptcy.

20.    "To the extent allowed by federal law," § VII.B of the Covenants seeks to carve out the American Artifacts from the bankruptcy estate of the Trustee, in order "to protect the unity and integrity" of the American Artifacts. As this condition applies only to the American Artifacts, and not to the French Artifacts, there is no judicial mandate, nor other legal basis to carve out the French Artifacts from the bankruptcy estate.

### III.    Proposed Sale of French Artifacts

21.    For nearly 100 years, the wreck of the RMS TITANIC sat lifeless beneath the Atlantic Ocean. The 1987 expedition commenced nearly 30 years of uninterrupted efforts by RMST to recover and stabilize approximately 5,500 artifacts from the seabed, restore and conserve these artifacts, and exhibit them to tens of millions of people around the world. As the owner and Trustee of these artifacts, RMST recognizes and appreciates their historic value, and believes that the artifacts

should remain together as a collection, made available to future generations. Recognizing, however, the extraordinary monetary value of the individual artifacts, and the Company's current circumstances, RMST believes a sale in bankruptcy of a very specific, limited number of artifacts from the French Collection serves the best interests of the Debtors' creditors, their shareholders, and both artifact collections.

22.     The American and French Titanic Artifact Collections have significant monetary value.  In 2007, the American Collection was appraised at approximately $189 million.  In 2009, noted personal property and fine arts appraiser Richard-Raymond Alasko conducted an appraisal review of the 2007 appraisal, and confirmed the reliability of the report.  See Exhibit A attached hereto.  A copy of Mr. Alasko's curriculum vitae is attached hereto as Exhibit B.  In 2014, Mr. Alasko issued a report in which he opined that the combination French and American Collections had a total market value of approximately $218 million.  See Exhibit C attached hereto.

23.     RMST has never sold an artifact, nor has any other entity ever legally recovered or sold artifacts from the wreck site of the Titanic.  Nevertheless, there exists a fertile market for the sale of Titanic-related artifacts and memorabilia saved by survivors of the tragedy, or culled from the surface waters by rescuers.  For example, a cracker from the ship sold for $23,000 last year.  In 2013, a violin from a crew member sold for $1,454,400 at auction. In 2012, two menus sold for $140,000.  While extraordinary, none of these items were recovered from the depths of the Atlantic, nor stabilized and conserved through decades of stewardship, which circumstances enhance the intrinsic value of the artifacts owned by the Company.

24.    Under these circumstances, the Debtors believe that a limited sale of artifacts (perhaps as few ten to twenty) from the French Collection would generate enough revenue to pay all of the Debtors' creditors in full, return all of the equity to the Debtors' shareholders and provide working capital for the Debtors as they emerge from bankruptcy.  The proceeds from such a sale could likewise fund some or all of the Titanic reserve account referenced in Section V.D. of the Covenants, which is a dedicated endowment for the future care of the collections.  Such a sale would leave the American Collection intact, and would preserve the vast majority of the approximately 2100 artifacts in the French Collection for presentation to future generations, thus facilitating the Debtors' ongoing obligations under the Covenants.

25.    RMST recognizes that Section VII.B. of the Covenants seeks to carve out the American Artifacts from the Debtors' bankruptcy estate.   RMST has no intent to pursue a sale of artifacts from the American Collection, nor at this time explore whether this provision of the Covenants is enforceable against the bankruptcy estate. Neither does RMST wish to break up the entire French Collection to generate a windfall for the Debtors and their shareholders.  Instead, to the greatest extent possible, the Debtors seek only to sell a narrow subset of artifacts from the French Collection to pay the creditors in full, return all equity positions to the Debtors' shareholders, and possibly fund some or all of the Titanic reserve account.  Such a sale would preserve the American Collection, "together and intact."  See Covenants § I.G.

26.    Attached as Exhibit D is a list of ten (10) artifacts within the Debtors' French Collection.  This list reflects some, but not all, of the important pieces within

the French Collection; it reflects one-half of one percent of the approximately 2,100 artifacts which comprise the French Collection.  This list is provided merely as an example of some of the artifacts within the French Collection; it is not intended as an election to sell any specific artifacts. Upon information and belief, the Debtors believe that a sale of as few as four (4) of these artifacts could yield ten million dollars or more at auction.

27.     All of the parties of the Debtors' bankruptcy benefit from a limited sale of artifacts from the French Collection.  As of today's date, the Debtors owe their creditors approximately $12,000,000 in unsecured debts.  A sale of just a small subset of artifacts from the French Collection would permit the Debtors to pay every creditor in full, and allow every Common shareholder to retain their equity positions as the Company emerges from bankruptcy.  The Debtors regret the Debtors' current financial circumstances, but welcome the opportunity to make every creditor whole, while preserving the investments of the shareholders, and providing the Debtors a fresh start going forward with 99.5% of the French Collection intact.  Indeed, in the context of a Chapter 11 filing, this is a uniquely beneficial opportunity.

## BASIS FOR RELIEF

28.     Cause exists to authorize the marketing and sale, after notice and hearing, of certain of the Titanic artifacts from the French Collection.

29.     The Debtors submit that ample authority exists for the approval of the proposed sale of the French Artifacts.  Section 363 of the Bankruptcy Code, which authorizes a debtor to sell assets of the estate other than in the ordinary course of

business, provides, in relevant part: "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1).

30.     Although Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets, courts have held that approval of a proposed sale of property pursuant to Section 363(b) is appropriate if the transaction represents the reasonable business judgment of the debtor.  See In re Schipper, 933 F.2d 513, 515 (7th Cir. 1991); Grochocinski v. Zeigler (In re Zeigler), 320 B.R. 362, 381 (Bankr. N.D. Ill. 2005); see also Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063 (2d Cir. 1983); see also In re Delaware & Hudson River Co., 124 B.R. 169, 176 (D. Del. 1991) (holding that a court must be satisfied that there is a "sound business reason" justifying the pre-confirmation sale of assets); In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that the elements necessary for approval of a § 363 sale in a Chapter 11 case are "that the proposed sale is fair and equitable, that there is a good business reason for completing the sale and the transaction  is in good faith"); Stephens Indus., Inc. v. McClung, 789 F.2d 386, 391 (6th Cir. 1986).

31.     If valid business justification exists for the sale, as it does in this case, a debtor's decision to sell property out of the ordinary course of business enjoys a strong presumption "that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in an honest belief that the action taken was in the

best interests of the company." In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D. N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)). Therefore, parties objecting to the Debtors' proposed sale must make a showing of "bad faith, self-interest or gross negligence." Id.; see also Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D. N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct").

32.    Courts typically consider the following factors in determining whether a proposed sale satisfies this standard: (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was given to interested parties; (c) whether the sale will produce a fair and reasonable price for the property; and (d) whether the parties have acted in good faith.  See, e.g., In re Schipper, 933 F.3d 513, 515 (7th Cir. 1991); Grochocinski v. Zeigler (In re Zeigler), 320 B.R. 362, 381 (Bankr. N. D. Ill. 2005); In re Delaware & Hudson River Co., 124 B. R. 169, 176 (D. Del. 1991); In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (Bankr. D. Del. 1987).  The proposed sale satisfies all these factors.

33.    The Debtors further submit that it is appropriate to sell the French Artifacts,  without restriction, pursuant to Section 363(b)(1) as there are no liens, encumbrances or interests on the property under either French law or United States law, and such assets are without question property of the bankruptcy estate under Section 541.

34.     Under French law, the *proces verbal* constitutes a legally enforceable administrative decision which transferred to RMST legal title to the French Artifacts. See, Declaration of Denis Mouralis, attached hereto as Exhibit E, at §§ 7 and 8. The transfer of title to RMST is unconditional. Id. at § 11. Title to the French Artifacts contains no liens or encumbrances, and no party other than RMST has a legal interest in them. Id. at §§ 12 and 13. There are no restrictions on transferability of the French Artifacts. Id. at §§ 14 and 15.

35.     There are no legally enforceable liens, encumbrances or interests on the French Artifacts under United States law.   Although the Covenants seek to impose encumbrances on title to the America Artifacts (*in specie* award to the American Artifacts "to be held in trust for the benefit of and subject to the beneficial interest of the public") and restrictions on transferring to the American Artifacts (they "shall be kept together and intact forever," not deaccessioned except under "extraordinary circumstances" and sold only as a collection and as approved" by the EDVA Court), no such restrictions are found in the Covenants or elsewhere with respect to the French Artifacts.[4]

---

[4] The EDVA Court lacks subject matter jurisdiction to include similar provisions in the Covenants with respect to the French Collection. R.M.S. Titanic, Inc., 435 F.3d at 528.   See also R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel, 323 F. Supp. 2d 724, 734 (E.D. Va. 2004) ("if RMST is declared the owner of the 1987 artifacts, then this court [the EDVA Court] has no legal basis on which to prohibit the company from auctioning off individual artifacts or otherwise disposing of them in a manner that deprives the public of their benefit. See, Titanic 2002, 286 F.3d at 209 (stating in dicta that RMST's argument that the district court lacks the authority to restrict how the company disposes of the artifacts if it is awarded title is "probably correct"))."   As the principles of waiver, consent and estoppel do not apply to subject matter jurisdiction, the Covenants cannot impose restrictions as to the French Collection, even if the Company agreed to their implementation. See e.g., Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 702 (1982) ("Subject-matter jurisdiction, then, is an Art. III as well as a statutory requirement; it functions as a restriction on federal power, and contributes to the

36.    Without any encumbrances or liens on title to the French Collection, a sale under Section 363(b)(1) is appropriate.

37.    To the extent that an incorporeal "public benefit" interest exists as to the French Collection, which Debtors deny, a sale made free and clear of all interest, pursuant to Section 363(f) is appropriate. Section 363(f) of the Bankruptcy Code authorizes a sale of a debtor entity's assets free and clear of liens, claims, interests and encumbrances if:

    (1)    applicable non-bankruptcy law permits sale of such property free and clear of such interests;
    (2)    such entity consents;
    (3)    such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;
    (4)    such interest is in bona fide dispute; or
    (5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

38.    Because Section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five (5) requirements will suffice to permit the sale of the Debtor's assets "free and clear" of liens and interests.  Grochocinski v. Zeigler (In re Zeigler), 320 B.R. 362, 381 (Bankr. N.D. Ill. 2005); see also Michigan Emp't Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.), 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code § 363(f) is written in the disjunctive; holding that the court may approve the sale "free and clear" provided at

---

characterization of the federal sovereign. Certain legal consequences directly follow from this. For example, no action of the parties can confer subject-matter jurisdiction upon a federal court. Thus, the consent of the parties is irrelevant, California v. LaRue, 409 U. S. 109 (1972), principles of estoppel do not apply, Am. Fire & Casualty Co. v. Finn, 341 U. S. 6, 17-18 (1951), and a party does not waive the requirement by failing to challenge jurisdiction early in the proceedings.").

least one of the subsections of Bankruptcy Code § 363(f) is met); In re Dundee Equity Corp., No. 89-B-10233, 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D. N.Y. Mar. 6, 1992) ("Section 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met"); In re Bygaph, Inc., 56 B.R. 596, 606 n.8 (Bankr. S.D. N.Y. 1986).

39.     The standard for a sale under Section 363(f) of the Bankruptcy Code is satisfied here for multiple reasons, including that applicable non-bankruptcy law permits the sale of such property free and clear of such interests.  See, Mouralis Declaration.  Accordingly, Section 363(f) of the Bankruptcy Code authorizes the sale and transfer of the assets free and clear of any such encumbrances.

### NOTICE

40.     Notice of this Motion will be given to: (i) the 20 largest creditors; (ii) the Office of the United States Trustee for the Middle District of Florida; (iii) the Internal Revenue Service; (iv) the Securities and Exchange Commission; (v) Jihe Zhang; (vi) Lange Feng; (vii) High Nature Holdings Limited; (viii) National Oceanic and Atmospheric Administration; and (ix) United States District Court for the Eastern District of Virginia.  The Debtors submit that, under the circumstances, no other or further notice is required.

### NO PRIOR REQUEST

41.     No previous request for the relief sought herein has been made to this Court or any other court.

## CONCLUSION

Wherefore, the Debtors respectfully request that the Court enter an order granting the relief requested in the Motion and such other further relief as may be just and proper.

NELSON MULLINS RILEY
& SCARBOROUGH LLP

By _____ /s/ Daniel F. Blanks _____

Daniel F. Blanks (FL Bar No. 88957)
Lee D. Wedekind, III (FL Bar No. 670588)
50 N. Laura Street, Suite 4100
Jacksonville, Florida 32202
(904) 665-3656 (direct)
(904) 665-3699 (fax)
daniel.blanks@nelsonmullins.com
lee.wedekind@nelsonmullins.com

*Proposed Counsel for the Debtors and Debtors in Possession*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using CM/ECF on June 20, 2016.  I also certify that the foregoing document is being served this day on the following counsel of record via transmission of Electronic Filing generated by CM/ECF:

David W. Baddley, Esq.
U.S. Securities and Exchange Commission
Office of Reorganization
950 E. Paces Ferry Road, NE, Suite  900
Atlanta GA 30326
(404) 842-7625
(404) 842-7633 (fax)
atlreorg@sec.gov
*Attorneys for U.S. Securities and*
*Exchange Commission*

Jay B. Verona, Esq.
Shumaker, Loop & Kendrick, LLP
101 E. Kennedy Blvd., Suite 2800
Tampa, FL 33602
(813) 229-7600
(813) 229-1660 (fax)
jverona@slk-law.com
*Attorneys for George F. Eyde*
*Orlando, LLC and Louis J. Eyde*
*Orlando, LLC*

United States Trustee
Middle District of Florida
400 W. Washington Street, Suite 1100
Orlando FL 32801
USTP.Region21.OR.ECF@usdoj.gov

Scott M. Grossman, Esq.
Greenberg Traurig
401 East Las Olas Boulevard, Suite 2000
Fort Lauderdale, FL 33301
(954) 768-5212
(954) 765-1477 (fax)
grossmansm@gtlaw.com

## Via FedEx

Internal Revenue Service
Centralized Insolvency Operations
600 Arch Street
Philadelphia PA 19106

High Nature Holdings Limited
Lange Feng
Jihe Zhang
15953 107th Avenue
Surrey, BC V4N 5N7

417 Fifth Ave Real Estate LLC
c/o Sebastian Capital, Inc.
417 Fifth Avenue
New York, New York 10016

ABC Imaging
1155 21st Street NW, Suite M
Washington, DC 20036

Broadway Video
30 Rockefeller Plaza, 54th Floor
New York, NY 10112

CBS Outdoor/Outfront Media
185 US Highway 48
Fairfield, NJ 07004

Dentons Canada LLP
77 King Street West, Suite 400
Toronto, ON M5K 0A1

NASDAQ Stock Market, LLC
805 King Farm Blvd.
Rockville, MD 28050

National Oceanic and
Atmospheric Administration
1401 Constitution Avenue NW
Room 5128
Washington, DC 20230

Ramparts, Inc.
d/b/a Luxor Hotel and Casino
3900 Las Vegas Blvd. South
Las Vegas, NV 89119

Seaventures, Ltd.
5603 Oxford Moor Blvd.
Windemere, FL 34786

Structure Tone, Inc.
770 Broadway, 9th Floor
New York, NY 10003

United States District Court
Eastern District of Virginia
Attn:  Chief Judge Rebecca Beach Smith
600 Granby Street
Norfolk, VA 23510

WNBC
NBC Universal Media
15000 SW 27th Street
Hollywood, FL 33027

Hoffen Global Ltd.
305 Crosstree Lane
Atlanta, GA 30328

New York Dept. of Taxation and Finance
ATTN: Office of Counsel
Building 9, W. A. Harriman Campus
Albany, NY 12227

PacBridge Limited Partners
22/F Fung House
19-20 Connaught Road
Central, Hong Kong

Screen Actors Guild
1900 Broadway, 5th Floor
New York, NY 10023

Sophrintendenza Archeologica
di Napoli e Pompei
Piazza Museo 19
Naples, Italy 80135

TPL
3340 Peachtree Road, Suite 2140
Atlanta, GA 30326

Verifone, Inc.
300 S. Park Place Blvd.
Clearwater, FL 33759

Zigong Gengu Longteng Science
& Technical Co.
No. 10-4 TaiFeng Bldg.
68 HuiDong Road
Zigong, Sichuan Province, China 643000

Samuel Weiser
565 Willow Road
Winnetka, IL 60093


　　　　　　　　　　　　　　　　　　　　*/s/ Daniel F. Blanks*
　　　　　　　　　　　　　　　　　　　　　　　Attorney


~#4849-9362-7953 v.2