**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**
www.flmb.uscourts.gov

In re:

Case No.: 3:16-bk-02230-PMG

RMS TITANIC, INC., *et al.*,

Chapter 11

Debtors.[1]

(Jointly Administered)

_______________________________/

**MOTION OF EUCLID INVESTMENTS LP AND EUCLID CLAIMS RECOVERY LLC FOR ENTRY OF ORDER TERMINATING DEBTORS' EXCLUSIVE PERIODS TO FILE CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF**

The Motion of Euclid Investments LP, an equity security holder of Premier Exhibitions, Inc., and Euclid Claims Recovery LLC, a creditor of Premier Exhibitions Management LLC, by and through their undersigned counsel, respectfully represent and request as follows:

## PRELIMINARY STATEMENT

1. It is axiomatic that the centerpiece of a chapter 11 case is the development, proposal and ultimate confirmation of a plan of reorganization, and the requirement for good faith negotiation among the debtor and its stakeholders is a paramount condition in that undertaking.

[1] The Debtors in the chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include: RMS Titanic, Inc. (3162); Premier Exhibitions, Inc. (4922); Premier Exhibitions Management, LLC (3101); Arts and Exhibitions International, LLC (3101); Premier Exhibitions International, LLC (5075); Premier Exhibitions NYC, Inc. (9246); Premier Merchandising, LLC (3867); and Dinosaurs Unearthed Corp. (7309) (collectively, the "Debtors"). The Debtors' service address is 3045 Kingston Court, Suite I, Peachtree Corners, Georgia 30071.

2. While Bankruptcy Code Section 1121 provides a limited exclusive period for the debtor to propose a plan, that section does not abrogate the vital obligation for negotiation among parties in interest to develop a chapter 11 plan. That core principle was enunciated recently in the September 27, 2016 bench ruling by Bankruptcy Judge Sontchi terminating the debtors' exclusivity in the case of *In re: Samson Resources Corporation et al*, Case No. 15-11934 (Del):

> "I think this is a situation where the debtor is using exclusivity as a sword … a debtor has a duty and obligation to engage with the stakeholders …, particularly an official committee … I find that the debtors have not engaged constructively or even in good faith with the official committee. They have continued to dominate negotiation and control of the case in an inappropriately aggressive way."

3. With these cases now almost six months old, the debtors here have not only failed to engage constructively or in good faith with the official committees, but based on what can be gleaned from the public case record, they have failed to engage *in any manner whatsoever* in plan negotiations with the committees.

4. In fact, these debtors show such an astounding disregard for the fundamental chapter 11 process that they appear hostile to the very existence of the crucial statutory committees. Shockingly, within days of the committees being appointed, debtor management apparently instructed their attorneys to seek to disband the committees as disclosed in the following filed attorney time records [Docket No. 325 at Exhibit 4, page 30]:

> "8/31/16 Analyze issues regarding opposition to formation of committees - 2.20 hours
> 9/1/16 Draft motion to abate committees - 0.90 hours
> 9/1/16 Research issues regarding abating committees - 3.10 hours"

5. This imperial attitude of debtor management is nowhere more clear than in its unilateral approach to the plan process. From the very inception of these cases, the debtors' sole publicly stated concept of a "plan" has been singular and unbending: a) prosecute and win the

French litigation; b) assuming a litigation win, sell only that small number of Titanic artifacts necessary to pay creditors; and c) emerge from chapter 11 and go back to business as usual.

6. The debtors apparently would have all parties in interest sit on their hands and do nothing to formulate any alternative plan while they fumble along in pursuit of the French litigation. This was made clear by the following statement of debtor counsel at the October 25, 2016 hearing before the Court:

> "Unfortunately we are in a circumstance where we are effectively waiting on an adversary proceeding with respect to France before we can effectively formulate a plan of reorganization."

7. In what can only be viewed as an impermissible threat to use exclusivity as a sword, debtor counsel described the following "plan" that the debtor would file if it were "forced" to proceed before waiting on a favorable French litigation outcome:

> "If forced, we would file what we call Plan B. Unfortunately, a Plan B if we are not able to sell the French artifacts … would not be a return to equity and creditors would not be paid in full and probably get paid cents on the dollar."

8. Those statements made at the October 25 hearing are remarkable. First, it is preposterous to conclude that the "plan" alternatives set out by the debtors are the only alternatives available for stakeholders here. But even more remarkable is the fact that debtor counsel was completely silent about any efforts to negotiate with the two official committees in this case concerning other plan alternatives. One can only conclude that is because no such negotiations have occurred during the months these cases have been pending.

9. The apparent total disregard by debtor management of its fiduciary debtor-in-possession obligations in conducting plan negotiations with key stakeholders while it clings to its own self-serving "plan" is sufficient by itself to result in the termination of exclusivity. However, the public case record indicates that this debtor management has ignored its fiduciary

obligations and acted only in self-interest in many other aspects of these chapter 11 cases so that the forfeiture of any claim to exclusivity is mandated.

BACKGROUND AND JURISDICTION

10. The debtors commenced these cases by the filing of voluntary chapter 11 petitions in this Court on June 14, 2016.

11. On August 24, 2016 the Office of the United States Trustee appointed both an official committee of unsecured creditors and an official committee of equity security holders herein.

12. As the debtors' initial exclusive periods under Bankruptcy Code Section 1121 to file a plan and solicit acceptances thereof were about to expire in early October, the debtors sought and obtained an order [Docket No. 308] extending those exclusive periods, respectively, to January 10, 2017 and March 10, 2017. The relief in that order was expressly granted without prejudice to the rights of parties in interest to shorten or terminate those exclusive periods.

13. Euclid Investments LP and its affiliate Euclid Claims Recovery LLC are parties in interest in these cases, respectively, as an equity security holder of the debtor Premier Exhibitions, Inc. and as a creditor of the debtor Premier Exhibitions Management LLC.

14. This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. Sections 157 and 1334. This is a core proceeding under 28 U.S.C. Section 157(b) and venue is proper pursuant to 28 U.S.C. Section 1408. The Motion is brought under Bankruptcy Code Section 1121(d).

DEBTOR MANAGEMENT'S FRENCH LITIGATION "PLAN" IS SELF-SERVING AND ILL-CONCEIVED IN BOTH ITS EXECUTION AND OBJECTIVES; ESTATE STAKEHOLDERS ARE ENTITLED TO PURSUE MORE VALUE MAXIMIZING PLAN ALTERNATIVES

15. It is apparent from a review of the case record that the debtors initiated these cases with a belief that they could obtain a prompt, favorable litigation result against the Republic of France that would form the cornerstone of their plan and permit a rapid chapter 11 exit. Whether such a plan would be in the best interests of the stakeholders of these estates is questionable. However, regardless of the debtors' original hopes for a prompt result, their French litigation campaign appears from the case record to have been so badly mishandled that they are no closer now to having the French litigation issues even joined, let alone decided, than when these cases were first commenced almost six months ago.

16. With any resolution of the French litigation likely many months away, it is irresponsible and a derogation of fiduciary duty for debtor management to continue to cling to its French litigation "plan" as the sole plan of reorganization option and to preclude the statutory committees from advancing alternatives.

17. Before discussing the objectionable substantive features of the debtors' French litigation plan, it is instructive to review briefly the debtors' procedural handling of the French litigation to date to illustrate both the rightful frustration of estate stakeholders and the audacity of this debtor management in consistently advocating that parties in interest do nothing while they continue to prosecute the French litigation.

18. Within a week of the commencement of these cases, the debtors filed their Motion to Sell Property Free and Clear of Liens on June 20, 2016 [Docket No. 28] by which they sought

absolute authority to sell a limited number of French artifacts. A hearing was scheduled to consider that Motion on July 12, and on July 22 this Court entered its Order denying the debtors' Motion as *procedurally flawed* [Docket No. 102] but allowing for the debtors to commence a separate, procedurally appropriate, adversary proceeding.

19. *Not until almost four weeks later*, on August 17, did the debtors commence the referenced adversary proceeding [Adversary Proceeding Docket No. 3:16-ap-183, Adv. Docket No. 1], and on September 29 the debtors first moved for default against the Republic of France [Adv. Docket No. 5]. In response, the Court issued its Order Abating Motion for Entry of Default on October 4 [Adv. Docket No. 7] citing the debtors' *failure to comply with the Court's Local Rules* and holding: "Consideration of the Motion for Entry of Default is abated until the deficiency is corrected." *Not until a month later*, on November 4, did the debtors file a new Motion for Default purporting to correct the noted deficiency [Adv. Docket No. 10]. That Motion has been set for hearing on January 5, 2017.

20. The brief account above makes clear that the inordinate delay in the debtors' advancement of the French litigation is largely self-inflicted due to their various procedural missteps and slowness to respond with corrective actions. As of now, not even an appearance or any kind of response has been filed by the French government, and the core issues of that litigation remain totally open. While it is difficult to speculate what may happen at the time of the next scheduled French litigation hearing on January 5, 2017, it seems unlikely that a final resolution will be achieved then.

21. While the debtors' extensive procedural mismanagement of the French litigation is undoubtedly a cause for great concern, the substantive plan contemplated by the debtors based

on that litigation is even more problematic and plainly not in the best interest of estate stakeholders.

22. Based on public perception of the case record, the essence of that “plan” may be summarized in the following three steps: a) win the French litigation; b) sell only a few of the thousands of French artifacts necessary to pay creditors; and c) quickly emerge from chapter 11 with management remaining in place to conduct business as usual.

23. In advancing that simplistic plan narrative, debtor management apparently seeks to curtail any scrutiny of its management practices and further seeks to avoid any consideration by parties in interest of more value maximizing alternatives for its substantial Titanic artifact assets than the mere sale of a few French artifacts.

24. From the selfish perspective of debtor management, it is not surprising that management desires to get back to “business as usual” as quickly as possible outside of chapter 11 scrutiny while maintaining its significant asset base intact to deal with as only it sees fit. However, from the perspective of estate stakeholders this is a case that cries out for the oversight of the chapter 11 process and extensive stakeholder involvement in developing and implementing a comprehensive chapter 11 plan that unlocks the debtors’ full, substantial asset value.

25. By way of background, it is important to recognize that the present debtor management first came into control over the debtors’ substantial Titanic artifact assets at the end of October, 2015 as part of a merger transaction that was concluded at that time. While current debtor management ran other business enterprises previously, they had no prior involvement with the Titanic assets acquired as part of the merger.

26. The Titanic artifact assets are unquestionably unique and highly valuable as the debtors recognize in their filed schedules [Docket No. 172 at page 2] wherein they set forth the appraised value of those assets at $218,023,300. Significantly, the value of those Titanic artifacts, with which present debtor management had no experience prior to the merger, is multiples greater than the value of the combined assets of the other pre-merger companies.

27. The quality of debtor management is a matter of serious concern to estate stakeholders. After less than eight months under the stewardship of current management, the merged debtor entities were brought to the brink of financial disaster and commenced these chapter 11 proceedings on June 14, 2016.

28. Particularly concerning is that there are no apparent signs that management took prudent, pre-emptive planning actions as the debtors' financial circumstances were no doubt deteriorating for months under its watch. Instead, management cast the fate of the debtors and their stakeholders to a free fall chapter 11 case with no "plan" to address the debtors' dire financial circumstances other than the naïve expectation that management would obtain financial salvation through a rapid litigation victory over the Republic of France.

29. Of additional serious concern to stakeholders is the lack of any indication in the case record that debtor management has given any consideration to a comprehensive range of alternatives to realize full value from their most substantial asset – the Titanic artifacts. Certainly, the debtors' present financial circumstances make clear that management's existing deployment of the Titanic artifacts falls far short of realizing the $200+ million value of those assets.

30. Ironically, debtor management apparently recognizes the great value inherent in monetizing the Titanic artifacts when it proposes that the sale of only a relatively few would be

sufficient to raise millions of dollars to pay pre-petition creditors. It is therefore confounding to stakeholders that debtor management would stop at such a minimal asset realization when the potential for stakeholder value is so much greater.

31. Taking all of the above into account, the time has unquestionably passed for the Court to countenance any further argument by the debtors that they are entitled to maintain exclusivity in order to await the procedurally delayed French litigation outcome. Moreover, given management's short, abysmal pre-petition track record with the merged debtor entities, there is no reason to believe that management's plan that seeks to return to business as usual will be in the best interests of estate stakeholders. More likely, such a plan would result in the merged debtor entities limping along, at best. It is time that estate stakeholders are permitted to consider plan alternatives that contemplate new stewardship of the debtors' substantial assets and new alternatives for realizing the full value of those assets.

DEBTOR MANAGEMENT HAS SQUANDERED ITS EXCLUSIVITY PERIOD BY DIVERSIONARYAND SELF-INTERESTED ACTION; IT IS NOW TIME TO OPEN THE PLAN PROCESS TO THE OFFICIAL COMMITTEES AS ESTATE FIDUCIARIES

32. During the critical formative months of these chapter 11 cases, debtor management appears to have failed almost entirely to perform as a fiduciary debtor-in-possession to advance these cases for the benefit of all stakeholders. Instead, the case record reflects that management has largely behaved as if it has sole prerogative and control over the affairs of these debtor estates and seems resistant at times even to receiving the advice of debtor-in-possession professionals. Those self-interested actions have wastefully diverted significant time and attention of parties in interest away from the core issues of these cases. Several examples are briefly discussed below.

33. Debtor management has embroiled parties in its persistent campaign to retain multiple, duplicative legal counsel. At the outset, debtor management sought and obtained the retention of three law firms: Nelson Mullins Riley & Scarborough, Keleo Legal, and McGuire Woods. The retention of McGuire Woods as Special Litigation Counsel [Docket No. 74] appears sufficiently proscribed and typical of such special counsel retentions by chapter 11 debtors. However, the dual retentions of Nelson Mullins and Keleo as, respectively, "Counsel to the Debtors and Debtors-in-Possession [Docket No. 23] and "Special Litigation Counsel, Outside General Counsel, Securities Counsel and Conflicts Counsel" [Docket No. 25] appear highly duplicative based on a review of their interim fee applications [Docket Nos. 325 and 326].

34. With debtor management already having retained three law firms, it seems incomprehensible that midway through these cases, on September 30, 2016, debtor management filed an application to hire a fourth law firm, Dentons, as Outside General Counsel and Securities Counsel [Docket No. 244]. That action by management is all the more perplexing in light of the obvious and pervasive conflict of interest issues that made it clear from the outset that the application was doomed.

35. It appears from the case record that both official committees promptly advised the debtors that the Dentons retention was inappropriate insofar as Dentons could not possibly meet the "disinterested person" standard required of counsel for a debtor-in-possession. Specifically, Dentons is a creditor of the estates and had an attorney-client relationship with certain non-debtor parties that may be adverse to the estate.

36. Notwithstanding those obvious conflict issues and the opposition of both official committees, debtor management nonetheless persisted in its effort to retain Dentons. It withdrew its original application and filed a cosmetically revised retention application on October 12

[Docket No. 269]. In response, both committees were required to prepare and file objections to the Dentons application setting forth the obvious conflict problems [Docket Nos. 285 and 305]. Then, on November 15, management withdrew for good its ill-advised Dentons retention application, but not before carrying out an extremely wasteful diversion of estate resources over the previous month and a half.

37. One can only speculate on what motivated debtor management to seek the retention of a fourth law firm in this case at the end of September and to insist that the effort to effect that fatally flawed retention go forward. It does seem unlikely, however, that the debtors' existing counsel would have advised management to proceed with the Denton application under the circumstances presented.

38. As the Dentons application met its inevitable fate, debtor management initiated yet another attempt to bring on a fourth debtor law firm in this case by its November 15, 2016 application to retain Troutman Sanders as Bankruptcy Co-Counsel [Docket No. 324]. Reference to that application makes clear, without pretext, that the services to be performed by Troutman are completely duplicative and overlapping with at least two of the three firms already retained by the debtors and that Troutman would play a major role as bankruptcy counsel.

39. The Troutman application has not yet been acted on, and it is not known at this time whether the retention of a fourth debtor law firm will be authorized in this case. Such a retention of an additional primary bankruptcy counsel mid-stream in a chapter 11 case (the application here was first made five months after the petition date) would be extremely rare, if not unprecedented, and would certainly result in an even greater duplication of debtor services and costs. For now, however, one is led to speculate why debtor management is seeking to retain

a fourth law firm. Such action is more reflective of a management that is "opinion shopping" for what best suits its parochial needs rather than a debtor-in-possession fiduciary.

40. In contrast to its preoccupation with retaining multiple legal advisors, the record shows that debtor management has been glaringly resistant to the retention of a chief restructuring officer and financial advisor. It is certainly clear from the public case history here that this is a debtor management with no prior chapter 11 administration experience and little or no appreciation for the fiduciary obligations of a debtor-in-possession.

41. While it is not unusual for a debtor's pre-petition management contemplating a chapter 11 filing to be unfamiliar with the special requirements of acting as an estate fiduciary, it is customary in such situations for management to acknowledge the need for retaining a CRO and professional financial advisor at the inception of the case as an integral part of the debtor-in-possession team. In that context, management's delay and ambivalence in regard to the retention of a CRO and financial advisor in these cases is troubling in several respects.

42. It appears from a review of the debtors' statement of financial affairs [Case No. 16-2232, Docket No. 38 at page 22] that debtor management consulted with the GlassRatner financial advisory firm in advance of the chapter 11 filings insofar as a payment of $10,000 was made to the firm on June 9, 2016. However, rather than seeking to retain the firm at case inception, management inexplicably waited for 3 ½ months until September 30 to file its application [Docket No. 247] to retain GlassRatner as financial advisor and Ronald Glass as CRO. Then, also without explanation (and without public disclosure until weeks later), management revised the previous retention terms on October 13 to eliminate any CRO role [Docket No. 344 at paragraph 15].

43. In the absence of any other explanation, the initial delay in seeking the Glass Ratner retention and later CRO reversal seems to reflect management's resistance to anything that would interfere with its self-interested control of these cases. In any event, management's choice to go it alone without a CRO or financial advisor up to now has served to critically retard meaningful case progress.

44. Debtor management also appears to have exhibited an incessant disregard for its debtor-in-possession obligations to provide essential financial and other relevant information. The case record is replete with criticism by the statutory committees in regard to the delay or failure of debtor management to provide customary requested information, and that criticism is no doubt justified. However, the Court need not delve into that area for an illustration of management's disregard for crucial financial reporting.

45. Pursuant to Bankruptcy Rule 2015.3, debtor management was required to file important financial reports regarding non-debtor affiliates at the end of July, at least seven days prior to the initial Section 341 meeting in this case on August 1, 2016. Without explanation or any effort to seek extension of the filing deadline, debtor management ignored this requirement and delayed making any Rule 2015.3 filing until November 21 [Docket No. 332].

46. Management's failure of timely Rule 2015.3 disclosure is especially prejudicial in light of the substantial financial relationship between the debtors and one of its non-debtor affiliates, Dinoking Tech Inc. (DK). The record reflects that transfers of tens of thousands of dollars per month from the debtors to DK have been made during the pendency of these cases for DK employees that are charged to the debtors and for "business costs paid by DK on behalf of" debtors. Such transfers require close scrutiny, and the delay in the filing of any Rule 2015.3 reports has caused a delay in the investigation that now remains to be carried out.

47. It is admittedly not possible to know with certainty what has motivated debtor management in taking the various actions described above. From a public perception, however, it appears that the unfortunate result of those actions has been an extremely wasteful diversion of attention and estate resources from the work that should have been undertaken over the past 5 ½ months. In particular, management's refusal to have engaged in any plan negotiations with the official committees is inexcusable. The time has certainly arrived for the debtors' exclusivity to be terminated.

48. The debtors' late-in-the-case efforts described above to bring on a fourth law firm and a financial advisor raise one final concern should the debtors' seek a further extension of exclusivity. Any attempt by the debtors to use these "new" retentions as a reason for exclusivity extension should be flatly rejected. Having totally squandered its current exclusivity period, this management is certainly not entitled to restart the exclusivity clock with a "do over" on the pretext of newly retained advisors.

## CONCLUSION

49. Section 1121(d) of the Bankruptcy Code specifies that the exclusivity provided for therein may be terminated or extended "for cause." While cause is not specifically defined in the Bankruptcy Code, that determination is appropriately made by the Court on a case specific basis. *See, e.g., In re Geriatrics Nursing Home, Inc.*, 187 B.R. 128, 132 (D.N.J. 1995)

50. While courts have identified a number of factors as relevant to determining whether cause exists to terminate a debtor's exclusivity, the overriding consideration is whether such termination "will facilitate moving the case forward toward a fair and equitable resolution."

*In re Henry Mayo Newhall Memorial Hospital*, 282 B.R. 444, 453 (B.A.P. 9th Cir. 2002); *see also In re Dow Corning Corp*., 208 B.R. 661, 670 (Bankr. E.D. Mich. 1997).

51. Courts have consistently made clear in decisions terminating exclusivity that it is not appropriate for a debtor to use exclusivity as a sword to hold parties in interest hostage to a self-interested debtor plan, *see, e.g., In re Curry Corp*., 148 B.R. 754, 756 (Bankr. S.D.N.Y. 1992); *In re Public Service Co.*, 88 B.R. 521, 537 (Bankr. D.N.H. 1988); *In re Lake in the Woods*, 10 B.R. 338, 345 (E.D. Mich. 1981), and that exclusivity is not intended to impair or limit the right of parties in interest other than the debtor to have their reorganization proposals considered. *See, e.g. Century Glove, Inc. v. First Am Bank*, 860 F.2d 94, 102 (3d Cir. 1988); *In re Sharon Steel Corp*., 78 B.R. 762, 766 (Bankr. W.D. Pa. 1987)

52. For all the reasons stated herein, it is requested that the debtors' exclusivity periods be terminated immediately.

WHEREFORE, Movants respectfully request that the Court enter an Order:

A) Immediately terminating the Debtors' exclusive periods under Bankruptcy Code Section 1121 to file a chapter 11 plan and to solicit acceptances thereof; and

B) Granting such other relief as is just and proper.

DATED: November 29, 2016.

/s/ Aaron R. Cohen

AARON R. COHEN
Florida Bar No. 0558230
Post Office Box 4218
Jacksonville, FL 32201
Tel: 904-389-7277
Fax: 904-389-7273
Email: acohen60@bellsouth.net

*Local Counsel for the Movants*

/s/ Howard Siegel

HOWARD SIEGEL
Connecticut Bar No. 07092
945 McKinney Street, PMB 434
Houston, TX 77002
Tel: 713-984-4801
Email: howard@eucinv.com

*Motion to Appear Pro Hac Vice for Movants Pending*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on 29 of November 2016, a true and correct copy of the foregoing motion has been served through the CM/ECF system to all registered CM/ECF recipients.

Per the Court's Order Granting Debtors' Motion for an Order Pursuant to 11 U.S.C. § 105(a) and Rule 2002 Establishing Notice Procedures [Doc. No. 140], a true and correct copy of the foregoing was also furnished on November 29, 2016 via first-class U.S. Mail, postage-prepaid, to the Master Service List attached hereto.

/s/ Aaron R. Cohen

**AARON R. COHEN**