January 18, 2016, Helsinki, Finland

LL.M Ville Peltokorpi
Lutherinkatu 8 c 46
00100 Helsinki
Finland

Honorable Bankruptcy Judge Paul M. Glenn
U.S. Bankruptcy Court, Middle District of Florida
Bryan Simpson United States Courthouse
300 North Hogan Street, Suite 3-150
Jacksonville, Florida 32202
United States of America

Dear Judge Glenn,
with regards to the case concerning:
RMS TITANIC, INC., et al. / Debtors
Case No. 3:16-bk-02230-PMG,

I would wish to bring to your attention the following, as a Finnish cultural heritage lawyer and a scientific diver.

My name is Ville Peltokorpi and I work currently as an associate in a Finnish law firm. I heard recently about the bankruptcy of Premier Exhibitions and was able to get hold of the materials regarding the forthcoming hearing in January.

A few years back between 2010 and 2012 we had a case in Finland, that concerned the selling of the world's oldest Champagne that was found from a shipwreck that dated back to the 1850s. While this case had nothing to do with bankruptcy, it taught some valuable lessons to the authorities that were involved. I would wish to share these lessons with you, because they prove and illustrate certain issues that are present in the case concerning the RMST, and the motion to sell certain artifacts from the French collection.

I am not familiar with common law bankruptcy procedures, or the judicial system of the United States in general. Therefore, I will not even try to refer to the applicable legal doctrines. Instead, I would like to draw your attention to certain issues that are present in

January 18, 2016, Helsinki, Finland

this case, which I think are essential regardless of procedural matters. At the same time as a lawyer, I believe that these concerns I wish to express, are universal in the sense, that as a judge, you might be interested.

In 2010, world's oldest champagne was found in a shipwreck in the Åland islands, an autonomous region in Finland. The news was quickly spread all over the globe and a Swedish champagne expert, Richard Juhlin, estimated that the street value of one bottle would be around €50.000. According to Juhlin's own website, he considers himself the "#1 champagne expert in the world". He is probably right about that.

During the spring of 2011 the Parliament of Åland had a discussion about the possible profits after a decision was made to sell the champagne in yearly champagne auctions. The politicians based the profitability of the auctions purely on the estimations made by Juhlin. The minutes from the Parliamentary hearing reveal for example the following comment: "… if we assume that one bottle could bring in 50.000 euro, it means approximately a revenue of 100.000 euro from the forthcoming auction."

During the first champagne auction in 2011, the Acker Merrall & Condit auctioneers sold two bottles of champagne. The first bottle from an already deceased champagne house Juglar, was sold for €24,000 while the other bottle of Veuve Clicquot, dating back to approximately 1841, went for €30,000, both sums excluding buyer's premium and tax. Thus, the total income from two bottles was €54,000, which was just a bit more than the estimated street value of one bottle. The income in 2011 did not even cover the costs of the auction, not to mention the costs of the salvage or other associated expenses.

The second auction held in 2012, was conducted by auctioneers Artcurial. This time six bottles of Juglar, four bottles of Veuve Clicquot and one bottle of Heidsieck & Co, together with 18 lots of donated vintage Veuve Clicquot champagne were available for purchase. The total income from the wreck champagne in this auction, excluding buyer's premium and tax was €109,280. This time, the sale of ten (10) bottles, produced just a little bit over what was the original estimation for two bottles in 2011.

As it becomes clear from these numbers, the actual prices were far from the original estimations, made by one of the world's leading experts. While the Åland Government

January 18, 2016, Helsinki, Finland

has been reluctant to admit their failure, these numbers can be confirmed from multiple (online) sources. No one just bothered to look, or questioned the project, because the politicians justified it by promising the surplus for the improvement of water quality in the Baltic Sea, and for research in marine archaeology and naval history. However, there was no surplus. The whole project had to be funded by tax payers. There have been no further auction plans since 2012. Furthermore, there has been no surplus.

What then, does this case have to do with the RMST? While it cannot be denied, that the objects from both, the American and the French collection, surely are of extraordinary monetary value, the sale of individual objects will have far reaching consequences. While the inherent object and purpose of bankruptcy proceedings is not to serve the general public and public interest, some general observations deserve to be made.

**RMST is only after a carte blanche order to sell artifacts, which will not be limited to a small subset of artifacts, because their expectations are unrealistic.**

It is clear, that RMST has failed to identify the objects it desires to sell. Instead, RMST is seeking a *carte blanche* to sell something between "as few as four (4)" and "just a small subset of artifacts" without making it clear, what these objects are. RMST also claims, that the intended sale would leave "99.5%" of the French collection intact. This would mean, that only a dozen (around 12) artifacts would be sold. However, this will not be the case, if we look at the numbers provided by the RMST.

The most important observation I would like to express is, that RMST has been reluctant to specify what they would choose to sell. This results from the fact that RMST knows for certain, that the sale of just a small subset of artifacts will not be enough to cover what the Debtors owe to their creditors. RMST, if they wanted to, had the possibility to propose to the Court, which artifacts they would like to sell. Furthermore, RMST, if they wanted to, could have provided the Court with a list with individual price assessments of the most valuable items. Instead, RMST chose not to.

In their motion RMST claims, that between 2007 and 2009 the worth of the American collection was at approximately $ 189 million. On the other hand, based on Mr. Alasko's 2014 report, the combined value of the French and American collection had a total

January 18, 2016, Helsinki, Finland

market value of approximately $218 million. This evaluation is only $29 million more, than the claimed value of the whole American collection in 2009. One way of interpreting this would be, that the worth of the French collection is only $29 million. Needless to say, this is surely not correct, but nevertheless proves, that the estimations provided by RMST are dubious at best, and far from being exact. In other words, RMST has not been able to show the market value of the French collection, unless one accepts, that the market value is approximately the combined value of both collections, detracted by the value of the American collection. Thus, it is impossible to say, how much the sale of "just a small subset of artifacts" would gather. Furthermore, it makes impossible to assess the profitability of the sale RMST is seeking in their motion.

If, just for the sake of the argument, the value of the French collection is $29 million, RMST would have to sell over 40% of the whole collection. On the other hand, a sale of 0,5%, which equals only a dozen of artifacts, and the very hoped net revenue of over $12 million, is not plausible. In reality it means, that RMST would have to sell much more, than what they claim would be enough. The advisory opinion RMST is seeking would in the end give RMST the justification to sell as many objects as they wish by claiming that they would only sell a few.

The most highly priced object from the Titanic has been the violin from a crew member, sold in 2013 for $1,454,400 (presumably excluding buyer's premium and tax). In their motion the Debtors state, "as of today's date" (06/20/16), the Debtors owe their creditors approximately $12,000,000 in unsecured debts. This equals over 8 violins. In other words, RMST believes, that the French collection would have approximately ten to twenty objects, which would fetch together over $12 million in auction. This would require that these individual objects – which RMST has failed to clarify and identify – would sell at least for over $500,000 each. Furthermore, "upon information and belief", the Debtors believe that a sale of as few as four (4) of these artifacts could yield $10 million or more at auction. This would require, that each artifact would have to be valued (and actually sold for) over $2.5 million each – almost twice as much as the most valuable artifact ever sold from the Titanic.

Taken into account the uncertain market value of the French collection and the value of the most highly priced object(s), RMST still believes, that a limited sale of artifacts –

January 18, 2016, Helsinki, Finland

"perhaps as few as ten to twenty" – from the French Collection would generate enough revenue to pay all of the Debtors' creditors in full, return all of the equity to the Debtors' shareholders and provide working capital for the Debtors as they emerge from bankruptcy, while preserving the vast majority of the approximately 2100 artifacts in the French Collection for presentation to future generations. This is simply impossible, and would only open a Pandora's box for further sales, which will eventually lead to the slow dispersion of the French collection, after more and more sales are required.

While the appraisal report (Exhibit C) lists individual objects that have been valued and estimated highly valuable (for over $500,00 or more), the report fails to make a distinction between the American and French collection, thus making it impossible to assess the feasibility and profitability of the proposed sale. This ambiguity is elaborated even further by the list of ten artifacts (Exhibit D) without any price estimations, whatsoever.

If the intended sale does not go as planned – which seems very likely taken into account the vagueness of the motion with respect to the artifacts which would be sold – RMST can easily refer to the previous sale and justify the selling off more of the French collection. Furthermore, the case will also become an international precedent, and endanger the safeguarding of underwater cultural heritage in general across the globe.

The historic, educational, scientific and international considerations associated with both collections are unique. The best option would be to keep both collections together and intact. This way they their monetary value will also be preserved. Based on the historical background of the French collection, the Covenants and Conditions imposed on RMST suggest, that the French collection would never have been allowed to be acquired in the first place, if it was thought, that the conditions of keeping it together could be waived. These covenants also have their object and purpose which is very clear – to keep the collection(s) intact and preserve them for future generations.

The sale of certain artifacts would have influence, first, on the monetary value of the French collection, but second, also on the historic, scientific and public display value of the collection. There is no doubt, that RMST would action only the most interesting (i.e. valuable) artifacts to private collectors. However, these artifacts have also the highest public interest value, because in general the values of the general public and private

January 18, 2016, Helsinki, Finland

collectors can be assumed to be the same. It is highly unlikely, that a private collector would find items of great public interest unattractive. Thus, by selling these objects, the value of the French collection for exhibition purposes would slowly diminish.

Yours Sincerely,

Ville Peltokorpi

LL.M, Helsinki

+358 50 584 2158

ville.peltokorpi@gmail.com