**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

---------------------------------------------------------x
In re:                                                  :     Case No. 3:16-bk-02230-PMG
                                                        :
RMS TITANIC, INC., *et al.*,[1]                         :     Chapter 11 (Jointly Administered)
                                                        :
                    Debtors.                            :
---------------------------------------------------------x

**DECLARATION OF MARSHALL GLADE IN
SUPPORT OF DEBTORS' MOTION SEEKING AN
ORDER AUTHORIZING THE DEBTORS TO (I) IMPLEMENT
KEY EMPLOYEE RETENTION PLAN, (II) IMPLEMENT KEY
EMPLOYEE INCENTIVE PLAN FOR CERTAIN INSIDERS AND
(III) PAY ANY OBLIGATIONS ARISING UNDER THE KEY EMPLOYEE
RETENTION AND INCENTIVE PLANS AS ADMINISTRATIVE EXPENSES**

I, Marshall Glade, hereby declare that the facts set forth herein are based upon my personal knowledge, information and belief.

1. I hold the position of Managing Director for GlassRatner Advisory & Capital Group, LLC ("GlassRatner"), financial advisors for Premier Exhibitions, Inc.[2] and its related debtors in the above-styled Chapter 11 cases. I am the lead advisor for GlassRatner with respect to this engagement, and in that capacity I was directly involved in the process of developing the Premier Exhibitions 2017 Key Employee Retention Plan (the "Retention Plan") and the Premier

---

[1] The Debtors in the chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include: RMS Titanic, Inc. (3162); Premier Exhibitions, Inc. (4922); Premier Exhibitions Management, LLC (3101); Arts and Exhibitions International, LLC (3101); Premier Exhibitions International, LLC (5075); Premier Exhibitions NYC, Inc. (9246); Premier Merchandising, LLC (3867); and Dinosaurs Unearthed Corp. (7309). The Debtors' service address is 3045 Kingston Court, Suite I, Peachtree Corners, Georgia 30071.

[2] All capitalized terms not otherwise defined herein shall have the meaning set forth in the *Debtors' Motion Seeking an Order Authorizing the Debtors to (I) Implement Key Employee Retention Plan, (II) Implement Key Employee Incentive Plan for Certain Insiders and (III) Pay Any Obligations Arising Under the Key Employee Incentive Plan as Administrative Expenses*, the Retention Plan attached thereto as **Exhibit C**, or the Incentive Plan attached thereto as **Exhibit D**.

42753584;1

Exhibitions 2017 Key Employee Incentive Plan (the "Incentive Plan"). In connection therewith, I worked closely with the Debtors' senior management and consulted the Debtors' bankruptcy attorneys. In developing the plans, I also worked closely with Lincoln Partners Advisors LLC ("Lincoln"), the financial advisors to the Official Committee of Equity Security Holders and the Official Committee of Unsecured Creditors (collectively, the "Committees") and counsel for both Committees.

2. I respectfully submit this declaration (the "Declaration") in support of the *Debtors' Motion Seeking an Order Authorizing the Debtors to (I) Implement Key Employee Retention Plan, (II) Implement Key Employee Incentive Plan for Certain Insiders and (III) Pay Any Obligations Arising Under the Key Employee Retention and Incentive Plans as Administrative Expenses* (the "Motion").

3. I have also reviewed and considered the United States Trustee's limited objection to the Motion (the "Objection").

## Incentive Plan

4. As a result of the ongoing bankruptcy proceedings, employees of the Debtors have assumed responsibilities above their normal duties and have experienced extraordinary stress, pressure, and uncertainty. After evaluating all of the options, a sale of the company or its assets is likely the best opportunity to maximize value for creditors, shareholders, and employees. The Incentive Plan is designed to incentivize the Incentive Plan Participants to complete a sale that will maximize the value of the company and its assets. It is my belief that the Incentive Plan as currently designed will effectively serve the purpose of motivating the senior management upon which the Debtors rely to drive superior performance in ongoing management of the Debtors and to maximize the proceeds from the sale of the Debtors, thus

42753584;1

preserving the value of the Debtors for the benefit of the Debtors' creditors and shareholders.

5.    The Debtors' management and restructuring advisors have conducted a review of the compensation levels currently in place for the Debtors' senior management to assess the need for and sizing of incentive compensation awards. Based on this review, the Debtors' management and restructuring advisors recommended the adoption of an EBITDA-based incentive plan to incentivize members of the Debtors' senior management to maximize the value and earnings of the Debtors through the Chapter 11 process. Each employee listed to receive the EBITDA-based bonus plays a critical role in the overall operations of the Debtors' business, and I believe each will be incentivized through the proposed bonus to maximize their individual production and increase profitability for the company through the process.

6.    Incentive Plan Participants will be eligible to receive payouts for the EBITDA Incentive Bonus if (i) the EBITDA of the Debtors for calendar year 2017 equals or exceeds $2,400,000 (the "<u>EBITDA Target</u>") and (ii) the Incentive Plan Participant remains employed with the Debtors from the Effective Date of the Incentive Plan through and including the effective date of a Chapter 11 plan of reorganization.

7.    The bonus target of all vice-presidents of the Debtors except the Vice-President of Conservation of Collection is $12,500. The bonus target of the Vice-President of Conservation of Collection is $17,500. The bonus targets for the Chief Executive Officer, Chief Financial Officer and Corporate Secretary/Vice President of Corporate affairs are $90,000, $60,000 and $60,000 respectively. Once the Debtors achieve an EBITDA of $2,400,000, exclusive of Chapter 11 costs and expenses, the participants will be entitled to an incentive bonus equal to their target bonus amount multiplied by the Achievement Percentage set forth on the following table:

42753584;1

| **EBITDA Achievement Level** | **Achievement Percentage** |
|---|---|
| Less than $2,400,000 | 0% |
| $2,400,000 | 80% |
| $2,700,000 | 90% |
| $3,000,000 | 100% |
| $3,300,000 | 110% |
| $3,750,000 | 125% |
| $4,500,000 and greater | $150% |

8. Incentivizing senior management of the Debtors through the sales process is particularly critical given the substantial number of key employees who have left the Debtors' employment during the pendency of the bankruptcy cases, including the following: the Debtor's Chief Financial Officer and Chief Operating Officer, a Vice President of Sales, a Director of Sales, a Director of Design, a Vice President of Production, the Manager of Venue Technology Operations and Corporate IT, the Vice President of Sales and Marketing and Client Services, a Senior Production Manager, and two Conservation Registrars. Such departures have required substantial undertakings by others in senior management of the Debtors, and it is critical that the remaining members of senior management be incentivized to maximize their individual performance for the company.

9. The EBITDA-based plan was specifically designed to incentivize management to make extraordinary efforts in improving the company's operating performance while in Chapter 11. The EBITDA Incentive Bonus is based on the Debtors obtaining a threshold EBITDA performance of at least $2,400,000, without taking into account the Chapter 11 administrative

costs and expenses. Such a result is by no means a given in this case and in fact represents a substantial stretch goal that can only be achieved through extraordinary performance at all levels of the company. This is particularly true if you look at recent performance of the Debtors. As an example, in 2016 the combined companies' EBITDA was $1,875,514, without taking into account the Chapter 11 costs and expenses incurred after the bankruptcy filing. In 2015, the last full year outside of bankruptcy, the combined companies had a **negative** EBITDA of $4,908,493. The $2,400,000 EBITDA target (a **28% increase** over the prior year) established under the plan truly represents a stretch goal for a company operating under Chapter 11 with a reduced work force and an ongoing effort to sell the company.

### The Sales Transaction Incentive Bonus

10.     In addition to the EBIDTA Incentive Bonus, the Debtors have proposed a Sales Transaction Incentive Bonus for the three most senior members of the Debtors' management, the Chief Executive Officer, the Chief Financial Officer, and the Vice President of Corporate Affairs and Corporate Secretary (the "Senior Executives"). Because their job responsibilities are most impacted by the sales process on a daily basis, and their cooperation and direct involvement in the sales process is critical to any potential sales transaction, a sales transaction incentive plan was designed to incentivize them in the process.

11.     The additional tasks the Senior Executives have been required to take on in connection with the sales process and outside of their normal job functions include the following:

- **Negotiation of Plan Support Agreement** – The Senior Executives actively worked with counsel and other professionals, the board of directors, and the Committees for four months to negotiate the terms of the plan support agreement to include the sale of the Debtors' entire company and/or all of their assets.

- **Confidential Information Memorandum ("CIM")** – The Senior Executives wrote, collaborated, compiled, researched, and prepared a 173 page deck for the company's financial advisors to assist them in creating a CIM to distribute to potential buyers.

42753584;1

> The deck included company history, industry information, background to the company's niche market, SWOT analysis for the company's venue operations by city, growth opportunity analysis, and inherent risks. The Senior Executives also had numerous meetings with the Debtors' professionals to finalize the CIM's content, messaging and strategy, and reviewed and edited the CIM multiple times.
>
> - **Diligence and Analysis** – The Senior Executives have provided and continue to provide significant and critical assistance in creating diligence materials and responding to diligence requests of potential bidders, including designing, programming, and populating the data room and diligence materials; writing summaries, preparing charts and documents, and compiling and updating volumes of records for the data room and other diligence requests; researching and retrieving documents from former management; and responding to continuing diligence requests from potential bidders. They have also reviewed and executed numerous non-disclosure agreements from potential interested parties and reviewed contact lists and logs. Further, the CFO has prepared financial presentations and models for potential purchasers, assisted with business presentations to potential purchasers, and had extensive correspondence and meetings with potential purchasers to explain operations and operating procedures.
>
> - **Sale Negotiations and Structure** – The Senior Executives have been and will be actively involved and critical in negotiations with potential bidders and the formulation of an expected stalking horse agreement, both by way of direct interaction with potential bidders and by providing assistance to the Debtors' professionals. For example, the Senior Executives prepared a four-hour management presentation for management meetings with potential buyers. They have also reviewed letters of intent received from potential buyers, had numerous meetings with the Debtors' financial advisors and professions regarding letters of intent and potential bidders, formulated management recommendations to the board of directors, and attended additional board meetings regarding letters of intent and proposals. The CFO has further engaged in extensive correspondence and meetings with tax and corporate advisers to strategize the sale methodology and structure to comply with applicable regulations and tax laws.
>
> - **Public Relations** – The Senior Executives have had close and substantial interaction with the Debtors' PR firm that was hired to assist with the public relations aspect of the sale, including providing substantial amounts of information and attending numerous meetings and phone calls to familiarize the PR firm with the Debtors' operations and assets as well as develop strategy and messaging for public relations. The Senior Executives coordinated extensively with the PR firm and internal teams for television, newspaper, and electronic coverage, interviews, and press releases related to the sale. Certain of the Senior Executives personally designed and programmed the landing page for a potential sale (https://www.titanicartifacts.com/). And the Senior Executives have and continue to monitor press coverage for inaccuracies and work with the PR firm to make necessary corrections.

- **Internal Communications** – The Senior Executives have formulated numerous staff communications and engaged in numerous verbal communications with staff to bolster morale and address employee concerns and anxiety related to the potential sale, both at the corporate headquarters and at location venues, including conducting weekly communication calls with officers on the status of the sale process. The Senior Executives are also responsible for reporting all sale process activities to the board of directors, scheduling meetings with the board and professionals, and coordinating participation in the process.

- **External Communications –** The Senior Executives formulate and engage in external communications to partners and vendors to abate anxiety and concerns surrounding a potential sale. They engage in constant oversight related to retention of salvor status for preservation of value for potential buyers to conduct future dives. They work with maritime counsel to ensure proper communication of the sale process to the Norfolk Federal Court. They prepare for and meet regularly with the Committees to, among other things, report status and efforts related to the sale process.

12. The foregoing list is not exhaustive of all the additional responsibilities that the Senior Executives have taken on and will continue to perform as part of the sale process. I have personally worked closely with the Senior Executives and witnessed them performing many of the above tasks and responsibilities. They have been critical in assisting me and the Debtors' other professionals during the sale process.

13. The Senior Executives will receive payouts for the Sale Transaction Incentive Bonus if (i) the Complete Sale Transaction is consummated on or before the one year anniversary of the Effective Date and (ii) the Incentive Plan Participant remains continuously employed with the Debtors from the Effective Date until the effective date of a Chapter 11 plan of reorganization.

14. If a Complete Sale Transaction is consummated, a pool of funds will be allocated to the Senior Executives based on a percentage of proceeds of the sale (the "Executive Proceeds") if the proceeds from the transaction achieve certain confidential thresholds that the Debtors and the Committees have determined would represent a substantial achievement in these

42753584;1

Chapter 11 cases. None of the sales transactions thresholds are certain in these cases, and any transaction that closes and meets those thresholds will be a substantial achievement in this complicated Chapter 11 case. If the Debtors consummate a Complete Sale Transaction with a purchase price within certain thresholds that were heavily negotiated and agreed to by the Committees, the Senior Executives will be entitled to 0.5%, 0.75% or 1.0% of the sale proceeds depending on the level of sales proceeds achieved. The Executive Proceeds will then be divided among the Senior Executives as follows: 50% to the Chief Executive Officer, 30% to the Chief Financial Officer, and 20% to the Vice-President of Corporate Affairs and Corporate Secretary.

15. The events in the Chapter 11 Case underscore the substantial uncertainty associated with the completion of a sale. Furthermore, there is no certainty that a sale, should it occur, will result in proceeds sufficient for the Senior Executives to earn a bonus. Therefore, there is the possibility that the bonuses will not be earned and thus the goals should not by any means be considered a certainty in these cases.

16. The Debtors did not retain an independent benefits consultant to assist in the formulation of the Incentive Plan in the Chapter 11 Case because the Debtors do not believe the cost of such is justified under the circumstances of the Chapter 11 Case. GlassRatner in consultation with the Debtors legal counsel and the advisors and professionals of the Committees were fully involved in all aspects of the design of the Incentive Plan. The target amounts (sale price and EBITDA) set forth in the plan were heavily negotiated with the Committees and represent the collective judgment of the Debtors and the Committees as to possible values that could be achieved in a sale for which the Senior Executives should be incentivized to obtain. The threshold sales incentive targets were not set at amounts expected to be received, but at amounts the parties hope can be achieved through a fulsome sales process and the diligent efforts

of the Senior Executives. The thresholds represent real benchmarks and not lay-ups, and they are not designed merely to encourage the Senior Executives to stay with the business.

17. Based upon my experience with the Debtors' businesses, as well as my knowledge of how the Debtors operate, I have concluded that the Incentive Plan will appropriately incentivize the Debtors' management through the Debtors' restructuring efforts. I believe the Incentive Plan is narrowly tailored for the Debtors' business purposes to motivate senior management to drive superior performance in ongoing management of the Debtors, is in the best interest of the Debtors' continuing business operations and is justified by the facts and circumstances of the Chapter 11 Case.

18. The ongoing negotiations in conjunction with the court approved plan support agreement and the Debtors' and the Committees' views as to potential values that may be achieved through a sale are confidential. Disturbing that confidentiality would negatively impact the ongoing sale process and be detrimental to the Debtors' bankruptcy estates.

19. Delaying approval of the Motion based on the concerns set forth in the Objection will negatively impact the sale process and unnecessarily increase administrative expenses in this case. The Debtors have shared information with the United States Trustee relative to the ongoing sale process and offered to provide additional confidential information to the United States Trustee provided that such information will be maintained as confidential.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on the 31st day of August, 2017.

_/s/ Marshall Glade_
Marshall Glade

42753584;1