**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

In re:

RMS TITANIC, INC., *et al.*,

      Debtors. [1]

_____/

Case No.: 3:16-bk-02230-PMG

Chapter 11

(Jointly Administered)

**MOTION OF EUCLID CLAIMS RECOVERY LLC FOR**
**APPOINTMENT OF CHAPTER 11 TRUSTEE**

The Motion of Euclid Claims Recovery LLC, a creditor herein, for Appointment of Chapter 11 Trustee, by and through its undersigned counsel, hereby represents and requests as follows:

JURISDICTION AND VENUE

1.    This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. Sections 157 and 1334. This is a core proceeding under 28 U.S.C. Section 157(b) and venue is proper pursuant to 28 U.S.C. Section 1408. The Motion is brought under Bankruptcy Code Section 1104(a).

---

[1] The Debtors in the chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include: RMS Titanic, Inc. (3162); Premier Exhibitions, Inc. (4922); Premier Exhibitions Management, LLC (3101); Arts and Exhibitions International, LLC (3101); Premier Exhibitions International, LLC (5075); Premier Exhibitions NYC, Inc. (9246); Premier Merchandising, LLC (3867); and Dinosaurs Unearthed Corp. (7309) (collectively, the "Debtors"). The Debtors' service address is 3045 Kingston Court, Suite I, Peachtree Corners, Georgia 30071.

{39838418;1}

<u>PRELIMINARY STATEMENT</u>

2.      As this chapter 11 case approaches its two-year anniversary, it is extremely concerning that the debtor-in-possession has failed to propose even an initial plan of reorganization or disclosure statement.   This failure is particularly vexing to estate creditors in light of the following circumstances, among others:

a.      Multiple, fumbling, start-and-stop efforts to set and then abandon publicly announced procedures and deadlines for the sale of the debtors' assets without ultimately finalizing any sale process;

b.      Serial mistakes and failed attempts to make proper service of legal process and to obtain a default judgment against France resulting in many months of needless and costly delay in the critical litigation to establish clear title to the debtor's French artifacts;

c.      The incurring of aggregate fees and expenses of chapter 11 professionals approaching $5 million without yielding any return for creditors in this case involving pre-petition unsecured claims of approximately $12 million;

d.      Substantial and continuing loss to and diminution of the estate as a result of the funding of post-petition administrative losses through a $5 million super priority lending facility under which $4.2 million was reported to be outstanding as of March 31, 2018.

3.      The debtor-in-possession's lack of fiduciary stewardship in advancing this case is especially problematic when viewed in light of the Motion for Order Authorizing the Debtors to Market and Sell Certain Titanic Artifacts filed by the debtor at the very inception of these proceedings in June, 2016 (the "Initial Sale Motion"). [Docket No. 28]

4.      The Initial Sale Motion set out a clear and unequivocal course to readily pay creditors in full through the sale of a portion of the debtor's Titanic artifacts drawn from its so-called French Collection.  The Initial Sale Motion noted that the Titanic artifacts are divided in

two segments -- the American Collection and the French Collection -- and that while the American Collection is subject to severe covenants and restrictions on sale, no such restrictions exist in regard to the French Collection.[2]

5.      Indeed, the debtors' intent was stated in unmistakable terms at paragraph 27 of the Initial Sale Motion:

> "All of the parties of the Debtors' bankruptcy benefit from a limited sale of artifacts from the French Collection.  As of today's date, the Debtors owe their creditors approximately $12,000,000 in unsecured debts.  A sale of just a small subset of artifacts from the French Collection would permit the Debtors to pay every creditor in full…"

6.      The debtors' contention appears amply supported by the comprehensive appraisal report attached as Exhibit C to the Initial Sale Motion (the "Appraisal Report"). The Appraisal Report finds a total value for all of the individual Titanic artifacts of $218 million, and the French Collection represents almost one-half of the total number of artifacts.

7.      The Initial Sale Motion was equally clear in stating the intent of the debtor in regard to the American Collection.  After discussing in detail the history and nature of the covenants and restrictions attendant to the American Collection and the considerable legal uncertainties and difficulties in pursuing any disposition of the artifacts within that segment, the debtor states at paragraph 25 of the Initial Sale Motion:

> "[The debtor] has no intent to pursue a sale of artifacts from the American Collection."

8.      The prudence of considering a sale of individual artifacts from the French Collection rather than a singular sale of the entirety of the debtors' Titanic artifacts is starkly apparent by reference to the Appraisal Report, which states at page 1:

---

[2] See Initial Sale Motion at pars. 8, 9, 16 and 17.

"Research finds no public record for the singular sale of a personal property collection matching the cultural and historic magnitude of the Titanic collection.  There is no adequate basis for a valuation opinion when the combined RMS Titanic properties are treated as a single entity."

9.      Instead, the Appraisal Report proceeds to a detailed valuation of the various

Titanic artifacts based on an assessment of public sales of individual artifacts through recognized

auction houses specializing in historical and maritime memorabilia.  The authors of the Appraisal

Report describe their data gathering activity as follows: [3]

> "All Titanic memorabilia auction sales data available via online auction databases, auction house websites, as well as in printed auction catalogs, published articles and price lists were assembled."

The Appraisal Report makes reference to specific sales data from RR Auction in Amherst, New

Hampshire and Henry Aldridge & Son auction house in England which are regarded as leading

sources for auctions of this type and then further elaborates: [4]

> "Titanic sales were researched at all major auction houses in the United States and England, both in printed auction catalogues and online, including Christie's, Sotheby's and Bonhams, as well as regional and local auction houses including Heritage Auctions, Swann Auction Galleries, Skinner Auctioneers, Doyle New York, Philip Weiss Auctions, Rago Auctions, Cowans Auctions, Freeman's, Antiquorum, Northeast Auction, PBA Galleries, Saco River Auctions and DuMouchelle Auction Galleries."

10.      In light of this background, and the expert opinion contained in the Appraisal

Report, it is dumbfounding that there is no indication whatsoever in the public record of this case

that the debtors have ever pursued any auction house sale of individual artifacts from the French

Collection.  Instead, the only publicly announced sale efforts attempted by the debtors have been

for the singular sale of the Titanic artifacts as an entirety – an effort without precedent, and, as

noted by the debtors at inception, a course fraught with legal complexity and tremendous

---

[3] Appraisal Report at page 13.
[4] Appraisal Report at page 14.

uncertainty.  The failure of the debtors' sale efforts to date is thus hardly surprising.  Moreover, such a sale, even if arranged, seems unlikely to produce a value maximizing result for the benefit of creditors.

## ILL-CONCEIVED AND FAILED SALE EFFORTS

11.    Not only is the debtors' decision to pursue an entirety sale highly questionable, but the manner and timetable by which they have conducted and then abandoned their sale efforts has been muddled, halting and ineffectual.  After the failure of the June, 2016 Initial Sale Motion on procedural grounds, there is no indication on the public case record of any further sale efforts by the debtor until almost a year later when it filed its Motion seeking approval of a certain plan support agreement on May 18, 2017 (the "Plan Support Motion"). [Docket No. 587].

12.    Embedded within the Plan Support Motion was a sale process that, instead of seeking the sale of individual artifacts from the French Collection, contemplated offering all Titanic artifacts from both the American Collection and the French Collection as an entirety in what it described as a "Complete Sale Process": [5]

> "The Debtors with the consent of the Supporting Committees shall conduct a process to market and sell: (i) the common shares in RMST or the entire artifact collection held by RMST; and (ii) the operations of PRXI and its subsidiaries with continued licensing rights for existing operations."

13.    The Plan Support Motion and attached Complete Sale Transactions Term Sheet set out the following timeline for conducting the entirety asset sale:

---

[5] Plan Support Motion, Exhibit A Complete Sale Transactions Term Sheet at page 4.

- May 19, 2017 finalization of marketing materials
- July 21, 2017 deadline for submission of letters of intent from interested bidders
- September 25, 2017 deadline for selection of stalking horse bidder
- October 23, 2017 deadline for entry of sale procedure order
- November 20, 2017 deadline for conducting final auction sale

14.    After extending the deadline for selection of a stalking horse bidder several times and allowing those extended dates to lapse without any stalking horse bidder being found, the debtor filed its Motion to sell all or substantially all of its assets on November 14, 2017 (the "November Sale Motion") [Docket No. 811] by which it sought to conduct an auction sale of the entirety of the Titanic artifacts without a stalking horse bidder in one or more of the following "Auction Lots": [6]

> "(i) the common shares of RMST; (ii) the entire artifact collection held by RMST; (iii) the operations of PRXI and/or any of its subsidiaries (with continued licensing rights for existing operations); and/or (iv) the assets of PRXI and/or any of its subsidiaries"

15.    The November Sale Motion contemplated a bid deadline of January 30, 2018 and an auction date of February 6, 2018.  However, before a hearing could even be held to approve the November Sale Motion, the debtor withdrew the Motion on December 15, 2017 in apparent response to withering objections that the entirety sale process was not value maximizing and also ran afoul of the covenants and restrictions affecting the American Collection.  Thus, after almost two years of questionable and non-productive sale efforts, and long after the expiration of the exclusive periods for the debtors to file and obtain confirmation of a plan, this case now stands in limbo without any public indicia of an end game -- let alone a value maximizing result for creditors.

---

[6] November Sale Motion at page 10.

16.     The grave mishandling of the sale process and the categorical failure to promulgate even an initial plan within, and now well beyond, the exclusive period are sufficient grounds alone to displace the debtor-in-possession with a chapter 11 trustee.  Unfortunately, however, the severe lack of responsible fiduciary stewardship by this debtor-in-possession is even more widespread extending to the careless and excruciatingly slow manner in which it prosecuted the critical litigation concerning title to the French Collection. Moreover, the deficient oversight of the administration of this chapter 11 case by the debtor-in-possession has resulted in post-petition losses and diminution in value already approaching $6 million to the severe detriment of pre-petition creditors.  These additional failings are discussed below.

<u>MISHANDLING OF FRENCH ARTIFACTS LITIGATION</u>

17.     Given the critical importance of the French litigation in establishing title to the French Collection, the lack of diligence and timeliness by the debtor-in-possession in prosecuting that litigation is staggering.  As indicated above, that litigation was initiated in June, 2016 by the Initial Sale Motion in the form of a contested matter.  The Court found that Motion to be procedurally defective by its Order entered on July 22, 2016 holding that an adversary proceeding was required. [Docket No. 102]   The debtor-in-possession cavalierly took almost a month after that decision before filing the required adversary complaint on August 17, 2016 naming the Republic of France as defendant.

18.     France did not appear in response to the adversary complaint, and on September 29, 2016 the debtor moved for the entry of default. [Adv. Pro. Docket No. 5]   However, that motion for default was abated by Court order entered on October 4, 2016 [Adv. Pro. Docket No. 7] finding that the motion did not comply with the Court's Local Rules.  Not until one month

Case 3:16-bk-02230-PMG    Doc 1013    Filed 05/01/18    Page 8 of 17


later on November 4, 2016, with France still not appearing, did the debtor file its second motion

for entry of default. [Adv. Pro. Docket No. 10]   On its face, that motion appeared based on a

defective method of service by the debtor.  For whatever the reason, that motion languished

without any action for more than three additional months until the debtor filed its third motion

for entry of default on February 16, 2017.  [Adv. Pro. Docket No. 45]   The supporting exhibits

filed with that motion appear to indicate that the debtor finally employed a correct method of

service of process to support a default motion against France – six months after the adversary

complaint was first initiated and almost eight months after the Initial Sale Motion was filed.

19.      Unfortunately, the lack of diligence by the debtor in prosecuting the French

litigation was not limited to its deficient handling of service of process.  When the debtor filed its

motion for entry of default on February 16, 2017 it concurrently filed its motion for judgment

[Adv. Pro. Docket No. 46], and the Court set both motions for hearing on March 30, 2017.

Following that hearing, the Court issued its ruling on April 25, 2017 [Adv. Pro. Docket No. 52]

allowing the entry of default but declining to enter judgment for the following reasons and

ordering that a further evidentiary hearing take place:[7]

> "The Court has considered the documents submitted by the Debtor to
> support its claim of unconditional title, and cannot determine that the
> current record contains satisfactory evidence to establish that the French
> Republic has no interest in the French Artifacts, or that the Debtor is
> entitled at this time to the relief it requests."

20.      A hearing pursuant to the Court's order was then conducted on August 17, 2017

at which the Debtor ultimately cured its prior deficiencies in submitting evidentiary support for a

default judgment against the Republic of France, and a final Judgment was entered by the Court

on September 29, 2017. France has never filed an appearance in the adversary proceeding or

---

[7] Adv. Pro. Docket No. 52 at pages 15-16.

otherwise in the chapter 11 case, and it is thus notable that the debtor faced no opposition from the defaulting defendant at any stage of the more than year-long odyssey to obtain the judgment the debtor first sought in June, 2016.

<u>SUBSTANTIAL AND CONTINUING ADMINISTRATIVE LOSSES</u>

21.    It is distressingly clear that the debtor-in-possession has produced no benefit for creditors in light of its ineffectiveness in proposing a plan and its ineptness in conducting a sale process and prosecuting the French litigation. Even worse, however, is the fact that the debtor-in-possession has caused great detriment to pre-petition creditors by presiding over an estate administration that has incurred substantial post-petition losses, substantial post-petition priming debt and inordinately high administrative fees and costs.

22.    A review of the case docket reflects that, to date, aggregate fees and expenses in excess of $4.1 million have been allowed to chapter 11 professionals on account of interim fee applications for time and expenses incurred through August or September, 2017, as applicable. Moreover, the docket reflects that there are currently pending additional interim fee applications that have not yet been allowed seeking further aggregate fees and expenses of more than $725,000 for the incremental time periods through, as applicable, December, 2017 or January, 2018. Given the status and history of this case, it can certainly be expected that a further round of interim fee applications will soon be filed for the next 120-day incremental period, and even those are not likely to be the last of the fee requests as this case grinds on. These fee amounts are astounding for a case involving $12 million of pre-petition unsecured debt and in which so little has been accomplished.

23.     The cumulative effect of the day-to-day mismanagement of this case by the debtor-in-possession as it mounts up substantial post-petition losses has been especially damaging to unsecured creditors.  At inception, the only pre-petition claims requiring payment through an asset sale or under a plan were $12 million of unsecured claims and $3 million of secured claims.  Now, however, the debtor-in-possession has built up a staggering wall of post-petition obligations with priority over unsecured claims as a result of its serious and continuing administrative losses and delays.

24.     Of most direct negative impact on unsecured creditors is the $5 million secured, super priority debtor-in-possession financing facility that the debtor entered into.  It appears clear at this juncture that this facility has been utilized primarily as a vehicle to fund administrative losses insofar as the loan balance so closely tracks the amount of aggregate professional fees incurred in this case.  The most recent operating report filed by the debtor indicates that the loan balance as of March 31, 2018 stood at $4.2 million, an amount closely aligned with the more than $4.1 million of aggregate professional fees and expenses allowed as of that date.  The history of loan advances under that facility combined with the amount of pending fee applications suggests that the full $5 million credit line will soon be outstanding.

25.     Also negatively impacting unsecured creditors is the accrual of post-petition interest now approaching $1 million on the $3 million of pre-petition secured claims.  This, combined with the imminent, expected $5 million balance of the debtor-in-possession financing facility, creates a new $6 million wall of priming post-petition debt that stands ahead of the $15 million of combined pre-petition secured and unsecured claims. At a minimum, the administration of this case by the debtor-in-possession has thus raised the cost of exit to at least $21 million to make pre-petition creditors whole. Even more troubling is the fact that the

administrative expense burn is not yet over, and it can be expected that further priming

administrative expenses will be incurred if the debtor-in-possession is allowed to continue on its

wasteful, non-productive course.  If that occurs, the exit cost will be even higher.

<u>APPOINTMENT OF CHAPTER 11 TRUSTEE REQUIRED</u>

26.    In light of the position stated in the Initial Sale Motion; the methodology

supporting the $218 million valuation set forth in the Appraisal Report; and the very substantial

(albeit mishandled) efforts taken in this case to obtain a final judgment against the Republic of

France to confirm the debtor's title to the French Artifacts, it is almost incomprehensible that

there is no indication whatsoever in the public record that the debtor-in-possession has ever

sought to pursue an auction-house type sale of individual French Artifacts.

27.    The Initial Sale Motion makes clear the legal demarcation between the American

Collection and the French Collection as determined by the course of pre-petition federal court

litigation leading to the controlling Fourth Circuit precedent summarized below: [8]

> "10. In 2004, RMST filed a "Motion for Salvage and/or Finds Award"
> with the EDVA Court. Id. at 525. The motion sought an award of title to
> the American Artifacts; the motion excluded any requests for
> compensation as to the French Artifacts, for which title had already
> transferred to the Company pursuant to the French administrator's 1993
> award. Id. By Order dated July 2, 2004, the EDVA Court refused to
> recognize the previous decision by the French Administrator, effectively
> stripping the Company of title to the French Artifacts. R.M.S. Titanic, Inc.
> v Wrecked & Abandoned Vessel, 323 F. Supp. 2d 724 (E.D. Va. 2004). In
> refusing to recognize the French Administrator's decision to award the
> French Artifacts to RMST, the EDVA Court concluded that an application
> of the principles of comity did not justify the EDVA Court's recognition
> of the French administrative proceeding. Id. at 733. The EDVA Court
> directed RMST to prepare a motion for salvage award on the entire
> collection of Titanic artifacts – the French Artifacts and the American
> artifacts.

---

[8] Initial Sale Motion at pars. 10 and 11.

11. RMST appealed the July 2, 2004 Order to the United States Court of Appeals for the Fourth Circuit. On January 31, 2006, the Fourth Circuit vacated the EDVA Court Order with respect to the ownership of the French Artifacts, holding that the EDVA Court "does not have in rem jurisdiction over the French artifacts, or, absent in rem jurisdiction, any other jurisdictional basis upon which to issue a declaratory judgment" and remanded the case to the EDVA Court for administration of the American Artifacts. R.M.S. Titanic, Inc., 435 F.3d at 528. This decision effectively reconfirmed the French Administrator's transfer of title to RMST of the French Artifacts, and established as the law of the case that the EDVA Court's subject matter jurisdiction extends only to the American Artifacts and the wreck itself, but not to the French Artifacts."

28.    Whatever restrictions and limitations may exist with respect to the American Artifacts under the jurisdiction of the United States District Court for the Eastern District of Virginia, the above makes clear that such jurisdiction does not extend to the French Artifacts. Furthermore, to the extent there was any question about whether the Republic of France may have retained or imposed any interest in or restrictions or limitations upon the debtor with respect to the French Artifacts, the final judgement of this Court in the French adversary proceeding has put that issue to rest by holding as follows:

"The French Republic a/k/a Republic of France and its government agencies have no interest in the French Artifacts, defined as approximately 2,100 artifacts that were recovered from the wreck site of the RMS Titanic during an exhibition conducted in 1987."

29.    The path to conduct an auction-house sale of individual French Artifacts is clear as a result of the above judicial decisions.  Moreover, the Appraisal Report makes clear that such auction house sales formed the basis of its $218 million value opinion and therefore appear to represent the best and most certain value proposition for the benefit of the estate. In contrast, any effort to sell the overall collection as a single entirety would be unprecedented, and the inclusion of the American Artifacts in a singular, entirety sale raises highly problematic issues in relation to the severe legal covenants and restrictions attendant to the American Collection.  Such

problems with an entirety sale are sadly apparent from the debtor's failed marketing efforts to date.

30.     In light of the above, it is absolutely confounding that the debtor has refused to pursue an auction-house sale of individual French Artifacts.  Indeed, such a sale may represent the only means to achieve full payment to creditors at this stage of the case given the extent of administrative expense losses that the debtor has allowed to pile up.

31.     It is not productive at this juncture to speculate on the motivation or agenda for the actions by the debtor in the administration of this case that have been so ineffective and harmful and by which it has unquestionably forfeited any right to continue as a fiduciary debtor-in-possession. What is clear, for all the foregoing reasons, is that it is time to appoint a qualified, disinterested chapter 11 trustee to immediately and actively explore and implement a prompt, value-maximizing chapter 11 exit and to impose some long-overdue discipline on the runaway expenses and continuing losses that have been experienced on the debtor's watch.

32.     The foregoing allegations drawn from the uncontroverted public case record establish that cause exists for the appointment of a chapter 11 trustee and that such appointment is in the interests of creditors and the estate in accordance with Bankruptcy Code Section 1104. Additional support for the appointment of a chapter 11 trustee may be found in Bankruptcy Code Section 1112(b).

33.     While this Motion does not seek conversion to chapter 7, reference to section 1112(b) indicates that such conversion could be mandatory upon the request of a party in interest as a result of the various instances of "cause" defined therein that unquestionably have come to exist under the watch of this debtor-in-possession.  However, subsection 1112(b)(1) permits the

Court to avoid a mandatory chapter 7 conversion upon finding that the appointment of a chapter 11 trustee under section 1104 "is in the best interests of creditors and the estate." Insofar as conversion to chapter 7 would likely be more disruptive to the estate than the appointment of a chapter 11 trustee, the ability to pre-empt this otherwise mandatory conversion by appointing a trustee surely comports with this "best interests" standard.

WHEREFORE, Movant respectfully requests that:

A)    The Court enter an order for the appointment of a Chapter 11 trustee herein pursuant to Bankruptcy Code Section 1104(a);

B)    In the event such appointment is ordered, the Office of the United States Trustee convene a meeting of creditors pursuant to Bankruptcy Code Section 1104(b)(1) for the purpose of electing one disinterested person to serve as trustee in the case; and

C)    The Court grant such other and further relief as is just and proper.

Dated this 1st day of May, 2018

/s/ Howard Siegel
_____
HOWARD SIEGEL
Connecticut Bar No. 07092
945 McKinney Street, PMB 434
Houston, TX 77002
Tel: 713-984-4801
Email: howard@eucinv.com

*Counsel to the Movants*

/s/ Aaron R. Cohen
_____
AARON R. COHEN
Florida Bar No. 0558230
Post Office Box 4218
Jacksonville, FL 32201
Tel: 904-389-7277

14

Fax: 904-389-7273
Email: acohen60@bellsouth.net

*Local Counsel to the Movants*

*Filer's Attestation: Pursuant to Local Rule 1001-2(e)(3) regarding signatures, Aaron Cohen attests that concurrence in the filing of this paper has been obtained.*

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on 1 of May 2018, a true and correct copy of the foregoing has been served through the CM/ECF system to all registered CM/ECF recipients.

Per the Court's Order Granting Debtors' Motion for an Order Pursuant to 11 U.S.C. § 105(a) and Rule 2002 Establishing Notice Procedures [Doc. No. 140], a true and correct copy of the foregoing was also furnished on May 1, 2018 via first-class U.S. Mail, postage-prepaid, to the Master Service List attached hereto.

/s/ Aaron R. Cohen

_____

**AARON R. COHEN**

A-1 Storage and Crane
2482 197th Avenue
Manchester, IA 52057

ABC Imaging
14 East 38th Street
New York, NY 10017

A.N. Deringer, Inc.
PO Box 11349
Succursale Centre-Ville
Montreal, QC H3C 5H1

ATS, Inc.
1900 W. Anaheim Street
Long Beach, CA 90813

Broadway Video
30 Rockefeller Plaza
54th Floor
New York, NY 10112

CBS Outdoor/Outfront Media
185 US Highway 48
Fairfield, NJ 07004

Dentons Canada LLP
250 Howe Street, 20th Floor
Vancouver, BC V6C 3R8

Enterprise Rent-A-Car Canada
709 Miner Avenue
Scarborough, ON M1B 6B6

Expedia, Inc.
10190 Covington Cross Drive
Las Vegas, NV 89144

George Young Company
509 Heron Drive
Swedesboro, NJ 08085

Gowlings
550 Burrard Street
Suite 2300, Bental 5
Vancouver, BC V6C 2B5

Hoffen Global Ltd.
305 Crosstree Lane
Atlanta, GA 30328

Kirvin Doak Communications
5230 W. Patrick Lane
Las Vegas, NV 89118

MNP LLP
15303 - 31st Avenue
Suite 301
Surrey, BC V3Z 6X2

Morris Visitor Publications
PO Box 1584
Augusta, GA 30903

NASDAQ Stock Market, LLC
805 King Farm Blvd.
Rockville, MD 20850

National Geographic Society
1145 - 17th Avenue NW
Washington, DC 20036

NYC Dept. of Finance
PO Box 3646
New York, NY 10008

PacBridge Limited Partners
22/F Fung House
19-20 Connaught Road
Central Hong Kong

Pallet Rack Surplus, Inc.
1981 Old Covington Cross Road NE
Conyers, GA 30013

Ramparts, Inc.
d/b/a Luxor Hotel and Casino
3900 Las Vegas Blvd. South
Las Vegas, NV 89119

Screen Actors Guild
1900 Broadway
5th Floor
New York, NY 10023

Seaventures, Ltd.
5603 Oxford Moor Blvd.
Windemere, FL 34786

Sophrintendenza Archeologica
di Napoli e Pompei
Piazza Museo 19
Naples, Italy 80135

Syzygy3, Inc.
231 West 29th Street
Suite 606
New York, NY 10001

Time Out New York
405 Park Avenue
New York, NY 10022

TPL
3340 Peachtree Road
Suite 2140
Atlanta, GA 30326

TSX Operating Co.
70 West 40th Street
9th Floor
New York, NY 10018

Verifone, Inc.
300 S. Park Place Blvd.
Clearwater, FL 33759

Samuel Weiser
565 Willow Raod
Winnetka, IL 60093

WNBC - NBC Universal Media
30 Rockefeller Center
New York, NY 10112

United States Attorney's Office
Middle District of Florida
300 N. Hogan Street, Suite 700
Jacksonville, FL 32202

Jonathan B. Ross, Esq.
Gowling WLG (Canada) LLP
550 Burrard Street, Suite 2300, Bentall 5
Vancouver, BC V6C 2B5

Christine R. Etheridge, Esq.
Bankruptcy Administration
Wells Fargo Vendor Financial Services, LLC
PO Box 13708
Macon, GA 31208

TSX Operating Co., LLC
c/o James Sanna
70 W. 40th Street
New York, NY 10018

Dalian Hoffen Biotechnique Co., Ltd.
c/o Ezra B. Jones
305 Crosstree Lane
Atlanta, GA 30328

B.E. Capital Management Fund LP
Thomas Branzlel
205 East 42nd Street , 14th Floor
New York, NY 10017