**UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

In re:

RMS TITANIC, INC., *et al.*,

      Debtors. [1]

_____/

Case No.: 3:16-bk-02230-PMG

Chapter 11

(Jointly Administered)

**EMERGENCY MOTION OF THE OFFICIAL COMMITTEE OF
EQUITY SECURITY HOLDERS FOR ENTRY OF AN ORDER
GRANTING DERIVATIVE STANDING AND AUTHORITY TO PROSECUTE
AND SETTLE CERTAIN CLAIMS ON BEHALF OF THE DEBTORS' ESTATES**

The Official Committee of Equity Security Holders (the "Equity Committee") of Premier Exhibitions, Inc. ("Premier"), Chapter 11 Debtor in Case No. 3:16-bk-02232-PMG and the parent company of RMS Titanic, Inc. ("RMST"), Chapter 11 Debtor in Case No. 3:16-bk-02230-PMG, by and through undersigned counsel, moves the Court for entry of an Order in the form attached hereto as **Exhibit A**, on an emergency basis, authorizing the Equity Committee to commence, prosecute, and, if appropriate, settle certain claims against certain parties on behalf of the bankruptcy estates (the "Estates") of the above-captioned debtors (the "Debtors").   In support of this Motion, the Equity Committee respectfully says:

**BASIS FOR EMERGENCY RELIEF**

The Equity Committee requests emergency consideration of this Motion because the statutes of limitations for the claims the Equity Committee seeks leave to pursue may expire as early as June 14, 2018.  Although the Equity Committee accepts responsibility for the emergent

---

[1] The Debtors in the chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include: RMS Titanic, Inc. (3162); Premier Exhibitions, Inc. (4922); Premier Exhibitions Management, LLC (3101); Arts and Exhibitions International, LLC (3101); Premier Exhibitions International, LLC (5075); Premier Exhibitions NYC, Inc. (9246); Premier Merchandising, LLC (3867); and Dinosaurs Unearthed Corp. (7309) (collectively, the "Debtors"). The Debtors' service address is 3045 Kingston Court, Suite I, Peachtree Corners, Georgia 30071.

nature of this Motion, much of the delay in bringing this Motion was engendered by the efforts of the Equity Committee to include prosecution, and potential resolution of these claims within the context of a Chapter 11 plan.  As this Court is aware, the Equity Committee has, for more than a year, engaged in good faith negotiations with the Debtors, and with the Creditors Committee, toward a consensual plan of reorganization that would include provisions to address these claims.  The Plan Support Agreement, itself, and the agreed Plan Term Sheet attached thereto, contemplated inclusion of these claims in a Chapter 11 plan.  Indeed, the Equity Committee would have preferred these claims be preserved in a plan and prosecuted post-confirmation by a Liquidation Trust.  That has been the Equity Committee's position consistently in its plan negotiations.  The Court will recall that the Equity Committee negotiated and entered a Plan Support Agreement which contained a consensual Plan Term Sheet.  That Plan Time Sheet, for example, included provisions preserving these causes of action:

> In accordance with section 1123(b)(3) of the Bankruptcy Code, all causes of action and litigation rights (the "Litigation Rights") of the Debtors not otherwise settled or released under the plan shall be transferred to the Liquidation Trust for purposes of resolution or liquidation, and nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any such Litigation Rights. The Liquidation Trustee may (but is not required to) enforce all Litigation Rights and all other similar claims arising under applicable state laws, including fraudulent transfer claims, if any, and all other causes of action of a trustee and debtor-in-possession under the Bankruptcy Code.

See, Order Authorizing the Debtors, The Official Committee of Unsecured Creditors and The Official Committee of Equity Security Holders to Enter into And Perform Their Obligations Under a Plan Support Agreement, entered July 7, 2017, Docket 642, at page 35 of 37

The Plan Term Sheet also provides:

> Any discharge or release provisions of the Plan shall not diminish or impair the enforceability of any of the Debtors' insurance policies, including any that may cover Claims against the Debtors or the Reorganized Debtors, and their current and former officers and directors, or any other person or entity.

Id.

Thus, it had been the expectation of the Equity Committee that these claims would be prosecuted by a post-confirmation liquidating trust.  These claims may ultimately be transferred to such a trust, but it now is not feasible for that trust to be established in time, given the impending potential statutory deadlines. Unfortunately, as events in the Chapter 11 case played out, time has run on the prospect to provide for these claims in the context of a plan.  According, the Equity Committee is required to preserve these claims for the benefit of the estate in the manner requested in this motion.

Moreover, the estate is not prejudiced by any delay and the Motion is necessary because the Debtor will not bring these claims, yet the claims have the potential to bring significant value to the estate, which stands to gain in having the Equity Committee prosecute these claims.

## OVERVIEW

The Equity Committee brings this Motion for leave to prosecute claims of the Estates against certain Insiders[2] (as defined below) that will yield significant value for unsecured

---

[2] Based upon its discovery and analysis of the facts, the Equity Committee has already identified certain of the Insiders against whom claims do not exist.  Accordingly, simply being designated an "Insider" does not mean that

creditors and the Estates.   The Debtors have refused to pursue these claims and other claims against the Insiders.   The Debtors have inherent conflicts of interest and have refused to act as fiduciaries for the Estates to protect unsecured creditors.   Thus, the Equity Committee should be granted standing to pursue estate claims and causes of action against the Insiders, as well as authority to settle those claims.

Specifically, the Equity Committee seeks standing to immediately commence all available actions, including, without limitation, (i) for recovery of claims arising under 11 U.S.C. §§ 547, 548, 550, and 551, as well as applicable state laws (collectively, the "Insider Claims"), (ii) to avoid, preserve, and/or recover for the benefit of the Debtors' bankruptcy estates all of the claims against certain of the Debtors' former and current directors and officers (the "D&O Claims"), and (iii) for all direct and/or indirect transfers of interest in money or property of the Debtors, to or for the benefit of certain of the Insiders (the "Transfer Claims").

By letter dated May 1, 2018, the Equity Committee asked the Debtors to pursue the Insider Claims, D&O Claims, Transfer Claims and other claims against the Insiders (the "Demand Letter").  The Demand Letter is attached hereto and incorporated herein as **Exhibit B.**

The Debtors refused the Equity Committee's request, on two grounds: first, the Equity Committee did not include a draft complaint with the Demand Letter, and second, the Equity Committee lacks standing to bring the proposed claims.  As set forth below, the Debtors' refusal is unjustified and the cited grounds are meritless.

---

individual would be subject to claims.  On the other hand, as facts continue to be developed, it is possible additional Insiders would likewise be excluded as targets of claims.

## BACKGROUND

1. On June 14, 2016 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, commencing the above-captioned, jointly administered bankruptcy case (the "Bankruptcy Case").

2. The Debtors continue to operate their businesses as debtors in possession pursuant to Bankruptcy Code Section 1107 and 1108.

3. No trustee or examiner has been appointed in the Bankruptcy Case.

4. On August 24, 2016, the Acting United States Trustee, Guy G. Gebhardt, appointed the members of the Equity Committee. On August 31, 2016, the Equity Committee selected Landau Gottfried & Berger LLP and Akerman LLP as its general bankruptcy counsel.

## JURISDICTION AND VENUE

5. The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.

6. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

7. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

8. The statutory predicates for relief are §§ 105, 1103(c), and 1109(b) of title 11 of the United States Code (the "Bankruptcy Code").

## THE INSIDERS

9. The Board of Directors of the Debtors can be broken down into three categories: (i) the pre-merger board, (ii) the post-merger board, and (iii) the board as of the Petition Date.

10. The pre-merger board included: (i) Bruce Steinberg; (ii) Ronald C. Bernard; (iii) William M. Adams; (iv) Douglas Banker; (v) Richard Kraniak; (vi) Jack H. Jacobs; (vii) Mark A. Sellers; and (viii) Samuel Weiser. The Equity Committee is not pursuing claims against

Messrs. Steinberg, Bernard, and Adams.  For purposes of this motion, "Pre-Merger Board" shall consist of Messrs. Banker, Kraniak, Jacobs, Sellers, and Weiser.

11.     The post-merger board included: (i) Daoping Bao; (ii) Michael Evans; (iii) Sid Dutchak; (iv) Mingcheng Tao; (v) Mark Sellers; (vi) Richard Kraniak; and (vii) Douglas Banker (the "Post-Merger Board").

12.     The board as of the Petition Date included: (i) Daoping Bao; (ii) Douglas Banker; (iii) Sid Dutchak; (iv) Mingcheng Tao; and (v) Richard Kraniak (the "Petition Date Board").

13.     The members of the Pre-Merger, Post-Merger, and Petition Date Boards are referred to collectively herein as the "Insiders".

## THE D&O CLAIMS

14.     As set forth more specifically below, the D&O Claims primarily arise from (i) the "Armada Transaction", as described below, and (ii) the merger between the Debtors and Dinoking (the "Merger") and April 11, 2016 restatement of Dinoking's financial information (the "Restatement").[3]

### A.     The Armada Transaction.

15.     In early 2014, the Pre-Merger Board assessed strategic alternatives available to the Company, and retained JPMorgan Securities to assist in this process.

16.     In the early stages of the strategic alternative process, Premier engaged in discussions with numerous entities, including Armada (whose principal was George Wight), Dinoking (whose principal was Dao Ping Bao), and Base Entertainment.  These companies all seemed eager to enter into a transaction with Premier and submitted indications of interest. Simultaneously, Premier was also exploring potential debt financing options so that the Company would have capital to carry out its business plans.

---

[3] Further discovery could identify other matters from which claims may arise.

17.     During this same time-frame, Sellers Capital, an entity owning the largest block of Premier stock and managed by Mr. Sellers and Mr. Weiser – two of Premier's directors – was actively attempting to sell its Premier shares (the "Sellers Capital Shares").  By April 2014, Mr. Sellers had already obtained two letters of intent for the purchase of the Sellers Capital Shares: (a) an offer from an entity called "KOP" at $1.08 per-share, and (b) an offer from "Salvor Fund," whose principal was George Wight (from Armada), at $1.30 per share.

18.     As Mr. Sellers contemplated the two offers, Premier was contemplating accepting a loan offer from either Brevet Capital Advisors or Twin Haven Capital Partners.  In an email exchange between Mr. Sellers and Mr. Weiser on May 8, 2014, Mr. Sellers expressly stated that he would vote against Premier accepting any loan offer at that point because he would be signing the KOP letter of intent that day.  Mr. Sellers did not want the Company to have any additional debt at that time.  Mr. Sellers signed the KOP letter of intent later that day.  The loan offers from Brevet and Twin Haven were never accepted by Premier.

19.     Thereafter, both Base Entertainment and Dinoking, who had previously only been negotiating deals with Premier, also made offers to Mr. Sellers for the purchase of the Sellers Capital Shares. Thus, almost every entity negotiating with Premier also made an offer to purchase the Sellers Capital Shares.  E-mails from Mr. Bao confirm that the notion of purchasing the Sellers Capital Shares was suggested to him by Mr. Weiser.

20.     The companies then negotiating with both Premier and Sellers Capital were forced to balance competing interests.  For example, in an email exchange on May 19, 2014, Mr. Sellers explained to Mr. Weiser that he simply wanted to cash out his shares and exit the Company.  In response, Mr. Weiser stated his belief that Base Entertainment understood that dynamic, and was in fact "diverting" cash they would use to make an offer for Premier so that

they could be in a position to purchase the Seller Capital shares if the KOP transaction was not successful.

21.     On June 13, 2014, before any deal between KOP and Sellers Capital was finalized, the Pre-Merger Board abruptly terminated Mr. Weiser's employment as CEO and appointed Mike Little as the interim CEO. Mr. Weiser remained on the Pre-Merger Board.[4]

22.     Once removed as CEO, Mr. Weiser increased the efforts to sell the Sellers Capital Shares (even at Premier's expense).   On July 16, 2014, Mr. Weiser spoke with Dinoking representatives to convince Dinoking that it would not be able to negotiate a deal with Premier at that time.  Instead, Mr. Weiser suggested that Mr. Bao first purchase the Sellers Capital Shares and then use the influence provided by the block of shares to negotiate a merger with Premier.  It seems that Dinoking investigated that strategy at that time.

23.     Mr. Sellers ultimately decided that he wanted to move forward with KOP. However, at a board meeting on July 23, 2014, the Pre-Merger Board rejected Sellers Capital's request to enter into a formal transaction with KOP.[5]  At the very next board meeting, Mr. Sellers moved to reconstitute the Pre-Merger Board.  On August 25, 2014, board members William Adams, Ronald Bernard, and Bruce Steinberg, who had opposed Mr. Sellers' actions, were replaced by Jack Jacobs and Rick Kraniak.  The newly reconstituted board acted quickly to appoint Mr. Weiser as the Executive Chairman of the board with a $30,000 per month salary.

24.     In September 2014, Mr. Weiser continued to give the Pre-Merger Board updates about Premier's strategic alternatives, which still included possible transactions with Dinoking and Armada. At that time, Premier was in dire financial shape and accepted a loan from

---

[4] At his deposition, Mike Little explained that the Pre-Merger Board fired Mr. Weiser based on the Debtors' poor execution in carrying out the strategic plans and Mr. Weiser's lack of effort at aiding the Debtors through difficult times.

[5] Sellers Capital believed Premier's approval was required under the Florida Control Share Acquisition Statute.

Pentwater Capital Management.  The loan was a bridge loan and was contemplated as only a short-term solution to Premier's financing problems.

25.      On October 13, 2014, while the Pre-Merger Board contemplated the transactions with Dinoking or Armada, Mr. Sellers told it that he believed the company "needed to be prepared to remain independent."  This conversation is telling because, two days later, Sellers Capital entered into a Stock Purchase Agreement with Armada.  The Sellers Capital-Armada transaction required the Pre-Merger Board to approve three new board members chosen by Armada.  On November 20, 2014, the newly reconstituted Pre-Merger Board approved the proposed Armada directors.

26.      The Armada transaction failed to close.[6]  Mr. Sellers then directed that Premier return its attention to Dinoking.  Negotiations between the companies ultimately led to the signing of a merger agreement on April 2, 2015.  The Dinoking deal closed in November 2015.

**B.      *Breach of the Duty of Loyalty.***

27.      The Estate has claims for the breach of the duty of loyalty against Mr. Sellers, Mr. Weiser, and the rest of the reconstituted board.  Mr. Sellers and Mr. Weiser's conduct in pursuing both a sale of Premier and a sale of the Sellers Capital Shares simultaneously constitutes a breach of the duty of loyalty.  Both directors held fiduciary duties to both companies even though the companies had conflicting interests.

28.      This conflict of interest manifested in numerous ways.  First, Mr. Sellers was so keen on selling the Sellers Capital's shares that he rejected potentially beneficial loans from Brevet and/or Twin Haven despite Premier's need for debt financing.  That decision, which was made to aid Sellers Capital and make the shares seem more enticing, ultimately forced Premier to

---

[6] Sellers Capital successfully sued Armada and George Wight in the United States District Court for the Northern District of Illinois for breach of contract based on the Armada's failure to close the transaction.  In November 2017, Sellers Capital obtained a $6 million judgment in that case.

scramble for alternative financing and accept the onerous Pentwater loan months later.   The

Brevet and Twin Haven loan terms were more advantageous to Premier because, among other

things, they had a 36-month term compared to the six-month term for Pentwater.

29.    Second, Mr. Sellers' actions in putting his personal interests ahead of Premier's

resulted in the forced resignation of three board members who did not approve the KOP

transaction.  After appointing his hand-picked new board members, Mr. Sellers quickly got Mr.

Weiser (who handled all negotiations with Armada) reinstituted in a leadership position within

Premier (at a large salary).  A month later, Mr. Sellers informed the reconstituted board that

Premier needed to be ready to remain an independent company.  But, just two days later, Sellers

Capital entered into the Armada deal.  The newly reconstituted board did not object to Mr.

Sellers' conduct, and in fact, tacitly approved by agreeing to appoint the Armada directors.

30.    Third, Mr. Weiser's and Mr. Sellers' conflicts caused them to interfere with

Premier's potential transactions. Mr. Weiser actively influenced Dinoking to cease negotiations

with Premier so that Dinoking could acquire the Sellers Capital Shares.  At the time of these

communications, Mr. Weiser and Mr. Sellers were still Premier board members.

31.    Fourth, the conflict of interest reached a pinnacle when Sellers Capital entered

into a contract with Armada for which Premier gained no benefit.  Instead of focusing on the

potential transactions that would have benefitted the Debtors as well as Premier's shareholders,

Mr. Sellers and Mr. Weiser pursued a transaction that would only benefit Sellers Capital.

Furthermore, Mr. Sellers was able to use his control over his hand-picked Premier board

members to make sure the transaction got approved.  Accordingly, Mr. Sellers, and the rest of the

Pre-Merger Board, acted in bad faith and breached their duty of loyalty, in obtaining and

approving the Armada transaction.

32.    "Once disloyalty has been established," a fiduciary cannot be allowed to "profit personally from his conduct," and the beneficiary should "not be harmed by such conduct." *Thorpe by Castleman v. CERBCO, Inc.*, 676 A.2d 436, 437 (Del. 1996) (finding breach of the duty of loyalty where a board member who was also a controlling shareholder sold his personal shares when the shareholder also negotiated the deal despite being conflicted due to his duties owing to the company).    Thus, at a minimum, Mr. Sellers and Mr. Weiser are liable for any benefit they received from the Armada transaction, *i.e.* the $6 million judgment, as well as any expenses incurred by Premier throughout the Armada transactions.    The other Pre-Merger Board members are also, at a minimum, liable for any fees incurred in assisting Sellers Capital's with the Armada deal.

C.    ***Claims Premised on Delay of the Dinoking Transaction***

33.    Dinoking and Premier had been in discussions regarding a possible deal since early in 2014.    However, the potential transactions involving Sellers Capital continuously interfered with the Dinoking negotiations. In a presentation to potential investors, Dinoking explained that "[Premier] and [Dinoking] began discussing a potential merger in January 2014 but the merger did not move ahead as [Mr.] Sellers was focused on selling his stake and did not want to be diluted at the time.    Furthermore, during the pendency of the Sellers Capital-Armada transaction, Mr. Weiser complained to George Wight that Armada's failure to close the transaction cost Premier "valuable weeks" in negotiating other deals.    Indeed, Mr. Little testified that Premier would have "[a]bsolutely" been better off as a Company had it entered into a strategic transaction earlier than it did.

34.    Premier's stock price drastically dropped between January 2014 and November 2015 when the Dinoking deal ultimately closed.    If the Dinoking transaction (or any other

strategic transaction) was more actively pursued earlier, while the Premier shares were more valuable, Premier would have obtained a more advantageous deal. Thus, the Estate has claims for the breach of the duty of loyalty against Mr. Weiser, Mr. Sellers and the Pre-Merger Board based on this lack of focus on Premier's interests. *In re Chira*, 353 B.R. 693, 729 (Bankr. S.D. Fla. 2006), *aff'd*, 378 B.R. 698 (S.D. Fla. 2007), *aff'd*, 567 F.3d 1307 (11th Cir. 2009) (finding a breach of fiduciary duty in delaying a sale of the company that was advantageous).

35.    Instead of focusing on a potential deal for Premier, Mr. Weiser and Mr. Sellers continuously pursued transactions that would unload Sellers Capital's Shares. Had Mr. Weiser and Mr. Sellers pushed for any of Premier's potential transactions instead of the self-interested deals, the Dinoking deal (or another transaction) could have closed earlier. Similarly, the Pre-Merger Board was aware of the potential transactions available to the Company, and the need for an infusion of capital, but nonetheless allowed the Armada deal to move forward even though it would negatively affect the other negotiations. Indeed, in the Proxy Statement, Premier disclosed that with the announcement of the Armada deal, "discussions with the PacBridge/Dinoking group, along with other potential strategic partners with whom the Company was in discussion, were paused pending the outcome of the Sellers/Armada transaction [for the purchase of the Sellers Capital Shares]." *See* Proxy Statement at 43.

**D.    Usurpation of Corporate Opportunity**

36.    The Estate has claims against Mr. Sellers and Mr. Weiser for usurpation of a corporate opportunity. Armada was negotiating with Premier for a stock-for-stock transaction. In the end, Armada only signed a cash deal with Sellers Capital. A claim that a director or officer improperly usurped a corporate opportunity belonging to the corporation is a derivative claim. *In re Digex Inc. Shareholders Litig.*, 789 A.2d 1176, 1189 (Del. Ch. 2000); *see also*

*Dinuro Investments, LLC v. Camacho*, 141 So. 3d 731, 739 (Fla. 3d DCA 2014) (stating that a direct claim is not available when there is no "special injury to the shareholder or member that is separate and distinct from those sustained by the other shareholders or members."). Premier's damages for the usurpation will need to be fully calculated, but, at a minimum, that claim could start at the $6 million judgment that Sellers Capital obtained against Armada and George Wight, and be subject to upward adjustment by future expert witness review.

E.    ***Aiding and Abetting Breach of Fiduciary Duty***

37.    To the extent the Estate can state claims against Mr. Sellers or Mr. Weiser for their misconduct, Premier can bring claims against Sellers Capital for aiding and abetting breach of fiduciary duty based on the same actions. *Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 643 (Del. Ch. 2013) (because directors who breached fiduciary duties were also directors of other companies involved in the breach, the knowledge that the actions were in furtherance of a breach could be imputed to other companies and they could be liable for aiding and abetting). The Estate should thus seek recovery of, at a minimum, $6,000,000 against Sellers Capital for aiding and abetting breach of fiduciary duties.

F.    ***The Merger and Restatement***

38.    After the Armada deal failed to close in November 2014, the Premier Pre-Merger Board shifted its focus to the Dinoking transaction. In February 2015, Premier recognized that if a deal was not finalized, the company would likely end up in bankruptcy. By March 2015, Premier's financial status was so gloomy (partially due to the impending term of the Pentwater loan), that Mr. Weiser recommended that the board accept "the first deal ready to be signed." Because the Dinoking offer was the first offer available, Premier accepted the terms before even hearing an offer for long term convertible debt from a group led by Andrew Shapiro.

39.    On April 2, 2015, Dinoking and Premier entered into the Merger agreement. While preparing the proxy statement for the Merger, Premier noted that it required a "resolution of issues in the Dinoking financial statements."  E-mail correspondence shows that Premier was concerned about a revenue recognition issue in Dinoking's audited financial statements.  Premier understood that the issue would likely cause the financial statements to be restated post-merger. Mike Little testified that Mr. Bao was aware of the accounting issues both before and after the Merger closed.  The Dinoking transaction closed on November 2, 2015, without the faulty financial information having been dealt with.  Thereafter the board was once again reconstituted.

40.    On January 19, 2016, Premier's newly appointed audit committee raised the accounting issue to the rest of the Post-Merger Board, and explained that there was "a likelihood of a necessary restatement of Dinoking's premerger valuation."  However, Mr. Little testified that, at the time, Mr. Bao persisted that the accounting was done correctly and that Mr. Bao "push[ed] back against the need for a restatement."

41.    On April 11, 2016, nearly six months after the Merger closed, Premier issued a disclosure statement explaining that Premier was restating Dinoking's fiscal information from 2013 and 2014.  Specifically, for fiscal year 2013, Dinoking's revenues were really $5.4 million[7] and not the $6.4 million mentioned in the Proxy Statement; the cost of sales were reduced from $2.5 million to $1.6 million; and the 2013 operating income was really $0.7 million and not the $1.0 million previously reported.  For fiscal year 2014, Dinoking's revenues were not $11.1 million, as reported, but were really $6.0 million; the cost of sales was reduced from $1.6 million to $1.0 million; and the operating income was not $6.5 million, but rather only $2.1 million.

---

[7] All of Dinoking's financial information is in Canadian dollars.

## PRELIMINARY ANALYSIS OF CLAIMS

### A.    *Claims Against Pre-Merger Board*

42.    The Pre-Merger Board, at Mr. Sellers' direction and encouragement, rush to complete the Merger before Premier's financial condition became even more dire.  In doing so, the Board, consisting of Mr. Weiser, Mr. Sellers, Mr. Banker, and Mr. Kraniak, breached their fiduciary duties by entering into the Merger on a rushed basis.  This claim stems from the delay claim discussed above.   The Pre-Merger Board rushed to complete the Merger based on Premier's dwindling financial situation and the need for immediate cash.  The Pentwater notes were coming due, and Premier needed an infusion of cash.  Had Mr. Sellers and Mr. Weiser not been so focused on selling the Sellers Capital Shares, Premier could have found a more stable debt financing option and could have avoided the immediate need to enter into the Merger. Furthermore, had the Pre-Merger Board turned its attention to Dinoking earlier, instead of aiding Mr. Sellers with the Armada transaction, Premier may have been in a better position to fully analyze the deal and not just sign whatever deal first became available.  If the Dinoking deal was given more vetting, Premier may have had time to fully assess the accounting errors in Dinoking's financials prior to closing the deal.

### B.    *Claims Against Mr. Bao*

43.    Mr. Bao breached his fiduciary duty to Premier by, *inter alia*, failing to disclose Dinoking's improper accounting after the Merger.[8]  Mr. Bao knew of the accounting issue prior to the Merger.  As soon as the Merger closed, Mr. Bao became a Premier board member and CEO who undoubtedly owed fiduciary duties to Premier.   Failure to disclose the financial problems and misstatements constitutes a breach of fiduciary duty.  *Rehab. Advisors, Inc. v. Floyd*, 601 So. 2d 1286, 1288 (Fla. 5th DCA 1992) (breach of fiduciary duty for director to keep

---

[8] Failure to bring claims against the Insiders may give rise to other claims against Mr. Bao.

vital information from the company); *Hoover Indus., Inc. v. Chase*, 14 Del. J. Corp. L. 332, 338 (Ch. 1988) ("A director does breach his duty of loyalty if he knows that the company has been defrauded and does not report what he knows to the board or to an appropriate committee of the board, at the very least when he is involved in the fraud and keeps silent in order to escape detection.").

44.     Mr. Bao's breach can also be styled as a *Caremark* claim. *See In re Caremark Int'l Derivative Litig.*, 698 A.2d 959, 971 (Del. Ch. 1996).  Under *Caremark*, a plaintiff must show "either (1) that the directors knew or (2) should have known that violations of law were occurring and, in either event, (3) that the directors took no steps in a good faith effort to prevent or remedy that situation, and (4) that such failure proximately resulted in the losses complained of..." Id.  Mr. Bao's failure to correct the financial misinformation as soon as he ascended to the Post-Merger Board was a knowing failure to act in violation of his duties.

45.     Not only did Mr. Bao fail to disclose the financial misstatements to the rest of the board,[9] he actively fought a restatement once the issue was raised.  Due to his conduct, the accounting issues were not fixed immediately upon the closing of the Merger; instead, Premier continued operating under faulty financial information and Premier's shareholders were left in the dark about the true nature of Premier's financial well-being for nearly six-months, well after they voted in favor of the Merger.

### C.     Potential Additional Claims

46.     In addition, because, among other things and without limitation, upon information and belief, the Insiders at all relevant times dominated and absolutely controlled the Debtors and breached their respective fiduciary duties of care and loyalty to the Debtors as officers and

---

[9] The financial misinformation was only discovered by the audit committee.

directors of the Debtors, the Equity Committee hereby demands that the Debtors commence actions against the Insiders for and/or based on, without limitation:

    a.   Equitable subordination of the Insiders' claims against the Debtors;

    b.   Recharacterization of the Insiders' purported loans to the Debtors as equity capital contributions;

    c.   Recovery for the breaches of the duty of care and the duty of loyalty by, without limitation, all applicable Insiders;

    d.   Recovery for the aiding and abetting of breaches of the duties of care and of loyalty;

    e.   Recovery for injuries caused by the Insiders' inappropriate exercise of control over the Debtors and transactions with the Debtors' purported lenders that were not and have not been arm's length transactions; and

    f.   Recovery for the Debtors' failure to pursue the Estate Claims (as defined below)

(collectively, the "Miscellaneous Claims").

**RELIEF REQUESTED**

47.      By this Motion, the Equity Committee seeks entry of an Order, in substantially the form attached hereto as **Exhibit A**, granting it authority and standing to commence, prosecute, and if appropriate, settle the Insider Claims, D&O Claims, Transfer Claims, and Miscellaneous Claims, and any other similar claims the Equity Committee may discover (collectively, the "Estate Claims"), and to take such other action as may be necessary or appropriate in connection therewith.

## BASIS FOR RELIEF REQUESTED

48.    In chapter 11 cases in which no trustee has been appointed, a debtor-in-possession enjoys the powers that would otherwise vest in a bankruptcy trustee.  *See* 11 U.S.C. § 1107(a). The debtor-in-possession is thus vested with the duty to maximize value for the estate for purposes of distribution to all parties in interest.  *See e.g., Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568 (3d Cir. 2003) (en banc) ("A paramount duty of a trustee or debtor in possession in a bankruptcy case is to act on behalf of the bankruptcy estate.")

49.    While the Eleventh Circuit has not directly addressed the issue, courts within the Eleventh Circuit recognize that bankruptcy courts are empowered to confer standing upon creditors' committees to bring precisely the type of claims and causes of action the Equity Committee seeks to initiate here.  *See e.g., Feltman v. Prudential Bache Sec.*, 122 B.R. 466 (Bankr. S.D. Fla. 1990); *In re Florida Group, Inc.*, 123 B.R. 923, 924 (Bankr. M.D. Fla. 1991) (stating that "[t]his Court is convinced a creditors committee has a limited derivative right to institute a suit on a debtor's cause of action …").

50.    It is well-settled within other circuits that bankruptcy courts may allow a committee to pursue causes of action on behalf of the estate under certain circumstances.  *See Cybergenics*, 330 F.3d at 567-68; *Infinity Investors Ltd. ex rel. Yes! Entm't Corp. v. Kingsborough (In re Yes! Entm't Corp.)*, 316 B.R. 141, 145 (Bankr. D. Del. 2004).

51.    A committee's right to bring an action on behalf of the estate is not unqualified. Courts have generally required a committee satisfy a four-element test before it can pursue claims on behalf of a debtor's estate: (i) a demand must have been made upon the trustee or debtor-in-possession to bring such action; (ii) such demand must have been unjustifiably refused;

(iii) there must have been a prima facie demonstration of a colorable claim; and (iv) the party seeking to bring the action must have obtained leave of court.  *See, e.g., Louisiana World Exposition, Inc. v. Fed. Ins. Co.*, 858 F.2d 233, 247(5th Cir. 1988).

52.     Under these principles, courts have granted equity security holders' committees derivative standing and authority under similar circumstances as creditors' committees.  *See In re Washington Mut., Inc.*, 461 B.R. 200, 267 (Bankr. D.Del. 2011), *vacated in part*, No. 08-12229-MFW, 2012 WL 1563880 (Bankr. D.Del. 2012) (granting Equity Committee standing motion, but directing parties to mediate); *In re Betty Owens Sch., Inc.*, 1997 WL 188127, at *4, n.3 (S.D.N.Y. April 17, 1997) ("[E]quity holders' committees may obtain standing to pursue a cause of action for breach of fiduciary duty on behalf of a debtor where a colorable claim exists which the debtor has refused to assert.") (quoting *Nat'l Convenience Stores Inc. v. Shields (In re Shepps Food Stores, Inc.*), 160 B.R. 792, 799 (Bankr. S.D. Tex. 1993); *see also* 11 U.S.C. § 1109(b) ("an equity security holders' committee … may raise and appear and be heard on any issue in a case under this chapter.").

53.     Courts in the Eleventh Circuit have further held that breach of fiduciary duty claims against a debtor's officers and directors are quintessential causes of action that a creditors' committee should prosecute on behalf of the estate.  *See e.g., In re TOUSA, Inc.*, 437 B.R. 447, fn. 31 (Bankr. S.D. Fla. 2010) (granting a creditors' committee derivative standing to bring breach of fiduciary duty claims against a debtor's present and past officers and directors).

54.     As set forth below, the Equity Committee clearly satisfies the test for derivative standing and the Court should confer derivative standing on the Equity Committee to commence, prosecute, and if appropriate, settle the Estate Claims.

55.    The Equity Committee satisfied the first element by its letter dated May 1, 2018, demanding the Debtors bring the claims described above.  The Debtors refused.

56.    The second element is satisfied for several reasons.  First, the Debtors contend they cannot adequately assess the merits of the Estate Claims because the Equity Committee did not include a draft complaint with the Demand Letter.  The Debtors place form over substance here: the Demand Letter sets out, in explicit detail, the factual bases for the Estate Claims, as well as the legal grounds for each claim.  Undoubtedly, a draft complaint would include additional information, primarily procedural allegations pertaining to the statutory predicate for the claims and procedural rules.  However, the Equity Committee has conducted discovery and has included in the Demand Letter specific factual statements based upon that discovery that are more than sufficient to allow the Debtors to determine the validity of the Estate Claims.  Second, the Debtors allege that the Equity Committee lacks standing to bring the Estate Claims because it does not stand to recover anything in this case.  The Equity Committee disputes that conclusion. The Equity Committee is prepared to propose a plan which will result in recovery for equity holders and further, as set out above, believes the Estate Claims will result in recovery, when coupled with other estate assets, which will enhance distributions to equity holders if this bankruptcy case and the estate's assets are properly administered.  Here, the Debtors underestimate of the value of the estate is an attempt to take advantage of their own protracted mismanagement of the case.  Finally, the Equity Committee's proposed counsel for this litigation is committed to pursuing the Estate Claims on a contingency fee basis, as has been approved before by the court in *In re Centaur, LLC*, 10-10799-KJC, 2010 WL 4624910, at *4 (Bankr. D.Del. Nov. 5, 2010).  The Debtors' reasons for refusing the Equity Committee's demands are meritless and the refusal itself is unjustifiable.

57.     Third, as set forth in detail above, the Equity Committee has demonstrated *prima facie* colorable claims with respect to the Estate Claims, and particularly against the Insiders, for breach of their fiduciary duties, aiding and abetting other directors and officers in breaching their fiduciary duties, usurpation of corporation opportunity, and other claims arising from the Insiders' repeated breaches of their fiduciary duties.

58.     Finally, the Equity Committee seeks to satisfy the fourth element through this Motion.

<strong><u>CONCLUSION</u></strong>

WHEREFORE, for the reasons set forth herein, the Official Committee of Equity Security Holders of Premier Exhibitions, Inc. respectfully requests the Court enter an Order in the form attached hereto as **Exhibit A**, conferring upon the Equity Committee standing to commence, prosecute, and, if appropriate, settle the claims described herein, and grant such other and further relief as the Court deems just and proper.

Dated: May 11, 2018

Peter J. Gurfein, Esq.
**LANDAU GOTTFRIED & BERGER LLP**
1801 Century Park East, Suite 700
Los Angeles, California 90067
(310) 557-0050
(310) 557-0056 (Facsimile)
pgurfein@lgbfirm.com

-and-

**AKERMAN LLP**

By: */s/ Jacob A. Brown*
Jacob A. Brown
Florida Bar No. 170038
50 North Laura Street, Suite 3100
Jacksonville, Florida 32202
(904) 798-3700
(904) 798-3730 (Facsimile)
Jacob.brown@akerman.com

Attorneys for the Official Committee of Equity
Security Holders of Premier Exhibitions, Inc.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 11, 2018, the foregoing was transmitted to the Court
for uploading to the Case Management/Electronic Case Files ("CM/ECF") System, which will
send a notice of electronic filing to all creditors and parties in interest who have consented to
receiving electronic notifications in this case.  In accordance with the Court's Order Granting
Debtors' Motion for an Order Pursuant to 11 U.S.C. § 105(a) and Rule 2002 Establishing Notice
Procedures (Doc. 140), a copy of the foregoing was also furnished on May 11, 2018 by U.S.
mail, postage prepaid and properly addressed, to the Master Service List attached hereto.

*/s/ Jacob A. Brown*
Attorney

**MASTER SERVICE LIST**
*Case No. 3:16-bk-02230-PMG*

A-1 Storage and Crane
2482 197th Avenue
Manchester, IA 52057

ABC Imaging
14 East 38th Street
New York, NY 10017

A.N. Deringer, Inc.
PO Box 11349
Succursale Centre-Ville
Montreal, QC H3C 5H1

ATS, Inc.
1900 W. Anaheim Street
Long Beach, CA 90813

Broadway Video
30 Rockefeller Plaza
54th Floor
New York, NY 10112

CBS Outdoor/Outfront Media
185 US Highway 48
Fairfield, NJ 07004

Dentons Canada LLP
250 Howe Street, 20th Floor
Vancouver, BC V6C 3R8

Enterprise Rent-A-Car Canada
709 Miner Avenue
Scarborough, ON M1B 6B6

Expedia, Inc.
10190 Covington Cross Drive
Las Vegas, NV 89144

George Young Company
509 Heron Drive
Swedesboro, NJ 08085

Gowlings
550 Burrard Street
Suite 2300, Bental 5
Vancouver, BC V6C 2B5

Hoffen Global Ltd.
305 Crosstree Lane
Atlanta, GA 30328

Kirvin Doak Communications
5230 W. Patrick Lane
Las Vegas, NV 89118

MNP LLP
15303 - 31st Avenue
Suite 301
Surrey, BC V3Z 6X2

Morris Visitor Publications
PO Box 1584
Augusta, GA 30903

NASDAQ Stock Market, LLC
805 King Farm Blvd.
Rockville, MD 20850

National Geographic Society
1145 - 17th Avenue NW
Washington, DC 20036

NYC Dept. of Finance
PO Box 3646
New York, NY 10008

PacBridge Limited Partners
22/F Fung House
19-20 Connaught Road
Central Hong Kong

Ramparts, Inc.
d/b/a Luxor Hotel and Casino
3900 Las Vegas Blvd. South
Las Vegas, NV 89119

Seaventures, Ltd.
5603 Oxford Moor Blvd.
Windemere, FL 34786

Syzygy3, Inc.
231 West 29th Street
Suite 606
New York, NY 10001

TPL
3340 Peachtree Road
Suite 2140
Atlanta, GA 30326

Verifone, Inc.
300 S. Park Place Blvd.
Clearwater, FL 33759

WNBC - NBC Universal Media
30 Rockefeller Center
New York, NY 10112

Jonathan B. Ross, Esq.
Gowling WLG (Canada) LLP
550 Burrard Street, Suite 2300, Bentall 5
Vancouver, BC V6C 2B5

Pallet Rack Surplus, Inc.
1981 Old Covington Cross Road NE
Conyers, GA 30013

Screen Actors Guild
1900 Broadway
5th Floor
New York, NY 10023

Sophrintendenza Archeologica
di Napoli e Pompei
Piazza Museo 19
Naples, Italy 80135

Time Out New York
405 Park Avenue
New York, NY 10022

TSX Operating Co.
70 West 40th Street
9th Floor
New York, NY 10018

Samuel Weiser
565 Willow Raod
Winnetka, IL 60093

United States Attorney's Office
Middle District of Florida
300 N. Hogan Street, Suite 700
Jacksonville, FL 32202

Christine R. Etheridge, Esq.
Bankruptcy Administration
Wells Fargo Vendor Financial Services, LLC
PO Box 13708
Macon, GA 31208

TSX Operating Co., LLC
c/o James Sanna
70 W. 40th Street
New York, NY 10018
***Creditor Committee***

Dallian Hoffen Biotechnique Co., Ltd.
c/o Ezra B. Jones
305 Crosstree Lane
Atlanta, GA 30328
***Creditor Committee***

B.E. Capital Management Fund LP
Thomas Branziel
205 East 42nd Street , 14th Floor
New York, NY 10017
***Creditor Committee***

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**
**www.flmb.uscourts.gov**

In re:

                                     Case No.: 3:16-bk-02230-PMG

RMS TITANIC, INC., *et al.*,

                                     Chapter 11

         Debtors. [1]

_____/        (Jointly Administered)

**ORDER GRANTING EMERGENCY MOTION OF**
**THE OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS FOR**
**ENTRY OF AN ORDER GRANTING DERIVATIVE STANDING AND**
**AUTHORITY TO PROSECUTE AND SETTLE CERTAIN CLAIMS**
**ON BEHALF OF THE DEBTORS' ESTATES**

THIS CAUSE came before the Court upon the Emergency Motion (the "Motion") (Doc.

__)[2] of the Official Committee of Equity Security Holders of Premier Exhibitions, Inc., for entry

of an Order granting the Equity Committee Derivative Standing and Authority to Prosecute and

Settle Certain Claims on behalf of the Debtors' Estates.   Through the Motion, the Equity

Committee seeks derivative and exclusive standing to commence, prosecute, and if appropriate,

---

[1] The Debtors in the chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include: RMS Titanic, Inc. (3162); Premier Exhibitions, Inc. (4922); Premier Exhibitions Management, LLC (3101); Arts and Exhibitions International, LLC (3101); Premier Exhibitions International, LLC (5075); Premier Exhibitions NYC, Inc. (9246); Premier Merchandising, LLC (3867); and Dinosaurs Unearthed Corp. (7309) (collectively, the "Debtors"). The Debtors' service address is 3045 Kingston Court, Suite I, Peachtree Corners, Georgia 30071.

[2] Defined terms from the Motion are incorporated by reference herein.

**Exhibit A**

settle the Estate Claims.  The Court having considered the Motion, the evidence presented, and the arguments of counsel at the [DATE] hearing on the Motion, it is

**ORDERED**:

1.      The Motion is **GRANTED**.

2.      The Equity Committee is granted derivative and exclusive standing pursuant to 11 U.S.C. §§ 1103(c)(5) and 1109(b) to commence, prosecute, and if appropriate, settle, the Estate Claims.

3.      The Court retains jurisdiction to interpret and enforce the terms of this Order.

Attorney Jacob A. Brown is directed to serve a copy of this Order on interested parties who are non-CM/ECF users and file a proof of service within 3 days of entry of the Order.

2
**Exhibit A**

# LANDAU GOTTFRIED & BERGER LLP

ATTORNEYS AT LAW
1801 CENTURY PARK EAST, SUITE 700
LOS ANGELES, CALIFORNIA 90067
TELEPHONE (310) 557-0050
FACSIMILE (310) 557-0056
www.LGBFIRM.com

pgurfein@lgbfirm.com

May 1, 2018

<u>**VIA E-MAIL AND U.S. MAIL**</u>
Harris B. Winsberg, Esq.
Troutman Sanders LLP
600 Peachtree Street NE, Suite 3000
Atlanta, Georgia 30308-2216
Email: harris.winsberg@troutman.com

Re:    *In re: RMS Titanic, Inc., et al., Debtors; United States Bankruptcy Court, Middle District of Florida, Jacksonville Division; Case No.: 3:16-bk-02230-PMG (Jointly Administered)*

Dear Harris:

Landau Gottfried & Berger LLP is counsel to the Official Committee of Equity Security Holders (the "Equity Committee") appointed in the Chapter 11 cases of RMS Titanic, Inc. and its affiliated debtors and debtors-in-possession (collectively, the "Debtors"), jointly administered under case no. 3:16-bk-02230-PMG (the "Bankruptcy Cases"), filed June 14, 2016 (the "Petition Date"), pending in the United States Bankruptcy Court for the Middle District of Florida, Jacksonville Division.

The Equity Committee hereby demands that the Debtors immediately commence all available actions, including, without limitation, for recovery of claims arising under 11 U.S.C. §§ 547, 548, 550, and 551, as well as applicable state laws (collectively, the "**Insider Claims**"), to avoid, preserve and/or recover for the benefit of the Debtors' bankruptcy estates all of the claims, described below in part, against the Debtors' former and current directors and officers (the "D&O Claims") and for all direct and/or indirect transfers of interests in money or property of the Debtors, to or for the benefit of Insiders (as defined herein) (the "Transfer Claims"), or, alternatively, secure adequate tolling agreement to preserve such claims through at least June 30, 2019.

The D&O Claims are described in part as follows:

**Exhibit B**

Harris B. Winsberg, Esq.
May 1, 2018
Page 2


## I. Claims Relating to Armada Transaction:

### A.    Factual Background:

In early 2014, Premier's board was assessing strategic alternatives available to the Company. The board retained JPMorgan Securities to assist in this process.

In the early stages of the strategic alternative process, Premier engaged in discussions with numerous entities, including Armada (whose principal was George Wight), Dinoking (whose principal was Dao Ping Bao), and Base Entertainment. These companies all seemed eager to enter into a transaction with Premier and submitted indications of interest. Simultaneously, Premier was also exploring potential debt financing options so that the Company would have capital to carry out its business plans.

During this same time-frame, Sellers Capital, an entity owning the largest block of Premier stock and managed by Mr. Sellers and Mr. Weiser – two of Premier's directors – was actively attempting to sell its Premier shares (the "Sellers Capital Shares"). By April 2014, Mr. Sellers had already obtained two letters of intent for the purchase of the Sellers Capital Shares: (a) an offer from an entity called "KOP" at $1.08 per-share, and (b) an offer from "Salvor Fund," whose principal was George Wight (from Armada), at $1.30 per share.

As Mr. Sellers contemplated the two offers, Premier was contemplating accepting a loan offer from either Brevet Capital Advisors or Twin Haven Capital Partners. In an email exchange between Mr. Sellers and Mr. Weiser on May 8, 2014, Mr. Sellers expressly stated that he would vote against Premier accepting any loan offer at that point because he would be signing the KOP letter of intent that day. Mr. Sellers did not want the Company to have any additional debt at that time. Mr. Sellers signed the KOP letter of intent later that day. The loan offers from Brevet and Twin Haven were never accepted by Premier.

Thereafter, both Base Entertainment and Dinoking, who had previously only been negotiating deals with Premier, also made offers to Mr. Sellers for the purchase of the Sellers Capital Shares. Thus, almost every entity negotiating with Premier also made an offer to purchase the Sellers Capital Shares. Emails from Mr. Bao confirm that the notion of purchasing the Sellers Capital Shares was suggested to him by Mr. Weiser.

The companies then negotiating with both Premier and Sellers Capital were forced to balance competing interests. For example, in an email exchange on May 19, 2014, Mr. Sellers explained to Mr. Weiser that he simply wanted to cash out his shares and exit the Company. In response, Mr. Weiser stated his belief that Base Entertainment understood that dynamic, and was in fact "diverting" cash they would use to make an offer for Premier so that they could be in a position to purchase the Seller Capital shares if the KOP transaction was not successful.

**Exhibit B**

Harris B. Winsberg, Esq.
May 1, 2018
Page 3


On June 13, 2014, before any deal between KOP and Sellers Capital was finalized, Premier's board of directors abruptly terminated Mr. Weiser's employment as CEO and appointed Mike Little as the interim CEO. Mr. Weiser remained on the board.[1]

Once removed as CEO, Mr. Weiser increased his efforts to sell the Sellers Capital Shares (even at Premier's expense). On July 16, 2014, Mr. Weiser spoke with Dinoking representatives to convince Dinoking that it would not be able to negotiate a deal with Premier at that time. Instead, Mr. Weiser suggested that Mr. Bao first purchase the Sellers Capital Shares and then use the influence provided by the block of shares to negotiate a merger with Premier. It seems that Dinoking investigated that strategy at that time.

Mr. Sellers ultimately decided that he wanted to move forward with KOP. However, at a board meeting on July 23, 2014, Premier's board rejected Sellers Capital request to enter into a formal transaction with KOP.[2] At the very next meeting of Premier's board, Mr. Sellers moved to reconstitute Premier's board. On August 25, 2014, board members William Adams, Ronald Bernard, and Bruce Steinberg, who had opposed Mr. Sellers' actions, were replaced by Jack Jacobs and Rick Kraniak. The newly reconstituted board acted quickly to appoint Mr. Weiser as the Executive Chairman of the board with a $30,000 per month salary.

In September 2014, Mr. Weiser continued to give the board updates about Premier's strategic alternatives which still included possible transactions with Dinoking and Armada. At that time, Premier was in dire financial shape and accepted a loan from Pentwater Capital Management. The loan was a bridge loan and was contemplated as only a short term solution to Premier's financing problems.

On October 13, 2014, while the board contemplated the transactions with Dinoking or Armada, Mr. Sellers told the Premier board that he believed the company "needed to be prepared to remain independent." This conversation is telling because two days later, Sellers Capital entered into a Stock Purchase Agreement with Armada. The Sellers Capital-Armada transaction required the Premier board to approve three new board members chosen by Armada. On November 20, 2014, the newly reconstituted Premier board approved of the proposed Armada directors.

---

[1]     At his deposition, Mike Little explained that the board fired Mr. Weiser based on the Company's poor execution in carrying out the strategic plans and Mr. Weiser's lack of effort at aiding the Company through difficult times.

[2]     Sellers Capital believed Premier's approval was required under the Florida Control Share Acquisition Statute.

**Exhibit B**

Harris B. Winsberg, Esq.
May 1, 2018
Page 4

The Armada transaction failed to close.[3] Mr. Sellers then directed that Premier return its attention to Dinoking. Negotiations between the companies ultimately led to the signing of a merger agreement on April 2, 2015. The Dinoking deal closed in November 2015.

## 1. Breach of the Duty of Loyalty.

The Estate has claims for the breach of the duty of loyalty against Mr. Sellers, Mr. Weiser, and the rest of the reconstituted board. Mr. Sellers and Mr. Weiser's conduct in pursuing both a sale of Premier and a sale of the Sellers Capital Shares simultaneously constitutes a breach of the duty of loyalty. Both directors held fiduciary duties to both companies even though the companies had conflicting interests.

This conflict of interest manifested in numerous ways. First, Mr. Sellers was so keen on selling the Sellers Capital's shares that he rejected potentially beneficial loans from Brevet and/or Twin Haven despite Premier's need for debt financing. That decision, which was made to aid Sellers Capital and make the shares seem more enticing, ultimately forced Premier to scramble for alternative financing and accept the onerous Pentwater loan months later. The Brevet and Twin Haven loan terms were more advantageous to Premier because, among other things, they had a 36-month term compared to the six-month term for Pentwater.

Second, Mr. Sellers' actions in putting his personal interests ahead of Premier's resulted in the forced resignation of three board members who did not approve the KOP transaction. After appointing his hand-picked new board members, Mr. Sellers quickly got Mr. Weiser (who handled all negotiations with Armada) reinstituted in a leadership position within Premier (at a large salary). A month later, Mr. Sellers informed the reconstituted board that Premier needed to be ready to remain an independent company. But, just two days later, Sellers Capital entered into the Armada deal. The newly reconstituted board did not object to Mr. Sellers' conduct, and in fact, tacitly approved by agreeing to appoint the Armada directors.

Third, Mr. Weiser's and Mr. Sellers' conflicts caused them to interfere with Premier's potential transactions. Mr. Weiser actively influenced Dinoking to cease negotiations with Premier so that Dinoking could acquire the Sellers Capital Shares. At the time of these communications, Mr. Weiser and Mr. Sellers were still Premier board members.

Fourth, the conflict of interest reached a pinnacle when Sellers Capital entered into a contract with Armada for which Premier gained no benefit. Instead of focusing on the potential transactions that would have benefitted all Premier shareholders, Mr. Sellers and Mr. Weiser pursued a transaction that would only benefit Sellers Capital. Furthermore, Mr. Sellers was able to use his control over his hand-picked Premier board members to make sure the transaction got

---

[3]      Sellers Capital successfully sued Armada and George Wight in the District Court for the Northern District of Illinois for breach of contract based on the Armada's failure to close the transaction. In November 2017, Sellers Capital obtained a $6 million judgment in that case.

**Exhibit B**

Harris B. Winsberg, Esq.
May 1, 2018
Page 5

approved.  Accordingly, Mr. Sellers, and the rest of the board, acted in bad faith and breached their duty of loyalty, in obtaining and approving the Armada transaction.

"Once disloyalty has been established," a fiduciary cannot be allowed to "profit personally from his conduct," and the beneficiary should "not be harmed by such conduct." *Thorpe by Castleman v. CERBCO, Inc.*, 676 A.2d 436, 437 (Del. 1996) (finding breach of the duty of loyalty where a board member who was also a controlling shareholder sold his personal shares when the shareholder also negotiated the deal despite being conflicted due to his duties owing to the company).  Thus, at a minimum, Mr. Sellers and Mr. Weiser are liable for any benefit they received from the Armada transaction, *i.e.* the $6 million judgment, as well as any expenses incurred by Premier throughout the Armada transactions.  The other board members are also, at a minimum, liable for any fees incurred in assisting Sellers Capital's with the Armada deal.

2.    **Claims Premised on Delay of the Dinoking Transaction**

Dinoking and Premier had been in discussions regarding a possible deal since early in 2014.  However, the potential transactions involving Sellers Capital continuously interfered with the Dinoking negotiations.  In a presentation to potential investors, Dinoking explained that "[Premier] and [Dinoking] began discussing a potential merger in January 2014 but the merger did not move ahead as [Mr.] Sellers was focused on selling his stake and did not want to be diluted at the time.  Furthermore, during the pendency of the Sellers Capital-Armada transaction, Mr. Weiser complained to George Wight that Armada's failure to close the transaction cost Premier "valuable weeks" in negotiating other deals.  Indeed, Mr. Little testified that Premier would have "[a]bsolutely" been better off as a Company had it entered into a strategic transaction earlier than it did.

Premier's stock price drastically dropped between January 2014 and November 2015 when the Dinoking deal ultimately closed.   If the Dinoking transaction (or any other strategic transaction) was more actively pursued earlier, while the Premier shares were more valuable, Premier would have obtained a more advantageous deal.  Thus, the Estate has claims for the breach of the duty of loyalty against Mr. Weiser, Mr. Sellers and the board based on this lack of focus on Premier's interests. *In re Chira*, 353 B.R. 693, 729 (Bankr. S.D. Fla. 2006), *aff'd*, 378 B.R. 698 (S.D. Fla. 2007), *aff'd*, 567 F.3d 1307 (11th Cir. 2009) (finding a breach of fiduciary duty in delaying a sale of the company that was advantageous).

Instead of focusing on a potential deal for Premier, Mr. Weiser and Mr. Sellers continuously pursued transactions that would unload Sellers Capital's Shares. Had Mr. Weiser and Mr. Sellers pushed for any of Premier's potential transactions instead of the self-interested deals, the Dinoking deal (or another transaction) could have closed earlier.  Similarly, the pre-closing board was aware of the potential transactions available to the Company, and the need for an infusion of capital, but nonetheless allowed the Armada deal to move forward even though it would negatively affect the other negotiations.  Indeed, in the Proxy Statement, Premier

**Exhibit B**

Harris B. Winsberg, Esq.
May 1, 2018
Page 6

disclosed that with the announcement of the Armada deal, "discussions with the PacBridge/Dinoking group, along with other potential strategic partners with whom the Company was in discussion, were paused pending the outcome of the Sellers/Armada transaction [for the purchase of the Sellers Capital Shares]." *See* Proxy Statement at 43.

### 3. Usurpation of Corporate Opportunity

The Estate has claims against Mr. Sellers and Mr. Weiser for usurpation of a corporate opportunity. Armada was negotiating with Premier for a stock-for-stock transaction. In the end, Armada only signed a cash deal with Sellers Capital. A claim that a director or officer improperly usurped a corporate opportunity belonging to the corporation is a derivative claim. *In re Digex Inc. Shareholders Litig.*, 789 A.2d 1176, 1189 (Del. Ch. 2000); *see also Dinuro Investments, LLC v. Camacho*, 141 So. 3d 731, 739 (Fla. 3d DCA 2014) (stating that a direct claim is not available when there is no "special injury to the shareholder or member that is separate and distinct from those sustained by the other shareholders or members."). Premier's damages for the usurpation claim could be, at a minimum, the $6 million judgment that Sellers Capital obtained against Armada and George Wight, subject to adjustment by future expert witness review.

### 4. Aiding and Abetting Breach of Fiduciary Duty

To the extent the Estate can state claims against Mr. Sellers or Mr. Weiser for their misconduct, Premier can bring claims against Sellers Capital for aiding and abetting breach of fiduciary duty based on the same actions. *Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 643 (Del. Ch. 2013) (because directors who breached fiduciary duties were also directors of other companies involved in the breach, the knowledge that the actions were in furtherance of a breach could be imputed to other companies and they could be liable for aiding and abetting). The Estate should thus seek recovery of, at a minimum, $6 million.

## II. Claims Relating to the Merger and Restatement.

After the Armada deal failed to close in November 2014, the Premier board shifted its focus to the Dinoking transaction. In February 2015, Premier recognized that if a deal was not finalized, the company would likely end up in bankruptcy. By March 2015, Premier's financial status was so gloomy (partially due to the impending term of the Pentwater loan), that Mr. Weiser recommended that the board accept "the first deal ready to be signed." Because the Dinoking offer was the first offer available, Premier accepted the terms before even hearing an offer from a group led by Andrew Shapiro.

On April 2, 2015 Dinoking and Premier entered into the Merger agreement. While preparing the proxy statement for the merger, Premier noted that it required a "resolution of issues in the Dinoking financial statements." Email correspondence shows that Premier was concerned about a revenue recognition issue in Dinoking's audited financial statements. Premier

**Exhibit B**

Harris B. Winsberg, Esq.
May 1, 2018
Page 7

understood that the issue would likely cause the financial statements to be restated post-merger. Mike Little testified that Mr. Bao was aware of the accounting issues both before and after the Dinoking merger closed. The Dinoking transaction closed on November 2, 2015, without the faulty financial information having been dealt with. Thereafter the board was once again reconstituted.

On January 19, 2016, Premier's newly appointed audit committee raised the accounting issue to the rest of the board and explained that there was "a likelihood of a necessary restatement of Dinoking's premerger valuation." However, Mr. Little testified that, at the time, Mr. Bao persisted that the accounting was done correctly and that Mr. Bao "push[ed] back against the need for a restatement.

On April 11, 2016, nearly six months after the merger closed, Premier issued a disclosure statement explaining that Premier was restating Dinoking's fiscal information from 2013 and 2014. Specifically, for fiscal year 2013, Dinoking's revenues were really $5.4 million[4] and not the $6.4 million mentioned in the Proxy Statement; the cost of sales were reduced from $2.5 million to $1.6 million; and the 2013 operating income was really $0.7 million and not the $1.0 million previously reported. For fiscal year 2014, Dinoking's revenues were not $11.1 million, as reported, but were really $6.0 million; the cost of sales was reduced from $1.6 million to $1.0 million; and the operating income was not $6.5 million, but rather only $2.1 million.

### III. Preliminary Analysis of Claims

#### 1.    Claims Against Pre-Merger Board

The pre-merger board, consisting of Mr. Weiser, Mr. Sellers, Mr. Banker and Mr. Kraniak breached their fiduciary duties by entering into the Dinoking merger on a rushed basis. This claim stems from the delay claim discussed above. The board rushed to the Dinoking merger based on Premier's dwindling financial situation and the need for immediate cash. The Pentwater notes were coming due and Premier needed an infusion of cash. Had Mr. Sellers and Mr. Weiser not been so focused on selling the Sellers Capital Shares, Premier could have found a more stable debt financing option and could have avoided the immediate need to enter into the Dinoking deal. Furthermore, had the board turned its attention to Dinoking earlier, instead of aiding Mr. Sellers with the Armada transaction, Premier may have been in a better position to fully analyze the deal and not just sign whatever deal first became available. If the Dinoking deal was given more vetting, Premier may have had time to fully assess the accounting errors in Dinoking's financials prior to closing the deal.

---

[4] All of Dinoking's financial information is in Canadian dollars.

**Exhibit B**

Harris B. Winsberg, Esq.
May 1, 2018
Page 8

### 2.    Claims Against Mr. Bao

Mr. Bao breached his fiduciary duty to Premier by failing to disclose Dinoking's improper accounting after the merger. Mr. Bao knew of the accounting issue prior to the merger. As soon as the merger closed, Mr. Bao became a Premier board member and CEO who undoubtedly owed fiduciary duties to Premier. Failure to disclose the financial problems and misstatements constitutes a breach of fiduciary duty. *Rehab. Advisors, Inc. v. Floyd*, 601 So. 2d 1286, 1288 (Fla. 5th DCA 1992) (breach of fiduciary duty for director to keep vital information from the company); *Hoover Indus., Inc. v. Chase*, 14 Del. J. Corp. L. 332, 338 (Ch. 1988) ("A director does breach his duty of loyalty if he knows that the company has been defrauded and does not report what he knows to the board or to an appropriate committee of the board, at the very least when he is involved in the fraud and keeps silent in order to escape detection.").

Mr. Bao's breach can also be styled as a *Caremark* claim. *See In re Caremark Int'l Derivative Litig.*, 698 A.2d 959, 971 (Del. Ch. 1996). Under *Caremark*, a plaintiff must show "either (1) that the directors knew or (2) should have known that violations of law were occurring and, in either event, (3) that the directors took no steps in a good faith effort to prevent or remedy that situation, and (4) that such failure proximately resulted in the losses complained of..." Id. Mr. Bao's failure to correct the financial misinformation as soon as he ascended to Premier's board was a knowing failure to act in violation of his duties.

Not only did Mr. Bao fail to disclose the financial misstatements to the rest of the board,[5] he actively fought against a restatement once the issue was raised. Due to his conduct, the accounting issues were not fixed immediately upon the closing of the merger; instead, Premier shareholders were left in the dark about the true nature of the Company's financial well-being for nearly six-months, well after they voted in favor of the merger.

Following are persons that would be among those considered as Insiders:

**PRE-MERGER BOARD:**

1. **Bruce Steinberg (resigned August 25, 2014)**
   58 Frognal
   London, UK NW3 6XG

2. **Ronald C. Bernard (resigned August 25, 2014)**
   33 Fieldstone Lane
   Oyster Bay, NY 11771

---

[5] The financial misinformation was only discovered by the audit committee.

**Exhibit B**

Harris B. Winsberg, Esq.
May 1, 2018
Page 9

3. **William M. Adams (resigned August 25, 2014)**
   Alpine Investors
   Two Embarcadero Center, Suite 2320
   San Francisco, CA 94111

4. **Douglas Banker**
   c/o Madhouse Management
   PO Box 15108
   Ann Arbor, MI 48113

5. **Richard Kraniak**
   101 West Long Lake Road
   Bloomfield Hills, MI 48304

6. **Jack H. Jacobs (resigned March 16, 2015)**
   Hayer Leader Development Group as West Point
   674 Thayer Road
   West Point, NY 10996

7. **Mark A. Sellers**
   707 Skokie Blvd.
   Northbrook, IL 60062

8. **Samuel Weiser  (resigned April 2, 2015)**
   Foxdale Management LLC
   707 Skokie Blvd.
   Northbrook, IL 60062

**POST MERGER BOARD**

1. **Daoping Bao**
   Premier Exhibitions, Inc.
   3045 Kingston Ct., Suite 1
   Peachtree Corners, GA 30071

2. **Michael Evans (resigned June 13, 2016)**
   1330-1075 West Georgia St.
   Vancouver, BC V6E 3C9

3. **Sid Dutchak**
   356 Sienna Park Drive
   Calgary, AB T3H 326

**Exhibit B**

Harris B. Winsberg, Esq.
May 1, 2018
Page 10


    **4.  Mingcheng Tao**
       595 Caoxi (ix) Road
       Shanghai, China 20030

    **5.  Mark Sellers (resigned Nov. 5, 2015)**
       707 Skokie Blvd.
       Northbrook, IL 60062

    **6.  Richard Kraniak**
       101 West Long Lake Road
       Bloomfield Hills, MI 48304

    **7.  Douglas Banker**
       c/o Madhouse Management
       PO Box 15108
       Ann Arbor, MI 48113

## BOARD AT TIME OF BANKRUPTCY PETITION[6]

    **1.  Daoping Bao**
       Premier Exhibitions, Inc.
       3045 Kingston Ct., Suite 1
       Peachtree Corners, GA 30071

    **2.  Douglas Banker**
       c/o Madhouse Management
       PO Box 15108
       Ann Arbor, MI 48113

    **3.  Sid Dutchak**
       356 Sienna Park Drive
       Calgary, AB T3H 326

    **4.  Mingcheng Tao**
       595 Caoxi (ix) Road
       Shanghai, China 20030

    **5.  Richard Kraniak**
       101 West Long Lake Road
       Bloomfield Hills, MI 48304

---

[6] Jerome Henshall joined the Board post-Petition Date, on or about June 17, 2016. The Equity Committee does not include him as an insider for purposes of this correspondence.

**Exhibit B**

Harris B. Winsberg, Esq.
May 1, 2018
Page 11

(collectively, the " **Insiders**").

In addition, because, among other things and without limitation, upon information and belief, the Insiders at all relevant times dominated and absolutely controlled the Debtors and breached their respective fiduciary duties of care and loyalty to the Debtors as officers and directors of the Debtors, the Equity Committee hereby demands that the Debtors commence actions against the Insiders for and/or based on, without limitation:

- Equitable subordination of the Insiders' claims against the Debtors;

- Recharacterization of the Insiders' purported loans to the Debtors as equity capital contributions;

- Recovery for the breaches of the duty of care and the duty of loyalty by, without limitation, all applicable Insiders;

- Recovery for the aiding and abetting of breaches of the duties of care and of loyalty; and

- Recovery for injuries caused by the Insiders' inappropriate exercise of control over the Debtors and transactions with the Debtors' purported lenders that were not and have not been arm's length transactions.

The Equity Committee reserves all rights to assert, and/or bring to the attention of the Debtors, additional claims beyond those described above and to demand that the Debtors prosecute same. Given the evidence uncovered throughout the course of the Debtors' bankruptcy cases, the Equity Committee believes the D&O Claims, Transfer Claims and other claims outlined above are actionable and that it is in the best interest of the Debtors' estates to immediately pursue such claims against the Insiders and otherwise, or, alternatively, obtain adequate tolling agreements from all Insiders to preserve all such claims for the benefit of the Debtors' bankruptcy estates.

Where it appears the Debtors have failed, refused, and/or are unable to pursue the Insider Avoidance Claims and other claims referenced above against the Insiders, the Bankruptcy Code contemplates derivative standing for the Equity Committee to do so. *See* 11 U.S.C. § 1103(c)(5); 11 U.S.C. § 1109(b); 11 U.S.C. § 105(a); *see also The Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 566, 568 (3d Cir. 2003) (holding that it is a "straightforward application of the bankruptcy court's equitable powers" to confer derivative standing upon a creditors' committee).

Given that the Debtors appear to be completely controlled and dominated by Insiders, as well as the lack of any disinterested managers, officers or directors of the Debtors, the Equity

**Exhibit B**

Harris B. Winsberg, Esq.
May 1, 2018
Page 12


Committee has concluded that the Debtors are unable to commence actions against the Insiders for recovery of potentially valuable estate assets.

As stated by the Fifth Circuit Court of Appeals, "[w]here the debtor-in-possession is unable or unwilling to fulfill its obligations . . . the Committee may assert . . . cause[s] of action on behalf and in the name of [the debtor] if authorized to do so by the bankruptcy court." *Louisiana World Exposition v. Federal Insurance Co.*, 858 F.2d 233, 252 (5th Cir. 1988).

Please advise **by noon E.S.T. on May 9, 2018**, whether the Debtors will promptly commence actions for recovery against the Insiders based on the D&O Claims, Transfer Claims, and other claims referenced above or provide proof of adequate tolling agreements with all Insiders to preserve all such claims for a period no less than through June 30, 2019. **Time is of the essence as arguably certain limitations period could expire in early June 2018.** In the alternative, the Equity Committee respectfully requests that the Debtors consent to derivative standing in favor of the Equity Committee, so that the Equity Committee may proceed with prosecution of these claims.

In absence of the Debtors' written commitment immediately to initiate the described actions, the Equity Committee will promptly seek authorization from the Bankruptcy Court to pursue avoidance of liens and recoveries against the Insiders on behalf of the bankruptcy estates. The Equity Committee also intends to immediately start sharing information previously marked as confidential with prospective counsel to bring these claims on the Equity Committee's behalf.


Very truly yours,

*Peter J. Gurfein* E.M.

Peter J. Gurfein



Cc:   Jeffrey Chubak
      Jacob Brown
      Brian Miller
      Andrew Shapiro


**Exhibit B**