**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| In re | ) | |
| RMS TITANIC, INC., et al.,[1] | ) | Case No. 3:16-bk-2230-PMG |
| Debtors. | ) | Chapter 11 |
| _____ | ) | |

**CREDITOR COMMITTEE'S OBJECTION TO EQUITY**
**COMMITTEE'S EMERGENCY DERIVATIVE STANDING MOTION AND**
**EMERGENCY APPLICATION TO EMPLOY SPECIAL COUNSEL**

The Official Committee of Unsecured Creditors (the "Creditors' Committee")
hereby objects to the (a) emergency motion of the Official Committee of Equity Security
Holders (the "Equity Committee") for derivative standing to prosecute litigation on
behalf of the Debtors' estates (the "Motion"), and (b) emergency application to employ
Robert Charbonneau and Agentis PLLC as special counsel to the Equity Committee,
pursuant to Bankruptcy Code section 327(e)[2] ("Employment Application"), and
respectfully states:

---

[1] The Debtors in these cases, along with the last four digits of their respective
federal tax identification numbers, are: RMS Titanic, Inc. (3162); Premier Exhibitions,
Inc. (4922); Premier Exhibitions Management, LLC (3101); Arts and Exhibitions
International, LLC (3101); Premier Exhibitions International, LLC (5075); Premier
Exhibitions NYC, Inc. (9246); Premier Merchandising, LLC (3867); and Dinosaurs
Unearthed Corp. (7309).  The Debtors' mailing address is 3045 Kingston Court, Suite I,
Peachtree Corners, Georgia 30071.

[2] The Employment Application states that it is brought under section 327(a).
Proposed special counsel has agreed that any retention would appropriately be under
section 327(e).

## Introduction

1.      The marketing process for the sale of the Debtors' assets pursuant to the plan support agreement has been underway for over a year.[3]  To date that process has failed to yield a complete sale transaction that would pay creditors in full, even though this Court has long since entered judgment in the Debtors' favor in the adversary proceeding against the Republic of France.  The Equity Committee now seeks authority to prosecute a long-shot litigation that it wants creditors to fund, after wasting well over $1 million in estate funds taking discovery and investigating potential claims.  Until such time as creditors are paid in full, or sufficient funds are secured by the Debtors' estates to pay creditors in full, the Equity Committee cannot be allowed to waste estate resources on speculative litigation that has little chance of yielding significant recoveries.

2.      Following receipt of the demand letter annexed to the Motion, the Creditors' Committee advised the Equity Committee that it had serious doubts concerning the merits of the claims described therein, and that whether the Creditors' Committee would oppose a derivative standing motion hinged largely on the Equity Committee's ability to prosecute the claims on a pure contingency basis, so the litigation is not funded at creditors' expense.  The Equity Committee advised the Creditors' Committee that it was in the process of securing contingency counsel, and was still exploring securing litigation financing to fund associated costs.

3.      The Equity Committee has now made clear how it intends to fund costs in its Employment Application.  The proposed order annexed thereto provides:

---

[3] The motion to approve a plan support agreement that contemplated the sale of substantially all of the Debtors' assets was filed May 18, 2017 [ECF No. 587].

2

> If costs are incurred and advanced by Agentis, Agentis may seek reimbursement of those costs from the estate, or any source of payment there may be.  If the costs remain unpaid, Agentis shall not be required to further advance costs.  Agentis may also apply for compensation and reimbursement of costs, pursuant to 11 U.S.C. §§ 330 and 331, at its ordinary rates, as they may be adjusted from time to time, for services rendered and costs incurred on behalf of the Equity Committee.[4]

4.      That is unacceptable.  The cost of a single damages expert could easily run well into the seven figures in complex litigation, putting aside additional costs associated with litigation such as transcription and travel costs.  If derivative standing is granted and the Employment Application is approved, creditors will be required to pay for those expenses even if they significantly erode creditor recoveries and the litigation proves a bust.

5.      The Equity Committee's response is simply that its proposed contingency counsel should not be expected to advance costs.  It is not uncommon, however, for contingency counsel to do exactly that, particularly where, as here, serious reservations regarding the subject claims have been expressed by estate fiduciaries.[5]  *See also In re STN Enters.*, 779 F.2d 901, 906 (2d Cir. 1985) (key inquiry is whether the "fee arrangement [would] impose a net burden on the bankruptcy estate"); *Point Serv. Corp. v.*

---

[4]  The reference to applying for compensation at ordinary rates, as adjusted from time to time, should be stricken.  The Employment Application states employment is to be on a contingency fee basis, pursuant to Bankruptcy Code section 328(a).

[5]  In *In re Magnesium Corp. of Am.*, No. 01-14312 (Bankr. S.D.N.Y.), for example, contingency counsel was required by the U.S. Trustee to advance costs without interest as a condition to its employment, where the creditors' committee concluded that there did not appear to be a substantial likelihood that viable claims existed, and former Bankruptcy Judge Robert E. Gerber stated in open court that the subject litigation was not "by any means a slam dunk."  *See* Declaration of Leo R. Beus ¶¶11-15, annexed hereto as Exhibit 1 (citing ECF No. 386 pp.63-66).  The Creditors' Committee has suggested that proposed contingency counsel charge interest on costs advanced, or advance costs without interest but raise its contingency fee.  Those proposals were rejected.

*Pritchard Min. Co.*, No. 09-145, 2010 WL 1410673, at *5 (S.D. W. Va. Mar. 31, 2010) (affirming decision granting derivative standing where plaintiff would "proceed at its own expense").

6.      Significantly, it will be virtually impossible to challenge the reasonableness of costs incurred by proposed contingency counsel after-the-fact, when counsel files its application(s) for compensation, because approval of its employment is being sought under section 328(a).  Employment terms approved under section 328(a) can only be revisited if they "prove to have been improvident in light of developments not capable of having been anticipated at the time of the fixing of such terms." The Creditors' Committee presently believes approval of the proposed retention will prove improvident given the inevitable costs associated with the litigation and the likelihood of success on the subject claims.  Further, Bankruptcy Code section 330(a)(1), which provides for "reimbursement for actual, necessary expenses," by its terms is "subject to" section 328.  *See also In re Smart World Techs., LLC*, 552 F.3d 228, 233 (2d Cir. 2009) ("Where the court pre-approves the terms and conditions of the retention under section 328(a), its power to amend those terms is severely constrained").

7.      The Equity Committee's motivation for seeking derivative standing is understandable, given the current posture of these cases. However, it has been in possession of discovery on which the subject claims are premised for many months, and had ample time to make appropriate arrangements for pursuing the claims for which it seeks derivative standing.

8.      It also makes no sense to force creditors to fund litigation controlled by the Equity Committee unless and until creditors are paid in full.  *Official Comm. of Equity Sec. Holders v. Adelphia Comm. Corp. (In re Adelphia Comm. Corp.)*, 371 B.R.

660, 673 (S.D.N.Y. 2007), *aff'd*, 544 F.3d 430 (2d Cir. 2008) (affirming bankruptcy court decision withdrawing derivative standing previously conferred on equity committee where equity was "out of the money," and so the equity committee "would have an inherent conflict of interest [with creditors] in controlling any litigation [because] given the order of priority for recoveries, the Equity Committee would 'always hav[e] the incentive to do nothing but swing for the fences'"). Particularly given the extraordinary amount spent by the Equity Committee to date on attorneys' fees in these cases.[6]

### Response to Stated Basis for Emergency Relief

9.      The Equity Committee's moving papers state emergency relief is needed because the statutes of limitations for the subject claims "may expire as early as June 14, 2018," and "the delay in bringing the Motion was engendered by the efforts of the Equity Committee to include prosecution, and potential resolution of these claims within the context of a Chapter 11 plan." That explanation does not hold water. The Equity Committee should have known it would not be able to confirm a plan that addressed these claims at least two months before June 14, 2018 (*i.e.*, mid-April), and should have planned appropriately. There is also no reason why the subject motions could not be heard at the June 7, 2018 hearing without prejudicing the Equity Committee.

---

[6]      To date, the Equity Committee's attorneys' fees alone have exceeded $1.5 million [ECF Nos. 495, 507, 658-59, 802, 806, 948-49]. That amount is astonishing, given the posture of these cases and that the Debtors commenced these cases with approximately $3 million in secured debt and $12 million in unsecured debt [ECF No. 8, ¶36]. The Creditors' Committee's attorneys' fees run less than one-quarter that [ECF Nos. 503-04, 576, 580, 762-63, 899, 909].

### Argument

### I.   Legal Standard on Motion for Derivative Standing

10.   A person seeking derivative standing bears the burden of proof on the following elements: (a) the claim for which derivative standing is sought must be colorable; (b) demand must have been made on the debtor to bring the claim; and (c) the debtor must have unjustifiably refused to bring the claim.  *See*, *e.g.*, *PW Enters., Inc. v. N.D. Racing Comm'n (In re Racing Servs., Inc.)*, 540 F.3d 892, 898 (8th Cir. 2008).

11.   A claim is considered colorable if it would survive a motion to dismiss. *Id*.

12.   To satisfy its burden on the unjustifiable refusal element, the person seeking derivative standing "must provide the bankruptcy court with specific reasons why it believes the trustee's refusal is unjustified," "supported by competent evidence, for example, in the form of affidavits or through oral testimony at an evidentiary hearing."
*Id*. at 900; *id*. at n.8.

13.   The court must then "perform a cost-benefit analysis" to determine if refusal was justified.  *Id*. (citing *STN*, 779 F.2d at 905).

14.   In performing the analysis, "a court may consider the probability of success in litigation, potential financial recovery, expenses which could be incurred, and the delay in case administration."  *In re Foster*, 516 B.R. 537, 543 (B.A.P. 8th Cir. 2014) (citing *Racing Servs.*, 540 F.3d at 901).

II.    **Derivative Standing Should be Denied as to the Insider Claims,
Transfer Claims and Miscellaneous Claims**

15.    By the demand letter, the Equity Committee demanded that the Debtors pursue claims described in the Motion as "D&O Claims."  (Motion ¶¶14-45.)  By the Motion, the Equity Committee seeks derivative standing to prosecute the D&O Claims and three more categories of claims: "Insider Claims," "Transfer Claims," and "Miscellaneous Claims."   These claims (together with the D&O Claims) are collectively defined as "Estate Claims" and the proposed order annexed to the Motion would grant the Equity Committee derivative standing to prosecute and settle the same.  (Motion ¶47; *id.* Ex. A, ¶2.)  None of the Insider, Transfer, or Miscellaneous Claims are described in the demand letter.  Accordingly, derivative standing should be denied as to such claims.  Nor does the Motion allege facts on which said claims are premised.  The sole question properly before the Court on the Motion is whether derivative standing should be granted with respect to the D&O Claims.

III.    **Derivative Standing Should be Denied as to D&O Claims**

A.    **The Debtors Did Not Unjustifiably Refuse to Bring the
D&O Claims**

16.    The Debtors' response to the Equity Committee's demand letter gave two reasons for declining to pursue the subject claims.  First, the demand letter was not accompanied by a draft complaint, making it difficult to evaluate if the claims are colorable (*i.e.*, satisfy plausibility requirements under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)). Second, derivative standing is not properly vested in the Equity Committee based on the current posture of these cases, citing *Adelphia*, 371 B.R. at 673 (quoted above).

17.    The Motion does not explain why the Debtors' position is unjustified.  The Equity Committee states a draft complaint is unnecessary because its demand letter and the Motion are sufficiently detailed.  (Motion ¶56.)  That argument fails.  *See*, *e.g.*, *In re Bank United Fin. Corp.*, 442 B.R. 49, 53 (Bankr. S.D. Fla. 2010) ("without the benefit of seeing an actual complaint, the Court was unwilling (and … unable) to determine whether any or all claims asserted by the Committee were" colorable).

18.    The Equity Committee also states derivative standing is properly conferred upon it (as opposed to the Creditors' Committee) because it "is prepared to propose a plan which will result in recovery for equity holders," and "believes the Estate Claims will result in recovery, when coupled with other estate assets, which will enhance distributions to equity." (Motion ¶56.)  No detail has been provided as to how creditors would be paid in full under the Equity Committee's plan other than through this litigation and the sale of the Debtors' assets. "Naked assertions" such as this are insufficient to satisfy the Equity Committee's burden on the unjustifiable refusal element.  *Racing Servs.*, 540 F.3d at 901 (citing *STN Enters.*, 779 F.2d at 905).

### B.    Derivative Standing Should be Denied with Respect to the Armada Claims

19.    Derivative standing should be denied with respect to the so-called Armada claims, because the subject claims are either not colorable, or the requisite cost-benefit analysis weighs against granting derivative standing, as described below.  Significantly, these are not even the type of claims for which derivative standing is generally considered appropriate, such as where a debtor is unwilling to sue current management, as the sole litigation targets presently associated with the Debtors are their current independent directors (Richard Kraniak and Douglas Banker), and the remaining

litigation targets have long since dissociated from the Debtors.  That the Debtors remain unwilling to pursue these claims speaks volumes.

### 1.      Breach of Duty of Loyalty Claims

20.      The Equity Committee seeks derivative standing to prosecute breach of duty of loyalty claims against former directors Mark Sellers and Samuel Weiser, and the balance of the board of directors prior to the merger with DinoKing, and as reconstituted in August 2014, for pursuing or approving a sale of a 31.5% equity stake in the Debtors owned by Sellers Capital, LLC ("Sellers Capital Shares"), an entity managed by Mark Sellers and Samuel Weiser, while potential merger deals with Armada and DinoKing were under discussion.

21.      According to the Equity Committee, this harmed the Debtors because they rejected "potentially beneficial loans" (the Brevet and Twin Haven loans), so the Sellers Capital Shares could be sold while the Debtors had a clean balance sheet, which resulted in the Debtors having to incur "onerous" alternative financing several months later (the Pentwater loan).

22.      The damages suffered by the Debtors—a necessary element of a breach of fiduciary duty claim—are questionable, at best.  The sole reason offered why the Pentwater loan was onerous but other loans were not, is because the former was a bridge loan with a six-month term, whereas the others had a three-year term.  (Motion ¶28.)  Six months ultimately proved sufficient to obtain replacement financing in the form of a convertible loan extended in connection with the Debtors' subsequent merger with DinoKing.  The Equity Committee offers no explanation why the Debtors would be any

better off had they incurred the Brevet or Twin Haven loans.  At a minimum, proving damages will require expensive expert testimony.

23.    The Equity Committee also states that prioritizing the sale of the Sellers Capital Shares interfered with negotiations with DinoKing (*id.* ¶30), the Debtors' eventual merger partner. However, the Motion does not explain how said interference damaged the Debtors, other than by delaying the merger (discussed below).

24.    The Equity Committee states that the appropriate measure of damages for prioritizing the sale of the Sellers Capital Shares over consummating a merger is the profit that resulted from the alleged loyalty breach.  (Motion ¶32.)  That profit is illusory. Sellers Capital ultimately entered into a Stock Purchase Agreement, dated October 15, 2014 ("SPA"), under which it agreed to sell the Sellers Capital Shares to Armada for $16.2 million, which is $1.05/share prior to the 1:10 split effected February 2015, or an adjusted value of $10.50/share.  Armada defaulted under the SPA without having purchased the Sellers Capital Shares, however, and on August 31, 2015, Sellers Capital commenced an action against Armada for breach of the same.  That action was subsequently settled on terms whereby Armada agreed to make payments to Sellers Capital; however, Armada defaulted on the first payment due under the settlement, resulting in entry of a $6 million judgment against it, a copy of which is annexed hereto as Exhibit 2. That judgment is still unpaid, and its collectability is questionable at best.[7]

---

[7] A quick Google search reveals that Armada and its principal, George Wight, have repeatedly defaulted on obligations taken on to pay cash or procure financing in business deals.  Their projects have also been linked in media reports to recognized securities fraudsters.  *See* Nathan Vardi, "The $2.4 Billion Nasdaq Stock Headquartered in Apartment 2A," Forbes.com (June 13, 2017).

## 2. <u>Damages from Delayed Merger</u>

25.     On April 2, 2015, roughly five months after the SPA and four months after Armada's default thereunder, the Debtors entered into a merger agreement with DinoKing.  The Equity Committee asserts that the Debtors suffered damages which they are entitled to recover because the Debtors' share price dropped between January 2014 and November 2015, when the merger ultimately closed, citing *In re Chira*, 353 B.R. 693, 729 (S.D. Fla. 2006).  (Motion ¶34.)

26.     Significantly, this is not an independent claim, but a measure of damages for the breach of fiduciary duty claims.  The Equity Committee, however, has not articulated how delay resulted in damages.  The DinoKing merger was a stock-for-stock transaction, coupled with a convertible rescue loan.[8]  Neither the demand letter nor the Motion states how the merger consideration paid by the Debtors for DinoKing would have been lower had that transaction, or any alternative transaction under consideration, closed sooner, despite having taken discovery on this issue.  *Chira* is also inapposite.[9]

---

[8] A full copy of the merger agreement is annexed to the Debtors' Form 8-K, filed April 8, 2015.   The merger terms are summarized in the Debtors' press release announcing the merger, an SEC-filed copy of which is annexed hereto as <u>Exhibit 3</u>.

[9] In *Chira* damages were awarded to compensate the chapter 7 debtor (a divorced husband) for the reduction in the value of his equity in a hotel property he and his ex-wife co-owned, which reduction resulted from his ex-wife's misconduct. 353 B.R. at 729. Here, there is no diminution in value to estate property, just alleged diminution in the value of equity interests in the Debtors resulting from a delayed stock-for-stock merger. Further, damages awarded in *Chira* were amounts attributable to the ex-wife's misconduct (*e.g.*, attorneys' fees, management charges), whereas here damages resulting from delay, if any, would be extremely difficult to measure.  *Id.*

### 3.        Usurpation of Corporate Authority

27.        The Equity Committee states that the Debtors have a cause of action for usurpation of a corporate authority against Mark Sellers and Samuel Weiser, because Sellers Capital (which they managed) agreed to sell the Sellers Capital Shares to Armada even though the Debtors had previously commenced negotiations with Armada concerning a stock-for-stock merger transaction. (Motion ¶36.)

28.        That claim is not colorable. A corporate opportunity claim fails where, as here, the alleged usurping party has a blocking position:

> *CERBCO* … preclude[s] a plaintiff from claiming that a corporate opportunity has been usurped where the majority shareholder could have blocked the transaction in any event. This is so because no "interest or expectation" fairly belonged to the corporation since the majority could block the transaction at any time.
>
> *In re Digex Inc. S'holders Litig.*, 789 A.2d 1176, 1191 (Del. Ch. 2000).

29.        That Sellers Capital had a blocking position is evidenced by its having caused the reconstitution of the board of directors after the board rejected a request to approve a sale of the Sellers Capital Shares to KOP in August 2014. (Motion ¶23.)

30.        Even if the corporate opportunity claim survived a motion to dismiss, damages would be premised on the theory that a stock-for-stock merger with Armada would have resulted in a successful business combination. That theory is speculative, at best, given Armada's track record. (*See* Footnote 7, *supra*.)

4.      **Aiding and Abetting Claims**

31.      The Equity Committee states to the extent it has viable breach of fiduciary duty claims against Mark Sellers and Samuel Weiser, the Debtors can bring aiding and abetting claims against Sellers Capital.  (Motion ¶37.)  Putting aside issues with the breach of fiduciary duty claims and the associated damages theory (discussed above), the value of any potential judgment against Sellers Capital is far from obvious, as Sellers Capital liquidated beginning September 2008, when Mark Sellers retired from the hedge fund business.  *See* Kaja Whitehouse, "Tiger Cubs Meow During September," New York Post (Oct. 10, 2008).

C.      **Derivative Standing Should be Denied with Respect to the Merger and Restatement Claims**

32.      The Equity Committee states the Debtors have breach of fiduciary duty claims against Daoping Bao because DinoKing's financials had to be restated post-merger, on April 11, 2016.  (Motion ¶41.)  According to the Equity Committee, Daoping Bao breached his fiduciary duty by failing to disclose accounting issues, and then fighting a restatement when the issue was raised post-merger. (*Id*. ¶40.)  This claim is questionable, to the extent colorable.  As noted above, the DinoKing merger was a stock-for-stock transaction, coupled with a convertible rescue loan.  The only persons conceivably harmed by the above conduct are those who held shares prior to the disclosures, and who are not aligned with DinoKing.  (*Id*. ¶45.)  To the extent those

shareholders still hold shares, their value is questionable, at best, given the posture of these cases.[10]

## IV.    The Employment Application Should be Denied

33.    By the Employment Application, the Equity Committee seeks to employ special counsel to prosecute and settle so-called Estate Claims on behalf of the Debtors' estates.  Naturally, if the Equity Committee is denied derivative standing to bring said claims, the Employment Application should be denied.

## Conclusion

The Equity Committee states that it filed the Motion to "yield significant value for" and "protect unsecured creditors." (Motion pp.2-4.)  By failing to secure contingency counsel willing to advance the significant costs that would inevitably be incurred in prosecuting the claims for which derivative standing is sought, or litigation financing to cover said costs, the contemplated litigation risks becoming yet another major cost center in these cases, which creditors do not wish to fund.  The Motion and Employment Application should therefore be denied.  Alternatively, the Equity Committee should be

---

[10] The Equity Committee further asserts that Daoping Bao breached his duty of loyalty by engaging in an intentional violation of law (Motion ¶44), but does not assert what law was violated, let alone plead damages.

directed to file a draft Complaint and consideration of the Motion and Employment

Application should be deferred until the June 7, 2018 hearing.

Dated: May 21, 2018

Jeffrey Chubak (admitted pro hac vice)
**STORCH AMINI PC**
140 East 45th Street, 25th Floor
New York, New York 10017
(212) 490-4100
(212) 490-4208 (Facsimile)
jchubak@storchamini.com

- and -

**THAMES MARKEY & HEEKIN, P.A.**

*/s/ Richard R. Thames*
By: _____
Richard R. Thames
Robert A. Heekin

Florida Bar No. 0718459
Florida Bar No. 652083
50 North Laura Street, Suite 1600
Jacksonville, Florida  32202
(904) 358-4000
(904) 358-4001 (Facsimile)
rrt@tmhlaw.net
rah@tmhlaw.net

Attorneys for the Official Committee
of Unsecured Creditors

## **Certificate of Service**

I hereby certify that on May 21, 2018, the foregoing pleading was transmitted to the Clerk of the Court for uploading to the Case Management/Electronic Case Files System, which will send a notice of electronic filing to all parties who have consented to receiving electronic notifications in this case.

*/s/ Richard R. Thames*

_____

Attorney

# Exhibit "1"

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 7 |
| MAGNESIUM CORPORATION OF AMERICA, *et al.*, | Case No. 01-14312 (MKV) |
| | (Jointly Administered) |
| Debtors. | |

<u>**DECLARATION OF LEO R. BEUS**</u>

I, Leo R. Beus, declare:

1.      I am attorney at law, admitted to practice in the State of Arizona.  I submit this declaration in support of the final application of Beus Gilbert PLLC ("<u>Beus Gilbert</u>") for allowance of compensation, filed contemporaneously herewith.  I have personal knowledge of the facts set forth herein and, if called as a witness, could and would testify competently to the following.

**I.      EXPERIENCE IN BANKRUPTCY CASES**

2.      I was first admitted to practice in 1971, and have been continuously practicing law for 46 years.  I am the senior member of Beus Gilbert, located in Phoenix, Arizona.

3.      During my many years as a practicing attorney, I have represented numerous bankruptcy trustees in adversary proceedings, including in the following cases:

- Bonneville-Pacific (Utah)

- Boston Chicken, Inc. (Arizona)

- Crown Paper (California)

- Farmland Dairies (New York)

- Flooring America (Georgia)

- Keller Financial (Florida)

- Parmalat (New York)

- Roadmaster, LLC (Georgia)

- SPhinX (part of Refco bankruptcy) (New York)

- United Companies (Louisiana)

- Vesta (Alabama, Texas)

4.     In these cases, Beus Gilbert obtained settlements and/or judgments totaling more than $1 billion for the debtors' respective estates.

5.     In every case in which Beus Gilbert represented bankruptcy trustees, I have always insisted that the firm's fee arrangement with the trustee be approved before Beus Gilbert undertakes the litigation. My practice has been that if I do not obtain prior bankruptcy court approval of Beus Gilbert's representation—and the approval of our fee arrangement with the trustee—I will not undertake the representation.

6.     Invariably, these cases involved a lengthy representation, with complex legal and factual issues and extreme risk for the firm.  These cases have typically involved hotly contested legal and factual issues, extensive motion practice, millions of pages of documents, extensive discovery involving dozens of depositions and, in some cases, over a dozen experts.  The defendants have been large law firms, accounting firms, investment banks, corporations, and directors and officers.  They have always been represented by national, prestigious law firms.  And, prestigious law firms represented the defendants in the litigation for which Beus Gilbert was employed herein.

## II.     BEUS GILBERT'S RETENTION

7.     These cases were originally commenced as voluntary chapter 11 cases on August 2, 2001.

2

8.      I was first approached to serve as litigation counsel in September 2002 by Citadel Investment Group, a senior noteholder.

9.      Lee E. Buchwald was appointed chapter 11 trustee for the Debtors' estates by order, entered April 14, 2003, and was subsequently appointed chapter 7 trustee by order, entered September 24, 2003 (the "Trustee").

10.     On his appointment, I immediately began discussions with the Trustee and his bankruptcy counsel, Nicholas F. Kajon, regarding the terms under which Beus Gilbert would consider undertaking the representation.

11.     From the outset, I knew this would be a difficult undertaking for the firm.  First, two national law firms—Willkie, Farr & Gallagher LLP and Chapman & Cutler LLP, representing an ad hoc noteholder group and the Creditors' Committee, respectively—concluded that there did not appear to be a substantial likelihood viable claims existed against the Debtors' parent, The Renco Group, Inc. ("Renco Group"), or its affiliates.  Second, Judge Robert E. Gerber, then presiding over the Debtors' chapter 11 cases, expressed grave reservations about the litigation, stating in open court that the action was not "by any means [a] slam dunk," and that he would "almost certainly not approve any legal fees for either litigating or even investigating those claims, unless they are on a contingent fee basis."

12.     Nevertheless, despite the conclusions of Willkie Farr and Chapman & Cutler, as well as the reservations of Judge Gerber, I decided to undertake the representation.  In undertaking this representation, I was also well aware the Trustee had not been successful in securing the agreement of any other firm to pursue this litigation, which he acknowledged in his application to employ Beus Gilbert.

3

13.     During the summer of 2003, the Trustee and I made significant efforts to secure everyone's approval of his retention of Beus Gilbert on a contingency fee basis. We had no difficulty in securing the agreement of the ad hoc noteholder group, by value, the largest creditor group, and the Beus Gilbert retention application acknowledged their support of the engagement.

14.     Securing the approval of the United States Trustee was more difficult.  We first contacted that office in June 2003, at which time we presented our standard Legal Representation Agreement ("LRA") for consideration.  The United States Trustee required several changes.

15.     Although we were able to accommodate the United States Trustee with respect to the vast majority of the proposed changes, the United States Trustee was absolutely inflexible on one point that posed a problem for me: not only must Beus Gilbert pay all costs and expenses incurred in prosecuting the litigation (these would be substantial, exceeding $2.1 million), but we must also remove our standard provision that, if we were successful in the litigation, interest must be paid on unpaid balances for costs and expenses, even though we agreed that if there was no recovery, expenses need not be paid by the estates.  This last point represented a big problem for me because it resulted in Beus Gilbert not only funding the litigation over the course of many years, but also advancing all the expenses and costs incurred in prosecuting the case, without interest.

16.     This last point proved such a significant issue that I personally met with Carolyn S. Schwartz, then the United States Trustee in this district. Ms. Schwartz was adamant: she would not agree to the Trustee's retention of Beus Gilbert unless the LRA's provision for the payment of interest on unpaid costs was removed.   But, Ms. Schwartz volunteered an alternative—the United States Trustee's Office would approve the retention if Beus Gilbert removed the interest provision and instead *increased* its contingency fee percentages upon

settlement (33-1/3%) or verdict/judgment (40%) by one percentage point. Although this change obviously shifted additional risk to Beus Gilbert, I agreed.

17.     On July 11, 2003, Beus Gilbert sent the United States Trustee's Office a revised LRA which reflected that important change. The other changes demanded were so numerous that, rather than submit a redlined version of the LRA to the United States Trustee, we prepared an entirely new version that incorporated the many changes required by it. (July 11, 2003 Letter to Brian Masumoto, annexed hereto as <u>Exhibit 1</u>.)

18.     Eventually, when Beus Gilbert's retention under the revised LRA was approved in October 2003, the Trustee's counsel was able to report to the Court that "Mr. Masumoto has advised that the United States Trustee has no objection to the form of the order" retaining Beus Gilbert. (October 30, 2003 Letter to Judge Gerber, annexed hereto as <u>Exhibit 2</u>.)

19.     Although the Trustee had now secured the approval of the ad hoc noteholder group and the United States Trustee of the terms of Beus Gilbert's LRA, I nevertheless anticipated objections from the Renco Group, which was expected, as it was a litigation target.

20.     Meanwhile, the Trustee was facing a critical deadline—the running of the statute of limitations under Bankruptcy Code section 546. Therefore, even though Beus Gilbert had not yet been retained, on July 31, 2003, on behalf of the Trustee, Beus Gilbert filed its adversary complaint in the Bankruptcy Court, naming as defendants, Renco Group, certain of its affiliates, and various individuals and professional firms previously retained by the Debtors. Despite filing this complaint (to prevent the claims from being time-barred) I made clear to the Trustee—and it was stated in the LRA (§ 3.1)—that should the Bankruptcy Court not approve the LRA in accordance with its terms and provisions, Beus Gilbert reserved the right to withdraw from the litigation.

21.     On September 3, 2003, the Trustee filed his application to retain Beus Gilbert, on terms set forth in the LRA, which was annexed to the application as an exhibit.  The application also specified the exact percentages which would be paid to Beus Gilbert in the event of a recovery, and further specified that it was seeking approval of compensation terms under Bankruptcy Code section 328(a).

22.     Judge Gerber approved Beus Gilbert's retention, over the objection of Renco Group, and entered an order approving the retention on October 31, 2003, following a hearing held four days prior.

## III.    THE PRIOR INTERIM FEE APPLICATION

23.     In 2005, the Trustee negotiated a settlement with two defendants in the adversary proceeding, Keith Sabel and K. Sabel Holdings, Inc., for a total of $75,000.  The settlement was approved pursuant to Rule 9019, by order, entered July 18, 2005.

24.     On February 16, 2006, Beus Gilbert applied for an interim fee award of $25,749.75, or 34-1/3% of any settlement reached after 90 days following the date of the LRA, pursuant to the terms of the agreement, which was annexed to the application.

25.     No party objected to Beus Gilbert's interim fee application, or its right to compensation in accordance with the terms of the LRA, and an order granting Beus Gilbert the requested interim fee award was entered on May 12, 2006.

## IV.    ADMINISTRATIVE MATTERS

26.     Typically, it is Beus Gilbert's practice not to prepare detailed monthly billing statements in cases undertaken on a contingency fee basis. However, in this case, each Beus Gilbert attorney and employee who worked in the case recorded their time and submitted it to the firm's accounting department at the end of every month.  Those time records, which are annexed

6

to the accompanying final fee application as Exhibit 4, and are summarized in the summary sheet preceding the application, reflect that from September 2002—when Beus Gilbert commenced working on the action—through July 2017, Beus Gilbert employees expended approximately 55,000 hours on the action, and that the total value of Beus Gilbert's services, calculated on an hourly rate basis, was approximately $14.9 million.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 13, 2017.

/s/ Leo R. Beus

# Exhibit "2"

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SELLERS CAPITAL, LLC, and | ) | |
| SELLERS CAPITAL MASTER | ) | Case No. 15-cv-07644 |
| FUND, LTD. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Mag. Judge Jeffrey T. Gilbert |
| | ) | |
| GEORGE WIGHT, ARMADA | ) | |
| GROUP, GP, INC. and ARMADA | ) | |
| ENTERPRISES, INC. | ) | |
| | ) | |
| Defendants. | ) | |

## FINAL JUDGMENT ORDER IN A CIVIL CASE

THIS CAUSE COMING to be heard on a motion for entry of final judgment order following Defendants' confession of judgment, Defendants having confessed to judgment in the parties' Settlement Agreement, the Court being fully advised in the premises, IT IS HEREBY ORDERED THAT:

1.    Defendants are found to be in default and to have breached the parties' Settlement Agreement due to nonpayment of the First and Second Payments.

2.    Defendants have failed to cure their default.

3.    For the reasons set forth in open court on November 28, 2017, final judgment is hereby entered in favor of Sellers Capital, LLC and Sellers Capital Master Fund, Ltd. and against Defendants George Wight, Armada Group, GP, Inc., and Armada Enterprises, Inc., jointly and severally, in the amount of $6,000,000. Post-judgment interest accrues on this amount at the rate provided by law from the date of this judgment.

4.    There being no further claims pending in this matter, this judgment is

final and enforceable according to law.

ENTERED:

11/28/17

Jeffrey T. Gilbert
United Stated Magistrate Judge

2

# Exhibit "3"

5/15/2018 Premier Exhibitions Inc Enters Into Definitive Merger Agreement to Combine With Dinoking Tech Inc.

Case 3:16-cv-02230-PMC Doc 1023 Filed 05/21/18 Page 29 of 32

EX-99.1 2 exh_991.htm EXHIBIT 99.1

EXHIBIT 99.1

# Premier Exhibitions, Inc. Enters Into Definitive Merger Agreement to Combine With Dinoking Tech Inc.

## An Investor Group Will Invest Up to $13.5 Million in Premier as Part of the Transaction

ATLANTA, April 2, 2015 (GLOBE NEWSWIRE) -- Premier Exhibitions, Inc. (Nasdaq:PRXI), a leading provider of museum-quality touring exhibitions around the world ("Premier" or the "Company"), today announced that it has entered into a definitive merger agreement ("Merger Agreement") whereby it will combine with Dinoking Tech Inc. ("DK"). Under the Merger Agreement, the DK shareholders will be entitled to up to 24% of the fully diluted ownership of the Company for all of the issued and outstanding shares of DK. In addition, an Investor Group will provide up to $13.5 million in funding to Premier to repay $8 million of existing debt and $5.5 million for corporate purposes including the completion of the development of "Saturday Night Live: The Exhibition" and "Premier on 5th", the Company's state-of-the-art exhibition and special events center located in New York City. The transaction has been approved by the Board of Directors of Premier. Premier's principal shareholder, Sellers Capital, as well as the directors and officers of the Company have entered into agreements to vote in favor of the transaction. The completion of the transaction is subject to Premier shareholder approval among other customary closing conditions. The merger is expected to be completed in August 2015.

Dinoking Tech Inc., based in Richmond, British Columbia, Canada, is the holding company of Dinosaurs Unearthed, an industry-leading traveling exhibition company with a range of indoor and outdoor exhibition experiences designed to engage and entertain audiences. Current exhibitions include Dinosaurs Alive!, Dinosaurs Unearthed, Extreme Dinosaurs, Xtreme BUGS!, and, to be launched in June 2015 in Australia, Creatures of the Deep.

### Strategic Benefits of the Transaction

- Further strengthens Premier's leadership position as the dominant global exhibition provider by combining a number of extremely successful brands
- Leverages DK's existing infrastructure and relationships to expand presence in Asia and other markets
- Provides financing solutions allowing the Company to focus on growth and revenue and content diversification
- Broadens strong operational expertise with a combined management team with a track record of bringing successful and innovative content to market

Mark Sellers, board member and managing member of Sellers Capital, Premier's largest shareholder, said, "By combining Premier's assets with DK's, we've created a stronger company with the scope and capabilities to leverage long-term growth opportunities in the marketplace, including Asia. Daoping Bao has a track record of success and fiscal discipline in the exhibition business and we're excited to have him oversee the combined company. With the infusion of growth capital, Premier's core operating business will finally be stabilized and we can focus on further leveraging existing content by bringing our exhibitions, as well as new content, to previously untapped markets throughout the world. I'm excited about the growth opportunities this merger presents."

"As leaders in the industry, Premier and DK will seek to leverage the combined brand portfolio and capitalize on the significant global opportunities inherent in this transaction. We look to expand our footprint globally, especially in Asia, where we believe there are opportunities for our combined entity to deliver world class exhibitions and other new content," said Daoping Bao, Founder and President of DK.

5/15/2018                                        Premier Exhibitions Inc. Enters Into Definitive Merger Agreement Combining With Dinoking Tech Inc.

Case 3:16-bk-02230-PMG     Doc 1023     Filed 05/21/18     Page 30 of 32

## Summary of Merger Agreement

Under the terms of the agreement, Premier will acquire all outstanding shares of DK, of which Daoping Bao is the principal shareholder, for a total consideration of US$6.4 million payable in Premier shares or shares exchangeable for Premier shares at transaction close. Premier has also agreed to future contingent payments to the DK shareholders of up to US$8.6 million payable in either cash or stock if certain milestones are reached. In addition, an Investor Group will invest up to $13.5 million in Premier through convertible debentures carrying an interest rate of 12% per annum and a conversion price of $4.48 per share. The conversion price represents a premium of approximately 38.5 percent and 32.4 percent to Premier's volume weighted average price for the trailing 30 days and 60 days, respectively. The merger and conversion of the debenture is subject to shareholder approval and expected to take place at the closing of the deal.

Upon the signing of the Merger Agreement, $8.0 million of the proceeds will be used to repay the existing $8.0 million Secured Promissory Note and Guarantee entered into with two affiliates of Pentwater Capital Management LP on September 30, 2014. The remaining $5.5 million will be provided through subsequent capital drawdowns and be primarily used to complete Premier's current development projects and to fund working capital requirements.

Upon the closing of the transaction, the DK shareholders and the Investor Group will hold 47.0% of the outstanding Premier voting shares, subject to additional contingent payments, and the right to nominate four out of seven board members. Mr. Bao will become the Executive Chairman, President and Chief Executive Officer of Premier while DK will become an indirect wholly-owned subsidiary.

Thompson Hine LLP and Gowling Lafleur Henderson LLP served as legal counsel to Premier and DK was represented by Dentons in both Canada and the U.S..

## Conference Call for Investors

The Company will hold a conference call with investors at 12:00 pm EDT on Wednesday, April 8, 2015 to further discuss the transaction. U.S. and Canadian participants may dial toll-free: (888) 556-4997; International participants may dial toll: 719-325-2494. Please ask for conference ID: 5798810

## About Premier Exhibitions, Inc.

Premier Exhibitions, Inc. (Nasdaq:PRXI), located in Atlanta, GA, is a major provider of museum quality exhibitions throughout the world and a recognized leader in developing and displaying unique exhibitions for education and entertainment. The Company's exhibitions present unique opportunities to experience compelling stories using authentic objects and artifacts in diverse environments. Exhibitions are presented in museums, exhibition centers and other entertainment venues.

Additional information about Premier Exhibitions, Inc. is available at www.prxi.com.

## About Dinoking Tech Inc.

Dinoking Tech Inc. is a holding company operating under the name Dinosaurs Unearthed. Dinosaurs Unearthed, located in Richmond, British Columbia, Canada, is an industry-leading traveling exhibition company with a range of exhibition products designed and developed by its creative and innovative team of experts and scientific advisors. Exhibition products include Dinosaurs Unearthed, Dinosaurs Alive!, Extreme Dinosaurs, Xtreme BUGS! and, soon to be launched in June 2015, Creatures of the Deep. The company creates outstanding immersive guest experiences that are engaging, entertaining and grounded in current science. Since the company's launch in 2007, exhibitions have opened to great success throughout North America, Australia, Asia, Europe and the Middle East, inspiring millions of guests in museums, science centers, zoos, amusement parks and other unique venues.

Additional information about Dinosaurs Unearthed is available at www.dinosaursunearthed.com.

## Forward Looking Statements

This press release may contain forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995 that involve certain risks and uncertainties. The actual results or outcomes of Premier Exhibitions, Inc. may differ materially from those anticipated. Although Premier Exhibitions, Inc. believes that the assumptions underlying the forward-looking statements contained herein are reasonable, any such assumptions could prove to be inaccurate. Therefore, Premier Exhibitions, Inc. can provide no assurance that any of the forward-looking statements contained in this press release will prove to be accurate.

In light of the significant uncertainties and risks inherent in the forward-looking statements included in this press release, such information should not be regarded as a representation by Premier Exhibitions, Inc. that its objectives or plans will be achieved. Included in these uncertainties and risks are, among other things, fluctuations in operating results, general economic conditions, uncertainty regarding the results of certain legal proceedings and competition. Forward-looking statements consist of statements other than a recitation of historical fact and can be identified by the use of forward-looking terminology such as "may," "intend," "expect," "will," "anticipate," "estimate" or "continue" or the negatives thereof or other variations thereon or comparable terminology. Because they are forward-looking, such statements should be evaluated in light of important risk factors and uncertainties. These risk factors and uncertainties are more fully described in Premier Exhibitions, Inc. most recent Annual and Quarterly Reports filed with the Securities and Exchange Commission, including under the heading entitled "Risk Factors." Premier Exhibitions, Inc. does not undertake an obligation to update publicly any of its forward-looking statements, whether as a result of new information, future events or otherwise, except as required by law.

## Additional Information about the Merger Agreement and Where to Find It

Premier Exhibitions, Inc. intends to file with the Securities and Exchange Commission (SEC) a preliminary proxy statement in connection with the proposed business combination and will mail a definitive proxy statement and other relevant documents to its shareholders. This press release does not contain all the information that should be considered concerning the business combination. It is not intended to provide the basis for any investment decision or any other decision in respect to the proposed business combination. Premier Exhibitions, Inc.'s shareholders and other interested persons are advised to read, when available, the preliminary proxy statement, the amendments thereto, and the definitive proxy statement in connection with Premier Exhibitions, Inc.'s solicitation of proxies for the special meeting to be held to approve the business combination, as these materials will contain important information about Premier Exhibitions, Inc. and Dinoking Tech Inc. and the proposed business combination.

The definitive proxy statement will be mailed to shareholders of Premier Exhibitions, Inc. as of a record date to be established for voting on the business combination. Shareholders will also be able to obtain copies of the proxy statement, without charge, once available, at the SEC's Internet site at http://www.sec.gov, or by directing a request to: Premier Exhibitions, Inc., 3340 Peachtree Road, NE, Suite 900, Atlanta, GA 30326, attention: Michael Little.

## Participants in the Solicitation

Premier Exhibitions, Inc. and its directors and officers may be deemed participants in the solicitation of proxies to Premier's shareholders with respect to the transaction. A list of the names of those directors and officers and a description of their interests in Premier is contained in Premier's proxy statement that was filed with the SEC on January 16, 2015 and will also be contained in the proxy statement for the proposed business combination when available.

```
CONTACT: Investor Contact:

        Michael J. Little
        Interim President and Chief Executive Officer
        Chief Financial Officer and Chief Operating Officer
        (404) 842-2600
```

michael.little@prxi.com

Nancy Brenner
Managing Director
(604) 277-0707
nancy@dinosaursunearthed.com