**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

In re:

RMS TITANIC, INC., *et al.*,[1]

          Debtors.

Case No.  3:16-bk-02230-PMG
Chapter 11 (Jointly Administered)

---

**DEBTORS' MOTION FOR ENTRY OF AN ORDER (A) APPROVING**
**COMPETITIVE BIDDING AND SALE PROCEDURES; (B) APPROVING FORM**
**AND MANNER OF NOTICES; (C) APPROVING FORM OF ASSET PURCHASE**
**AGREEMENT; (D) APPROVING BREAK UP-FEE AND EXPENSE**
**REIMBURSEMENT; (E) SCHEDULING AUCTION AND HEARING TO**
**CONSIDER FINAL APPROVAL OF SALE, INCLUDING REJECTION OR**
**ASSUMPTION AND ASSIGNMENT OF RELATED EXECUTORY CONTRACTS**
**AND UNEXPIRED LEASES; (F) AUTHORIZING SALE OF**
**THE TRANSFERRED ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS,**
**ENCUMBRANCES, AND INTERESTS; AND (G) APPROVING SETTLEMENT**
**WITH THE PACBRIDGE PARTIES; AND (H) GRANTING RELATED RELIEF**

RMS Titanic, Inc.  ("RMST") and certain of its affiliates, as Debtors and

Debtors in possession in the above-captioned case (collectively, the "Debtors"), by

and through their undersigned counsel, hereby move the Court (the "Motion"),

pursuant to sections 105(a), 363, 365, 503 and 507 of title 11 of the United States

Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rules 2002, 6004, 6006,

9014, and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

---

[1] The Debtors in the chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include: RMS Titanic, Inc.  (3162); Premier Exhibitions, Inc.  (4922); Premier Exhibitions Management, LLC (3101); Arts and Exhibitions International, LLC (3101); Premier Exhibitions International, LLC (5075); Premier Exhibitions NYC, Inc.  (9246); Premier Merchandising, LLC (3867); and Dinosaurs Unearthed Corp.  (7309).   The Debtors' service address is 3045 Kingston Court, Suite I, Peachtree Corners, Georgia 30071.

Rules"), and Rule 2002-1 of the Local Rules of the United States Bankruptcy Court for the Middle District of Florida (the "Local Rules"), for entry of two orders: (I) an order substantially in the form annexed hereto as **Exhibit A** (the "Bidding Procedures Order"):

    a)    Approving the Bidding Procedures attached as Exhibit 1 to the Bidding Procedures Order (the "Bidding Procedures") establishing the competitive bidding and auction procedures in connection with the sale (the "Sale") of the Transferred Assets, as defined in the Asset Purchase Agreement dated as of June 14, 2018 by and among (i) Premier Exhibitions, Inc., a Florida corporation, (ii) Arts and Exhibitions International, LLC, a Florida limited liability company, (iii) Premier Exhibition Management LLC, a Florida limited liability company, (iv) Premier Exhibitions NYC, Inc., a Nevada corporation, (v) Premier Merchandising, LLC, a Delaware limited liability company, (vi) Premier Exhibitions International, LLC, a Delaware limited liability company, (vii) Dinosaurs Unearthed Corp., a Delaware corporation, (viii) DinoKing Tech Inc. d/b/a Dinosaurs Unearthed, a company formed under the laws of British Columbia, (ix) RMS Titanic, Inc., a Florida corporation, solely for purposes of Article III, Article V, Article VII and Article VIII, and Premier Acquisition Holdings LLC, a Delaware limited liability company (as amended, modified or supplemented, the "APA"), as applicable);

b)      approving the form of the APA attached hereto as **Exhibit B** (the "APA")[2];

c)      approving the Bid Protections (as defined below) as administrative expense claims against the Debtors' estates;

d)      Scheduling (i) an auction for sale of the Transferred Assets (the "Auction") and (ii) a hearing to consider the Sale, the results of the Auction, assumption and assignment of executory contracts and unexpired leases, and the settlement of certain claims against the Debtors' estates (the "Sale Hearing");

e)      Approving the manner of notice of the Auction and Sale Hearing in the form attached to the Bidding Procedures Order as Exhibit 2 (the "Sale Notice");

f)      Approving procedures for the assumption and assignment of executory contracts and unexpired leases, including notice and determination of cure costs, and the form of notices in connection therewith attached to the Bidding Procedures Order as Exhibit 3 (the "Cure Notice") and as Exhibit 4 (the "Assumption Notice"); and

g)      granting related relief;

(II) an order substantially in the form attached hereto as **Exhibit C** (the "Sale Order")

---

[2] The APA is being filed without the Seller Disclosure Letter and accompanying schedules, but such documents will be made available to Contact Parties (as defined in the Bid Procedures) and other interested parties following the execution of a confidentiality agreement with the Debtors.

a)      authorizing the Sale to the party that is the successful bidder at the Auction, free and clear of all liens, interests, claims and encumbrances;

b)      authorizing the assumption and assignment of certain executory contracts and unexpired leases and determination of cure amounts in connection with the Sale;

c)      authorizing the Debtors to pay the DIP Loan (as defined below) at closing;

d)      approving the PacBridge Parties Settlement (as defined in the APA); and

e)      granting certain related relief as described herein.

In support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§157 and 1334.  The subject matter of this Motion is a core proceeding pursuant to 28 U.S.C. §157(b).  Venue in this district is proper pursuant to 28 U.S.C. §1408.

2.      The statutory predicates for the relief sought herein are sections 105(a), 363, 365, 503 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9014 and 9019, and Local Rule 2002-1.

## BACKGROUND

3.      On June 14, 2016 (the "Petition Date"), each of the Debtors filed a voluntary petition in this Court for relief under Chapter 11 of the Bankruptcy Code.

4.      The Debtors continue to manage and operate their business as debtors in possession under Bankruptcy Code sections 1107 and 1108.

5.     On August 24, 2016, the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Creditors Committee") and an Official Committee of Equity Security Holders (the "Equity Committee" and together with the Creditors Committee, the "Committees") [D.E. 166, 167].

**The Debtors**

6.     Premier Exhibitions, Inc. ("Premier") is the parent corporation of each of the other Debtors.  It is also the parent of several non-debtor subsidiaries,[3] including its indirect wholly owned subsidiary DinoKing Tech, Inc., a British Columbia company ("DinoKing," and together with the Debtors, the "Sellers").  Premier, together with its subsidiaries, is a leading provider of museum quality touring exhibitions around the world.  Since Premier's formation, it has developed, deployed, and operated unique exhibition products that are presented to the public in exhibition centers, museums, and non-traditional venues.  Income from the exhibitions is generated primarily through ticket sales, third-party licensing, sponsorships, and merchandise sales.  The Exhibitions include varied subject matter and artifacts, including the *RMS Titanic*, human anatomy, King Tut, animatronic dinosaurs and bugs, and Saturday Night Live.  Premier and its subsidiaries either own the artifacts and exhibitry associated with the various exhibits or have licensed the rights to tour and exhibit artifacts owned by third-parties.

---

[3] Premier's other non-debtor subsidiaries include 1032403 B.C. Ltd., a company formed under the laws of British Columbia; DinoKing International, Inc., a company formed under the laws of British Columbia; Premier International Holdings CV, a company formed under the laws of the Netherlands; and Premier Hollywood Pictures LLC, a Nevada limited liability company. The APA also contemplates the possibility that, subject to certain conditions contained therein, DinoKing may become a Debtor in these cases.

7.    The Debtors' most significant assets are those related to the *RMS Titanic*. Debtor RMST owns the rights to approximately 5,500 artifacts recovered from the wreck site of the *RMS Titanic* (the "Titanic Artifacts").    RMST also has been declared the "salvor-in-possession" of the *RMS Titanic* wreck site by the United States District Court for the Eastern District of Virginia (the "Admiralty Court") and has the exclusive right to recover additional objects from the *RMS Titanic* wreck site.    Through the Debtors' explorations, they have obtained and are in possession of the largest collection of data, information, images, and cultural materials associated with the *RMS Titanic* shipwreck.

**The Titanic Artifacts**

8.    The Titanic Artifacts can be divided into two collections, the "French Artifacts" and the "American Artifacts."    The French Artifacts are comprised of approximately 2,100 artifacts recovered by a predecessor-in-interest to RMST during its 1987 expedition to the *RMS Titanic* wreck site and brought to France for restoration and conservation.    In 1993, an Administrator in the French Office of Maritime Affairs awarded RMST title to the French Artifacts.    Subsequently, this Court entered default judgment in favor of RMST in Adversary Proceeding No. 16-00183 declaring that France has no interest or claim in the 1987 Artifacts.

9.    The American Artifacts consist of all artifacts recovered after the 1987 expedition. In 1993, RMST recovered the first of the American Artifacts, and landed the artifacts in Norfolk, Virginia.    On August 26, 1993, RMST commenced an *in rem* action in the Admiralty Court against both the artifacts recovered in the 1993 expedition and the wreck itself.    *See R.M.S. Titanic, Inc. v. The Wrecked and*

*Abandoned Vessel*, 435 F.3d 521, 528 (4th Cir. 2006).  As a result of this action, the Admiralty Court declared RMST salvor-in-possession of the Titanic wreck site.  *See id.* at 524.  Pursuant to its status as salvor-in-possession, RMST recovered the remainder of the American Artifacts through expeditions in 1994, 1996, 1998, and 2004.  The American Artifacts are subject to the ongoing *in rem* jurisdiction of the Admiralty Court.

10.    In 2011, the Admiralty Court granted to RMST an *in-specie* salvage award to the American Artifacts.  The Admiralty Court, however, conditioned the *in-specie* award to the American Artifacts on certain covenants and conditions pursuant to the Revised Covenants and Conditions set forth in Exhibit A to the August 12, 2010 Opinion of the Admiralty Court (the "Covenants and Conditions").  Among other things, the Covenants and Conditions strictly limit RMST's ability to sell the American Artifacts individually or as a collection.

11.    Specifically, the Covenants and Conditions require that the American Artifacts "shall be kept together and intact forever, pursuant to the terms of the [Covenants and Conditions]."[4]  Covenants and Conditions § III.A.  The terms of the Covenants and Conditions, in turn, allow for the sale of individual artifacts in the American Artifact collection only under very limited circumstances that make any sale of individual artifacts commercially impractical if not impossible.

---

[4] By its plain language, this requirement only applies to the American Artifacts, not the French Artifacts, because the Admiralty Court has no subject matter jurisdiction over the French Artifacts. *See R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel*, 435 F.3d 521 (4th Cir. 2006) (vacating the Admiralty Court ruling involving the French Artifacts for lack of subject matter jurisdiction).

12.     The Covenants and Conditions place further requirements on the American Artifacts that make a traditional sale or auction of the Titanic Artifacts, even as a whole collection, difficult.  For instance, the Covenants and Conditions require that the Titanic Artifacts be made available for public display and exhibition, historical review, and research.  *Id.* at § III.B.  The Covenants and Conditions place strict conservation, curation, and management requirements on the Titanic Artifacts.  *Id.* at § IV.  The Covenants and Conditions appoint the National Oceanic and Atmospheric Administrative ("NOAA") in an oversight role to ensure adherence to the Covenants and Conditions.  *Id.* at § V.  The Covenants and Conditions also place a number of substantive and procedural requirements for the care and transfer of the American Artifacts to any subsequent trustee.  *Id.*

13.     Because the Admiralty Court has no subject matter jurisdiction over the French Artifacts, the Covenants and Conditions only apply to the American Artifacts. *See R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel*, 435 F.3d 521 (4th Cir. 2006); *see also* June 21, 2016 transcript of hearing in the Eastern District of Virginia, Norfolk Division (The Court: "the French artifacts . . . were excepted in the covenants and conditions that protected the artifacts that were before this Court.")   NOAA, nevertheless,  has consistently maintained that the Covenants and Conditions do not allow a sale of the French Artifacts separately from the American Artifacts, and has repeatedly indicated that it would vigorously challenge any effort to auction any French

Artifacts individually or separately from the American Artifact collection.[5]  Regardless of whether NOAA's position is correct, the litigation risk[6] associated with pursuing a piecemeal sale of the French Artifacts poses a significant challenge to monetizing those artifacts apart from a sale of the entire artifact collection, and fundamentally undermines the reliability of any appraisal or opinion of value for the Titanic Artifacts that assumes the artifacts can be sold individually.  In short, and as evidenced by several unsuccessful attempts by the Debtors to sell the artifacts dating back to 2012, the Covenants and Conditions result in significant risks and uncertainty attendant to any sale or disposition of the Titanic Artifacts, and particularly any sale of individual or small groups of artifacts.

**Prepetition Secured Creditors**

14.     As of the Petition Date, the Debtors owed approximately $3,000,000 in aggregate principal amount pursuant to the following: (i) the Revised and Restated Secured Promissory Note and Guarantee issued by Premier to Lange Feng on March 24, 2016 in the principal amount of $1,000,000; (ii) the Revised and Restated Secured Promissory Note and Guarantee issued by Premier to Jihe Zhang on March 24, 2016 in the principal amount of $1,000,000; and (iii) the Revised and Restated Secured Promissory Note and Guarantee issued by Premier to Haiping Zou on March 24, 2016 in the principal amount of $1,000,000.  Haiping Zou, Lange Feng, and Jihe Zhang are

---

[5] Indeed, NOAA reiterated its position in response to the motion of Euclid Claims Recovery LLC to appoint chapter 11 trustee.  *See* D.E. 1041.

[6] As a governmental entity, NOAA could appeal an adverse determination without having to post a bond, thus significantly delaying any resolution of this issue.

collectively referred to as the "Secured Lenders" and their claims are collectively referred to as the "Secured Lender Claims." The Secured Lenders assert liens on the assets of Premier and several other Debtors, and assert collectively more than $1,000,000 in post-petition interest and fees on the Secured Lender Claims, for total Secured Lender Claims in excess of $4,000,000. The Debtors and the Committees have asserted disputes with respect to the timing of perfection of certain of the liens securing the Secured Lender Claims, and the Debtors and the Secured Lenders have executed a tolling agreement with respect to the Debtors' potential causes of action related thereto.

**The Sale Process**

15.     On September 30, 2016, the Debtors retained GlassRatner Advisory & Capital Group, LLC ("GlassRatner"), as financial advisor and investment banker to advise them in connection with their chapter 11 cases and various restructuring alternatives. The Debtors, with the assistance of GlassRatner and its other professionals, carefully evaluated each of their various options, and engaged in extensive negotiations with the legal and financial advisors to the Committees, NOAA, and other constituents regarding a consensual resolution to these chapter 11 cases. During this time, the Debtors and the Committees considered all potential restructuring and liquidation options for the Debtors' business and assets, including an auction of the French Artifacts.

16.     In November of 2016, the Debtors submitted a request for proposals to a variety of auction houses for the auction and sale of a portion or all of the

Titanic Artifacts to which Bonhams and Christie's responded.    Following discussions with the Equity Committee, the Debtors circulated a revised request for proposals to a wider group of auction houses in January of 2017 (the "Debtors' RFP"), which contemplated an auction of any of the following: 1) the entire collection of the Titanic Artifacts, subject to the Covenants and Conditions; 2) the entire collection of the French Artifacts; or 3) a subset of the French Artifacts.    In late February of 2017, the Debtors received a new proposal from Guernsey's and revised proposals from Bonhams and Christie's.

17.    The responses revealed significant hurdles in connection with the proposed auction.    As an initial matter, each of the three respondents indicated that an evaluation and auction timeframe would likely last through much of 2017. Additionally, the respondents expressed significant concerns and reluctance to handle and sell the Titanic Artifacts, stemming largely from the Covenants and Conditions and the corresponding litigation exposure.    Additionally, the Court received informal objections from several members of the international maritime community over the proposed auction of the artifact collection.    [D.E. 435, 436].

18.    Thus, after extensive negotiations and evaluation, the Debtors and the Committees determined that a sale of all the Debtors' assets as a going concern, including the sale of the Titanic Artifacts as a whole collection, was in the best interests of the Debtors and their estates.    Accordingly, in April of 2017, the Debtors' RFP was suspended and, shortly thereafter, the Debtors and the Committees entered into a Plan Support Agreement on May 18, 2017 (the "PSA")

which was approved by the Court on July 6, 2017 [D.E. 642]. The PSA contemplated a sale of all of the Debtors' assets as a going concern after a marketing period to be conducted by the Debtors and GlassRatner.

19.    As required by the PSA, the Debtors, through GlassRatner, marketed the Debtors' assets to potential purchasers over several months.   GlassRatner conducted an extensive and far-reaching marketing campaign, contacting potential buyers and interested parties (as identified through independent research and Debtor and Committee contacts) across the globe.  In addition, Kekst (a reputable PR firm) conducted a national campaign to uncover and reach other potential buyers.  As a product of these efforts, news of the sale of the Titanic Artifacts reached a global audience – the sale was featured on the Today Show, national television nightly news programs, and newspapers worldwide.  In or about November of 2017, these marketing efforts succeeded in yielding a significant offer, with a high certainty of closing, that would have provided sufficient funds to pay creditors in full and allow shareholders to retain their equity.  Ultimately, however, this offer was rescinded after certain allegations were made by the Equity Committee regarding the purchaser and management – allegations that ultimately were unfounded.

20.    Despite receiving expressions of interest from a number of other interested buyers, ultimately a definitive agreement with a stalking horse bidder on the time table originally agreed upon by the Debtors and Committees in the PSA never materialized.  The Debtors and Committees initially determined to proceed toward an

auction of the Debtors' business without a stalking horse bidder and filed a motion to approve such a "naked auction" process on November 14, 2017.

21.     On December 12, 2017, an ad hoc group of equity holders (the "Ad Hoc Group") comprised of funds managed by affiliates of Apollo Global Management, LLC ("Apollo") and Alta Fundamental Advisers LLC ("Alta") filed an objection to the naked auction, requesting that they be given time to conduct diligence on the Debtors to formulate a restructuring alternative to the naked auction. [D.E. 850].  On December 14, 2017, the Trustees of the National Maritime Museum filed a motion to withdraw the reference with respect to the proposed naked auction motion and transfer it to the Admiralty Court. [D.E. 853].

22.     Because of these objections, the interest of the Ad Hoc Group to pursue a restructuring alternative, and other considerations, on December 15, 2017, with the support of the Committees, the Debtors withdrew the "naked auction" motion [D.E. 863] and began to re-evaluate all potential restructuring alternatives to exit the chapter 11 process.  The Debtors, with aid of its professionals and GlassRatner, continued to engage in discussions with potential buyers and other potential sources of financing to restructure the Debtors' businesses, including the Ad Hoc Group.

23.     The Debtors' exclusive period to file and obtain acceptances of a plan of reorganization expired on February 14, 2018.

24.     Given the posture of the cases and the various and competing interests of the estates' constituents, on February 25 and 26, 2018, representatives of the Debtors, the Committees, NOAA, the DIP Lender, the Secured Lenders, the Ad Hoc

Group, and other major constituents in the cases convened for a mediation to attempt to reach agreement on the best path forward to exit these chapter 11 cases. The mediation parties ultimately did not reach a formal resolution, however, the parties agreed that continued pursuit of a sale transaction was in the best interests of the Debtors and their estates. [D.E. 970].

25.    On June 1, 2018, the Equity Committee filed its Chapter 11 Plan of Reorganization and accompanying Disclosure Statement, proposing to market and sell the American Artifacts to a "qualified institution," and market and auction the French Artifacts [D.E. 1044, 1045]. The proposed Chapter 11 Plan of Reorganization and accompanying Disclosure Statement contain no apparent funding source with which to fund litigation likely to ensue with NOAA over the proposed liquidation of the French Artifacts.

**The DIP Loan**

26.    Concurrently with entering into the PSA, the Debtors entered into a post-petition financing agreement with Bay Point Capital (the "DIP Lender") on May 18, 2017 for up to $5 million (the "DIP Loan") to fund the Debtors' business and the administrative costs of the bankruptcy during the marketing process. The Court approved the DIP Loan by order effective June 29, 2017. The current balance of the DIP Loan as of the date of this Motion is $4,600,000.00, plus accrued interest of $107,000.00. On May 29, 2018, the Debtors exercised an extension option extending the maturity date of the DIP Loan for one year to June 29, 2019.

**The Stalking Horse Purchaser APA**

27.     After considering numerous alternatives and significant arms-length negotiations with various potential buyers, lenders, and investors, the Debtors, in consultation with their professionals and advisers, negotiated the proposed sale of the Transferred Assets to Premier Acquisition Holdings LLC, a Delaware limited liability company (the "Stalking Horse Purchaser"), an entity formed by affiliates of members of the Ad Hoc Group, the Secured Lenders, and PacBridge Capital Partners (HK) Ltd. ("PacBridge").

28.     The APA was extensively negotiated, involving complex issues of bankruptcy law, admiralty law, Canadian laws and other issues related to the unique nature of the Transferred Assets, in addition to those issues commonly arising in a more traditional M&A transaction or bankruptcy Section 363 sale. Among the most difficult issues to address was the appropriate mechanism for a sale of the Debtors' interests in the Titanic Artifacts. Ultimately, after significant negotiation and analysis – and as discussed in more detail below – the parties agreed to sale of the stock of RMST, as a means to ensure continued compliance with the Covenants and Conditions and to provide the most expeditious path toward Admiralty Court approval.

29.     The APA that resulted from those negotiations is the culmination of an extraordinary and thorough marketing and sale process conducted by the Debtors, through GlassRatner, over a period of approximately one year. In connection with that process, the Debtors contacted over 150 parties and signed over 30 non-disclosure

agreements with parties who were sent information packages and provided registered access to its diligence data room.

30.     Shortly after filing this Motion, the Debtors will be filing a motion with the Admiralty Court seeking approval of the Sale to the Stalking Horse Purchaser (or any other Prevailing Bidder) as contemplated in the APA.

## SUMMARY OF THE PROPOSED SALE AND APA

31.     Pursuant to the terms and subject to the conditions of the APA, the Sellers, subject to a Court-approved auction and sale process, including any required approval of the Sale by the Admiralty Court, and any higher and better offers in accordance with the proposed Bidding Procedures outlined below, will sell to the Stalking Horse Purchaser its right, title and interest in and to the Transferred Assets,[7] as set forth in the APA and, in connection therewith, will assign to the Stalking Horse Purchaser certain executory contracts and unexpired leases (the "Assumed and Assigned Contracts").  The Stalking Horse Purchaser will purchase the Transferred Assets and Assumed and Assigned Contracts of the Debtors free and clear of all liens, claims, encumbrances and interests pursuant to Sections 363 and 365 of the Bankruptcy Code.[8]

---

[7] As noted above, the Transferred Assets include 100% of Premier's stock in RMST.

[8] The APA, to which DinoKing is a party as a Seller and which includes the sale of DinoKing assets, contemplates that DinoKing may become a Debtor in these cases. If DinoKing does become a debtor in these cases, the provisions of Sections 363 and 365 would apply directly to the assets of DinoKing included in the Transferred Assets. To the extent DinoKing does not become a debtor, the Debtors nevertheless seek authority under Section 363 to exercise Premier's interests in DinoKing to cause DinoKing to perform under the APA.

32.    The terms of the Stalking Horse Purchaser's offer to purchase the

Transferred Assets are set forth in the APA and are summarized herein:[9]

a) **Stalking Horse Purchaser**.    The Stalking Horse Purchaser is an acquisition vehicle formed by affiliates of or funds managed by the Secured Lenders, PacBridge, Alta, and Apollo.    The Secured Lenders[10] and funds managed by Alta and Apollo are each equity holders of Premier.    Collectively, the Secured Lenders own approximately 2,232,143 shares of Premier.    Funds managed by Alta own approximately 1,057,624 shares of Premier.    Funds managed by Apollo own approximately 463,038 shares of Premier.    Further each of the Secured Lenders and PacBridge (collectively, the "PacBridge Parties") has asserted claims against the Debtors.    The Secured Lenders each assert secured claims each in the principal amount of $1,000,000, plus post-petition interest and fees.    PacBridge asserts an unsecured claim against the Debtors in the approximate amount of $1,195,350.39.    As discussed in more detail below, the Debtors have asserted objections and/or potential avoidance claims against the Secured Lenders and PacBridge in connection with their claims that will be resolved as part of the Sale contemplated in the APA.    The Debtors are aware of and disclose the following relationships:

- DinoKing engaged PacBridge and its principal, Giovanni Wong, as financial advisor for DinoKing's November 2015 sale to Premier, pursuant to which PacBridge referred $3,500,000.00 of the $13,500,000.00 original investment for a 3% fee;[11]
- The President of Premier, Daoping Bao, has been friends with Mr. Zou for over 20 years, and is Mr. Zhang's cousin by marriage;
- Pursuant to that certain Stockholders Agreement dated as of April 2, 2015 (the "Stockholders Agreement"),[12] the following parties have assigned the rights to vote their shares in Premier

---

[9] Capitalized terms used in this summary but not otherwise defined in the Motion shall have the meaning given to them in the APA.

[10] Secured Lender Haiping Zou owns his shares of Premier through High Nature Holdings, Ltd. ("High Nature")

[11] Consistent with this engagement, the Debtors have asserted, in response to certain discovery requests issued by the Equity Committee in these cases, that Mr. Wong was a financial consultant and therefore fell within the attorney-client privilege as to discussions between Mr. Wong and counsel for the Debtors in connection with the DinoKing merger.

[12] See Schedule 13D, dated March 31, 2016.

to Mr. Bao: Nancy Brenner, High Nature, Lange Feng, Jihe Zhang, and Mandra Forestry Ltd. The Stockholders Agreement continues until a majority cancels it, or until its five-year expiration. As such, none of Ms. Feng, Mr. Zhang or High Nature currently have any voting rights with respect to Premier.

b) **Transferred Assets**.  Pursuant to Section 1.1(a) of the APA, the Transferred Assets include all of the right, title and interest of Sellers as of the Closing Date in and to the tangible and intangible assets, properties and rights and claims, to the extent used or otherwise related to, useful in or necessary for the conduct of, the Sellers' Business, other than the Excluded Assets and any Consent Asset subject to Section 1.3. *See* APA, § 1.1.  The Transferred Assets will also include the outstanding stock of RMST, which is 100% owned by Premier. APA, § 1.1(a)(xiv).

c) **Excluded Assets**.  Section 1.1(b) of the APA sets forth the Excluded Assets, which includes, among other things, avoidance actions other than certain claims against affiliates of the Stalking Horse Purchaser and claims against counterparties to Assumed and Assigned Contracts and critical vendors.  APA, § 1.1(b).

d) **Assumed Liabilities**.  The Stalking Horse Purchaser will only assume those liabilities specifically listed in section 1.1(c) of the APA, which include Cure Costs, obligations under Assumed and Assigned Contracts after Closing, obligations under the Covenants and Conditions after Closing, and certain specified liabilities of DinoKing in an amount up to CAD$270,000.  APA § 1.1(c).

e) **Cure Payments**.  The Stalking Horse Purchaser will pay Cure Costs. APA §§ 1.3(b) and 8.5 (definition of Cure Costs).

f) **Purchase Price**.  The Purchase Price is $17,500,000 in cash, subject to adjustment for the amount of Current Assets at Closing.  APA, §§ 1.2 and 8.5 (definition of Purchase Price).

g) **Good Faith Deposit/Liquidated Damages**.  The Stalking Horse Purchaser will deposit within three Business Days of the execution of the APA $1,750,000 into escrow which shall be applied to the Purchase Price at closing or retained by the Sellers in the event the APA is terminated pursuant to Section 7.3(b) for a breach by Purchaser as liquidated damages or returned to the Stalking Horse Purchaser in

the event the APA is terminated for any other reason.   APA, §§ 1.4(b)(ii) and 7.3(b).

h) **Closing Date**.  The Closing Date shall be no later than seventy days after the Admiralty Court Order Entry Date.  APA, § 7.4(j).

i) **Representations and Warranties**.  The APA contains representations and warranties of the Sellers in Article III and of the Stalking Horse Purchaser in Article IV.

j) **Covenants**.  The APA contains covenants of the Sellers in Article V, including provisions requiring the Sellers to obtain continued D&O Insurance for a period of six years after Closing.  APA § 5.6.

k) **Bankruptcy Court Matters**.  The APA requires the Debtors to obtain entry of the Bidding Procedures Order by July 20, 2018; and to obtain entry of the Sale Order on or before August 17, 2018.  APA §§ 7.4(b). As summarized in more detail below, should other potential parties not submit a Qualified Bid by August 8, 2018, the Debtors request a hearing to approve the Sale to the Stalking Horse Bidder on August 13, 2018.

l) **Admiralty Court Matters**.  The APA requires the Debtors to obtain entry of an order from the Admiralty Court approving the Sale as contemplated in the APA by no later than September 7, 2018.  APA §§ 7.4(b).

m) **Bid Protections.**  The APA provides that the Stalking Horse Purchaser shall be entitled to receive a Break-up Fee in an amount equal to the greater of $500,000 or 3% of the Purchase Price, and an Expense Reimbursement for the aggregate documented, actual, out-of-pocket costs and expenses incurred by the Stalking Horse Purchaser in connection with the transactions contemplated in the APA, provided that the total Break-up Fee and Expense Reimbursement shall not exceed a total of $1,000,000 (the Break-up Fee and the Expense Reimbursement collectively being the "Bid Protections") in the event that the APA is terminated under certain circumstances set forth in § 7.5(b) of the APA.   The APA further requires that the Bidding Procedures Order approve the Bid Protections as administrative expenses of Seller under Sections 503(b) and 507 of the Bankruptcy Code, and that the Bid Protections be paid to the Stalking Horse Purchaser at closing of any Competing Transaction or from gross proceeds of any Competing Transaction or, in the event the definitive

agreement for a Competing Transaction is terminated, within one Business Day of any such termination.  APA § 7.5(b)-(c).

n) **Settlement of Claims.**  The APA provides that upon Closing, in full satisfaction of the respective claims of the PacBridge Parties, (x) the Secured Lenders will receive in consideration of their Secured Lender Claims, (i) a $1 million cash payment, plus (ii) allowed general unsecured claims against the Debtors in the total aggregate amount of $2,000,000, to be allocated $666,666.67 to Feng, $666,666.67 to Zhang, and $666,666.66 to Zou, and (y) PacBridge will have an allowed general unsecured claim against the Debtors in the amount of $1,195,350.39 (the "PacBridge Parties Settlement"). The APA further provides that this Motion will include a request under Bankruptcy Rule 9019 Bankruptcy Court for approval of the PacBridge Parties Settlement, and the Sale Order must include Bankruptcy Court approval of the PacBridge Parties Settlement.  APA § 5.7(h).

o) **Conditions to Closing**.  The APA contains conditions to Closing in Article VI, including a requirement that the Luxor Lease be renewed on terms acceptable to Stalking Horse Purchaser.  APA § 6.3(e).

p) **Termination**.  The APA contains termination provisions in Article VII.

33.   The Debtors seek authority to sell the Transferred Assets to the Stalking Horse Purchaser on the terms and conditions set forth in the APA or to a higher and better bidder to be determined in accordance with the Bidding Procedures.  The Debtors believe that securing the Stalking Horse Purchaser after many months of extensive marketing efforts, further marketing of the Debtors' assets with the assistance of GlassRatner over the time period contemplated by the Bidding Procedures, and the holding of the Auction will result in the highest and best price for the Transferred Assets.

## SUMMARY OF BIDDING PROCEDURES

34.     Pursuant to the Bidding Procedures, the Sellers propose to sell all of their

rights, title and interest in the Transferred Assets free and clear of any liens, interests,

claims, charges or encumbrances in accordance with section 363 of the Bankruptcy Code,

to the maximum extent permitted by applicable law.[13]  The Debtors propose that any

encumbrances remaining with the Debtors' estates shall attach to any proceeds resulting

from the sale, net of any transaction costs and fees, in the same order of priority and

subject to the rights, claims, defenses, and objections, if any, of all parties with respect

thereto, subject to any further order of the Court.

35.     A summary of the important dates proposed in the Bidding Procedures are

as follows:

| | |
|---|---|
| **August 8, 2018, at 4:00 p.m.** | Bid Deadline |
| **August 8, 2018, at 4:00 p.m.** | Sale Objection Deadline<br>Cure Amount Objection Deadline |
| **August 10, 2018, at 4:00 p.m.** | Deadline for Debtors to Designate and Publish Qualified Bidders |
| **August 13, 2018, at 10:00 a.m.** | Auction, if any<br>Location:<br>Troutman Sanders, LLP<br>600 Peachtree Street NE<br>Suite 3000<br>Atlanta, Georgia 30308 |

---

[13] The Sale will not affect the Covenants and Conditions, as the Purchaser will acquire 100% of the stock of RMST, not the assets within RMST. The stock of RMST will be sold free and clear of any liens, interests, claims, charges or encumbrances.

| August 13, 2018, at 10:00 a.m. | Sale Hearing, if no Auction<br>Location:<br>United States Bankruptcy Court for the Middle District of Florida, Jacksonville Division<br>Bryan Simpson United States Courthouse<br>300 North Hogan Street, Courtroom 4A<br>Jacksonville, Florida 32202 |
|---|---|
| August 15, 2018, at 10:00 a.m. | Sale Hearing, if Auction occurs<br>Location:<br>United States Bankruptcy Court for the Middle District of Florida, Jacksonville Division<br>Bryan Simpson United States Courthouse<br>300 North Hogan Street, Courtroom 4A<br>Jacksonville, Florida 32202 |
| 4:00 p.m., one day before Sale Hearing | Deadline to File and Serve Responses to Any Sale Objection |

36.     In addition, the proposed Bidding Procedures are summarized as follows:[14]

| Marketing Process | The Debtors, in consultation with GlassRatner, have and will continue to develop a list of parties they believe may be interested in participating in the Auction. In accordance with the Bidding Procedures, the Debtors will provide such parties with certain preliminary information, and will provide interested parties with diligence materials upon execution of a satisfactory confidentiality agreement and evidence of the ability to consummate a Competing Transaction. |
|---|---|
| Auction Qualification Process | To be eligible to participate in the Auction, each Bid and/or Bidder must meet the following criteria:<br><br>• Include payment of a good faith deposit into escrow equal to 10% of the cash consideration |

---

[14] This summary disclosure contains a description of only certain terms of the Bidding Procedures.   A copy of the Bidding Procedures is attached to the Bidding Procedures Order as Exhibit 1.   The Bidding Procedures themselves should be consulted for a full description of the terms thereof.   To the extent that there are any inconsistencies between the terms set forth herein and in the actual terms set forth in the Bidding Procedures, the Bidding Procedures shall control.   Capitalized terms used in this summary but not otherwise defined in the Motion shall have the meaning given to them in the Bidding Procedures.

|  | provided for in the Bid (a "<u>Good Faith Deposit</u>");<br>• Be on substantially similar, the same or better terms than the APA and propose to buy substantially all of the Transferred Assets;<br>• Include a competing asset purchase agreement in substantially the same form and on substantially the same material terms as the APA, excepting the Bid Protections applicable only to the Stalking Horse Purchaser, and include a redline showing all changes from the APA;<br>• Be irrevocable until the earlier of the Outside Backup Date or the closing of a Competing Transaction and include a signed statement verifying the same;<br>• Include a signed statement that the Bidder agrees to be bound by the Covenants and Conditions;<br>• Propose a purchase price equal to or greater than $19,000,000.00[15]<br>• Obligate the Bidder to pay all Cure Amounts;<br>• Not contain a break-up fee, expense reimbursement, or similar provisions;<br>• Be received by August 8, 2018 the Bid Deadline by the parties listed in the Bidding Procedures;<br>• Include evidence that the Bidder has corporate authority to consummate the transaction;<br>• Include written evidence satisfactory to the Debtors demonstrating that the Bidder has the necessary financial ability to close the Competing Transaction and provide adequate assurance of future performance under all contracts to be assumed and assigned in such Competing Transaction, including specific information set forth in the Bidding Procedures; and<br>• Contain no financing contingency.<br><br>The Stalking Horse Purchaser is a Qualified Bidder, and the APA is a Qualified Bid. |
|---|---|

---

[15] All amounts herein are expressed in United States dollars.

| | The Debtors will file a notice with the Bankruptcy Court of all Qualified Bids no later than two business days after the Bid Deadline. |
| --- | --- |
| | The Auction will be cancelled if no Qualified Bids are received by the Bid Deadline and the Debtors will file a notice of the same with the Bankruptcy Court no later than two business days after the Bid Deadline. |
| **Assessment of Bids** | Bids will be assessed by taking into account, among other things, total consideration received by the Debtors, the likelihood that the Bidder will be approved by the Admiralty Court, and the likelihood of the Bidder's ability to consummate a transaction in a timely manner. |
| **The Auction** | The Auction, if any, will be held on August 13, 2018 at 10:00 a.m. prevailing eastern time at the offices of Troutman Sanders, LLP, located at 600 Peachtree Street NE, Suite 3000, Atlanta, Georgia 30308. |
| | Only Qualified Bidders shall be allowed to participate in the Auction. |
| | The Debtors and their professionals shall preside over the Auction. |
| | The Auction will be transcribed by a certified court reporter. |
| | At the start of the Auction, the Debtors shall describe the terms of the highest and best Qualified Bid received prior to the Bid Deadline (such Qualified Bid, the "Auction Baseline Bid"). The Stalking Horse Purchaser shall have the right (but not the obligation) to match the highest and best Qualified Bid received prior to the Bid Deadline, and thus become the Auction Baseline Bid |
| | Unless otherwise agreed by the Debtors, only the Debtors, the Committees, the Stalking Horse Purchaser, NOAA, the DIP Lender, and any other Qualified Bidder, along with each of their respective professionals (collectively, the "Auction Attendees"), may attend the |

| | |
|---|---|
| | Auction in person, and only the Stalking Horse Purchaser and other Qualified Bidders will be entitled to make any Bids at the Auction. |
| **Terms of Overbids** | The initial Overbid must be for a purchase price equal to or greater than $19,000,000.00 the "Initial Overbid"). <br><br> Any Bid after the Initial Overbid must be made in increments of not less than $500,000.00. <br><br> The Stalking Horse Purchaser shall be entitled to credit bid the Bid Protections as a portion of any Overbid (including an Initial Overbid). <br><br> All Overbids must remain open and binding on the Bidder until and unless the Debtors accept a higher Overbid. |
| **Provisions Governing Back-up Bidders** | The Qualified Bidder with the next highest or best Qualified Bid after the Prevailing Bidder at the Auction will be designated as a Backup Bidder and must keep its final Overbid open and irrevocable until the earlier of (i) 4:00 p.m. (prevailing Eastern time) on the date that is 30 days after the Closing Date provided for in the Sale Order approving the Prevailing Bid (the "Outside Backup Date"), or (ii) the date of closing of a Competing Transaction with the Prevailing Bidder or with the Backup Bidder. <br><br> If the Prevailing Bidder fails to close due to a breach or failure to perform on the part of such Prevailing Bidder, the Debtors may designate the Backup Bidder to be the new Prevailing Bidder, and the Debtors will be authorized, but not required, to consummate a transaction with the Backup Bidder without further order of the Bankruptcy Court. In such case, the defaulting Prevailing Bidder's Good Faith Deposit shall be forfeited to the Debtors. |
| **Return of Good Faith Deposits** | The Good Faith Deposit of any Qualified Bidder other than the Prevailing Bidder or the Backup Bidder shall be returned to such Qualified Bidder not later than three |

|  | business days after the Sale Hearing. The Good Faith Deposit of the Backup Bidder shall be returned to the Backup Bidder on the date that is the earlier of 24 hours after (a) the closing of the transaction with the Prevailing Bidder and (b) the Outside Backup Date. Upon the return of the Good Faith Deposits, their respective owners shall receive any and all interest that will have accrued thereon. If the Prevailing Bidder timely closes, its Good Faith Deposit shall be credited to its purchase price. |
|---|---|

37.     The Debtors believe that it is imperative that they promptly move forward with the Auction and the Sale, to generate and retain potential purchasers' interests in the Transferred Assets.   Accordingly, the Bid Procedures (as summarized above) were developed consistent with the Debtors' need to expeditiously move forward with the sale and potential auction process, but with the objective of promoting active bidding that will result in the highest or best offer for the Transferred Assets while affording appropriate protection for the Stalking Horse Purchaser.   Moreover, the Bid Procedures reflect the Debtors' objective of conducting the Auction in a controlled, but fair and open, fashion that promotes interest in the Transferred Assets by financially motivated bidders who are likely to close the transaction. Further, with these chapter 11 cases having been pending for over two years, and the Transferred Assets having been marketed extensively for at least the past year, the Debtors submit that the Bidding Procedures, including the Bid Protections and timelines contained therein, are necessary and appropriate to finally bring these Chapter 11 cases to an efficient and prompt resolution.

## FORM AND MANNER OF THE SALE NOTICE AND OBJECTION

38.     The Debtors seek to have the Auction scheduled for August 13, 2018. Due to the substantial and continuing costs of administering the Debtors' Chapter 11 cases, it is imperative to expeditiously move forward with the Auction and the Sale.

39.     No later than three business days after entry of this Bidding Procedures Order, the Debtors will cause the Sale Notice to be sent by first-class mail postage prepaid, to the following: (a) all creditors or their counsel known by the Debtors to assert a lien (including any security interest), claim, right, interest or encumbrance of record against all or any portion of the Transferred Assets; (b) the Office of the United States Trustee; (c) the Securities and Exchange Commission; (d) all applicable federal, state and local taxing and regulatory authorities of the Debtors or recording offices or any other governmental authorities that, as a result of the sale of the Transferred Assets, may have claims, contingent or otherwise, in connection with the Debtors' ownership of the Transferred Assets or have any known interest in the relief requested by the Motion; (e) the state and local environmental agencies in the jurisdictions where the Debtors own or lease real property; (f) the United States Attorney's office for the Middle District of Florida; (g) the National Oceanic and Atmospheric Administration; (h) all parties in interest who have requested notice pursuant to Bankruptcy Rule 2002 as of the date of entry of this Bidding Procedures Order; (i) counsel to the Creditors Committee; (j) counsel to the Equity Committee; (k) all parties to any litigation involving the Debtors; (l) all counterparties to any executory contract or unexpired lease of the Debtors; (m) counsel for the DIP Lender; (n) AEG Presents LLC *f/k/a* AEG Live LLC; (o) all of

DinoKing's known creditors, regulatory authorities, and other parties in interest that could assert Liens or Claims against the Transferred Assets; and (p) all other known creditors and interest holders of the Debtors.

40.    The Debtors submit that the Sale Notice is reasonably calculated to provide all interested parties with timely and proper notice of the proposed bidding and auction processes, including: (a) the date, time and place of the Auction; (b) the Bidding Procedures and the dates and deadlines related thereto; (c) a reasonably specific description of the criteria by which Bids will be evaluated; and (d) instructions for promptly obtaining access to due diligence materials.  The Debtors submit that such notice is good, adequate, sufficient and proper notice of the Bidding Procedures and the Auction. The Debtors respectfully request that the Court waive and dispense with any other notice that may be required pursuant to any Bankruptcy Rule or any Local Rule.

41.    The Debtors further request that the Bidding Procedures Order provide that all objections to the Sale contemplated by the Asset Purchase Agreement must: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules of the United States Bankruptcy Court for the Middle District of Florida; (c) be filed with the clerk of the United States Bankruptcy Court for the Middle District of Florida, United States Bankruptcy Court for the Middle District of Florida, Jacksonville Division, Bryan Simpson United States Courthouse, 300 North Hogan Street, Suite 3-150, Jacksonville, Florida 32202 (or filed electronically via CM/ECF), by 4:00 p.m. (prevailing Eastern Time) on August 8, 2018 (the "Sale Objection Deadline"); and (d) be served upon (i) counsel to the Debtors, Troutman Sanders LLP, 600 Peachtree Street NE, Suite 3000,

Atlanta, GA 30308, attention: Harris B. Winsberg (harris.winsberg@troutman.com) and Matthew R. Brooks (matthew.brooks@troutman.com); (ii) counsel to the Creditors Committee, Storch Amini PC, 140 East 45th Street, 25th Floor, New York, NY 10017, attention: Jeffrey Chubak (jchubak@storchamini.com); (iii) counsel to the Equity Committee, Landau Gottfried & Berger LLP, 1801 Century Park East, Suite 700, Los Angeles, CA 90067, attention: Peter J. Gurfein (pgurfein@LGBFirm.com); (iv) counsel to the Stalking Horse Purchaser, Greenberg Traurig, P.A., 401 East Las Olas Blvd., Suite 2000, Fort Lauderdale, FL 33301, attention: Scott M. Grossman (grossmansm@gtlaw.com) and Bracewell LLP, 1251 Avenue of the Americas, 49th Floor, New York NY 10020-1100, attention Jennifer Feldsher (jennifer.feldsher@bracewell.com) and (v) the Office of the United States Trustee, U.S. Department of Justice, George C. Young Federal Building, 400 West Washington Street, Suite 1100, Orlando, FL 32801, attention Miriam G. Suarez (Miriam.G.Suarez@usdoj.gov) (collectively, the "Notice Parties"), in each case, so as to be actually received no later than 4:00 p.m. (prevailing Eastern Time) on August 8, 2018.

## PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF ASSIGNED CONTRACTS AND LEASES

42.    In addition to the Bidding Procedures and Sale Notice, the Debtors are also seeking approval of certain procedures (the "Assumption Procedures") to facilitate the fair and orderly assumption and assignment of the Assumed and Assigned Contracts in conjunction with any Sale.

43.    The proposed Assumption Procedures are as follows:

a)    No later than three business days after the entry of the Bidding Procedures Order, the Debtors will serve by first class mail or hand delivery the Cure Notice on all non-Debtor parties to the Scheduled Contracts (as defined in the Cure Notice). The Cure Notice will identify the Scheduled Contracts and provide the cure amounts that the Debtors believe must be paid to cure all prepetition defaults under the Scheduled Contracts (collectively, the "Cure Amounts" and individually, a "Cure Amount").

b)    Unless the non-debtor party to a Scheduled Contract files by the Sale Objection Deadline an objection (the "Cure Amount Objection") to its scheduled Cure Amount, the assumption and assignment to the Stalking Horse Purchaser (or other Prevailing Bidder) of the Scheduled Contracts, or the ability of the Stalking Horse Purchaser to provide adequate assurance of future performance, and serves a copy of the Cure Amount Objection on the Notice Parties so as to be received by no later than the Sale Objection Deadline, such non-debtor party shall be deemed to consent to the Cure Amount proposed by the Debtors and shall be forever enjoined and barred from seeking an additional amount on account of the Debtors' cure obligations under section 365 of the Bankruptcy Code or otherwise from the Debtors, their estates or the Stalking Horse Purchaser (or other Prevailing Bidder) on account of the assumption and assignment of the Scheduled Contracts and shall be deemed to have consented to the proposed assumption and assignment.  In addition, if no timely Cure Amount Objection is filed, the Stalking Horse Purchaser (or other Prevailing Bidder) shall enjoy all the rights and benefits under all Scheduled Contracts without the necessity of obtaining any party's written consent to the Debtors' assumption and assignment of such rights and benefits, and each such party shall be deemed to have waived any right to object to, contest, condition or otherwise restrict any such assumption and assignment or to object or contest that the Stalking Horse Purchaser (or other Prevailing Bidder) has not provided adequate assurance of future performance. Information regarding adequate assurance of future performance submitted as part of any Qualified Bid with respect to Scheduled Contracts shall be provided, upon request to Debtors' counsel made on or before the Bid Deadline, to the requesting non-debtor party to a Scheduled Contract within 24 hours of the Bid Deadline.

c)      In the event of a dispute regarding: (a) any Cure Amount with respect to any Scheduled Contract; (b) the ability of the Prevailing Bidder (including the Stalking Horse Purchaser) to provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code, if applicable, under such Scheduled Contract or Additional Assumed Executory Contract; or (c) any other matter pertaining to assumption and assignment, the Cure Amounts shall be paid as soon as reasonably practicable after the Closing and following the entry of a final order resolving the dispute and approving the assumption of such Scheduled Contract; provided, however, that the Debtors, with the consent of the Stalking Horse Purchaser or other Prevailing Bidder, as applicable or as provided in paragraph f) below, are authorized to settle any dispute regarding the amount of any Cure Amount or assignment to the Prevailing Bidder (including the Stalking Horse Purchaser) without any further notice to or action, order or approval of the Court.

d)      Notwithstanding the inclusion of an executory contract or unexpired lease on any list of Scheduled Contracts, the Stalking Horse Purchaser or other Prevailing Bidder, as applicable, shall have authority, in its sole discretion, to remove any contract or lease from the list of Scheduled Contracts either (i) at the Auction, or (ii) no later than five business days after the Bankruptcy Court sustains, in whole or in part, such non-debtor party's Cure Amount Objection or Adequate Assurance Objection; in either such case, the Debtors shall not assume and assign such Scheduled Contract to the Stalking Horse Purchaser or other Prevailing Bidder, as applicable, who removed such contract or lease from any list of Scheduled Contracts.

e)      Nothing in the Bidding Procedures Order shall extend the Debtors' time to assume or reject any executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code; provided, however, that the Debtors retain all rights to seek such an extension after notice and an opportunity for a hearing consistent with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

f)      In the event any party to a Scheduled Contract timely objects to the calculation of the Cure Amount for such contract, and alleges that the Cure Amount for such contract exceeds the amount calculated by Debtors for such contract (the amount of such excess Cure

Amount for the contract in question, the "Excess Cure Amount"), then, (i) Debtors shall provide written notice to Stalking Horse Purchaser or other Prevailing Bidder, as applicable, of such Cure Amount objection and the amount of such Excess Cure Amount for each of the proposed Assumed Contracts, and (ii) Stalking Horse Purchaser or other Prevailing Bidder, as applicable shall, no later than three business days after receipt of such notice from Debtors either (a) notify the Debtors that Stalking Horse Purchaser or other Prevailing Bidder, as applicable, elects not to assume such contract if the Excess Cure Amount is in excess of ten percent of the Cure Amount for such contract or (b) take no action with respect to such notice, in which case, such contract shall continue to be assumed by the Stalking Horse Purchaser or the Prevailing Bidder, as applicable, at the Closing.  At the Closing, the Debtors shall retain the aggregate Excess Cure Amounts for all Assumed Contracts in escrow and shall use commercially reasonable efforts to resolve such discrepancy with such contract counterparties after the Closing.  In the event any such discrepancies are resolved by the Debtors, with the consent of the Stalking Horse Purchaser or other Prevailing Bidder, then the Debtors shall refund such Excess Cure Amounts to the Stalking Horse Purchaser or other Prevailing Bidder, as applicable.  In the event the Debtors do not resolve such discrepancy with such contract counterparty in question, then the Debtors shall deliver such Excess Cure Amount to the contract counterparties in question.

g)      Within two business days after the Closing Date, the Debtors will file a notice of assumption and assignment of the Assumed Executory Contracts, substantially in the form attached to the Bidding Procedures Order as Exhibit 4 (the "Assumption Notice"), listing the Scheduled Contracts that were assumed and assigned as Assumed Executory Contracts, as of the Closing Date, to the Stalking Horse Purchaser or to the Prevailing Bidder, to the extent that the Prevailing Bidder is not the Stalking Horse Purchaser. The form of Assumption Notice is hereby approved.

## **RELIEF REQUESTED**

44.      The Debtors request that this Court enter two orders:  (I) enter the Sale Order to, among other things, (i) authorize the Sale of the Transferred Assets of the Debtors to the Stalking Horse Purchaser pursuant to the APA or to another Prevailing

Bidder pursuant to a purchase agreement entered into with such Prevailing Bidder in accordance with the Bidding Procedures, free and clear of all liens, claims, encumbrances, and interests pursuant to Sections 363(b), (f), (k), and (m) of the Bankruptcy Code, (ii) approve the assumption and assignment of the Assumed and Assigned Contracts pursuant to Section 365 of the Bankruptcy Code, (iii) authorize the Debtors to pay the DIP Loan at closing of a Sale, (iv) approve the PacBridge Parties Settlement, and (v) grant such other and further relief as set forth in the Sale Order; and (II) enter the Bidding Procedures Order to, among other things, (i) approve the Bidding Procedures and schedule the Auction, (ii) approve the APA as a stalking horse bid, (iii) approve the Bid Protections as administrative expenses of the Debtors estates; (iv) approve the form, manner and sufficiency of notice of the Sale and schedule the Sale Hearing, (iv) approve the Assumption Procedures and (iv) grant such other and further relief as set forth in the Bidding Procedures Order.

45.    As described above, the Debtors, after extensive efforts to maximize value, a review of various reorganization, liquidation, and sale options and discussions with the Debtors' professionals, ultimately determined in the exercise of their reasonable business judgment that the most effective way to maximize the value of the Debtors' estates for the benefit of their constituents would be to sell substantially all of their assets and to then wind-down any remaining operations. The Debtors believe that the proposed Sale will maximize the value of the Debtors' assets for all stakeholders and reduce potential risks, contingencies, and uncertainties in the proposed wind-down.

## BASIS FOR RELIEF

**I.** **The Sale Is within the Sound Business Judgment of the Debtors and Should Be Approved.**

46.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor-in-possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan.  However, courts in this Circuit and others have required that the decision to sell assets outside the ordinary course of business be based upon the sound business judgment of the debtors.  *See In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986); *see also Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983); *Dai-Ichi Kangyo Bank, Ltd v. Montgomery Ward Holding Corp., (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D.D.C. 1991); *In re Diplomat Const., Inc.*, 481 B.R. 215 (Bankr. N.D. Ga. 2012); *In re Friedman's, Inc.*, 336 B.R. 891, 895 (Bankr. S.D. Ga. 2005).

47.     The "sound business judgment" test requires a debtor to establish four elements to justify the sale or lease of property outside the ordinary course of business, namely, (a) that a "sound business purpose" justifies the sale of assets outside the ordinary course of business, (b) that adequate and reasonable notice has been provided to interested

persons, (c) that the debtors have obtained a fair and reasonable price, and (d) good faith.

*See Abbotts Dairies*, 788 F.2d 143; *Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Sovereign Estates, Ltd*, 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989); *In re Gulf States Steel, Inc. of Alabama*, 285 B.R. 497, 514 (Bankr. N.D. Ala. 2002).    The Debtors submit that the decision to proceed with the Sale and the Bidding Procedures related thereto is based upon their sound business judgment and should be approved. A debtor's showing of a sound business purpose need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound business reasons." *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984). Whether there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case. *Lionel*, 722 F.2d at 1071; *Montgomery Ward*, 242 B.R. at 155 (approving funding of employee incentive and severance program; business purpose requirement fulfilled because stabilizing turnover rate and increasing morale were necessary to successful reorganization).

48.    Additionally, Section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code.    Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).    Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its Section 105(a) power is proper. *In re Fesco Plastics Corp.*, 996 F.2d 152,

154 (7th Cir. 1993); *Pincus v. Graduate Loan Ctr. (In re Pincus)*, 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002).   Pursuant to Section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. *See, e.g., Chinichian v. Campolongo (In re Chinichian)*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper Props. Liquidating Trust, Inc.*, 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.")

49.     The Debtors submit that sound business justification exists to sell the Transferred Assets to the Stalking Horse Purchaser or other Prevailing Bidder pursuant to the Bidding Procedures.   Absent a sale of their assets, the Debtors lack sufficient cash resources to continue to operate the business and pay their debts as they are due.   Further, any effort to liquidate the French Artifacts individually (as suggested by various parties) will be met with substantial challenge from NOAA, could take years to accomplish, and is not likely to generate recoveries for creditors and stakeholders in an amount greater than a sale of the Transferred Assets to the Stalking Horse Purchaser or other Prevailing Party.   Thus, the relief sought herein is not only reasonable, but necessary, to maximize the value of the Debtors' estates for the benefit of their stakeholders.

**II.**    **The Sale Is Proposed in Good Faith.**

50.    The Debtors request that the Court find that the Stalking Horse Purchaser or Prevailing Bidder is entitled to the benefits and protections provided by Section 363(m) of the Bankruptcy Code in connection with the Sale.  Section 363(m) of the Bankruptcy Code provides, in pertinent part:

> The reversal or modification on appeal of an authorization under subsection (b) . . . of this section of a sale . . . of property does not affect the validity of a sale . . . under such authorization to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

51.    Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to Section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal.  By its terms, Section 363(m) of the Bankruptcy Code applies to sales of interests in tangible assets, such as the Transferred Assets.

52.    The Debtors submit, and will present evidence at the Sale Hearing, if necessary, that the APA is an arm's-length transaction, in which the Stalking Horse Purchaser or other Prevailing Bidder acted in good faith.  The negotiations between the Debtors and the Stalking Horse Purchaser have been rigorous and extensive, conducted by independent professionals, and the APA has been approved by independent members of Premier's board.  Additionally, the Stalking Horse Purchaser is not an "insider" or "affiliate" within the meaning of the Bankruptcy Code.  Although the ultimate equity

interest holders in the Stalking Horse Purchaser, collectively, own roughly forty percent of Premier's shares, none of the direct members of the Stalking Horse Purchaser, nor any of their ultimate equity holders, individually own twenty percent or more of the shares of any of the Debtors. *See, e.g.*, *Agresti v. EBAR E. (In re Elephant Bar Rest.)*, 196 B.R. 747, 751 (Bankr. W.D. Pa. 1996) (holding that two debtors were not affiliates of each other when the same individual controlled thirty percent of one and ten percent of the other); *cf. Sugarloaf Indus. & Mktg. Co. v. Quaker City Castings, Inc. (In re Quaker City Castings, Inc.)*, 337 B.R. 729, at *7 (B.A.P. 6th Cir. 2005) ("While some of [the Purchaser's] individual members appear to meet [the definition of insider], [the objector] has cited no authority for the proposition that [the Purchaser], a distinct legal entity, should be deemed an insider based solely on the status of its members.").

53.     Similarly, the fact that Ms. Feng, Mr. Zhang, and High Nature are parties to the Stockholders Agreement, in which they assigned their voting rights to Bao, does not make them insiders. To the contrary, by virtue of the Stockholders Agreement, Ms. Feng, Mr. Zhang, and High Nature currently have no voting rights with respect to their Premier stock. Further, none of the ultimate equity holders of the Stalking Horse Purchaser are directors, officers, or have any control over any of the Debtors.

54.     Moreover, the Auction will be an open sale process, and each of the Stalking Horse Purchaser and the Debtors have their own separate legal counsel, who have been extensively negotiating the APA.  Accordingly, the Debtors request that the Court make the finding at the Sale Hearing that the Stalking Horse Purchaser or other

Prevailing Bidder has purchased the Transferred Assets in good faith within the meaning of Section 363(m) of the Bankruptcy Code.

**III.    The Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code.**

55.    Under Section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell all or any part of its property free and clear of any and all liens, claims, or interests in such property if: (a) such a sale is permitted under applicable non-bankruptcy law; (b) the party asserting such a lien, claim, or interest consents to such sale; (c) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (d) the interest is the subject of a bona fide dispute; or (e) the party asserting the lien, claim, or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest.  11 U.S.C. § 363(f); *Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that Section 363(f) of the Bankruptcy Code is written in the disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the subsections is met).

56.    The Debtors' only prepetition secured lenders are part of the group forming the Stalking Horse Purchaser and are entering into the PacBridge Parties Settlement as part of the proposed Sale.  Accordingly, the Secured Lenders have consented to the Sale as contemplated in the APA and related documents.  Further, the Purchase Price far exceeds all known liens on the Transferred Assets.  The Debtors propose to pay all outstanding liabilities to the DIP Lender, pursuant to the DIP Loan at closing.  As a result, the Debtors have satisfied, at minimum, the second and third

requirements of Section 363(f) of the Bankruptcy Code, if not others as well.[16] Therefore, approving the Sale of the Transferred Assets free and clear of all adverse interests, to the maximum extent permitted under applicable law (other than the Covenants and Conditions, to the extent applicable) is warranted.

## IV.   Bidding Procedures Are Reasonable and Appropriate and Should Be Approved.

57.    The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  To that end, courts uniformly recognize that procedures intended to promote competitive bidding are consistent with this goal and therefore are appropriate in the context of bankruptcy sales.  *See, e.g., In re Fin'l News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates.")

58.    Procedures to dispose of assets, similar to those delineated in the proposed Bidding Procedures, have previously been approved by this Court in multiple cases.  *See, e.g., In re LDG South, LLC*, No. 9:09-bk-24038-ALP, 2010 Bankr. LEXIS 5291 (Bankr. M.D. Fla. May 27, 2010); *In re Amelia Island Co.*, No. 3:09-bk-09601, 2010 Bankr. LEXIS 5396 (Bankr. M.D. Fla. July 9, 2010).

---

[16] Although AEG Presents LLC *f/k/a* AEG Live LLC ("AEG") is a minority (10%) equity holder in Premier Exhibitions Management LLC, the Debtors do not need to obtain AEG's consent to the Sale.  *See, e.g., In re Searles Castle Enters., Inc.*, 12 B.R. 127, 129 (Bankr. D. Mass. 1981) ("a stockholder, even a majority holder, is not entitled to veto or otherwise authorize a sale by the debtor in possession.")  Rather, the Debtors need only provide adequate notice of the proposed Sale, which the Debtors respectfully submit is accomplished by service on AEG as provided herein.

59.     The Debtors believe that the Bidding Procedures will establish fair parameters to test the value at an auction while doing so in a timely manner.   These procedures will increase the likelihood that the Debtors' creditors and other stakeholders will receive the greatest possible consideration for the Transferred Assets because they will ensure a competitive and fair bidding process.

60.     The Debtors also believe that the proposed Bidding Procedures will promote active bidding from seriously interested parties and will dispel any doubt as to the best and highest offer reasonably available for the Transferred Assets.   In particular, the proposed Bidding Procedures will allow the Debtor to conduct an Auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction.

61.     Accordingly, the proposed Bidding Procedures are reasonable, appropriate and within the Debtors' sound business judgment.

62.     Further, the proposed form of notice and time of the Auction and Sale Hearing are appropriate.   Under Bankruptcy Rules 2002(a) and (c), the Debtors are required to notify creditors of the proposed sale of the Debtors' Assets, including a disclosure of the time and place of an auction, the terms and conditions of a sale, and the deadline for filing any objections.   The Debtors submit that the notice procedures herein comply fully with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of any potential sale by Auction to the Debtors' creditors and other interested parties, as well as to those parties who have expressed an interest, or may express an interest, in bidding on the Transferred Assets.   The proposed timeframe

between the filing of this Motion, the commencement of the bidding process and the Auction should provide interested purchasers ample time to participate in the Auction, particularly given the extended marketing process that has preceded the APA with the Stalking Horse Purchaser.

**V.      The Proposed Break-Up Fee and Expense Reimbursement Are Appropriate Under the Circumstances.**

63.     As set forth in the APA, the Debtors seek approval from the court of the Bid Protections as administrative expenses of the Debtors' estates pursuant to sections 503 and 507 of the Bankruptcy Code.  The Bid Protections include (a) a Break-Up Fee in the greater amount of three percent (3%) of the Purchase Price set forth in any Prevailing Bid, or $500,000, plus (b) reimbursement of the Stalking Horse Purchaser's actual expenses in connection with the Sale, provided that the total of the Break-up Fee and Expense Reimbursement shall not exceed $1,000,000.  The Break-Up Fee and the Expense Reimbursement shall constitute administrative expenses with priority over any and all administrative expenses of the kind specified in Section 503(b) of the Bankruptcy Code until paid other than superpriority claims granted pursuant to the DIP Financing Order to the DIP Lender.

64.     Bid protections are standard and oftentimes necessary components of sales outside the ordinary course of business under section 363 of the Bankruptcy Code.  Bid protections encourage a potential purchaser to invest the requisite time, money and effort to conduct due diligence and sale negotiations with a debtor despite the inherent risks and uncertainties of the chapter 11 process.  *Integrated Res.*, 147 B.R. at 660 ("Break-up

fees and other strategies may be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking" and the expenses it incurs by having its offer held open, subject to higher and better offers); *see also In re ALC Holdings, LLC*, Case No. 11-13853 (MFW) (Bankr. D. Del. Jan. 10, 2012) (approving expense reimbursement in favor of stalking horse purchaser that also served as administrative agent and postpetition lender).

65.    Proposed bid protections should be approved in cases where implementing them would serve the best interests of the estate. *In re S.N.A. Nut Co.*, 186 B.R. 98, 104 (Bankr. N.D. Ill. 1995); *see also In re America West Airlines, Inc.*, 166 B.R. 908, 912 (Bankr. D. Ariz. 1994); *In re 995 Fifth Ave. Assocs. L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989). Typically, this means that some benefit must be provided to the debtor's estate. *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 533 (3d Cir. 1999) ("Such fees [to the stalking horse bidder] could be awarded under [section 503] only if [its] participation in the bidding process was necessary to accord the estate an actual benefit."); *Integrated Res.*, 147 B.R. at 660 ("Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets.")

66.    In *Calpine Corp.*, the Third Circuit found that whether breakup fees and expenses could be paid to Calpine Corp. as a "stalking horse" depended on whether such fees were necessary to preserve the value of the estate. 181 F.3d at 536. More specifically, the court determined that whether these protections were "necessary" depended on whether they provided a benefit to the debtor's estate by promoting

competitive bidding or researching the value of the assets at issue to increase the likelihood that the selling price reflected the true value of the company. *Id.* at 537.

67.    Here, the Bid Protections were critical in persuading the Stalking Horse Purchaser to make an initial offer and to expend the time and resources associated with conducting due diligence regarding the Transferred Assets and with negotiating and entering into the APA.   Indeed, without approval of the Bid Protections, the Stalking Horse Purchase will have the ability to, and likely will, terminate the APA and have no further obligation to pursue a transaction.  The APA will further serve as a "floor" for other bidders in connection with the sale process and increase the likelihood that other Potential Bidders will emerge and make Bids and participate in the Auction.  Without the Stalking Horse Purchaser, the Debtors may soon face liquidity constraints within several months and may not be able to continue as a going concern, which would likely lead to a substantially reduced price for the Transferred Assets than possible through the proposed APA and Auction process.

68.    A proposed break-up fee should be approved so long as it is reasonable in light of a stalking horse bidder's projected efforts and, in terms of its percentage and amount, is of the same order of magnitude as break-up fees approved in other cases. Courts typically approve break-up fees in the approximate amount of 3% of the stalking horse bid.  *See, e.g.*, *In re Global Home Products LLC, et al.*, Case No. 06-10340 (KG) (Bankr. D. Del. July 14, 2006) (order approving a breakup fee of $650,000 or 3.1% of purchase price of $21 million); *In re Fruit of the Loom, Inc.*, Case No. 99-4497 (PJW) (Bankr. D. Del. Dec. 11, 2001) (approving a $25 million, or 3% of purchase price,

breakup fee); *In re Caldor, Inc.*, Case No. 95-B-44080 (JLG) (Bankr. S.D.N.Y. Feb. 4, 1999) (order approving breakup fees of $1,900,000 on purchase price of $75,735,000 and $3,550,000 on purchase price of $142,000,000 or approximately 2.5%); *In re Fluid Routing Solutions Intermediate Holding Corp., et al.*, Case No. 09-10384 (CSS) (Bankr. D. Del., February 19, 2009) (order approving an expense reimbursement fee of $750,000 or 6.82% of the purchase price of $11 million); *In re G+G Retail, Inc.*, Case No. 06-10152 (RDD) (Bankr. S.D.N.Y. Jan. 30, 2006) (approving break-up fee of 3%); *In re Musicland Holding Corp.*, Case No. 06-10064 (SMB) (Bankr. S.D.N.Y. Jan. 17, 2006) (approving break-up fee of 3% of the purchase price); *In re Choice Building Supplies of Westchester Co. Inc.*, Case No. 13-23859 (RDD) (Bankr. S.D.N.Y. May 5, 2014) (approving bidder protections of approximately 3.64% of the purchase price); *In re HMX Acquisition Corp.*, Case No. 12-14300 (ALG) (Bankr. S.D.N.Y. Nov. 29, 2012) (approving bidder protections of approximately 3.46% of the purchase price); *In re Cabrini Med. Ctr.*, Case No. 09-14398 (AJG) (Bankr. S.D.N.Y. Dec. 30, 2009) (approving a breakup fee of approximately 3.75% of the purchase price).

69.     Here, the proposed Break-Up Fee satisfies these criteria because, if paid, it will be capped at the greater of $500,000 or three percent (3%) of the Purchase Price in any Prevailing Bid.  The Break-Up Fee is reasonable and consistent with the range of bid protections typically approved in bankruptcy courts in this District and elsewhere. *See, e.g.*, *In re dELiA*s, Inc.*, Case No. 14-23678 (RDD) (Bankr. S.D.N.Y. February 10, 2015) (order approving of a break-up fee equal to 3% of the cash portion of the payment amount and reimbursement of expenses for up to $50,000 in out of pocket

expenses or, combined, 5% of the cash portion of the purchase amount of $2.5 million); *In re BearingPoint, Inc.*, No. 09-10691 (REG) (Bankr. S.D.N.Y. Apr. 7, 2009) [Doc. No. 369] (approving a break-up fee of approximately 3% of the purchase price and expense reimbursement up to $5,000,000); *In re Bally Total Fitness of Greater New York, Inc.*, No 07-12395 (BRL) (Bankr. S.D.N.Y. Aug. 21, 2007) [Doc. No. 269] (approving break-up fee of 4.3% and expense reimbursement); *In re SiliconGraphics, Inc.*, No. 09-11701 (MG) (Bankr. S.D.N.Y. Apr. 3, 2009) (approving a breakup fee and expense reimbursement totaling approximately 6% of the total purchase price); *In re Nortel Networks Inc., et al.*, Case No. 09-10138(KG) (Bankr. D. Del., February 27, 2009) (order approving a break-up fee of $650,000 and additional expense reimbursement up to $400,000 or, combined, 5.95% of the base purchase price of $17.65 million); *In re Great Northern Paper, Inc., Case No. 03-10048* (Bankr. D. Me., February 18, 2003) (order approving a break-up fee of $5 million and additional expense reimbursement up to $750,000 or, combined 6.32% of the base purchase price of $91 million); *In re F-Squared Investment Management, LLC, et al.*, Case No. 15-11469 (LSS) (Bankr. D. Del., July 28, 2015) (order approving a break-up fee of $250,000 and expense reimbursement up to $250,000 or, combined, 10% of the $5 million cash portion of the base purchase price to be paid at the closing, where purchaser may be required to pay additional contingent earn-outs in the future); *In re Bank of Commerce Holdings, Inc.*, Case No. 8:16-bk-08197 (CPM) (Bankr. M.D. Fla. Oct. 3, 2016) (order approving a breakup fee of $200,000.00 on a purchase price of $1.75 million); *In re A123 Systems, Inc., et al.*, Case No. 12-12859 (KJC) (Bankr. D. Del., Nov. 8, 2012) [Doc. No. 314]

(order approving a break-up fee and expense reimbursement that totaled 6.2% of the purchase price). Additionally, the Expense Reimbursement is reasonable, and similar expense reimbursements have been approved in this District and Circuit. *See In re Antaramian Props., Inc.*, 564 B.R. 762 (M.D. Fla. 2016) (citing *In re Sea Island Company*, No. 10-21034, 2010 Bankr. LEXIS 3850 at *3 (Bankr. S.D. Ga. Sep. 14, 2010) for its holding "that a breakup fee of 3% constituted a fair and reasonable percentage of the proposed purchase price"); *In re Amelia Island Co.*, No. 3:09-bk-09601, 2010 Bankr. LEXIS 5396 (Bankr. M.D. Fla. July 9, 2010) (approving a $469,000.00 break-up fee and $500,000.00 expense reimbursement); *In re Camptech Precision Manufacturing, Inc.*, 2010 Bankr. LEXIS 6045 (Bankr. S.D. Fla. Dec. 23, 2010) (order approving what amounted to a 15% maximum – $150,000.00 in actual expenses and fees on a cash contribution of $1,000,000.00).

70. The Debtors believe that the proposed Bid Protections, if implemented, are fair and would reasonably compensate the Stalking Horse Purchaser(s) for taking actions that will benefit the Debtors' estates. The Bid Protections, if implemented, will compensate the Stalking Horse Purchaser(s) for the time, diligence, and professional fees incurred in negotiating the terms of the definitive Asset Purchase Agreement.

71. Also, the Debtors do not believe that the Bid Protections would have a chilling effect on the sale process. Rather, the Stalking Horse Purchaser(s), if designated, will increase the likelihood that the Debtors will receive the best possible price for the Assets, by permitting other Qualified Bidders to rely on the diligence performed by the Stalking Horse Purchaser, and moreover, by allowing Qualified Bidders to utilize the

Stalking Horse Bid as a platform for negotiations and modifications in the context of a competitive bidding process. Indeed, it was the Debtors' agreement (subject to this Court's approval) to the Bid Protections that finally commenced the sale process in earnest, after more than a year of formal marketing and more than two years since the Petition Date.

## VI.    The Assumption Procedures Provide Adequate Notice and Opportunity to Object and Should Be Approved.

72.    Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor-in-possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a). The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. *See, e.g., In re Stable Mews Assoc., Inc.*, 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984).   If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract. *See Group of Institutional Investors v. Chicago M St. P. & P.R.R. Co.*, 318 U.S. 523 (1943); *Sharon Steel Corp.*, 872 F.2d 36, 39-40 (3d Cir. 1989).   The business judgment test "requires only that the trustee [or debtor-in-possession] demonstrate that [assumption or] rejection of the contract will benefit the estate." *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting *Stable Mews Assoc.*, 41 B.R. at 596).  Any more exacting scrutiny would slow the administration of a debtor's

estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially. *See Richmond Leasing Co. v. Capital Bank, NA.*, 762 F.2d 1303, 1311 (5th Cir. 1985). Moreover, pursuant to Section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1).

73.    Once an executory contract is assumed, the trustee or debtor-in-possession may elect to assign such contract. *See In re Rickel Home Centers, Inc.*, 209 F.3d 291, 299 (3d Cir. 2000) ("[t]he Code generally favors free assignability as a means to maximize the value of the debtor's estate"); *see also In re Headquarters Dodge, Inc.*, 13 F.3d 674, 682 (3d Cir. 1994) (noting purpose of Section 365(f) is to assist the trustee in realizing the full value of the debtor's assets).

74.    Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future performance is provided." 11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent). Among other things, adequate assurance may be given

by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *Accord In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from debtors has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding.)

75.     Additionally, as set forth above, Section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under Title 11.  Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its Section 105(a) power is proper. *See In re Fesco Plastics Corp.*, 996 F.2d 152, 154 (7th Cir. 1993); *Pincus v. Graduate Loan Ctr. (In re Pincus)*, 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002). Accordingly, pursuant to Section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. *See, e.g., In re Chinichian*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code"); *In re Cooper Props. Liquidating Trust, Inc.*, 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of their creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws").

76.     The Debtors respectfully submit that the proposed Assumption Procedures are appropriate and reasonably tailored to provide non-Debtor parties to Assumed and Assigned Contracts with adequate notice, in the form of the Cure Notice, of the proposed

assumption and/or assignment of their applicable contract, as well as proposed Cure Amounts, if applicable. Such non-Debtor parties to the Assumed and Assigned Contracts will then be given an opportunity to object to such notice. Accordingly, the Debtors submit that implementation of the proposed Assumption Procedures and assumption and assignment of the Assumed and Assigned Contracts is appropriate in these cases.

**VII.    The PacBridge Parties Settlement Is Appropriate.**

77.    As set forth in the APA, the Sale to the Stalking Horse Purchaser requires that the Sale Order include approval of a settlement of various claims held by the PacBridge Parties against the Debtors. As set forth above, the Secured Lenders each assert that they hold a fully secured claim in the principal amount of $1,000,000 (for a total of $3,000,000) for pre-petition loans made by each of them to the Debtors, plus post-petition interest and fees. The Committees and the Debtors have asserted that certain of the liens securing the Secured Lenders' claims may be avoided as preferences, due to the timing of their perfection.[17]

78.    PacBridge has asserted an unsecured claim in the amount of $1,195,350.39 (the "PacBridge Claim" and together with the Secured Lender Claims, the "PacBridge Party Claims") against the Debtors in connection with its engagement by DinoKing to consult on the merger between DinoKing and Premier. The Debtors have filed an objection to the PacBridge Claim, but that objection is still pending.

---

[17] The Secured Lenders and the Debtors have entered into a tolling agreement to toll the running of the statute of limitations on the Debtors' avoidance claims pursuant to 546 of the bankruptcy code.

79.    The APA provides for the settlement of the disputes between the Debtors and the PacBridge Parties regarding the PacBridge Party Claims.  The APA provides that upon Closing, in full satisfaction of the respective claims of the PacBridge Parties, (x) the Secured Lenders will receive in consideration of their Secured Lender Claims, (i) a $1 million cash payment, plus (ii) allowed general unsecured claims against the Debtors in the total aggregate amount of $2,000,000, to be allocated $666,666.67 to Feng, $666,666.67 to Zhang, and $666,666.66 to Zou, and (y) PacBridge will have an allowed general unsecured claim against the Debtors in the amount of $1,195,350.39 (the "PacBridge Parties Settlement").  Thus, the PacBridge Parties Settlement will increase payouts to unsecured creditors in two ways:  1) the Debtors will not be required to pay post-petition interest or fees on the Secured Lender Claims, and 2) by agreeing that 2/3 of the claims are unsecured, the Secured Lenders will share in distributions pro rata with unsecured claims instead of being paid in full before unsecured claims receive a distribution.  The Debtors believe the PacBridge Parties Settlement is in the best interest of the Debtors and their estates and should be approved.

80.    Compromises are generally favored in Chapter 11 cases.  *See e.g., Barry v. Smith (In re New York, New Haven and Hartford R.R. Co.)*, 632 F.2d 955, 959 (2d Cir. 1980).  Approval of a settlement is left to the sound discretion of the court based upon the particular circumstances of the proposed settlement and the case as a whole. *See Langes v. Green*, 282 U.S. 531, 541 (1931).

81.    The Debtor is obligated to maximize the value of the estate and make its decisions in the best interests of all of the creditors of the estate.  *See, e.g., Myers v.*

*Martin (In re Martin)*, 91 F.3d 389, 394 (3d Cir. 1996).  Courts generally defer to a Debtor's business judgment when there is a legitimate business justification for the decision to compromise a dispute. *Id.* at 395.

82.    In determining whether a settlement should be approved under Bankruptcy Rule 9019, the court must consider: "(a) the probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises." *Wallis v. Justice Oaks II, Ltd. (In re Justice Oaks II, Ltd.)*, 898 F.2d 1544, 1549 (11th Cir. 1990) (internal citations omitted).

83.    As reiterated by numerous courts, "a bankruptcy court is not required to hold a mini-trial on the merits of the settlement.  Instead, it is charged with 'canvassing the issues to determine whether the settlement falls below the lowest point in the range of reasonableness.'" *In re Enron Corp.*, 2003 U.S. Dist. LEXIS 1383 at *6 (S.D.N.Y. Jan. 31, 2003) (affirming bankruptcy court order approving settlement and (quoting *In re Interstate Cigar Co.*, 240 B.R. 816, 822 (E.D.N.Y. 1999)); *Abeles v. Infotechnology (In re Infotechnology)*, 1995 U.S. App. LEXIS 39883 at *4-5 (2d Cir. Nov. 9, 1995) (the court should not substitute its business judgment for that of the debtor in possession).

84.    Here, the PacBridge Parties Settlement is reasonable and should be approved under the circumstances.  The Secured Lenders have significant defenses to any avoidance claims brought by the Debtors, and it is not certain that any claim seeking to avoid the liens would be successful.  Thus, the agreement to reduce the value of their

liens by more than 2/3 is of significant value to the Debtors and their estates given the uncertainty of outcome and cost associated with litigating such avoidance claims. The PacBridge Claim may also have a colorable basis for its unsecured claim despite its engagement letter being with DinoKing. Given the uncertainty surrounding the Debtors claims and objections regarding the PacBridge Parties Claims and that resolution of the PacBridge Parties' Claims on the terms set forth in the APA was a material inducement to the execution of the APA by the Stalking Horse Purchaser and its willingness to move forward with the Sale, it is appropriate to resolve the disputes between the Debtors and the PacBridge Parties on the terms embodied in the PacBridge Parties Settlement.

## NOTICE

85.    Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (a) all creditors or their counsel known by the Debtors to assert a lien (including any security interest), claim, right, interest or encumbrance of record against all or any portion of the Transferred Assets; (b) the Office of the United States Trustee; (c) the Securities and Exchange Commission; (d) all applicable federal, state and local taxing and regulatory authorities of the Debtors or recording offices or any other governmental authorities that, as a result of the sale of the Transferred Assets, may have claims, contingent or otherwise, in connection with the Debtors' ownership of the Transferred Assets or have any known interest in the relief requested by the Motion; (e) the state and local environmental agencies in the jurisdictions where the Debtors own or lease real property; (f) the United States Attorney's office for the Middle District of Florida; (g) the National Oceanic and Atmospheric Administration; (h) all parties in

interest who have requested notice pursuant to Bankruptcy Rule 2002 as of the date of entry of this Bidding Procedures Order; (i) counsel to the Creditors Committee; (j) counsel to the Equity Committee; (k) all parties to any litigation involving the Debtors; (l) all counterparties to any executory contract or unexpired lease of the Debtors; (m) AEG Presents LLC *f/k/a* AEG Live LLC; and (n) counsel for the DIP Lender.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

WHEREFORE, the Debtors respectfully request that the Court (i) enter the Bidding Procedures Order in the form attached hereto as Exhibit A, (ii) enter the Sale Order in the form attached hereto as Exhibit C, and (iii) grant such other and further relief as the Court may deem proper.

NELSON MULLINS RILEY
& SCARBOROUGH LLP


By_____*/s/ Daniel F. Blanks*_____
  Daniel F. Blanks (FL Bar No. 88957)
  Lee D. Wedekind, III (FL Bar No. 670588)
  50 N. Laura Street, Suite 4100
  Jacksonville, FL 32202
  (904) 665-3656 (direct)
  (904) 665-3699 (fax)
  daniel.blanks@nelsonmullins.com
  lee.wedekind@nelsonmullins.com

and

TROUTMAN SANDERS LLP
Harris B. Winsberg (GA Bar No. 117751)
Stephen S. Roach (GA Bar No. 770892)
Matthew R. Brooks (GA Bar No. 378018)
600 Peachtree Street NE, Suite 5200
Atlanta, GA 30308
(404) 885-3000 (phone)
(404) 962-6990 (fax)
harris.winsberg@troutmansanders.com
stephen.roach@troutmansanders.com
matthew.brooks@troutmansanders.com

*Counsel for the Debtors and Debtors in Possession*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using CM/ECF on June 15, 2018. I also certify that the foregoing document is being served this day on the following counsel of record via transmission of Electronic Filing generated by CM/ECF:

Jay B. Verona, Esq.
Shumaker, Loop & Kendrick, LLP
101 E. Kennedy Blvd., Suite 2800
Tampa, FL 33602
(813) 229-7600
jverona@slk-law.com
*Attorneys for George F. Eyde*
*Orlando, LLC and Louis J. Eyde*
*Orlando, LLC*

Jill E. Kelso, Esq.
Miriam G. Suarez, Esq.
Office of the United States Trustee
400 W. Washington Street, Suite 1100
Orlando FL 32801
(407) 648-6301 ext. 137
jill.kelso@usdoj.gov
Miriam.g.suarez@usdoj.gov
*Attorneys for Guy G. Gebhardt,*
*Acting U.S. Trustee for Region 21*

Scott M. Grossman, Esq.
Greenberg Traurig
401 East Las Olas Boulevard, Suite 2000
Fort Lauderdale, FL 33301
(954) 768-5212
grossmansm@gtlaw.com
*Attorneys for Lang Feng, Haiping Zou,*
*Jihe Zhang, and High Nature Holdings*
*Limited*

Ari Newman, Esq.
Greenberg Traurig, P.A.
333 S.E. 2nd Avenue, Suite 4400
Miami, FL 33131
(305) 579-0500
newmanar@gtlaw.com
*Attorneys for Lang Feng, Haiping Zou,*
*Jihe Zhang, and High Nature Holdings*
*Limited*

Jason B. Burnett, Esq.
GrayRobinson, P.A.
50 N. Laura Street, Suite 1100
Jacksonville, FL 32202
(904) 598-9929
jason.burnett@gray-robinson.com
*Attorneys for 417 Fifth Avenue Real*
*Estate, LLC*

Andrew T. Jenkins, Esq.
Bush Ross, P.A.
P.O. Box 3913
Tampa, FL 33601-3913
(813) 224-9255
ajenkins@bushross.com
*Attorneys for Bank of America, N.A.*

Matthew J. Troy, Esq.
U.S. Dept. of Justice
1100 L Street NW, Suite 10030
Washington, DC 20005
(202) 514-9038
matthew.troy@usdoj.gov
*Attorneys for the United States Department
of Commerce, National Oceanic and
Atmospheric Administration*

Kathy A. Jorrie, Esq.
Pillsbury Winthrop Shaw Pittman LLP
725 S. Figueroa Street, Suite 2800
Los Angeles, CA 90017
(213) 488-7251
Kathy.jorrie@pillsburylaw.com
*Attorneys for AEG Live, Inc.*

Brian D. Equi, Esq.
Goldberg Segalla, LLP
121 S. Orange Avenue, Suite 1500
Orlando, FL 32801
(407) 458-5608
bequi@goldbergsegalla.com
salamina@goldbergsegalla.com
sherndon@goldbergsegalla.com
*Attorneys for Structure Tone, Inc.*

J. Ellsworth Summers, Jr., Esq.
Burr Forman, LLP
50 N. Laura Street, Suite 3000
Jacksonville, FL 32202
(904) 232-7200
esummers@burr.com
*Attorneys for Michael J. Little*

Norman P. Fivel, Esq.
Assistant Attorney General
Office of the New York State
Attorney General
Civil Recoveries Bureau,
Bankruptcy Litigation Unit
The Capitol
Albany, NY 12224-0341
(518) 776-2264
norman.fivel@ag.ny.gov
*Attorneys for New York Dept. of Taxation
and Finance*

D. Marcus Braswell, Jr., Esq.
Sugarman & Susskind, P.A.
100 Miracle Mile, Suite 300
Coral Gables, FL 33134
(305) 529-2801
mbraswell@sugarmansusskind.com
*Attorneys for Theatrical Protective Union,
Local No. One, IATSE*

Chris Broussard, Esq.
Suzy Tate, P.A.
14502 N. Dale Mabry Highway, Suite 200
Tampa, FL 33618
(813) 264-1685
cbrouss@suzytate.com
*Attorneys for The Armada Group GP, Inc.*

Richard R. Thames, Esq.
Thames Markey & Heekin, P.A.
50 N. Laura Street, Suite 1600
Jacksonville, FL 32202
(904) 358-4000
rrt@tmhlaw.net
*Attorneys for Official Committee of
Unsecured Creditors*

Avery Samet, Esq.
Jeffrey Chubak, Esq.
Storch Amini & Munves PC
140 East 45th Street, 25th Floor
New York, NY 10017
(212) 490-4100
asamet@samlegal.com
jchubak@samlegal.com
*Attorneys for Official Committee of
Unsecured Creditors*

Jacob A. Brown, Esq.
Katherine C. Fackler, Esq.
Akerman LLP
50 N. Laura Street, Suite 3100
Jacksonville, FL 32202
(904) 798-3700
jacob.brown@akerman.com
katherine.fackler@akerman.com
*Attorneys for the Official Committee of
Equity Security Holders of Premier
Exhibitions, Inc.*

T. David Mitchell, Esq.
Brenner Kaprosy Mitchell, L.L.P.
30050 Chagrin Blvd., Suite 100
Pepper Pike, OH 44124
(216) 292-5555
tdmitchell@brenner-law.com
*Attorneys for CRI Properties, Ltd.*

Susan R. Sherrill-Beard, Esq.
U.S. Securities and Exchange Commission
Office of Reorganization
950 East Paces Ferry Road, N.E.
Suite 900
Atlanta, GA 30326
(404) 842-7626
sherrill-beards@sec.gov
atlreorg@sec.gov
*Attorneys for U.S. Securities and
Exchange Commission*

Peter J. Gurfein, Esq.
Roye Zur, Esq.
Landau Gottfried & Berger LLP
1801 Century Park East, Suite 700
Los Angeles, CA 90067
(310) 557-0050
pgurfein@lgbfirm.com
rzur@lgbfirm.com
*Attorneys for Official Committee of Equity Security
Holders of Premier Exhibitions, Inc.*

Skyler M. Tanner, Esq.
Lane Powell PC
601 SW Second Avenue, Suite 2100
Portland, OR 97204
tanners@lanepowell.com
beldingt@lanepowell.com
docketing-pdx@lanepowell.com
*Attorneys for Oregon Museum of Science and
Industry*

Howard Siegel, Esq.
945 McKinney Street, PMB 434
Houston, TX 77002
(713) 984-4801
howard@eucinv.com
*Attorney for Euclid Investments, LP
And Euclid Claims Recovery LLC*

Garrett A. Nail, Esq.
John F. Isbell, Esq.
Thompson Hine LLP
3560 Lenox Road, Suite 1600
Atlanta, GA 30326
(404) 541-2900
garrett.nail@thompsonhine.com
john.isbell@thompsonhine.com
*Attorneys for Bay Point Capital Partners, LP*

Steven R. Fox, Esq.
Fox Law Corporation
17835 Ventura Blvd., Suite 306
Encino, CA 91316
srfox@foxlaw.com
*Attorneys for Titanic Entertainment*
*Holdings*

Stephen D. Busey, Esq.
Asghar A. Syed, Esq.
Smith Hulsey & Busey
225 Water Street, Suite 1800
Jacksonville, FL 32202
(904) 359-7700
busey@smithhulsey.com
asyed@smithhulsey.com
*Attorneys for the Ad Hoc Group of Equityholders*

Jennifer Feldsher, Esq.
David L. Lawton, Esq.
Bracewell LLP
1251 Avenue of the Americas
New York, NY 10020
(212) 508-6100
Jennifer.feldsher@bracewell.com
David.laweton@bracewell.com
*Attorneys for the Ad Hoc Group of*
*Equityholders*

Patricia Ann Redmond, Esq.
Stearns Weaver, et al.
150 West Flagler Street, Suite 2200
Miami, FL 33130
(305) 789-3200
predmond@stearnweaver.com
*Attorneys for the Trustees of the National Maritime*
*Museum*

Timothy Graulich, Esq.
James I. McClammy, Esq.
Mara Theophila, Esq.
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
(212) 450-4000
Timothy.graulich@davispolk.com
James.mcclammy@davispolk.com
Mara.theophila@davispolk.com
*Attorneys for the Trustees of the National*
*Maritime Museum*

Jason B. Burnett, Esq.
Ashlea A. Edwards, Esq.
GrayRobinson, P.A.
50 N. Laura Street, Suite 1100
Jacksonville, FL 32202
(904) 598-9929
jason.burnett@gray-robinson.com
ashlea.edwards@gray-robinson.com
*Attorneys for Ramparts, Inc. d/b/a Luxor Hotel*
*and Casino*

**Via U.S. Mail**

A-1 Storage and Crane
2482 197th Avenue
Manchester, IA 52057

ABC Imaging
5290 Shawnee Road, Suite 300
Alexandria, VA 22312

A.N. Deringer, Inc.
PO Box 11349
Succursale Centre-Ville
Montreal, QC H3C 5H1

ATS, Inc.
1900 W. Anaheim Street
Long Beach, CA 90813

Broadway Video
30 Rockefeller Plaza
54th Floor
New York, NY 10112

CBS Outdoor/Outfront Media
185 US Highway 48
Fairfield, NJ 07004

Dentons Canada LLP
250 Howe Street, 20th Floor
Vancouver, BC V6C 3R8

Enterprise Rent-A-Car Canada
709 Miner Avenue
Scarborough, ON M1B 6B6

Expedia, Inc.
10190 Covington Cross Drive
Las Vegas, NV 89144

George Young Company
509 Heron Drive
Swedesboro, NJ 08085

Gowlings
550 Burrard Street
Suite 2300, Bental 5
Vancouver, BC V6C 2B5

Hoffen Global Ltd.
305 Crosstree Lane
Atlanta, GA 30328

Kirvin Doak Communications
5230 W. Patrick Lane
Las Vegas, NV 89118

MNP LLP
15303 - 31st Avenue
Suite 301
Surrey, BC V3Z 6X2

Morris Visitor Publications
PO Box 1584
Augusta, GA 30903

NASDAQ Stock Market, LLC
805 King Farm Blvd.
Rockville, MD 20850

National Geographic Society
1145 - 17th Avenue NW
Washington, DC 20036

NYC Dept. of Finance
PO Box 3646
New York, NY 10008

PacBridge Limited Partners
22/F Fung House
19-20 Connaught Road
Central Hong Kong

Screen Actors Guild
1900 Broadway
5th Floor
New York, NY 10023

Sophrintendenza Archeologica
di Napoli e Pompei
Piazza Museo 19
Naples, Italy 80135

Time Out New York
405 Park Avenue
New York, NY 10022

TSX Operating Co.
70 West 40th Street
9th Floor
New York, NY 10018

WNBC - NBC Universal Media
30 Rockefeller Center
New York, NY 10112

United States Attorney's Office
Middle District of Florida
300 N. Hogan Street, Suite 700
Jacksonville, FL 32202


B.E. Capital Management Fund LP
Thomas Branziel
228 Park Avenue South, Suite 63787
New York, NY 10003
***Creditor Committee***

Pallet Rack Surplus, Inc.
1981 Old Covington Cross Road NE
Conyers, GA 30013

Seaventures, Ltd.
5603 Oxford Moor Blvd.
Windemere, FL 34786

Syzygy3, Inc.
231 West 29th Street
Suite 606
New York, NY 10001

TPL
3340 Peachtree Road
Suite 2140
Atlanta, GA 30326

Verifone, Inc.
300 S. Park Place Blvd.
Clearwater, FL 33759

Jonathan B. Ross, Esq.
Gowling WLG (Canada) LLP
550 Burrard Street, Suite 2300, Bentall 5
Vancouver, BC V6C 2B5
Christine R. Etheridge, Esq.
Bankruptcy Administration
Wells Fargo Vendor Financial Services, LLC
PO Box 13708
Macon, GA 31208

TSX Operating Co., LLC
c/o James Sanna
70 W. 40th Street
New York, NY 10018
***Creditor Committee***

Dallian Hoffen Biotechnique Co., Ltd.
c/o Ezra B. Jones
305 Crosstree Lane
Atlanta, GA 30328
***Creditor Committee***

 

 

*/s/ Daniel F. Blanks*
Attorney

~#4851-7069-0410~