## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

In re:

RMS TITANIC, INC., *et al.*,[1]

        Debtors.

Case No. 3:16-bk-02230-PMG
Chapter 11 (Jointly Administered)

---

### OBJECTION OF THE DEBTORS AND DEBTORS-IN-POSSESSION TO THE ENTRY OF AN ORDER APPROVING DISCLOSURE STATEMENT TO ACCOMPANY CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY THE OFFICIAL EQUITY COMMITTEE OF SECURITY HOLDERS OF PREMIER EXHIBITIONS, INC.

COMES NOW RMS Titanic, Inc. ("RMST") and certain of its affiliates, as Debtors and Debtors-in-Possession in the above captioned cases (collectively, the "Debtors"), by and through their undersigned counsel, hereby file this objection (the "Objection") pursuant to Section 1125(a) of Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code") to the *Disclosure Statement to Accompany Chapter 11 Plan of Reorganization Proposed by the Official Committee of Equity Security Holders of Premier Exhibitions Inc.* (the "EC Disclosure") [D.E. 1044].   In support thereof, the Debtors respectfully represent as follows:

---

[1] The Debtors in the chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include: RMS Titanic, Inc. (3162); Premier Exhibitions, Inc. (4922); Premier Exhibitions Management, LLC (3101); Arts and Exhibitions International, LLC (3101); Premier Exhibitions International, LLC (5075); Premier Exhibitions NYC, Inc. (9246); Premier Merchandising, LLC (3867); and Dinosaurs Unearthed Corp. (7309).  The Debtors' service address is 3045 Kingston Court, Suite I, Peachtree Corners, Georgia 30071.

**PRELIMINARY STATEMENT**

Full and fair disclosure is a critical component of every disclosure statement. Occasionally this requirement mandates the disclosure of information that is disadvantageous for the plan proponent, such as the pitfalls and risks attendant to the proposed plan. Nevertheless, the duty to provide "adequate information" persists – even when it is inconvenient.  The Equity Committee has not fulfilled this duty.  Instead, the Equity Committee submitted a disclosure statement that is incomplete, inaccurate, and at times materially misleading.  The EC Disclosure should not be approved for at least two fundamental reasons.

First, the EC Plan is unconfirmable on its face.  Despite repeated requests from the Debtors and nearly seven weeks since filing the EC Disclosure, the Equity Committee has not come forward with any evidence of its financial ability to confirm the EC Plan much less fund the inevitable litigation over the proposed auction of the French Artifacts. [2]  Equally troubling is the lack of a definitive effective date.  The EC Plan provides that a condition precedent to the Effective Date is that "The District Court shall have entered an order approving any Sale transaction of the American Artifacts."  However, there is no timeline, outside date, or expected sale date for, or even potential purchaser of, the American Artifacts. Thus, the EC Plan cannot be confirmed under Section 1129(a) because it lacks committed funding, targets an indefinite effective date, and is otherwise not feasible.  Approval of the EC Disclosure would serve only to further drain the Debtors' already burdened estates – all

---

[2] Capitalized words used but not defined herein shall have the meaning given to them in the EC Disclosure.

for the exercise of soliciting votes for a plan that cannot be confirmed and initiating what will be expensive contested confirmation litigation, with nearly all of the costs being borne by the Debtors' estates.

Second, the EC Disclosure omits critical information. No projected liquidation recovery is provided for the American Artifacts. Instead, the EC Disclosure offers creditors a mere "TBD." And, while the EC Disclosure sets forth a projected liquidation recovery for the French Artifacts, the estimate is based on pure speculation rather than facts. Indeed, the declaration supporting the highly speculative auction estimate specifies that the collection "in theory" could fetch as much as $50-70 million, but quickly notes that many variables "make it impossible to predict" what the collection will fetch at auction. In other words, the EC Disclosure fails to provide a factually supported recovery projection. Also absent from the EC Disclosure is any estimated timeframe in which the artifacts would be liquidated or in which claimants could expect a distribution and how the EC intends to operate and fund the Debtors' estates until then. Moreover, the EC Disclosure omits and conceals the considerable litigation risk attendant to an auction of the French Artifacts, which has the potential to paralyze any such sale or prohibit it altogether. Instead of informing the reader of the substantial risks and potential outcomes, the EC Disclosure gives the reader false security, stating that the Admiralty Court lacks jurisdiction over the French Artifacts, and that the Equity Committee budgeted funds "in the event" of litigation. The critical importance of these omissions, and others discussed below, cannot be overstated, and the EC Disclosure's failure to address them is a fatal flaw. For these reasons, and as more completely set forth below, the EC Disclosure should not be approved.

## BACKGROUND

1.        On June 14, 2016 (the "Petition Date"), each of the Debtors filed a voluntary petition in this Court for relief under Chapter 11 the Bankruptcy Code.

2.        The Debtors continue to manage and operate their businesses as debtors in possession under Bankruptcy Code Sections 1107 and 1108.

3.        On August 24, 2016, the United States Trustee appointed an Official Committee of Equity Security Holders (the "Equity Committee") [D.E. 167].

4.        On June 1, 2018, the Equity Committee filed its EC Disclosure in advance of its *Chapter 11 Plan of Reorganization Proposed by the Official Committee of Equity Security Holders of Premier Exhibitions, Inc.* (the "EC Plan") [D.E. 1045].  The EC Disclosure was set for hearing on July 25, 2018 [D.E. 1060].

5.        On July 13, 2018, the Court entered an Order abating the July 25, 2018 hearing and scheduling a status conference in its stead [D.E. 1112].  While the Debtors have moved the Court to reconsider its July 13 Order [D.E. 1114], the EC Disclosure has not been reset for hearing.

## OBJECTION

### I.        THE EC DISCLOSURE MUST NOT BE APPROVED BECAUSE IT SOLICITS ACCEPTANCE OF A FACIALLY UNCONFIRMABLE PLAN.

6.        The EC Plan is patently unconfirmable.  It is well-settled that a court should not approve a disclosure statement under Section 1125 of the Bankruptcy Code when the plan it describes is not capable of being confirmed.  *See In re Am. Capital Equip.*, LLC, 688 F.3d 145, 154-55 (3d Cir. 2012) (citing a number of cases that reached the same conclusion and

holding "the bankruptcy court may address the issue of plan confirmation where it is obvious at the disclosure statement stage that a later confirmation hearing would be futile because the plan described by the disclosure statement is patently unconfirmable."). Although, ordinarily, plan confirmation is decided apart from disclosure statement approval, "there is nothing in either the language or logic of the Code requiring the court or parties to 'grind the same corn a second time.'" *Id.* (quoting *In re Acequia, Inc.*, 787 F.2d 1352 (9th Cir. 1986)).

7.     To the contrary, it is incumbent upon the court to decline approval of a disclosure statement that describes a patently unconfirmable plan, so as to prevent the diminution in the value of the estate that would result from the expense of soliciting votes and seeking confirmation. *See, e.g.*, *In re Pecht*, 57 B.R. 137, 139 (Bankr. E.D. Va. 1986) ("If, on the face of the plan, the plan could not be confirmed, then the court will not subject the estate to the expense of soliciting votes and seeking confirmation."). This concern is heightened in instances where, as here, equity is clearly out of the money.

8.     Section 1129(a)(9)(A) of the Bankruptcy Code requires that administrative claimants receive, in full, payment of their allowed administrative claims <u>on</u> the effective date of the plan. *See, e.g.*, 7 COLLIER ON BANKRUPTCY ¶ 1129.02 (16th 2018) ("holders of administrative claims . . . must be paid in cash on the effective date."). In addition, Section 1129(a)(11) the Bankruptcy Code broadly requires that a plan be feasible. *Holmes v. United States (In re Holmes)*, 301 B.R. 911, 914 (Bankr. M.D. Ga. 2003) ("Section 1129(a)(11) of the Bankruptcy Code is often referred to as the feasibility requirement."). Finally, a plan must contain a relatively certain effective date. The EC Plan plainly fails these requirements. Accordingly, approval of the EC Disclosure must be denied.

9.      First, the EC Plan lacks committed funding.  It is inexcusable that the Equity Committee would waste estate resources drafting and prosecuting a plan without first confirming that its proposal could be funded.  Even worse, the Equity Committee still does not have funding, despite having filed the EC Disclosure and EC Plan nearly seven weeks ago.  To date, despite repeated requests, the Equity Committee has failed to provide the Debtors with any evidence of its financial ability to confirm the EC Plan and sufficient funding to continue the Debtors' businesses while litigating its proposed auction process of the French Artifacts.

10.     Given the lack of any funding, the EC Plan does not, and cannot, provide for administrative claimants to be paid in full on the Effective Date.  Instead, it provides for payment on allowed administrative claims *no earlier than* forty-five days after the Effective Date.  EC Plan, at § II.B.a.  This violates the plain mandate of the Bankruptcy Code – *i.e.,* that administrative claims be paid in full "on the effective date of the plan."  11 U.S.C. 1129(a)(9)(A).  *See also Collins v. Tenn. Dep't of Revenue*, 555 B.R. 670, 680 (W.D. Tenn. 2016) (noting that the administrative claimant should have known something was awry when "it did not receive a cash distribution on the effective date of the Plan, October 21, 2012."). Accordingly, the EC Plan violates Section 1129(a)(9)(A) of the Bankruptcy Code; and it is, therefore, unconfirmable.

11.     Second, it is impossible to determine when the Effective Date will occur from the face of the EC Plan, if ever.  Section IX.A. of the EC Plan provides that a condition precedent to the Effective Date is that "The District Court shall have entered an order approving any Sale transaction of the American Artifacts."  But there is no timeline, outside

date, or expected sale date for, or even potential purchaser of, the American Artifacts. Therefore, the Effective Date would never occur if the Liquidating Trustee fails to identify a purchaser of the American Artifacts, or if the Admiralty Court determines a proposed purchaser is not a "Qualified Institution." Alternatively, it is highly possible that the Effective Date could drag on for years.

12.     To be confirmable, a plan's effective date cannot be vague or indefinite and should be reasonably close to the confirmation date. *In re Potomac Iron Works*, 217 B.R. 170, 173 (Bankr. D. Md. 1997) ("The effective date plays an important role in valuation and should therefore be set forth in the plan with specificity."). Where, as here, the plan is a liquidating plan, the effective date must be close in time to confirmation to be reasonable. *In re Kruegen*, 66 B.R. 463, 465 (Bankr. S.D. Fla. 1986) (holding that an effective date set at approximately four months after the confirmation hearing date is "beyond the interval essential for liquidation . . . [and] is unreasonable"); *see also In re Jones*, 32 B.R. 951, 958 n.13 (Bankr. D. Utah 1983) ("'The effective date of the plan' is expressly designated as the critical point for the major financial standards for confirmation. The valuations required by these sections are likely to be less accurate if the effective date is not close to the date of the hearing on confirmation."). As drafted, the EC Plan provides no meaningful way to discern the Effective Date and is, therefore, unconfirmable on its face.

13.     Third, the EC Plan is not feasible.[3] Indeed, even if the forty-five-day delay in payment to administrative claimants were acceptable under the Bankruptcy Code, the EC

---

[3] Although Section 1129(a)(11) seems to exclude liquidating plans from its requirement of feasibility, and even though the Equity Committee included language suggesting that, there is no liquidation exception. "Even

Plan still could not affect a distribution.  As discussed above, the EC Plan contemplates making distributions after the sale of the Titanic Artifacts (along with the Debtors' other assets).  Importantly, the orderly liquidation of the Debtors' assets is the sole funding source for making distributions under the EC Plan.  Yet, neither the EC Disclosure nor the EC Plan disclose an exit financing facility.  Thus, the contemplated liquidation must net at least approximately $8.2 million to pay the DIP Loan and administrative claimants in full – all within forty-five days of the Effective Date (excluding the nearly $3.8 million necessary to pay secured claims and post-petition interest thereon)  *See* EC Plan, at § II.B.a. ("payment of an Administrative Expense that is an Allowed Claim as of the Effective Date shall be made on the later of forty-five (45) calendar days after the Effective Date . . .").

14.    When the substantial likelihood of litigation with NOAA is interjected, this timeline devolves into fantasy.  Indeed, assuming that NOAA objects to any such sale, as it has threatened to do, the proposed distribution to administrative claimants could only be accomplished if: (i) the Liquidating Trustee wins a decisive victory, NOAA does not appeal, and approximately $8.2 million worth of the Titanic Artifacts are sold – all within forty-five days; or (ii) the Liquidating Trustee finds a lender willing to pay the DIP Loan and administrative claims on the Effective Date <u>and</u> fund the litigation with NOAA.  The former is ludicrous, and the latter does not exist.  Thus, even assuming delayed payment on administrative claims is permissible under the Bankruptcy Code, the EC Plan cannot affect a distribution under the delayed timeline.

---

liquidating plans must be feasible." *Holmes v. United States (In re Holmes)*, 301 B.R. 911, 914 (Bankr. M.D. Ga. 2003) (quoting *In re Calvanese*, 169 B.R. 104, 106 (Bankr. E.D. Pa. 1994)).

15.    Thus, because the EC Plan violates both Section 1129(a)(11) and Section 1129(a)(9)(A) of the Bankruptcy Code, it is patently unconfirmable.  The EC Disclosure should not, therefore, be approved.

## II.    THE EC DISCLOSURE MUST NOT BE APPROVED BECAUSE IT FAILS TO PROVIDE "ADEQUATE INFORMATION" UNDER 11 U.S.C. § 1125(b).

16.    Section 1125(b) of the Bankruptcy Code provides that "[a]n acceptance or rejection of a plan may not be solicited . . . unless . . . there is transmitted [to purported plan participants] . . . a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information."  11 U.S.C. § 1125(b).  The Bankruptcy Code defines "adequate information" as "information of a kind, and in sufficient detail . . . that would enable [a] hypothetical investor of the relevant class to make an informed judgment about the plan."  11 U.S.C. § 1125(a).

17.    "Adequate information," although defined by the Bankruptcy Code, gives courts "wide discretion to determine on a case by case basis whether the disclosure is reasonable."  *In re Ferretti*, 128 B.R. 16, 18 (Bankr. D.N.H. 1991) (internal quotations and citations omitted).  To aid in that determination, bankruptcy courts have identified a number of factors "which may be mandatory, under the facts and circumstances of a particular case, to meet the statutory requirement of adequate information."  *In re Metrocraft Pub. Servs., Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984).  Disclosure is generally reasonable (adequate) if it contains all of the following:

> (1) the events which led to the filing of a bankruptcy petition;
> (2) a description of the available assets and their value; (3) the
> anticipated future of the company; (4) the source of information
> stated in the disclosure statement; (5) a disclaimer; (6)  the

> present condition of the debtor while in Chapter 11; (7) the scheduled claims; (8) the estimated return to creditors under a Chapter 7 liquidation; (9) the accounting method utilized to produce financial information and the name of the accountants responsible for such information; (10) the future management of the debtor; (11) the Chapter 11 plan or a summary thereof; (12) the estimated administrative expenses, including attorneys' and accountants' fees; (13) the collectability [*sic*] of accounts receivable; (14) financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the Chapter 11 plan; (15) information relevant to the risks posed to creditors under the plan; (16) the actual or projected realizable value from recovery of preferential or otherwise voidable transfers; (17) litigation likely to arise in a nonbankruptcy context; (18) tax attributes of the debtor; and (19) the relationship of the debtor with affiliates.

*In re Metrocraft Pub. Servs., Inc.*, 39 B.R. 567, 570 (Bankr. N.D. Ga. 1984). *See also, e.g.*, *In re Ashley River Consulting, LLC*, Nos. 14-13406 (MG), 14-13407 (MG), 2015 Bankr. LEXIS 3819, at *27-28 (Bankr. S.D.N.Y. Nov. 6, 2015) (using the *Metrocraft* factors); *In re Divine Ripe, L.L.C.*, 554 B.R. 395, 402 (Bankr. S.D. Tex. 2016) (adopting and using the *Metrocraft* factors).

18.    While meeting all of the *Metrocraft* factors is often necessary, it is not always sufficient. *In re Reilly*, 71 B.R. 132, 134 (Bankr. D. Mont. 1987) (quoting *Metrocraft*, 39 B.R. at 568)). In every case, the disclosure statement must provide information "essential for a party weighing the credibility and merits of the plan." *Id.* (quoting *In re Fierman*, 21 B.R. 314, 315 (Bankr. E.D. Pa. 1982)). *See also In re United States Brass Corp.*, 194 B.R. 420, 423 (Bankr. E.D. Tex. 1996) ("The purpose of the disclosure statements is . . . to provide enough information to interested persons so they may make an informed choice

between two alternatives."). Here, the EC Disclosure fails to meet all of the *Metrocraft* factors or provide adequate disclosure otherwise.

> **A.      Projections Relevant to the Creditors' Decision to Accept or Reject the Chapter 11 Plan.**

19.    Although the EC Disclosure includes a projected liquidation recovery of $40 - $60 million for the French Artifacts, the projection is seriously deficient. There is no factual support for the range given, other than "preliminary estimates" provided from "various auction houses."[4] Liquidation Analysis. Projections (and valuations), however, must be based on <u>facts</u> – not speculation or unsupported opinion. *See In re Reilly*, 71 B.R. 132, 135 (Bankr. D. Mont. 1987) ("the disclosure statement . . . must contain factual support of the opinions contained in [it]."). *Cf. In re Fierman*, 21 B.R. 314 (Bankr. E.D. Pa. 1982) ("[t]he proposal must set forth a factual basis for the purported value of the real property."). Without any factual basis, the projected range is nothing more than "a list of unsupported numbers." *Bank of the Ozarks v. Coastal Realty Inv., Inc. (In re Coastal Realty Inv., Inc.)*, No. 12-20564, 2013 Bankr. LEXIS 197, at *19 (Bankr. S.D. Ga. Jan. 17, 2013). This level of uncertainty is unacceptable for a disclosure statement. *See, e.g.*, *Rielly*, 71 B.R. at 135. *Cf. Bank of the Ozarks*, 2013 Bankr. LEXIS 197, at *19 (sustaining a partial objection to a

---

[4] "Various auction houses" is remarkably vague and not enough to establish factual support for the valuation. Mr. Arlan Ettinger's proposed valuation of the French Artifacts is similarly unhelpful. Mr. Ettinger opined that "the collection [French Artifacts] could <u>in theory</u> fetch as much as $50 million to $70 million," but quickly included the caveat that "there are clearly a great many variables which would make it <u>impossible</u> to predict with any certainty that similar items would perform in the same fashion." Declaration of Arlan Ettinger in Support of Equity Committee's Application for an Order Pursuant to 11 U.S.C. §§ 327(a) and 328(a) Authorizing the Retention of Guernsey's as Auctioneer (emphasis added). Assuming Mr. Ettinger's proposed liquidation valuation is based on anything other than speculation, it is clear that even he does not believe the valuation is accurate. Indeed, the Equity Committee has not indicated that Guernsey's (or any other auction house) has agreed to a guaranteed minimum price for <u>any</u> of the French Artifacts, much less the entire collection.

disclosure statement when the debtor failed to provide a narrative or data in support of the figures in his budget). It is particularly egregious here, where the EC Plan contemplates a full recovery[5] for creditors from liquidation of the Debtors' assets (the cornerstone of which are the French Artifacts and American Artifacts).

20. Worse still, the EC Disclosure does not estimate a timeframe in which claimants can expect the projected recovery.[6] The EC Disclosure provides only that beneficiaries of the Liquidating Trust will receive "an initial distribution," followed by "one or more interim distributions," after which they will receive "a final distribution." EC Disclosure § C. The EC Disclosure fails to provide even a rough estimate of the approximate date(s) on which those distribution(s) will be received. Instead, the EC Disclosure provides that distributions to unsecured creditors "will be made as soon as practicable after the Effective Date." EC Disclosure, § III.G.1. Likewise, while the EC Disclosure states that unsecured claimants and equity holders are "impaired" under the EC Plan, it does not state the basis for that impairment. Is it because unsecured claimants will eventually be paid in full, but not until the passage of, months, years, or longer, if at all? The reader has no way of predicting.

---

[5] This, arguably one of the most important facets of any disclosure statement, is not clear at all in the EC Disclosure. The Liquidation Analysis seems to contemplate a full recovery to unsecured creditors, but the EC Disclosure never affirmatively states that unsecured creditors will be paid in full. And, while all distributions to unsecured creditors are provided for as "pro rata distributions," the EC Disclosure (and EC Plan) seems to contemplate payment to equity, too. The lack of clarity is befuddling.

[6] This categorical failure to inform stakeholders of any projected recovery timeframe is even more ironic in the face of the Equity Committee's *Limited Joinder in and Statement in Support of the Motion of the Official Committee of Unsecured Creditors, the Trustees of the National Maritime Museum, the Board of Trustees of National Maritime Museums and Galleries of Northern Ireland, and Running Subway Productions, LLC for Entry of an Order Scheduling a Status Conference on or Before July 25, 2018* [D.E. 1103], in which they protest that "surprise" and "disenfranchisement of the Debtors' economic stakeholders" have "no place in a bankruptcy case." *Id.* at ¶ 12.

**B.      Information Relevant to the Risks Posed to Creditors under the Plan.**

21.     The EC Disclosure is woefully inadequate with regard to the litigation risks implicated by the EC Plan.  As set forth above, the EC Plan is premised on a sale of the Titanic Artifacts, sold separately as the American Artifacts and the French Artifacts.  The EC Plan contemplates the sale of the American Artifacts (as a whole) to a Qualified Institution.  EC Disclosure, at § III.C.1.  As for the French Artifacts, the EC Plan provides for their auction and sale by Guernsey's, not as an entire collection, but piecemeal or in lots (the proceeds of which are estimated to be anywhere from $40-60 million).[7]  EC Disclosure, at § I.J.; Liquidation Analysis.

22.     This rosy outlook is unaccompanied by any meaningful discussion of the substantial – and nearly certain – litigation risks associated with the sale of the French Artifacts.  Footnote five in the EC Disclosure, which states that the Equity Committee included "legal fees in the event that the right to sell the French Artifacts is challenged," Liquidation Analysis, at fn. 5 (emphasis added), is incredibly deceptive and carelessly gives the distinct impression that the risk of litigation is remote.  To the contrary, there is a substantial risk that NOAA will object to the Liquidating Trustee's auction and sale of the French Artifacts.  NOAA has consistently taken the position that the Covenants and Conditions require the Titanic Artifacts – including the French Artifacts[8] – to be kept together "as an integral whole."  *Response of United States of America to Motion of Euclid Claims*

---

[7] This valuation is factually unsupported, as discussed above.
[8] The Debtors do not agree with this analysis.  The Fourth Circuit found that the French Artifacts were not part of the *in rem* jurisdiction of the Admiralty Court; thus, the Covenants and Conditions are binding only on the American Artifacts.  Nonetheless, the Debtors recognize – and have been candid about – NOAA's interpretation.

*Recovery LLC for Appointment of Chapter 11 Trustee* [D.E. 1041] (the "NOAA Trustee Response"), at ¶ 3 (internal citations and quotations omitted).  In fact, the NOAA Trustee Response is an explicit warning that NOAA will object to any sale that breaks apart the Titanic Artifacts: "In light of . . . the movant's obvious preference for a sale of the French [A]rtifacts . . . NOAA expressly reserves its right to object or otherwise respond to any motion filed in the Court seeking authority to sell any of the artifacts recovered from the Titanic." *Id.* at ¶ 4 (emphasis added).

23.     Thus, there is a present, substantial, and known litigation risk attendant with selling (or attempting to sell) the French Artifacts.[9]  The outcome of that litigation has far-reaching implications as to whether and when the Liquidating Trust could ever make distributions.  If, for example, the Liquidating Trustee suffered an adverse ruling (*e.g.*, that the French Artifacts could not be sold apart from the American Artifacts), it almost certainly would have a tremendous impact on stakeholders' recovery.  In fact, even if the Liquidating Trustee won a favorable judgment at trial, NOAA would be entitled to an appeal without posting bond.  Fed. R. Bankr. P. 8007(d).  *See also In re Diaz*, No. 6:02-bk-05591-ABB, 2011 Bankr. LEXIS 215, at *6 (Bankr. M.D. Fla. Jan. 25, 2011) (noting "[former rule 8005] waives the requirement to post a bond when an appeal is taken by the United States or an officer or agency of the United States.").  The time, expense, and risk (*e.g.*, reversal) of an appeal is not only worth mentioning, it warrants substantial discussion and should not be

---

[9] There is also the possibility that the Admiralty Court could prevent the sale of the American Artifacts (if, for example, the Liquidating Trustee attempted to sell them to an insufficiently qualified buyer).  Although this risk may be less pronounced than the risks surrounding sale of the French Artifacts, it still merits discussion – particularly in a disclosure statement.  The EC Disclosure does not discuss this risk.

buried in a footnote to the Liquidation Analysis about projected legal fees "in the event that the right to sell the French Artifacts is challenged." Particularly where, as here, the EC Plan is being funded by projected recoveries. Indeed, the initial *in rem* litigation of the Titanic Artifacts, including appeals, lasted for approximately eighteen years (1993 – 2011). The Debtors cannot afford the delay of even the few months that contested confirmation proceedings would yield, let alone years before resolution of the litigation and District Court proceedings contemplated by the EC Plan. Despite these significant risks to the stakeholders' projected recovery, the EC Disclosure does not mention – much less analyze – one.

### C.    The Scheduled Claims.

24.    The EC Disclosure does not contain a sufficient description of the scheduled claims. It provides only a brief mention of the amount of scheduled claims in footnote twelve of the Liquidation Analysis, which sets forth an "estimate[d] range of $10.2 m[illion] to $11.2 m[illion]" for general unsecured claims (presumably based on the Debtors' "estimate of approximately $10.7 m[illion]" of unsecured claims). Liquidation Analysis, fn. 12. The EC Disclosure does not list the scheduled claims, nor does it discuss the impact (or probability) of claims being disallowed. More is required than a rough estimate of claims. *See In re Grabanski*, No. 10-30902, 2013 Bankr. LEXIS 1593, at *18 (Bankr. D.N.D. Apr. 12, 2013) (noting that the court properly sustained objections to the debtor's disclosure statement because, among other things, it did not "list scheduled claims."). Rather than provide an imprecise range of possible claims, "the [disclosure] statement should inform the reader what the undisputed claims are, [and] what effect, if any, there will be on the distribution if disputed claims are or are not allowed . . .." *Ferretti*, 128 B.R. at 19.

## RESERVATION OF RIGHTS

25.     The Debtors reserve all rights to raise the issues contained in this Objection and any other related issues in any contested matter and/or adversary proceeding, including, without limitation, objections to confirmation of the EC Plan or any other plan.  The Debtors further reserve their rights to amend, modify, or supplement this Objection in response to, or as a result of, any discovery conducted in connection with confirmation of the EC Plan and/or other submission in connection with the EC Plan or any other plan.  Finally, the Debtors reserve their right to adopt any other objections to approval of the EC Disclosure, or any other disclosure statement, filed by any other party in interest.

## CONCLUSION

The EC Disclosure should not be approved.  It does not provide a hypothetical voter with the data necessary to make an informed decision; instead, the EC Disclosure relies on speculation and uncorroborated opinion in an insidious attempt to convince the reader that the EC Plan is viable and worthwhile.  Far worse is the EC Disclosure's deceptive and manipulative characterization of the litigation risk surrounding any sale of the French Artifacts.  Alone, these omissions and deceptions are sufficient to warrant denial of a disclosure statement; together, they demand it.

In addition to the considerable problems that warrant denial of the EC Disclosure in its own right, it should be denied for the separate and critical reason that the EC Plan is patently unconfirmable.  It lacks funding or any remote certainty regarding an effective date. Requiring the Debtors' estates to shoulder the burden of solicitation of an unconfirmable plan – including the expense of contested confirmation litigation – would be the height of inequity.

WHEREFORE, the Debtors request that the Court sustain their objections and (i) deny approval of the EC Disclosure for its failure to provide adequate information and/or because the accompanying EC Plan is unconfirmable on its face, and (ii) grant the Debtors such other and further relief as is just and proper.

NELSON MULLINS RILEY
& SCARBOROUGH LLP


By_____/s/ Daniel F. Blanks_____
        Daniel F. Blanks (FL Bar No. 88957)
        Lee D. Wedekind, III (FL Bar No. 670588)
        50 N. Laura Street, Suite 4100
        Jacksonville, FL 32202
        (904) 665-3656 (direct)
        (904) 665-3699 (fax)
        daniel.blanks@nelsonmullins.com
        lee.wedekind@nelsonmullins.com

and

TROUTMAN SANDERS LLP
Harris B. Winsberg (GA Bar No. 117751)
Matthew R. Brooks (GA Bar No. 378018)
600 Peachtree Street NE, Suite 5200
Atlanta, GA 30308
(404) 885-3000 (phone)
(404) 962-6990 (fax)
harris.winsberg@troutmansanders.com
matthew.brooks@troutmansanders.com

*Counsel for the Debtors and Debtors in Possession*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using CM/ECF on July 18, 2018. I also certify that the foregoing document is being served this day on the following counsel of record via transmission of Electronic Filing generated by CM/ECF:

Jay B. Verona, Esq.
Shumaker, Loop & Kendrick, LLP
101 E. Kennedy Blvd., Suite 2800
Tampa, FL 33602
(813) 229-7600
jverona@slk-law.com
*Attorneys for George F. Eyde
Orlando, LLC and Louis J. Eyde
Orlando, LLC*

Jill E. Kelso, Esq.
Miriam G. Suarez, Esq.
Office of the United States Trustee
400 W. Washington Street, Suite 1100
Orlando FL 32801
(407) 648-6301 ext. 137
jill.kelso@usdoj.gov
Miriam.g.suarez@usdoj.gov
*Attorneys for Guy G. Gebhardt,
Acting U.S. Trustee for Region 21*

Scott M. Grossman, Esq.
Greenberg Traurig
401 East Las Olas Boulevard, Suite 2000
Fort Lauderdale, FL 33301
(954) 768-5212
grossmansm@gtlaw.com
*Attorneys for Lang Feng, Haiping Zou,
Jihe Zhang, and High Nature Holdings
Limited*

Ari Newman, Esq.
Greenberg Traurig, P.A.
333 S.E. 2nd Avenue, Suite 4400
Miami, FL 33131
(305) 579-0500
newmanar@gtlaw.com
*Attorneys for Lang Feng, Haiping Zou,
Jihe Zhang, and High Nature Holdings
Limited*

Jason B. Burnett, Esq.
GrayRobinson, P.A.
50 N. Laura Street, Suite 1100
Jacksonville, FL 32202
(904) 598-9929
jason.burnett@gray-robinson.com
*Attorneys for 417 Fifth Avenue Real
Estate, LLC*

Andrew T. Jenkins, Esq.
Bush Ross, P.A.
P.O. Box 3913
Tampa, FL 33601-3913
(813) 224-9255
ajenkins@bushross.com
*Attorneys for Bank of America, N.A.*

Matthew J. Troy, Esq.
U.S. Dept. of Justice
1100 L Street NW, Suite 10030
Washington, DC 20005
(202) 514-9038
matthew.troy@usdoj.gov
*Attorneys for the United States Department
of Commerce, National Oceanic and
Atmospheric Administration*

Kathy A. Jorrie, Esq.
Pillsbury Winthrop Shaw Pittman LLP
725 S. Figueroa Street, Suite 2800
Los Angeles, CA 90017
(213) 488-7251
Kathy.jorrie@pillsburylaw.com
*Attorneys for AEG Presents, LLC*

Brian D. Equi, Esq.
Goldberg Segalla, LLP
121 S. Orange Avenue, Suite 1500
Orlando, FL 32801
(407) 458-5608
bequi@goldbergsegalla.com
salamina@goldbergsegalla.com
sherndon@goldbergsegalla.com
*Attorneys for Structure Tone, Inc.*

J. Ellsworth Summers, Jr., Esq.
Burr Forman, LLP
50 N. Laura Street, Suite 3000
Jacksonville, FL 32202
(904) 232-7200
esummers@burr.com
*Attorneys for Michael J. Little*

Norman P. Fivel, Esq.
Assistant Attorney General
Office of the New York State
Attorney General
Civil Recoveries Bureau,
Bankruptcy Litigation Unit
The Capitol
Albany, NY 12224-0341
(518) 776-2264
norman.fivel@ag.ny.gov
*Attorneys for New York Dept. of Taxation
and Finance*

D. Marcus Braswell, Jr., Esq.
Sugarman & Susskind, P.A.
100 Miracle Mile, Suite 300
Coral Gables, FL 33134
(305) 529-2801
mbraswell@sugarmansusskind.com
*Attorneys for Theatrical Protective Union,
Local No. One, IATSE*

Chris Broussard, Esq.
Suzy Tate, P.A.
14502 N. Dale Mabry Highway, Suite 200
Tampa, FL 33618
(813) 264-1685
cbrouss@suzytate.com
*Attorneys for The Armada Group GP, Inc.*

Richard R. Thames, Esq.
Thames Markey & Heekin, P.A.
50 N. Laura Street, Suite 1600
Jacksonville, FL 32202
(904) 358-4000
rrt@tmhlaw.net
*Attorneys for Official Committee of
Unsecured Creditors*

Avery Samet, Esq.
Jeffrey Chubak, Esq.
Storch Amini & Munves PC
140 East 45th Street, 25th Floor
New York, NY 10017
(212) 490-4100
asamet@samlegal.com
jchubak@samlegal.com
*Attorneys for Official Committee of
Unsecured Creditors*

Jacob A. Brown, Esq.
Katherine C. Fackler, Esq.
Akerman LLP
50 N. Laura Street, Suite 3100
Jacksonville, FL 32202
(904) 798-3700
jacob.brown@akerman.com
katherine.fackler@akerman.com
*Attorneys for the Official Committee of
Equity Security Holders of Premier
Exhibitions, Inc.*

T. David Mitchell, Esq.
Brenner Kaprosy Mitchell, L.L.P.
30050 Chagrin Blvd., Suite 100
Pepper Pike, OH 44124
(216) 292-5555
tdmitchell@brenner-law.com
*Attorneys for CRI Properties, Ltd.*

Susan R. Sherrill-Beard, Esq.
U.S. Securities and Exchange Commission
Office of Reorganization
950 East Paces Ferry Road, N.E.
Suite 900
Atlanta, GA 30326
(404) 842-7626
sherrill-beards@sec.gov
atlreorg@sec.gov
*Attorneys for U.S. Securities and
Exchange Commission*

Peter J. Gurfein, Esq.
Roye Zur, Esq.
Landau Gottfried & Berger LLP
1801 Century Park East, Suite 700
Los Angeles, CA 90067
(310) 557-0050
pgurfein@lgbfirm.com
rzur@lgbfirm.com
*Attorneys for Official Committee of Equity Security
Holders of Premier Exhibitions, Inc.*

Skyler M. Tanner, Esq.
Lane Powell PC
601 SW Second Avenue, Suite 2100
Portland, OR 97204
tanners@lanepowell.com
beldingt@lanepowell.com
docketing-pdx@lanepowell.com
*Attorneys for Oregon Museum of Science and
Industry*

Howard Siegel, Esq.
945 McKinney Street, PMB 434
Houston, TX 77002
(713) 984-4801
howard@eucinv.com
*Attorney for Euclid Investments, LP
And Euclid Claims Recovery LLC*

Garrett A. Nail, Esq.
John F. Isbell, Esq.
Thompson Hine LLP
3560 Lenox Road, Suite 1600
Atlanta, GA 30326
(404) 541-2900
garrett.nail@thompsonhine.com
john.isbell@thompsonhine.com
*Attorneys for Bay Point Capital Partners, LP*

Steven R. Fox, Esq.
Fox Law Corporation
17835 Ventura Blvd., Suite 306
Encino, CA 91316
srfox@foxlaw.com
*Attorneys for Titanic Entertainment
Holdings*

Stephen D. Busey, Esq.
Asghar A. Syed, Esq.
Smith Hulsey & Busey
225 Water Street, Suite 1800
Jacksonville, FL 32202
(904) 359-7700
busey@smithhulsey.com
asyed@smithhulsey.com
*Attorneys for the Ad Hoc Group of Equityholders*

Jennifer Feldsher, Esq.
David L. Lawton, Esq.
Bracewell LLP
1251 Avenue of the Americas
New York, NY 10020
(212) 508-6100
Jennifer.feldsher@bracewell.com
David.laweton@bracewell.com
*Attorneys for the Ad Hoc Group of
Equityholders*

Patricia Ann Redmond, Esq.
Stearns Weaver, et al.
150 West Flagler Street, Suite 2200
Miami, FL 33130
(305) 789-3200
predmond@stearnweaver.com
*Attorneys for the Trustees of the National Maritime
Museum*

Timothy Graulich, Esq.
James I. McClammy, Esq.
Mara Theophila, Esq.
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
(212) 450-4000
Timothy.graulich@davispolk.com
James.mcclammy@davispolk.com
Mara.theophila@davispolk.com
*Attorneys for the Trustees of the National
Maritime Museum*

Jason B. Burnett, Esq.
Ashlea A. Edwards, Esq.
GrayRobinson, P.A.
50 N. Laura Street, Suite 1100
Jacksonville, FL 32202
(904) 598-9929
jason.burnett@gray-robinson.com
ashlea.edwards@gray-robinson.com
*Attorneys for Ramparts, Inc. d/b/a Luxor Hotel
and Casino*

**Via U.S. Mail**

A-1 Storage and Crane
2482 197th Avenue
Manchester, IA 52057

ABC Imaging
5290 Shawnee Road, Suite 300
Alexandria, VA 22312

A.N. Deringer, Inc.
PO Box 11349
Succursale Centre-Ville
Montreal, QC H3C 5H1

ATS, Inc.
1900 W. Anaheim Street
Long Beach, CA 90813

Broadway Video
30 Rockefeller Plaza
54th Floor
New York, NY 10112

CBS Outdoor/Outfront Media
185 US Highway 48
Fairfield, NJ 07004

Dentons Canada LLP
250 Howe Street, 20th Floor
Vancouver, BC V6C 3R8

Enterprise Rent-A-Car Canada
709 Miner Avenue
Scarborough, ON M1B 6B6

Expedia, Inc.
10190 Covington Cross Drive
Las Vegas, NV 89144

George Young Company
509 Heron Drive
Swedesboro, NJ 08085

Gowlings
550 Burrard Street
Suite 2300, Bental 5
Vancouver, BC V6C 2B5

Hoffen Global Ltd.
305 Crosstree Lane
Atlanta, GA 30328

Kirvin Doak Communications
5230 W. Patrick Lane
Las Vegas, NV 89118

MNP LLP
15303 - 31st Avenue
Suite 301
Surrey, BC V3Z 6X2

Morris Visitor Publications
543 Broad Street
Augusta, GA 30901

NASDAQ Stock Market, LLC
805 King Farm Blvd.
Rockville, MD 20850

National Geographic Society
1145 - 17th Avenue NW
Washington, DC 20036

NYC Dept. of Finance
PO Box 3646
New York, NY 10008

PacBridge Limited Partners
22/F Fung House
19-20 Connaught Road
Central Hong Kong

Pallet Rack Surplus, Inc.
1981 Old Covington Cross Road NE
Conyers, GA 30013

Screen Actors Guild
1900 Broadway
5th Floor
New York, NY 10023

Seaventures, Ltd.
5603 Oxford Moor Blvd.
Windemere, FL 34786

Sophrintendenza Archeologica
di Napoli e Pompei
Piazza Museo 19
Naples, Italy 80135

Syzygy3, Inc.
231 West 29th Street
Suite 606
New York, NY 10001

Time Out New York
405 Park Avenue
New York, NY 10022

TPL
3340 Peachtree Road
Suite 2140
Atlanta, GA 30326

TSX Operating Co.
70 West 40th Street
9th Floor
New York, NY 10018

Verifone, Inc.
300 S. Park Place Blvd.
Clearwater, FL 33759

WNBC - NBC Universal Media
30 Rockefeller Center
New York, NY 10112

Jonathan B. Ross, Esq.
Gowling WLG (Canada) LLP
550 Burrard Street, Suite 2300, Bentall 5
Vancouver, BC V6C 2B5

United States Attorney's Office
Middle District of Florida
300 N. Hogan Street, Suite 700
Jacksonville, FL 32202

Christine R. Etheridge, Esq.
Bankruptcy Administration
Wells Fargo Vendor Financial Services, LLC
PO Box 13708
Macon, GA 31208

B.E. Capital Management Fund LP
Thomas Branziel
228 Park Avenue South, Suite 63787
New York, NY 10003
***Creditor Committee***

TSX Operating Co., LLC
c/o James Sanna
70 W. 40th Street
New York, NY 10018
***Creditor Committee***

Dallian Hoffen Biotechnique Co., Ltd.
c/o Ezra B. Jones
305 Crosstree Lane
Atlanta, GA 30328
***Creditor Committee***

AEG Presents LLC
c/o Managing Member
800 W. Olympic Blvd.
Suite 305
Los Angeles, CA 90015

AEG Presents LLC
c/o CT Corporation System,
Registered Agent
ATTN: Amanda Garcia
818 West Seventh Street
Suite 930
Los Angeles, CA 90017

AEG Presents LLC
c/o Managing Member
5750 Wilshire Blvd.
Suite 501
Los Angeles, CA 90036-3638

AEG Presents LLC
c/o Managing Member
425 W. 11th Street
Los Angeles, CA 90015-3459

                         */s/ Daniel F. Blanks*
                                Attorney

~#4850-8978-9293~