**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

In re:

RMS TITANIC, INC., *et al.*,

      Debtors. [1]

_____/

Case No.: 3:16-bk-02230-PMG

Chapter 11

(Jointly Administered)

**EQUITY COMMITTEE'S RESPONSE IN OPPOSITION TO DEBTORS' MOTION FOR
ENTRY OF AN ORDER (A) APPROVING COMPETITIVE BIDDING AND SALE
PROCEDURES; (B) APPROVING FORM AND MANNER OF NOTICES; (C)
APPROVING FORM OF ASSET PURCHASE AGREEMENT; (D) APPROVING
BREAK UP-FEE AND EXPENSE REIMBURSEMENT; (E) SCHEDULING AUCTION
AND HEARING TO CONSIDER FINAL APPROVAL OF SALE, INCLUDING
REJECTION OR ASSUMPTION AND ASSIGNMENT OF RELATED EXECUTORY
CONTRACTS AND UNEXPIRED LEASES; (F) AUTHORIZING SALE OF THE
TRANSFERRED ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS,
ENCUMBRANCES, AND INTERESTS; AND (G) APPROVING SETTLEMENT
WITH THE PACBRIDGE PARTIES; AND (H) GRANTING RELATED RELIEF**

The Official Committee of Equity Security Holders (the "Equity Committee") of Premier

Exhibitions, Inc. ("Premier"), Chapter 11 Debtor in Case No. 3:16-bk-02232-PMG, hereby files

its response in opposition ("Response") to the *Debtors' Motion for Entry of an Order (a) Approving*

*Competitive Bidding and Sale Procedures; (b) Approving Form and Manner of Notices; (c)*

*Approving Form of Asset Purchase Agreement; (d) Approving Break-Up Fee and Expense*

*Reimbursement; (e) Scheduling Auction and Hearing to Consider Final Approval of Sale,*

*Including Rejection or Assumption and Assignment of Related Executory Contracts and Unexpired*

*Leases; (f) Authorizing Sale of the Transferred Assets Free and Clear of All Liens, Claims,*

---

[1] The Debtors in the chapter 11 cases, along with the last four digits of each Debtor's federal tax
identification number include: RMS Titanic, Inc. (3162); Premier Exhibitions, Inc. (4922); Premier
Exhibitions Management, LLC (3101); Arts and Exhibitions International, LLC (3101); Premier
Exhibitions International, LLC (5075); Premier Exhibitions NYC, Inc. (9246); Premier Merchandising,
LLC (3867); and Dinosaurs Unearthed Corp. (7309) (collectively, the "Debtors"). The Debtors' service
address is 3045 Kingston Court, Suite I, Peachtree Corners, Georgia 30071.

*Encumbrances, and Interests; and (g) Approving  Settlement with the PacBridge Parties; and (h)*

*Granting Related Relief* (Doc. 1055) (the "Sale Motion"), and in support of its Response

respectfully represents the following:

## PRELIMINARY STATEMENT

The Debtors' proposed bid procedures are designed to chill bidding, deter outsiders from

participating in the auction process, and secure a sale of the Debtors' assets to their preferred buyer

– an insider coalition that benefits the Debtors' insiders to the detriment of stakeholders to who

they owe duties they have failed to fulfill.  Although the Equity Committee takes issue with

virtually all of the bidding procedures proposed by the Debtors, and particularly the so-called

"protections" for the Debtors' preferred buyer, and although the Equity Committee firmly believes

the proposed bidding procedures should be overhauled in their entirety, this Response will focus

on four key components: (i) restrictions on solicitation of competing bids, (ii) due diligence

limitations, (iii) asset purchase agreement restrictions, (iv) improper financial protections, and (v)

uniformity concerns.  The proposed bidding procedures are likewise unacceptable as they do not

stand up to the heightened scrutiny required of an insider sale under 11 U.S.C. § 363 and the

proposed purchaser has not acted in good faith and should not be afforded any protections under

11 U.S.C. § 363(m).

## FACTUAL BACKGROUND

1. On June 14, 2016 (the "Petition Date"), each of the Debtors filed a voluntary

petition for relief under chapter 11 of the Bankruptcy Code, commencing the above-captioned,

jointly administered bankruptcy case (the "Bankruptcy Case").

2. The Debtors continue to operate their businesses as debtors in possession pursuant

to Bankruptcy Code Section 1107 and 1108.

3. No trustee or examiner has been appointed in the Bankruptcy Case.

2

4.      On June 21, 2016, the Debtors filed their Motion for Order Pursuant to Bankruptcy Code Sections 105 and 363 and Bankruptcy Rules 6003, 6004, and 9014 Authorizing the Debtors to Market and Sell Certain Titanic Artifacts Free and Clear of Liens, Claims, and Interests (Doc. 28) (the "Initial Sale Motion").

5.      Paragraph 12 of the Initial Sale Motion provides in part that:

In August 2010, the EDVA Court granted RMST a salvage award for its efforts in recovering and restoring the American Artifacts, and determined the award to be 100% of the fair market value of the American Artifacts, or approximately $110 million. R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel, 742 F. Supp. 2d 784, 809 (E.D. Va. 2010).

6.      Paragraph 21 of the Initial Sale Motion provides in part that:

For nearly 100 years, the wreck of the RMS TITANIC sat lifeless beneath the Atlantic Ocean. The 1987 expedition commenced nearly 30 years of uninterrupted efforts by RMST to recover and stabilize approximately 5,500 artifacts from the seabed, restore and conserve these artifacts, and exhibit them to tens of millions of people around the world. As the owner and Trustee of these artifacts, RMST recognizes and appreciates their historic value, and believes that the artifacts should remain together as a collection, made available to future generations. Recognizing, however, the extraordinary monetary value of the individual artifacts, and the Company's current circumstances, RMST believes a sale in bankruptcy of a very specific, limited number of artifacts from the French Collection serves the best interests of the Debtors' creditors, their shareholders, and both artifact collections.

7.      Paragraph 22 of the Initial Sale Motion provides in part that:

The American and French Titanic Artifact Collections have significant monetary value. In 2007, the American Collection was appraised at approximately $189 million. In 2009, noted personal property and fine arts appraiser Richard-Raymond Alasko conducted an appraisal review of the 2007 appraisal, and confirmed the reliability of the report. . . . In 2014, Mr. Alasko issued a report in which he opined that the combination French and American Collections had a total market value of approximately $218 million.

8.      Paragraph 23 of the Initial Sale Motion provides that:

RMST has never sold an artifact, nor has any other entity ever legally recovered or sold artifacts from the wreck site of the Titanic. Nevertheless, there exists a fertile market for the sale of Titanic-related artifacts and memorabilia saved by survivors of the tragedy, or culled from the surface waters by rescuers. For example, a cracker

from the ship sold for $23,000 last year. In 2013, a violin from a crew member sold for $1,454,400 at auction. In 2012, two menus sold for $140,000. While extraordinary, none of these items were recovered from the depths of the Atlantic, nor stabilized and conserved through decades of stewardship, which circumstances enhance the intrinsic value of the artifacts owned by the Company.

9.      Paragraph 24 of the Initial Sale Motion provides that:

Under these circumstances, the Debtors believe that a limited sale of artifacts (perhaps as few ten to twenty) from the French Collection would generate enough revenue to pay all of the Debtors' creditors in full, return all of the equity to the Debtors' shareholders and provide working capital for the Debtors as they emerge from bankruptcy. The proceeds from such a sale could likewise fund some or all of the Titanic reserve account referenced in Section V.D. of the Covenants, which is a dedicated endowment for the future care of the collections. Such a sale would leave the American Collection intact, and would preserve the vast majority of the approximately 2100 artifacts in the French Collection for presentation to future generations, thus facilitating the Debtors' ongoing obligations under the Covenants.

10.     On July 5, 2016, the Debtors filed their Supplement (Doc. 69) to the Initial Sale Motion.

11.     On July 22, 2016, the Court entered the Order on Motion for Order Authorizing the Debtors to Market and Sell Certain Titanic Artifacts Free and Clear of Liens, Claims, and Interests (Doc. 102) denying the Initial Sale Motion.

12.     On August 24, 2016, the Acting United States Trustee, Guy G. Gebhardt, appointed the members of the Equity Committee.

13.     On August 26, 2016, the Debtors filed an amended Scheduled D identifying each of Lange Feng, Jihe Zhang, and Haiping Zou as an insider or related party.  *See* Doc. 172 at pp. 5-6.

14.     On December 14, 2017, the Debtors filed a Joint Plan under Chapter 11 of the Bankruptcy Code (the "Debtors' Plan") (Doc. 859).  The Debtors never filed a disclosure statement to accompany the Debtors' Plan.

15.     On February 13, 2018, in the face of informal opposition from the Equity Committee and other constituencies, the Debtors filed a Notice of Withdrawal of the Debtors' Plan (Doc. 944).

16.     On November 14, 2017, the Debtors filed their Motion for Entry of Order (i) Approving Procedures in Connection with the Sale of All or Substantially All of the Debtors' Assets; (ii) Scheduling a Related Auction; (iii) Approving Procedures Related to the Assumption of Certain Executory Contracts and Unexpired Leases; (iv) Approving the Form and Manner of Notice Thereof; (v) Approving Bid Protections; and (vi) Granting Related Relief (Doc. 811) (the "Second Sale Motion").

17.     On December 12, 2017, the Ad Hoc Equity Committee, composed of Apollo Global Management, LLC ("Apollo") and Alta Fundamental Advisors, LLC ("Alta"), filed its Objection to the Motion of the Debtors for Entry of Order (i) Approving Procedures in Connection with the Sale of All or Substantially All of the Debtors' Assets; (ii) Scheduling a Related Auction; (iii) Approving Procedures Related to the Assumption of Certain Executory Contracts and Unexpired Leases; (iv) Approving the Form and Manner of Notice Thereof; (v) Approving Bid Protections; and (vi) Granting Related Relief (Doc. 850) (the "Ad Hoc Committee Objection").  The Ad Hoc Committee Objection, which is incorporated hereto by reference, is riddled with numerous statements contradicting the relief now sought through the Sale Motion.

18.     Paragraph 2 of the Ad Hoc Committee Objection provides that:

The Debtors began these chapter 11 cases with the stated intention to reorganize. Through selling a select few of their French artifacts (the "French Artifacts"), the Debtors anticipated generating sufficient cash to repay their outstanding debt while keeping their U.S. and remaining French Artifacts intact for the benefit of existing equity security holders. These conservative expectations were fully supported by the appraised value of the Debtors' assets which exceeds $200 million – or over *10 times* the amount of the outstanding debt. *Debtors' Motion for Order to Market and*

*Sell Certain Titanic Artifacts Free and Clear of Liens, Claims and Interests* (Dkt. No. 28, the "French Artifacts Sale Motion") ¶ 22.

19.     Paragraph 7 of the Ad Hoc Committee Objection provides that:

The Debtors' assets are comprised of rare, unique, and highly valuable artifacts—as well as a portfolio of cash flow generative exhibition businesses. Among other valuable assets, the Debtors own 5,500 artifacts recovered from the wreck site of the RMS Titanic ("RMS Artifacts"). As the Debtors themselves have observed, "there exists a fertile market for Titanic-related artifacts and memorabilia . . . [and] extraordinary monetary value [to] the individual artifacts." French Artifacts Sale Motion ¶ 23.

20.     Paragraph 13 of the Ad Hoc Committee Objection provides that:

Although less than two months had elapsed since the favorable Title Dispute ruling, on November 14, 2017, the Debtors filed the Sale Motion seeking approval for the sale of all their assets pursuant to 11 U.S.C. § 363 (the "363 Sale"). Sale Motion ¶¶ 5-7. The Sale Motion omits any explanation of the Debtors' rationale for the proposed liquidation sale in light of the Title Dispute ruling. Moreover, the Sale Motion fails to provide a good business justification for the bidding process selected by the Debtors or any comparative transactions that demonstrate the proposed process is likely to garner favorable results. As indicated above, the Debtors have not consulted with any renowned auctioneers on the instant sales process (emphasis added).

21.     On December 15, 2017, the Debtors filed their Notice of Withdrawal (Doc. 863) of the Second Sale Motion.

22.     On June 1, 2018, the Equity Committee filed its Chapter 11 Plan and accompanying Disclosure Statement (Docs. 1045 and 1044).

23.     On June 6, 2018, Premier Acquisition Holdings LLC (the "Purchaser") was formed. The Purchaser's equity holders include three insiders, Lang Feng, Jihe Zhang, and Haiping Zou (the "Secured Lenders").

24.     On June 15, 2018, the Debtors filed the Sale Motion.

25.     On June 29, 2018, the Creditors Committee filed its Chapter 11 Plan and accompanying Disclosure Statement (Docs. 1085 and 1084).

26.    On July 25, 2018, the Court conducted a status conference (the "Status Conference") during which it heard from the Debtors, the Committees, the Purchaser, the DIP lender, and other parties interested in the sale process regarding, among other things, the Sale Motion, the Equity Committee's Plan and Disclosure Statement, and the Creditors' Committee's Plan and Disclosure Statement.

27.    Following the Status Conference, on August 3, 2018, the Court entered an Amended Order on Status Conference (Doc. 1151), among other things, setting a hearing date for consideration of the Sale Motion and Committees' disclosure statements and directing the parties to seek approval from the United States District Court for the Eastern District of Virginia (the "District Court") for those matters within the District Court's jurisdiction.

## EQUITY COMMITTEE RESPONSE

Where a debtor seeks to sell substantially all of its assets pursuant to section 363 of the Bankruptcy Code, and seeks to do so outside of the safeguards afforded by the plan confirmation process under the Bankruptcy Code, the transaction requires closer scrutiny than a typical sale of assets outside the ordinary course of business. *In re Weatherly Frozen Food Group, Inc.* 149 B.R. 480, 483-484 (Bankr. N.D. Ohio 1992) ( "[a] sale of substantially all of Debtor's property outside the ordinary course of business, and without a chapter 11 disclosure statement and plan, must be closely scrutinized"); *In re Plabell Rubber Products, Inc.* 149 B.R. 475, 480 (Bankr. N.D. Ohio 1992); *see also In re President Casinos, Inc.*, 314 B.R. 784, 785 (Bankr. E.D. Mo. 2004) (stating that "the sale of all or substantially all of the assets of a chapter 11 estate in the absence of a confirmed plan is not forbidden, but is subject to close scrutiny by creditors and the court").

The criteria for approving the sale of assets outside the ordinary course of business under section 363(b) of the Bankruptcy Code requires that a valid business justification exist for the sale,

that the price represent fair value, and that the parties negotiated and entered into the sale transaction in good faith. *In re Family Christian, LLC*, 533 B.R. 600, 626 (Bankr. W.D.Mich. 1995) (court cited the following criteria: (i) whether adequate and reasonable notice has been provided to parties in interest, including full disclosure of the sale terms and the debtor's relationship with the purchaser, (ii) whether the sale price is fair and reasonable, and (iii) whether the proposed buyer is proceeding in good faith); *see also In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 149-50 (3d Cir. 1986). Courts often rely on the price paid for assets at a competitive public auction to determine whether a purchase price constitutes fair and/or market value. *Abbotts Dairies*, 788 F.2d at 149; *In re Lahijani*, 325 B.R. 282, 289 (B.A.P. 9th Cir. 2005).

The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *Family Christian*, 533 B.R. at 627 ("[w]hen considering offers for the purchase of assets, the debtor's duty, and the primary concern of the bankruptcy court, is to ensure that the sale maximizes the value of the asset sold"); *In re Mushroom Trans. Co., Inc.*, 382 F.3d 325, 339 (3d Cir. 2004). To that end, courts will approve bidding procedures when they are designed to maximize the value of the estate. *See In re Calpine Corp. v. O'Brien Envl. Energy, Inc. (In re O'Brien Envl. Energy)*, 181 F.3d 527, 535-37 (3d Cir. 1999); *see also In re Cormier*, 382 B.R. 377, 388 (Bankr. W.D. Mich. 2008) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."). Generally stated, bidding procedures in the context of bankruptcy sales should enhance competitive bidding. *Id.*; *see also In re President Casinos, Inc.*, 314 B.R. 786, 789 (Bankr. E.D. Mo. 2004); *In re Integrated Res., Inc.*, 135 B.R. 746, 750 (Bankr. S.D.N.Y.) aff'd, 147 B.R. 650 (S.D.N.Y. 1992).

## A.    The Proposed Bidding Procedures Will Limit Competition and Chill Bidding.

The key to success for any auction is robust competition.  In this case, the proposed Bidding Procedures (as defined in the Sale Motion) are merely protections for the Purchaser and other of the Debtors' insiders, strategically designed to limit competition and chill bidding.  The Bidding Procedures issues are so extensive that the Court should not approve them in any respect.  The Court should deny the Sale Motion without prejudice and direct the Debtors to re-draft the Bidding Procedures to be fair and equitable to all interested parties, not just the Debtors' insiders and the insider Purchaser, as is the current case.

### i.    Restrictions on Solicitation of Competing Bids

Under the APA, the Debtors agreed that between the date of entry into the APA, June 14, 2018, through the conclusion of the auction, **the Debtors would not**

> "(A) *initiate contact with, or solicit or encourage submission of any inquiries, proposals or offers* by, any Person with respect to a Competing Transaction or otherwise *facilitate any effort or attempt to make a proposal or offer* with respect to a Competing Transaction or (B) engage in, continue or otherwise participate in any discussions or negotiations regarding, or provide any non-public information or data to any Person relating to, any Competing Transaction"  APA §5.12, at page 40.  (Emphasis added.)

The Equity Committee asserts that these restrictions will chill the bidding and have a deleterious effect on the sale process.  The deposition testimony of Marshall Glade, the Debtors' sale advisor, supports that conclusion.  During his August 24, 2018 deposition (the "Glade Deposition"),[2] Mr. Glade gave the following testimony:

```
3   Q   Okay.  Would it be fair to say that
4   GlassRatner's role [as Debtors' sales adviser] was to initiate contact with
5   potential bidders, solicit and encourage potential
6   bidders to submit inquiries, proposals or offers in
```

---

[2]Excerpts of the Glade Deposition are attached collectively as **Exhibit A**.

> 7   order ***to facilitate efforts at making proposals or***
> 8   ***offers*** to the debtor in the sale process?
> 9   A   Yes.  GlassRatner did.
> 10  Q   Okay and that's where GlassRatner's
> 11  focus was?
> 12  A   Yes.
> 13  Q   Okay.  And if GlassRatner hadn't done
> 14  that, what would happen to the sale process?
> 15  A   There would have been no sale process.

*See* Glade Deposition transcript p. 21, lines 3-15.  (Emphasis added.)

Thus, by Mr. Glade's own testimony, the restrictions on the Debtors set forth in Section 5.12 of the APA would negatively impact the sale process.  Those provisions should be deleted or "there [will be] no sale process."

### ii.   Due Diligence Limitations.

The Debtors have severely limited the ability of interested bidders to conduct due diligence regarding the assets for sale, by erecting multiple procedural and financial roadblocks in the Bidding Procedures.  First, rather than advertising broadly and soliciting potential bidders, the Bidding Procedures permit the Debtors to limit solicitation of bidders to only those potential bidders who have previously conducted due diligence *and been invited by the Debtors to bid*.  *See* Sale Motion, ¶36.  The Debtors should be required to cast a wider net.  The limitation on potential bidders directly limits competitive bidding in the first instance by limiting the pool of potential competing bidders.

Second, the Bidding Procedures require potential bidders to present evidence of financial wherewithal *before* being admitted to the Virtual Data Room (the "VDR") to conduct due diligence, contrary to typical procedure.  *See* Sale Motion, ¶36. That, too, will chill the bidding.  Many entities may elect not to bid, rather than choose to disclose confidential financial information before they are even permitted to conduct due diligence.  Financial wherewithal may

be appropriate to become a Qualified Bidder, that is, to submit a bid and attend the auction, but should not be a prerequisite to simply conducting due diligence.

### iii.      Restrictions Related to the Proposed APA.

The Sale Motion seeks to require interested bidders to submit competing bids on substantially the same terms as those contained in the Proposed APA, and to disregard competing bids that contain material alterations to the Proposed APA.  The Debtors' requested requirements presuppose the Proposed APA is the most appropriate form for this sale transaction, when in fact, it will chill bidding and prevent discovery of other business models that may result in a better return to the estate.

### iv.      Unreasonable Financial Protections.

Certain of the financial terms in the Bidding Procedures, including the proposed break-up fee, minimum bidding increments, and expense reimbursement, should be stricken and redrafted.

The definition of the "Break-up Fee" is not clear.  While page 19 of the Sale Motion defines the break-up fee as the greater of $500,000 or 3% of the Purchase Price[3], later paragraph 42 of the Sale Motion defines the break-up fee as $500,000 or "3% of the Purchase Price *set forth in any Prevailing Bid*."  (Emphasis added.)  Those calculations are different.  If the break-up fee is calculated from the Prevailing Purchase Price at the end of the auction, the estate's share of each incremental bid will diminish as the break-up fee increases.

A breakup fee is a "fee paid by a seller to a prospective purchaser in the event that a contemplated transaction is not consummated."  *Calpine Corp.,* 181 F.3d at 528. The fee is intended to compensate the bidder for the time, effort, and risk of being the stalking horse, and to

---

[3] The proposed APA defines "Purchase Price" in paragraphs 32 and 85 as "$17.5 million subject to the adjustments set forth therein."

encourage the bidder to do the necessary due diligence with the assurance that its efforts will be compensated if it is unsuccessful. *Id.* at 535.   A break-up fee that fluctuates based upon the prevailing purchase price runs the risk of significantly overcompensating a stalking horse bidder for its risk and diligence prior to the auction, particularly where the costs of that risk and diligence are known by the time of the auction.   And, any overcompensation, as would surely occur based on the Debtors' proposed calculations, accrues to the detriment of the estate.

Although a break-up fee set at 3% of the Purchase Price is not out of line with regularly approved break-up fees, it should be measured against the Purchaser's initial bid of $17.5 million, less any Purchase Price Adjustment.   The Equity Committee submits that a break-up fee capped at $500,000 is more than fair, especially for a transaction involving insiders.

The Equity Committee further submits that the Debtors' proposed minimum bidding increments at $500,000 are excessive, and that bidding increments of $50,000 are more than fair and will encourage bidding.   Also troubling is that if a third party outbids the Purchaser, the Proposed Bidder Protections permit the Purchaser just to match the overbid, which should not be permitted.   *See* Sale Motion, ¶36. The Purchaser must be required to bid in the same minimum bid increments as all other bidders to remain in the auction and continue to bid against the prior bid.  To do otherwise will work as a disincentive for competing bidders to increase their bids.

Finally, the Purchaser's expense reimbursement must be limited to the expenses incurred by the Purchaser *after* the constituencies formed the stalking horse group.  Expenses of PacBridge going back to last spring when it bid as PacBridge, and expenses of Apollo and Alta before they joined the stalking horse group, should not be reimbursable.  Likewise, expenses of PacBridge, Apollo, and Alta in advancing their interests in the Debtors should be distinguished and not be reimbursable.

v.      Uniformity Concerns.

The Equity Committee firmly believes the sale process should occur, as much as possible, before this Court with this Court conducting and supervising any auction.  This Court is well aware of the checkered, protracted history of this bankruptcy case, and to unify the sale and plan processes before this Court promotes efficiency, uniformity, and certainty.  To that end, the auction and all related proceedings should be conducted exclusively before this Court.  The auction should not occur in the Debtors' attorneys' offices in Atlanta, Georgia.

Furthermore, as a procedural matter, there are significant differences among the Bidding Procedures contained in the Asset Purchase Agreement, the Summary of the Bidding Procedures in the Sale Motion, and the Bidding Procedures set forth on the exhibit to the Proposed Bidding Procedures Order.  Many of these are contradictory, and have created confusion as to what procedure the Debtors seek to have approved.  The Debtors should be required to submit a single form of Bidding Procedures for consideration by the Court.

**B.      The Sale Is an Insider Transaction.**

The sale transaction in the Sale Motion and the Bidding Procedures must be closely scrutinized because the transaction was negotiated by and among insiders of the Debtors, as defined in 11 U.S.C. § 101(31).  *See U.S. Bank N.A. v. Village at Lakeridge, LLC,* 138 S. Ct. 960, 971 (March 5, 2018) (insider transaction "will not be considered an arms-length transaction and will be subject to close scrutiny") (concurring opinion); *In re Tidal Construction Co.,* 446 B.R. 620, 624 (Bankr. S.D. Ga. 2009) ("§ 363 sales to insiders are subject to a higher scrutiny because of the opportunity for abuse"); *Crown Vill. Farm, LLC v. Arl. L.L.C.* (*In re Crown Vill. Farm, LLC*), 415 B.R. 86, 93 (Bankr. D. Del. 2009) (holding that "[t]he sale process will be under the close scrutiny of the Court as required where the stalking horse is an insider"); *Citicorp Venture*

*Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims* (*In re Papercraft Corp.*), 211 B.R. 813, 823 (W.D. Pa. 1997), *aff'd*, 160 F.3d 982 (3d Cir. 1998) ("[I]nsider transactions are subjected to rigorous scrutiny and when challenged, the burden is on the insider not only to prove the good faith of a transaction but also to show the inherent fairness from the viewpoint of the corporation and those with interests therein."); *see also Brouwer v. Ancel & Dulap* (*In re Firstmark Corp.*), 46 F.3d 653, 656 (7th Cir. 1995) (citing with approval the district court's statement that "sale of a debtor's property to an insider is subject to close scrutiny"), *on subsequent appeal*, 132 F.3d 1179 (7th Cir. 1997); *Sltuck v. Seminole Oil & Gas Corp.* (*In re Seminole Oil & Gas Corp.*), No. 91-1636 (HEW), 1992 WL 110720, at *6 (4th Cir. May 22, 1992) ("[Transactions involving insiders should be closely scrutinized") (*quoting Harman v. First Am. Rank* (*In re Jeffrey Bigelow Design Grp., Inc.*), 956 F.2d 479, 484 (4th Cir. 1992) (internal citations omitted). Insider transactions cannot be approved unless they are the product of an "arm's length bargain" with "inherent fairness" from the viewpoint of interested parties. *Pepper v. Litton*, 308 U.S. 295, 306-07 (1939); *see also Brewer v. Erwin & Erwin PC.* (*In re Marquam Inv. Corp.*), 942 F.2d 1462, 1466 (9th Cir. 1991) (applying "rigorous scrutiny" to an insider's transactions with a bankrupt corporation).

In the Sale Motion, the Debtors go to great lengths to deny that the sale involves insiders, primarily by certifying that the Purchaser is not an affiliate under 11 U.S.C. § 101(20).  In fact, the Debtors' current position is contradictory to the representation made by the Debtors in their Amended Schedule D, on which they scheduled the Secured Lenders as insiders. *See* Amended Schedule D, Doc. 172, pp. 5-6. Thus, the Debtors are wrong to argue that the Purchaser is not an insider.

In any event, this Court should examine whether the terms of the Proposed APA, including the Bidding Procedures, were negotiated in good faith and at arm's length by the Debtors and the

Purchaser.  First, the Purchaser did not negotiate the Proposed APA's terms, nor could it have, as the Purchaser was not formed until *June 6, 2018*.  *See* Certificate of Formation of Premier Acquisition Holdings LLC, attached hereto and incorporated herein as **Exhibit B**.  The Term Sheet to which the Debtors agreed and from which the Asset Purchase Agreement was drafted, was executed in *May 2018*. Thus, the Purchaser could not have negotiated the APA's terms since it did not exist when those terms were agreed upon.   In fact, the APA terms were negotiated by the signatories to the APA, including PacBridge, the Secured Lenders, and Apollo and Alta (the "Private Equity Funds").

The interests of the Secured Lenders in the Debtors' operations are explained in an October 30, 2015 Schedule 13D (the "13D Filing") with the Securities and Exchange Commission, which identified the Secured Lenders as members of a group that controlled the Debtors (the "Control Group").  A copy of that 13D Filing is attached as **Exhibit C** and incorporated herein by reference. Each of Lange Feng, Jihe Zhang, and Haiping Zou is an insider because each was a "person in control of the Debtor" under 11 U.S.C. § 101(31), and the Debtors have already acknowledged their insider status.  (Doc. 172, pp. 5-6).

Further, Mr. Wong's role with the Debtor has never been fully clarified, but he and the Debtors/Mr. Bao have a long term relationship and the nature and extent of that relationship should be fully disclosed by the Debtors before the Bidding Procedures are approved.

### C.    The Proposed Purchaser is Not a Good Faith Purchaser.

A "good-faith purchaser" is "one who purchases the assets for value, in good faith and without notice of adverse claims." *Willemain v. Kivitz,* 764 F.2d 1019, 1023 (4th Cir. 1985). "A purchaser's good faith is shown "by the integrity of his conduct during the course of the sale proceedings." *In re Gucci*, 126 F.3d 380, 390 (2d Cir. 1997).  "The absence of good faith is shown

by fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *Id*.

A good-faith analysis examines "the purchaser's conduct in the course of the bankruptcy proceedings[,] ... [which includes] the purchaser's actions in preparation for and during the sale itself." *In re GSC, Inc.,* 453 B.R. 132, 180-181 (Bankr. S.D.N.Y. 2011). "The purchaser is prohibited from engaging in any fraudulent or collusive actions that are specifically intended to affect the sale price or control the outcome of the sale." *Id.* at 180–81. "Thus, notwithstanding the timing of the questionable conduct, the relevant inquiry [remains] whether that conduct was intended to control the sale price or take unfair advantage of prospective bidders." *Id.* at 181.

In fact, the Private Equity Funds specifically requested assistance from the Debtors to put them in touch with "insider-affiliated Equity Holders" so that they might solicit them to be plan sponsors with the Private Equity Funds' plan to acquire the Debtors to the exclusion of all "outside" equity holders. That is contained in a Term Sheet (the "Private Equity Term Sheet") submitted to the Debtors on January 22, 2018, a copy of which is attached hereto and incorporated herein as **Exhibit D**.  Under the Private Equity Term Sheet, the Private Equity Funds proposed to acquire the Debtors through a Chapter 11 plan and to include as Plan Sponsors insider-affiliated equity holders, and also offered that the "President and CEO of the Debtors [Daoping Bao] will be one of the members of the Board of Directors."  *See* Exhibit D at 5.

In his deposition testimony, Mr. Glade, in his capacity as the Debtors' financial advisor and sale advisor, admitted that he introduced representatives of PacBridge and Alta to each other in January or February 2018 (he could not recall when he made the introduction) with the intention that they join to make a single, joint proposal for the Debtors.   *See* Exhibit A, p. 71, lines 13-19.

Mr. Glade testified "it made sense" to put them together because they both held equity in the Debtor

that Glade described as a "blocking position":

4 Q    Please let me finish the question.  Was it

5  your intention in putting Giovanni Wong and Gilbert

6  Li together that they and their representative

7  groups make a joint offer for the company?

8    A    Yes.

9    Q    Were you at all concerned about putting

10  PacBridge in touch with a potentially competing

11  bidder when you made that introduction?

12    A    No.

13    Q    And why is that?

14    A    I felt that they both had blocking

15  positions, and that they -- blocking positions to a

16  transaction. And getting them on the same page

17  would effect a transaction faster.

18    Q    And what do you mean by blocking

19  positions?

20    A    They could both object to each other's

21  offer.

22    Q    In what capacity do you mean they could

23  object to it?

24    A    As equity holders who would have to vote

25  on this transaction.

See Exhibit A, p. 76, lines 4-25.

Q    Do you know how they [PacBridge and Alta] were introduced?

19 A Yeah, yeah, yeah, I introduced the two of

20 them.

21 Q And how did that come about?

22 A In understanding who owns the company and

23 who was a key representative for the company, I --

24 it made sense to bring them together.

25 Q What do you mean by that?

1 A Well, Gilbert and Bill have 16 percent,

2 and Gio [PacBridge] is essentially representing 45 percent. If

3 not 30 percent of the company. So if one was to

4 make an offer, the another needed to accept the

5 offer. So they needed to understand what was going

6 on together.

7 Q And did you suggest they get together to

8 talk?

9 A Yes.

*See* Transcript p. 71, line 19 through p. 72, line 9.

In fact, neither Apollo and Alta, with 16% of the company's common stock, nor PacBridge, which Glade said controlled 30% or 45% of the stock, had a "blocking position".   Under Bankruptcy Code § 1126(d), for a class of interests to accept a plan, the class must vote by two-

thirds in amount to accept the plan.  A holder of in excess of one-third of the voting equity securities can "block" acceptance by that class.  According to Mr. Glade, Apollo and Alta held 16% of the shares, which is less than one-third and so is not a blocking position.  Glade also testified that PacBridge controlled 30% or 45% of the shares.  But those shares are in a voting trust controlled by Daoping Bao.  *See* Exhibit C.  Thus, neither the Secured Lenders, nor PacBridge as their agent, controlled at least one-third of the voting equity securities.  Accordingly, Mr. Glade's excuse for putting together the PacBridge Group and the Private Equity Funds does not stand up to scrutiny.

At the time Mr. Glade brought the PacBridge Group together with the Private Equity Funds, each was a separate potential bidder for the Debtors or their assets. Moreover, Mr. Glade testified he had no concerns about Alta's, Apollo's, or PacBridge's financial wherewithal and ability to finance a transaction.  *See* Exhibit A, p. 92, line 9 through p. 93, line 7.

So, it appears that the Debtors, through their financial advisor and sales advisor, joined two separate, potentially competing bidders, each with financial wherewithal to finance a transaction, on the legally incorrect supposition that they each were equity holders who held blocking positions and could vote against each other.  Notwithstanding that the joining of PacBridge and Alta was a seminal point in this case and led to the current stalking horse bid, Mr. Glade testified that he could not recall with whom he had these conversations or whether the conversations were by telephone, by e-mail, or in person.  And, neither the Debtors nor Glass Ratner has produced any emails reflecting these discussions.  Moreover, Mr. Glade testified that he could not recall whether he attended even a single meeting with the combined PacBridge/Alta Group during the period between receipt of the Private Equity Term Sheet and the date of the mediation, February 27, 2018, at which PacBridge and the Private Equity Fuds appeared as joint bidders for the Debtors.  *See*

Exhibit A, p. 81, line 25 through p. 84, line 24.  Further discovery is necessary to determine the truth about how and why two viable, potentially competing bidders, PacBridge and the Private Equity Funds, were brought together by the Debtors to make a single offer for the Debtors.

In any event, there is no evidence that the Purchaser, if the successful bidder at the Auction, should be afforded the "good-faith purchaser" protections of section 363(m).  There are valid questions whether the parties comprising the Purchaser have proceeded in good faith or with integrity in the sale proceedings in this case.  Furthermore, it is clear the Sale Motion was negotiated between insiders, is a sale to an entity consisting of insiders, and is sale for the benefit of insiders and to the substantial detriment of non-insider creditors and equity holders.

As further evidence of the Purchaser's lack of good faith, the Purchaser admitted it is purchasing the Debtors' assets for "going concern" value while intending to realize "liquidation value" in the future.  Thus, the Purchaser intends to do the very thing the Debtors proposed to do at the outset of the case – sell the French artifacts.  At the Status Conference, the Equity Committee's counsel suggested that if the Purchaser were to purchase the stock of RMST and thereby acquire control over the French and American Artifacts collections, a trust should be imposed upon the French Artifacts so that if they were to be sold in the future, the proceeds would be paid into the estate.  *See* excerpts of July 25, 2018 Status Conference transcript, a copy of which is attached hereto and incorporated herein as **Exhibit E**, pp. 50-51.  In response, counsel to members of the Purchaser finally admitted the proceeds from the sale of the French Artifacts represent the "only upside that the [Purchaser] is ever going to see from the transaction."  *See* Exhibit E, p. 60.  Thus, the Purchaser does not intend to maintain the two collections as an integrated whole for the long term.  Rather, the Purchaser will seek to realize the "upside" on its investment by selling the French Artifacts in the future after having paid off creditors at a discount

and denying any recovery to non-insider equity holders.  This is additional evidence of the Purchaser's lack of good faith.  Under the foregoing circumstances, a finding of "good faith" under § 363(m) should be denied.

### D.    A Trust Should be Imposed

The Court should condition any sale(s) pursuant to the Sale Motion upon the imposition of a trust on the French Artifacts so that proceeds from any buyer's subsequent attempt to sell any of the French Artifacts will be held for the benefit of the estate.  To do otherwise would permit the Purchaser to acquire the assets by paying the "going concern" value of the enterprise while acquiring the "liquidation value" where the bulk of the value resides. The only reason for the Purchaser not to agree to that trust would be that it intended to realize that value for itself after cutting off the rights of other parties in interest.   It would be inequitable for the Purchaser to realize a windfall from the liquidation of the French Artifacts in the future while denying that value to the current creditors and equity holders if the sale is approved.  The Bankruptcy Court should retain jurisdiction to enforce the trust.

### E.    Timing of Sale and Plan Processes

If the Court approves the Committees' respective Disclosure Statements and permits plan solicitation, any confirmation hearing and sale hearing should be held concurrently.  As the three proposals are mutually exclusive, only one may be approved. And, as an aside, the Equity Committee submits that if the Court confirms one of the Chapter 11 Plans and does not approve the sale to the Purchaser under the Sale Motion, the Break-up Fee should not be paid the Purchaser since the auction did not result in any benefit to the estate.  A Break-up Fee of 3% of the purchase Price should only be paid if the Purchaser is outbid at the auction and the Court approves the Sale Motion and the Code §363 sale.

## RESERVATION OF RIGHTS

Nothing set forth herein is intended nor shall it be deemed to modify, limit, release, reduce, or waive any of the Equity Committee's rights, remedies, and privileges, at law or in equity, including its right to amend and/or supplement this Response, all of which are specifically reserved.

## CONCLUSION

WHEREFORE, the Equity Committee respectfully requests the Court enter an Order denying the Sale Motion and granting such other and further relief as the Court deems just and proper.

Date: August 27, 2018

By: */s/ Peter J. Gurfein*
Peter J. Gurfein
**LANDAU GOTTFRIED & BERGER LLP**
1801 Century Park East, Suite 700
Los Angeles, California 90067
(310) 557-0050
(310) 557-0056 (Facsimile)
pgurfein@lgbfirm.com

-and-

**AKERMAN LLP**

By: */s/ Jacob A. Brown*
Jacob A. Brown
Florida Bar No. 170038
50 North Laura Street, Suite 3100
Jacksonville, Florida 32202
(904) 798-3700
(904) 798-3730 (Facsimile)
Jacob.brown@akerman.com

Attorneys for the Official Committee of Equity
Security Holders of Premier Exhibitions, Inc.

## **CERTIFICATE OF SERVICE**

 I HEREBY CERTIFY that on August 27, 2018, the foregoing was transmitted to the Court for uploading to the Case Management/Electronic Case Files ("CM/ECF") System, which will send a notice of electronic filing to all creditors and parties in interest who have consented to receiving electronic notifications in this case.  In accordance with the Court's Order Granting Debtors' Motion for an Order Pursuant to 11 U.S.C. § 105(a) and Rule 2002 Establishing Notice Procedures (Doc. 140), a copy of the foregoing was also furnished on August 27, 2018 by U.S. mail, postage prepaid and properly addressed, to the Master Service List attached hereto.

*/s/ Jacob A. Brown*   
Attorney

**MASTER SERVICE LIST**
*Case No. 3:16-bk-02230-PMG*

A-1 Storage and Crane
2482 197th Avenue
Manchester, IA 52057

ABC Imaging
14 East 38th Street
New York, NY 10017

A.N. Deringer, Inc.
PO Box 11349
Succursale Centre-Ville
Montreal, QC H3C 5H1

ATS, Inc.
1900 W. Anaheim Street
Long Beach, CA 90813

Broadway Video
30 Rockefeller Plaza
54th Floor
New York, NY 10112

CBS Outdoor/Outfront Media
185 US Highway 48
Fairfield, NJ 07004

Dentons Canada LLP
250 Howe Street, 20th Floor
Vancouver, BC V6C 3R8

Enterprise Rent-A-Car Canada
709 Miner Avenue
Scarborough, ON M1B 6B6

Expedia, Inc.
10190 Covington Cross Drive
Las Vegas, NV 89144

George Young Company
509 Heron Drive
Swedesboro, NJ 08085

Gowlings
550 Burrard Street
Suite 2300, Bental 5
Vancouver, BC V6C 2B5

Hoffen Global Ltd.
305 Crosstree Lane
Atlanta, GA 30328

Kirvin Doak Communications
5230 W. Patrick Lane
Las Vegas, NV 89118

MNP LLP
15303 - 31st Avenue
Suite 301
Surrey, BC V3Z 6X2

Morris Visitor Publications
PO Box 1584
Augusta, GA 30903

NASDAQ Stock Market, LLC
805 King Farm Blvd.
Rockville, MD 20850

National Geographic Society
1145 - 17th Avenue NW
Washington, DC 20036

NYC Dept. of Finance
PO Box 3646
New York, NY 10008

PacBridge Limited Partners
22/F Fung House
19-20 Connaught Road
Central Hong Kong

Ramparts, Inc.
d/b/a Luxor Hotel and Casino
3900 Las Vegas Blvd. South
Las Vegas, NV 89119

Seaventures, Ltd.
5603 Oxford Moor Blvd.
Windemere, FL 34786

Syzygy3, Inc.
231 West 29th Street
Suite 606
New York, NY 10001

TPL
3340 Peachtree Road
Suite 2140
Atlanta, GA 30326

Verifone, Inc.
300 S. Park Place Blvd.
Clearwater, FL 33759

WNBC - NBC Universal Media
30 Rockefeller Center
New York, NY 10112

Jonathan B. Ross, Esq.
Gowling WLG (Canada) LLP
550 Burrard Street, Suite 2300, Bentall 5
Vancouver, BC V6C 2B5

Pallet Rack Surplus, Inc.
1981 Old Covington Cross Road NE
Conyers, GA 30013

Screen Actors Guild
1900 Broadway
5th Floor
New York, NY 10023

Sophrintendenza Archeologica
di Napoli e Pompei
Piazza Museo 19
Naples, Italy 80135

Time Out New York
405 Park Avenue
New York, NY 10022

TSX Operating Co.
70 West 40th Street
9th Floor
New York, NY 10018

Samuel Weiser
565 Willow Raod
Winnetka, IL 60093

United States Attorney's Office
Middle District of Florida
300 N. Hogan Street, Suite 700
Jacksonville, FL 32202

Christine R. Etheridge, Esq.
Bankruptcy Administration
Wells Fargo Vendor Financial Services, LLC
PO Box 13708
Macon, GA 31208

TSX Operating Co., LLC
c/o James Sanna
70 W. 40th Street
New York, NY 10018
***Creditor Committee***

Dallian Hoffen Biotechnique Co., Ltd.
c/o Ezra B. Jones
305 Crosstree Lane
Atlanta, GA 30328
***Creditor Committee***

B.E. Capital Management Fund LP
Thomas Branziel
205 East 42nd Street , 14th Floor
New York, NY 10017
***Creditor Committee***

# Exhibit A

Page 1

1          IN THE UNITED STATES BANKRUPTCY COURT

              MIDDLE DISTRICT OF FLORIDA

2                JACKSONVILLE DIVISION

3

4    In re:

                         Case No. 3:16-bk-02230-PMG

5    RMS TITANIC, INC.,

     et al.,                    Chapter 11

6          Debtors.

7

8              30(b)(6) DEPOSITION OF

9      GLASSRATNER ADVISORY & CAPITAL GROUP, LLC

10                MARSHALL GLADE

11               August 24, 2018

12                 12:16 p.m.

13     GlassRatner Advisory & Capital Group, LLC

14                 Suite 1225

15            3445 Peachtree Road, N.E.

16                Atlanta, Georgia

17     Carolyn J. Smith, CCR, RPR, RMR, CCR-A-1361

18

19

20

21

22

23

24

25

Page 2

1          DESCRIPTION OF EXHIBITS
2
3    EXHIBITS        DESCRIPTION            PAGE
4
5    Exhibit 1      Subpoena to Produce Documents,    8
6              Information, or Objects or to
7              Permit Inspection of Premises
8              in a Bankruptcy Proceeding
9    Exhibit 2      Exhibit "A" to Subpoena to       8
10             GlassRatner Advisory & Capital
11             Group, LLC
12   Exhibit 3      Subpoena to Testify at a         8
13             Deposition in a Bankruptcy
14             Case (Or Adversary Proceeding)
15   Exhibit 4      Notice of Deposition of         11
16             Corporate Representative
17             of GlassRatner Advisory &
18             Capital Group, LLC
19   Exhibit 5      Premier Exhibitions Target      25
20             List - Signed NDAs
21   Exhibit 6      e-mail from Mr. Li, to          42
22             Mr. McCaleb, 12/29/17,
23             GLASS000162
24   Exhibit 7      e-mail from Mr. Glade, to       43
25             Mr. Li, 1/2/18, GLASS000165-66

Page 3

1          DESCRIPTION OF EXHIBITS
2              (Continued)
3
4    EXHIBITS        DESCRIPTION            PAGE
5
6    Exhibit 8      e-mail from Mr. Glade, to       58
7              Mr. Cavender, 2/7/18,
8              GLASS000214
9    Exhibit 9      e-mail from Mr. Li, to          59
10             Mr. Glade, 2/23/18,
11             GLASS000234-235
12   Exhibit 10     e-mail from Mr. Glade, to       60
13             Mr. Schwartz, 1/10/18,
14             GLASS000167
15   Exhibit 11     Plan Term Sheet, Premier        63
16             Exhibitions, Inc.,
17             GLASS000184-192
18   Exhibit 12     e-mail from Mr. Wong, to        69
19             Mr. Glade, 3/9/18,
20             GLASS000408-419
21   Exhibit 13     e-mail from Mr. Roach, to       87
22             Mr. Grossman, 3/13/18,
23             RMST_EC2018 Subpoena_001694-1706
24
25

Page 4

1              INDEX TO EXAMINATION
2
3                      Page
4
5    By Mr. Gurfein                    8
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1    APPEARANCES OF COUNSEL:
2
3    On behalf of the Debtors:
4
5         MATTHEW R. BROOKS
6         Attorney at Law
7         Troutman Sanders, LLP
8         Suite 3000
9         600 Peachtree Street, N.E.
10        Atlanta, Georgia  30308
11        (404)885-2618
12
13   On behalf of the Official Committee of Equity
14   Security Holders of Premier Exhibitions, Inc.:
15
16        PETER J. GURFEIN
17        Attorney at Law
18        Landau Gottfried & Berger, LLP
19        Suite 700
20        1801 Century Park East
21        Los Angeles, California  90067
22        (310)691-7374
23
24
25

2 (Pages 2 - 5)

Page 6

1  APPEARANCES OF COUNSEL:
2      (Continued)
3
4  On behalf of Premier Acquisition Holdings, LLC,
5  Alta Fundamental Advisers, LLC, Apollo Global
6  Management:
7      JENNIFER FELDSHER
8      Attorney at Law
9      Bracewell
10     49th Floor
11     1251 Avenue of the Americas
12     New York, New York  10020
13     (212)508-6137
14
15 On behalf of Lange Feng, Jihe Zhang,
16 Haiping Zou, PacBridge Capital Partners (HK)
17 Limited, Premier Acquisition Holdings, LLC:
18     SCOTT M. GROSSMAN
19     Attorney at Law
20     Greenberg Traurig, P.A.
21     Suite 2000
22     401 East Las Olas Boulevard
23     Fort Lauderdale, Florida  33301
24     (954)768-5212
25

Page 7

1  APPEARANCES OF COUNSEL:
2      (Continued)
3
4  On behalf of GlassRatner:
5
6      ILYSE M. HOMER
7      Attorney at Law
8      Berger Singerman LLP
9      Suite 1900
10     1450 Brickell Avenue
11     Miami, Florida  33131
12     (305)755-9500
13
14
15     (Pursuant to Article 10(B) of the Rules
16 and Regulations of the Georgia Board of Court
17 Reporting, a written disclosure statement was
18 submitted by the court reporter to all counsel
19 present at the proceeding.)
20
21
22
23
24
25

Page 8

1      (Exhibit 1, Exhibit 2 and Exhibit 3
2  marked)
3      MR. GURFEIN:  Would you swear in the
4  witness, please.
5          MARSHALL GLADE,
6  30(b)(6) GLASSRATNER ADVISORY & CAPITAL GROUP, LLC
7  having been first duly sworn, was examined and
8  testified as follows:
9          EXAMINATION
10 BY MR. GURFEIN:
11  Q    Would you state your full name for the
12 record, spelling your last name.
13  A    Marshall Glade, G-L-A-D-E.
14  Q    Have you had your deposition taken before?
15  A    No.
16  Q    Okay.  Let me go over a couple of ground
17 rules.  And I want to make sure you understand
18 these.  And you're with your counsel today for
19 GlassRatner.
20      Any time you want to confer with counsel,
21 just indicate that you want to do so.  And I'm sure
22 you're not going to be shy about interjecting if
23 anything comes up that you want to mention.
24      MS. HOMER:  That's correct.
25

Page 9

1  BY MR. GURFEIN:
2   Q    Okay.  I'm going to be asking you
3  questions.  And I'll ask for answers from them.  And
4  the testimony is going to be the combination of the
5  questions and the answers.
6      If you don't understand a question that
7  I'm asking, please let me know and ask me to either
8  rephrase it or explain to you what you don't
9  understand.  Um, I'm going to be asking for your
10 best recollection.  It's not a memory test, your
11 best recollection as to facts that you've -- have to
12 testify with respect to questions I ask.
13      When we're finished, you will have an
14 opportunity to review the transcript and make any
15 corrections you may want to do.  And we'll cover
16 that in the stipulations at the end as to the timing
17 and performance of -- of that task.  If you need a
18 break for any reason, let me know, and we'll take a
19 break.
20      And then let me ask you, are you -- are
21 you on any medications today that would impair your
22 ability to testify?
23  A    No.
24  Q    Okay.  Is there any reason that we can't
25 continue today, proceed with today's examination,

1  access to the data room.
2      (Off-the-record discussion)
3  BY MR. GURFEIN:
4      Q   And in sending out the teaser to the
5  potential bidders, was this to solicit their
6  interest in the sale process?
7      A   Yes.
8      Q   And if they contacted you back after
9  having received the teaser, did you do anything to
10 encourage them to take a look at the assets, do due
11 diligence, express an interest in the sale?
12     A   Yes.
13     Q   Okay.  And did you ask them to submit
14 inquiries to you if they had questions about the
15 assets?
16     A   Yes, but this was all only after an NDA --
17     Q   After a --
18     A   -- was signed.
19     Q   -- nondisclosure agreement --
20     A   Yes.
21     Q   -- had been signed?
22     A   Yes.
23     Q   Okay, and after doing -- I'm assuming --
24 and correct me if I'm wrong -- that the purpose of
25 the NDA was to grant them access to the data room so

1  they could do due diligence; is that correct?
2      A   That's one of the purposes of the NDA.
3      Q   Okay.  What's -- what are the other
4  purposes?
5      A   So that we can have more substantial
6  discussions regarding a potential transaction.  Um,
7  Premier being a public company, we have to be -- we
8  had to be particularly sensitive to an NDA and not
9  providing a non-public information to someone who
10 may be trading in the stock, so we had to make sure
11 that we were particularly diligent on the NDA's.
12     Q   As a general rule, when -- when parties
13 conducted due diligence, did you follow up with them
14 with respect to the potential sale?
15     A   Yes.
16     Q   Did you solicit proposals from them --
17     A   Yes.
18     Q   -- for sale of the assets?
19     A   Yes.
20     Q   And were you successful in obtaining any
21 offers?
22     A   Yes.
23     Q   And, in fact, the purpose of everything
24 you've described was to lead to an offer in the hope
25 of it leading to a sale; would that be fair to say?

1      A   Yes.
2      Q   Okay.  And did you do anything to
3  facilitate the efforts of the potential bidders to
4  make proposals or offers to the company to buy their
5  assets or their -- or the company itself?
6      A   I don't -- I don't understand that
7  question.  What do you mean by facilitate?
8      Q   Let's -- let's try it this way.  Did you
9  have occasion to have people going to the virtual
10 data room and have questions about either
11 information that was there or information that they
12 were lacking?
13     A   Yes.
14     Q   Okay.  And how did you respond to those
15 inquiries?
16     A   We would respond to them in the
17 appropriate manner, whatever -- (witness shook head
18 negatively.)
19     Q   Can you give me an example of what an --
20     A   Well, if --
21     Q   -- appropriate manner might be?
22     A   -- if somebody requested a income
23 statement, we would provide the income statement.
24     Q   So it facilitated them doing their
25 diligence to leading to an offer?

1      A   Correct, (witness nodded head
2  affirmatively.)
3      Q   Okay.  Would it be fair to say that
4  GlassRatner's role was to initiate contact with
5  potential bidders, solicit and encourage potential
6  bidders to submit inquiries, proposals or offers, in
7  order to facilitate efforts at making proposals or
8  offers to the Debtor in the sale process?
9      A   Yes.  GlassRatner did.
10     Q   Okay.  And that's where GlassRatner's
11 focus was?
12     A   Yes.
13     Q   Okay.  And if GlassRatner hadn't done
14 that, what would happen to the sale process?
15     A   There would have been no sale process.
16     Q   Okay.  (Nodded head affirmatively).  I
17 think what we've just done is describe the job --
18     A   Yes.
19     Q   -- of a sale advisor.
20         MR. GURFEIN:  Off the record for a second.
21         (Off-the-record discussion)
22 BY MR. GURFEIN:
23     Q   Back on the record.  Are you aware that on
24 or about June 16th, 2016, the company filed a motion
25 relating to the sale of certain artifacts known as

1  company?
2      A   Yes.
3      Q   And how many of those conversations did
4  you have, approximately?
5      A   I don't know.
6      Q   During what period of time did you have
7  those discussions?
8      A   During the period of time here.
9      Q   That I described?
10     A   (Witness nodded head affirmatively.)
11     Q   And directing your attention just to --
12 strike that.
13         How early in that period, from January to
14 March 9, did you first talk to these parties as the
15 stalking horse group?
16     A   I don't recall.
17     Q   Do you have any records that would refresh
18 your recollection as to when those conversations
19 took place?
20     A   No.  Um, it -- I'm trying to think when
21 did we have the mediate -- about the mediation.  I
22 think that they were, um, shown together, so it must
23 have been before the mediation.
24     Q   Do you know how long before the mediation
25 they joined together?

1      A   Well, I don't know.  You provided an
2  e-mail here that says that they were -- that Gilbert
3  and Gio were meeting on the 23rd --
4      Q   You are referring to --
5      A   -- the meeting, so it must have been
6  before that.
7      Q   So sometime before February 23rd?
8      A   Yeah -- well, yeah, if they were meeting
9  in Chicago.
10     Q   Do you know how -- and when you say Gio,
11 you're referring to Giovanni Wong?
12     A   Correct.
13     Q   Okay.  Do you know when Gio met Apollo and
14 Alta for the first time?
15     A   Must have been in February.
16     Q   And do you know --
17     A   I think February.
18     Q   -- do you know how they were introduced?
19     A   Yeah, yeah, yeah, I introduced the two of
20 them.
21     Q   And how did that come about?
22     A   In understanding who owns the company and
23 who was a key representative for the company, I --
24 it made sense to bring them together.
25     Q   What do you mean by that?

1      A   Well, Gilbert and Bill have 16 percent,
2  and Gio is essentially representing 45 percent.  If
3  not 30 percent of the company.  So if one was to
4  make an offer, the another needed to accept the
5  offer.  So they needed to understand what was going
6  on together.
7      Q   And did you suggest they get together to
8  talk?
9      A   Yes.
10     Q   And how did that conversation come about?
11 Who were you talking to?
12     A   I don't know, one of Gilbert or Gio, both.
13 (Witness shrugs).
14     Q   Was this after you received the January
15 term sheet, Exhibit 11?
16     A   I don't recall.
17     Q   Well, the -- it was on or about January 11
18 that -- let me see -- it was on --
19     A   It was after this, if that's what
20 you're --
21     Q   There's an --
22     A   -- referring to.
23     Q   -- there's an Exhibit that -- in which you
24 transferred to them a list of creditors -- of
25 stockholders?

1      A   Right, so it was after that, for sure,
2  after January 10th.
3      Q   It was a January 10th --
4      A   Yeah.
5      Q   So it was sometime after January 10?
6      A   Correct.
7      Q   But before --
8      A   February twenty --
9      Q   -- third?
10     A   -- third; correct.
11     Q   And who were you talking to when you
12 suggested that the equity holders from the ad hoc
13 group and the PacBridge group get together?
14     A   Both of them.
15     Q   "Them" being Gilbert Li --
16     A   Yeah.
17     Q   -- and Giovanni Wong?
18     A   Correct.
19     Q   Were they together in a room at the time?
20     A   No.
21     Q   Well, how did you make the introduction?
22     A   Um, I -- I think I provided the contact
23 information.
24     Q   To whom did you --
25     A   I don't know which one I provided first.

19 (Pages 70 - 73)

1    Q    (Nodded head affirmatively).  But this was
2    after you had already received the term sheet from
3    Alta and Apollo that's Exhibit 11?
4    A    That's -- I don't know when I received
5    this.  So I'm not sure.
6         MR. GURFEIN:  Have we already left a space
7    in the record for that date when he received it?  I
8    think we have.
9         MS. HOMER:  Yes.
10        (Off-the-record discussion)
11   BY MR. GURFEIN:
12    Q    And the purpose of your introducing the
13   two, Giovanni Wong and PacBridge Group and Alta and
14   Apollo was what?
15    A    To come to a transaction.
16    Q    Jointly?
17    A    Or separately.  Either way.
18    Q    Well, what would the purpose be of
19   introducing them to do separate transactions?
20    A    I don't know if -- I don't -- I can't -- I
21   couldn't predict the future.
22    Q    How was this introduction made?  Was it in
23   person, by telephone, by e-mail?
24    A    I -- I don't recall.
25    Q    Did someone ask you to make an

1    introduction?
2    A    It was discussed.
3    Q    What does that mean, it was discussed?
4    A    It was discussed.  I don't recall the
5    exact components of the discussion --
6    Q    And who --
7    A    -- but it was discussed.
8    Q    -- was in that discussion?
9    A    Gilbert and myself, and Gio and myself.
10    Q    Well, was it Gio and yourself, or Gilbert
11   and yourself?
12    A    Both.  Like I said before, this was an
13   iterative discussion that was going on, me and Gio,
14   me and Gilbert, and understanding what they could
15   do.
16    Q    What do you mean by what they could do?
17    A    How they could potentially put together an
18   offer to purchase the company?
19    Q    So it was your intention in putting them
20   together that they make a joint offer for the
21   company?
22    A    It was my intention --
23    Q    That's a yes or no question.  Was it your
24   intention in putting Gilbert Li and Giovanni Wong
25   together --

1    A    To have --
2    Q    -- that they --
3    A    -- a transaction occur.
4    Q    Please let me finish the question.  Was it
5    your intention in putting Giovanni Wong and Gilbert
6    Li together that they and their representative
7    groups make a joint offer for the company?
8    A    Yes.
9    Q    Were you at all concerned about putting
10   PacBridge in touch with a potentially competing
11   bidder when you made that introduction?
12    A    No.
13    Q    And why is that?
14    A    I felt that they both had blocking
15   positions, and that they -- blocking positions to a
16   transaction.  And getting them on the same page
17   would effect a transaction faster.
18    Q    And what do you mean by blocking
19   positions?
20    A    They could both object to each other's
21   offer.
22    Q    In what capacity do you mean they could
23   object to it?
24    A    As equity holders who would have to vote
25   on this transaction.

1    Q    Whose idea was it to put the two groups
2    together, PacBridge group and the ad hoc equity
3    group?
4    A    I don't recall.
5    Q    Well, I'm trying to understand the genesis
6    of the conversation that led to the introduction.
7    How did this come about?
8    A    I don't recall.
9    Q    Well, you referred to it as being an
10   iterative process.  What does that mean?
11    A    Just in discussions, amongst these parties
12   and, you know, whether Gio was asking whether he
13   could partner with them or Gilbert was asking
14   whether he could partner with them.
15    Q    So either Gio asked you if PacBridge could
16   partner with the ad hoc group, or the ad hoc group
17   was asking you if they could partner with Gio?
18    A    If they could talk and figure out if
19   they -- if they could do something together, or it
20   was discussion amongst -- at the same time,
21   discussion amongst my team, whether we -- whether we
22   felt like that would give us the best chance at
23   having a transaction, or discussion amongst myself
24   and counsel.
25    Q    Were all of these conversations by

Page 78

1 telephone?
2    A   (Witness shrugs), I don't -- I don't know.
3    Q   Were some of these conversations by
4 telephone?
5    A   Sure -- yeah.
6    Q   And were some of these conversations in
7 person?
8    A   Potentially.
9    Q   I don't know what that means,
10 "potentially."
11    A   Well, I don't know if I was sitting in a
12 room with counsel discussing it or not.  I don't --
13    Q   And did you confer with counsel about
14 putting the two groups together?
15    A   Yes.
16    Q   And what -- what -- who was that you spoke
17 to?
18    A   I think at that point it was Mr. Cavender,
19 it was before --
20    Q   And what did he say about that?
21    A   He thought that was a good idea, supported
22 it.
23    Q   Were any of these communications -- and
24 I'm limiting it to this iterative process of you and
25 Gio and Gilbert.  Were any of these by e-mail?

Page 79

1    A   I don't -- I don't know.
2    Q   I did not see any e-mails with you and
3 Gilbert and Gio prior to March 9, 2018.  So I'll ask
4 if you could double-check the document production
5 demand and see if you have any e-mails either
6 between you and Gio, or you and Gilbert Li, or among
7 you and Gio and Gilbert Li during the period
8 January 10 to March 9.
9    A   So are you saying that there were no
10 e-mails between me and Gilbert in that time period?
11    Q   With respect to -- thank you for asking
12 for clarification.  E-mails between you and Gilbert
13 with respect to partnering with anyone in the
14 PacBridge group, or between you and Gio about
15 partnering with the ad hoc equity group --
16    A   Okay.
17    Q   -- or among you and Gio and Gilbert about
18 partnering with the ad hoc equity group and
19 PacBridge.
20    A   We can sure -- we can double-check that.
21    Q   Directing your attention to the
22 Exhibit 12, was this the first proposal you
23 received -- that the company received from this
24 stalking horse group?
25    A   Yes.

Page 80

1    Q   Were there any additional term sheets,
2 proposals, or offers provided to you by the ad hoc
3 equity group between the time you received January
4 term sheet, Exhibit 11, and the time you received
5 the March 9 term sheet, Exhibit 12?
6    A   I don't believe so.
7    Q   Using March 9 as a reference point --
8 actually, correct me if I'm wrong, but at the
9 mediation, February 27th, PacBridge Group and the
10 ad hoc equity group had already gotten together to
11 make a combined offer, even if they hadn't made it
12 yet; is that correct?
13    A   Yes, they were at the mediation together.
14    Q   Okay.
15    A   They were.
16    Q   So let's use that as our -- as our collar.
17 From the time you received the January term sheet,
18 Exhibit 11, and the date of the mediation.
19    A   Okay.
20    Q   That's the time frame we're focused on.
21       MS. FELDSHER:  Can you read that back?
22 What was the time period?  I apologize for
23 interrupting.
24       (Off-the-record discussion)
25 (Thereupon, the court reporter read as follows:

Page 81

1       "Question: So let's use that as our --
2 as our collar.  From the time you received the
3 January term sheet, Exhibit 11, and the date of the
4 mediation.  That's the time frame we're focused
5 on.")
6 BY MR. GURFEIN:
7    Q   Did you have any in-person joint meetings
8 with the ad hoc equity group and the PacBridge Group
9 during that time frame, concerning a sale
10 transaction?
11    A   I'd have to check my calendar.
12    Q   Well, just so I understand, I'm not asking
13 for a date --
14    A   Yeah.  I need to check my calendar.
15    Q   -- I'm just asking --
16    A   I can't recall every attendee of every
17 meeting.
18    Q   I'm not asking you for attendees.  I'm
19 asking whether you attended a meeting involving a
20 combined group --
21    A   Right.  That's what I'm --
22    Q   -- of PacBridge --
23    A   -- saying.
24    Q   -- and equity group.
25    A   I have -- I'm thinking about the meetings

21 (Pages 78 - 81)

Page 82

1 that were occurring in this time frame that you're
2 talking about, so I have to check my calendar to
3 recall who was there.
4     Q   I'll leave the space in the --
5     A   Fine.
6     Q   -- in the record then for you to --
7     A   You already requested that, I think.
8     Q   -- leave the dates of all either telephone
9 calls or meetings with a combined group of anyone
10 from the PacBridge group and --
11     A   That's fine.
12     Q   -- anyone from the ad hoc equity group.
13     A   That's fine.
14         MR. BROOKS:  For what purpose?  I'm just
15 trying to be clear about what the question is.  I'm
16 confused.
17         MR. GURFEIN:  Sure.
18         MR. BROOKS:  I'm not sure if the
19 witness --
20 BY MR. GURFEIN:
21     Q   During the time frame we're talking about,
22 the time of receipt of the January term sheet,
23 Exhibit 11, and the date of the mediation of
24 February 27th, did you have any meetings to discuss
25 a sale transaction with a combined group of the

Page 83

1 ad hoc equity group and the PacBridge Group?
2     A   I have to check and see.
3     Q   Without knowing the specific dates, do you
4 recall whether you had any meetings during that time
5 frame?
6         MS. HOMER:  He already answered that
7 question.  He said he would have to check his
8 calendar.
9 BY MR. GURFEIN:
10     Q   So you have no recollection as you're
11 sitting here today, if, during that six-week time
12 frame, you had any meetings with the combined group
13 on the sale, any meetings at all?
14     A   I --
15         MS. HOMER:  It's okay if you don't recall.
16         THE WITNESS:  Did I answer the question?
17         MR. BROOKS:  He said he doesn't know.
18         THE WITNESS:  Okay.  Have I answered the
19 question or not?
20         MS. HOMER:  You said --
21         THE WITNESS:  I thought that answered the
22 question.
23         MS. HOMER:  You did.
24         THE WITNESS:  Okay.  Thank you.
25

Page 84

1 BY MR. GURFEIN:
2     Q   Okay.  Were you directed by anyone not to
3 send a copy of Exhibit 11 to either of the
4 committees?
5     A   Trying to remember.
6         MS. HOMER:  If you don't know --
7     A   I don't -- I don't recall.  I don't know.
8 I don't recall.
9 BY MR. GURFEIN:
10     Q   But you did not send a copy of the term
11 sheet?
12     A   I don't recall.
13     Q   You don't recall whether you sent a copy
14 of the term sheet?
15     A   Exhibit 11?
16     Q   Exhibit 11.
17     A   Which one is that?  Is that this one?
18     Q   Yes, Exhibit 11.
19     A   Yeah.  I don't recall.
20     Q   You don't recall whether you sent it or
21 not?
22     A   No.
23         MS. HOMER:  Let's go off the record for a
24 second.
25         MR. GURFEIN:  Yeah.

Page 85

1         (Off-the-record discussion)
2         THE WITNESS:  It was my practice to
3 generally do it.
4         MS. HOMER:  And that's what you testified
5 already.
6 BY MR. GURFEIN:
7     Q   Well, I will -- I will preface this
8 question by stating that neither you, nor anyone
9 working with the Debtor forwarded a copy of
10 Exhibit 11 to the equity committee.
11         Do you have any understanding as to why
12 that would not have been forwarded to the equity
13 committee?
14     A   It was no dollars and cents to this.
15 There was no financial components of this.
16     Q   Well, I will represent to you that there
17 were several term sheets similarly missing key
18 elements that were forwarded to the equity
19 committee.
20     A   Okay.
21         MR. BROOKS:  Is that a question?
22         THE WITNESS:  I don't know what you're --
23 BY MR. GURFEIN:
24     Q   I haven't asked the question yet.  Knowing
25 that there were several term sheets missing key

22 (Pages 82 - 85)

1      (Off-the-record discussion with counsel)
2   A   I believe I've answered that question.
3 BY MR. GURFEIN:
4   Q   So nobody responded to the ad hoc group?
5   A   I believe I've answered the question.
6   Q   And what was your answer?
7   A   My answer was, the response was we need
8 financial terms to discuss this further.
9   Q   Did you get financial terms back from the
10 ad hoc group?
11   A   As a part of the stalking horse purchaser,
12 this was their response.
13   Q   Exhibit 12?
14   A   That's correct.
15   Q   (Nodded head affirmatively.)  By the way,
16 how was that response given to the ad hoc group,
17 that they needed to provide financial terms?
18   A   I don't recall.
19   Q   Did you provide that response to them?
20   A   It was -- like I said, I -- I don't
21 exactly recall whether this was provided from
22 counsel to counsel, or whether it was provided to me
23 directly.  So I'm not sure if the response was from
24 counsel to counsel or from me directly.
25   Q   And as you sit here, you have no

1 recollection of talking to either Gilbert Li or Bill
2 Schwartz about Exhibit 11?
3   A   I'm not -- I'm -- if I did, that's what I
4 would have said, that's what was discussed.
5   Q   Now, we talked about the list of potential
6 bidders earlier, the schedule.  It was, uh
7 Exhibit 5.
8      (Off-the-record discussion)
9 BY MR. GURFEIN:
10   Q   Exhibit 5.  And we talked about the
11 financial capability of the companies or targets on
12 that schedule.
13      Did you have any concerns about the
14 ability of Apollo to have the financial wherewithal
15 to satisfy their financial commitment in acquiring
16 the company?
17   A   No.
18   Q   Did you have any concerns about Alta
19 Fundamentals' financial capabilities?
20   A   (Witness shook head negatively,) no.
21   Q   No?
22   A   No.
23   Q   Did you have any questions about
24 PacBridge --
25   A   No.

1   Q   -- ability?  None?  And that's PacBridge's
2 ability to have the financial wherewithal to close a
3 transaction to acquire the company?
4   A   Well, we require equity commitment letters
5 from all three of them to prove it out.
6   Q   And you received those?
7   A   Correct.
8   Q   And now PacBridge had made a couple of
9 offers in term sheets prior to that.  Had you done
10 financial due diligence on PacBridge for the prior
11 offers they made?
12   A   We were, uh --
13      MR. BROOKS:  I'm going to object to the
14 scope.  It's outside the request for this
15 deposition.
16      MR. GURFEIN:  All right.
17   A   Our ability to begin those discussions was
18 short-cutted -- short-circuited, I would say.
19 BY MR. GURFEIN:
20   Q   Mr. Glade, the question is --
21   A   By the time --
22   Q   -- did you -- did you have financial
23 questions about the financial capability of
24 PacBridge to satisfy its obligations under either of
25 its other two proposals?

1   A   Say -- say the question again.  I want to
2 clarify.
3   Q   Did you have any questions about the
4 financial wherewithal of PacBridge to close either
5 of the other transactions that they had submitted to
6 the company?
7      MR. BROOKS:  I'm going to object again.
8 Let's move on here.
9      THE WITNESS:  Do I have to answer?
10      MR. BROOKS:  You don't need to answer.
11 It's outside the scope of this deposition.
12      MR. GURFEIN:  It's not your client.
13      MS. HOMER:  You don't --
14      MR. BROOKS:  I'm a party.
15      MR. GURFEIN:  It's not your client.
16      MS. HOMER:  You can either -- he's
17 answered the question.  You can either read it back,
18 you can repeat it, or you can just move on.
19 BY MR. GURFEIN:
20   Q   All right.  I'll -- I'll take it that you
21 had no questions as to their financial capacity to
22 fulfill --
23   A   I would --
24   Q   -- their offers.
25   A   I would have done -- had we been able to

24 (Pages 90 - 93)

Page 106

1  - Password-Protected Access:  Transcripts and
   exhibits relating to this proceeding will be
2  uploaded to a password-protected repository, to
   which all ordering parties will have access.
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 108

1  To:  Ilyse Homer
2  Re: Signature of Deponent MARSHALL GLADE
3  Date Errata due back at our offices:
4
5  Greetings:
6  This deposition has been requested for read and sign
   by the deponent.  It is the deponent's
7  responsibility to review the transcript, noting any
   changes or corrections on the attached PDF Errata.
8  The deponent may fill out the Errata electronically
   or print and fill out manually.
9
10 Once the Errata is signed by the deponent and
   notarized, please mail it to the offices of Veritext
11 (below).
12 When the signed Errata is returned to us, we will
   seal and forward to the taking attorney to file with
13 the original transcript.  We will also send copies
   of the Errata to all ordering parties.
14
15 If the signed Errata is not returned within the time
   above, the original transcript may be filed with the
16 court without the signature of the deponent.
17
18 Please send completed Errata to:
19 Veritext Production Facility
20 11539 Park Woods Circle, Suite 302
21 Alpharetta, GA 30005
22 (770) 343-9696
23
24
25

Page 107

1                CERTIFICATE
2  STATE OF GEORGIA:
   COUNTY OF FULTON:
3
4       I hereby certify that the foregoing
   transcript was taken down, as stated in the caption,
5  and the colloquies, questions, and answers were
   reduced to typewriting under my direction; that the
6  transcript is a true and correct record of the
   evidence given upon said proceeding.
7       I further certify that I am not a relative
   or employee or attorney of any party, nor am I
8  financially interested in the outcome of this
   action.
9       I have no relationship of interest in this
   matter which would disqualify me from maintaining my
10 obligation of impartiality in compliance with the
   Code of Professional Ethics.
11      I have no direct contract with any party
   in this action and my compensation is based solely
12 on the terms of my subcontractor agreement.
        Nothing in the arrangements made for this
13 proceeding impacts my absolute commitment to serve
   all parties as an impartial officer of the court.
14
15      This the 26th day of August, 2018.
16
17      Carolyn J. Smith
18      CAROLYN J. SMITH, RMR, CCR-A-1361
19
20
21
22
23
24
25

Page 109

1  ERRATA for ASSIGNMENT #2996119
2  I, the undersigned, do hereby certify that I have
   read the transcript of my testimony, and that
3
4  ___ There are no changes noted.
5  ___ The following changes are noted:
6
   Pursuant to Rule 30(7)(e) of the Federal Rules of
7  Civil Procedure and/or OCGA 9-11-30(e), any changes
   in form or substance which you desire to make to
8  your testimony shall be entered upon the deposition
   with a statement of the reasons given for making
9  them.  To assist you in making any such corrections,
   please use the form below.  If additional pages are
10 necessary, please furnish same and attach.
11 Page _____ Line _____ Change_____
12 _____
13 Reason for change_____
14 Page _____ Line _____ Change_____
15 _____
16 Reason for change_____
17 Page _____ Line _____ Change_____
18 _____
19 Reason for change_____
20 Page _____ Line _____ Change_____
21 _____
22 Reason for change_____
23 Page _____ Line _____ Change_____
24 _____
25 Reason for change_____

28 (Pages 106 - 109)

# Exhibit B

## CERTIFICATE OF FORMATION
## OF
## PREMIER ACQUISITION HOLDINGS LLC
### A Delaware Limited Liability Company

This Certificate of Formation of Premier Acquisition Holdings LLC (the "Company"), dated as of June 6, 2018, is being duly executed and filed by the undersigned authorized person to form a limited liability company under the Delaware Limited Liability Company Act (6 *Del. C.* §18-101, *et seq*.).

FIRST.  The name of the limited liability company formed is "Premier Acquisition Holdings LLC".

SECOND.  The address of the registered office of the Company in the State of Delaware and the name and address of the registered agent for service of process on the Company in the State of Delaware are:  Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808-1674.

**IN WITNESS WHEREOF**, the undersigned has executed this Certificate of Formation as of the date first above written.

By:    /s/ Mary Kearney
     Mary Kearney, Authorized Person

State of Delaware
Secretary of State
Division of Corporations
Delivered  06:05 PM 06/06/2018
FILED  06:05 PM 06/06/2018
SR 20185011869 - File Number  6919892

# Exhibit C

SC 13D 1 v424531_sc13d.htm FORM SC 13D

| OMB APPROVAL |
| --- |
| OMB Number: 3235-0145 |
| Expires:    February   28,   2009 |
| Estimated  average  burden  hours per response……..14.5 |

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C.  20549**

**SCHEDULE 13D**
**Under the Securities Exchange Act of 1934**
**(Amendment No. _____)\***

---

**Premier Exhibitions, Inc.**

(Name of Issuer)

---

**Common Stock**

(Title of Class of Securities)

---

**74051E102**

(CUSIP Number)

---

**Daoping Bao**
**C/O Premier Exhibitions, Inc.**
**3340 Peachtree Road NE, Suite 900**
**Atlanta, GA 30326**
**(404) 842-2600**

Copy to:

**Samuel C. Schlessinger**
**Dentons US LLP**
**Willis Tower**
**233 S. Wacker Drive, Suite 5900**
**Chicago, IL 60606**
**(312) 876-8000**

(Name, Address and Telephone Number of Person Authorized to
Receive Notices and Communications)

---

**October 30, 2015**

(Date of Event which Requires Filing of this Statement)

---

If the filing person has previously filed a statement on Schedule 13G to report the acquisition that is the subject of this Schedule 13D, and is filing this schedule because of §§240.13d-1(e), 240.13d-1(f) or 240.13d-1(g), check the following box. ¨

**Note**: Schedules filed in paper format shall include a signed original and five copies of the schedule, including all exhibits. See §240.13d-7 for other parties to whom copies are to be sent.

\* The remainder of this cover page shall be filled out for a reporting person's initial filing on this form with respect to the subject class of securities, and for any subsequent amendment containing information which would alter disclosures provided in a prior cover page.

The information required on the remainder of this cover page shall not be deemed to be "filed" for the purpose of Section 18 of the Securities Exchange Act of 1934 ("Act") or otherwise subject to the liabilities of that section of the Act but shall be subject to all other provisions of the Act (however, see the Notes).

CUSIP No. **74051E102**

| | | |
|---|---|---|
| 1. | Names of Reporting Persons. I.R.S. Identification Nos. of above persons (entities only). **Daoping Bao** | |
| 2. | Check the Appropriate Box if a Member of a Group (See Instructions) (a)                    **X** (b) | |
| 3. | SEC Use Only | |
| 4. | Source of Funds (See Instructions) **OO** | |
| 5. | Check if Disclosure of Legal Proceedings Is Required Pursuant to Items 2(d) or 2(e) | |
| 6. | Citizenship or Place of Organization **Canada** | |

| Number of Shares Beneficially by Owned by Each Reporting Person With | 7. | Sole Voting Power  **4,448,113** |
|---|---|---|
| | 8. | Shared Voting Power **0** |
| | 9. | Sole Dispositive Power **1,271,994** |
| | 10. | Shared Dispositive Power **0** |

| | | |
|---|---|---|
| 11. | Aggregate Amount Beneficially Owned by Each Reporting Person  **4,448,113** | |
| 12. | Check if the Aggregate Amount in Row (11) Excludes Certain Shares (See Instructions) X[1] | |
| 13. | Percent of Class Represented by Amount in Row (11)   **47.5%**[2] | |
| 14. | Type of Reporting Person (See Instructions) **IN** | |

---

[1] At the Closing (as defined herein), Mr. Bao received (a) 1,271,994 shares ("**Exchangeable Shares**") of 1032403 B.C. Ltd., a company existing under the laws at the Province of British Columbia and a wholly-owned subsidiary of the Issuer ("**Exchangeco**"), which are exchangeable for 1,271,994 shares of common stock, par value $0.0001 per share, of the Issuer ("**Issuer Common Stock**") pursuant to the terms of such shares and that certain Support Agreement entered into between the Issuer and Exchangeco at the Closing, and (b) one share of a separate class of stock of the Issuer (the "**Class 1 Special Voting Stock**") that provides for voting rights in the Issuer equal to the number of Exchangeable Shares held by Mr. Bao. The amount reported in Row 11 excludes the share of Class 1 Special Voting Stock held by Mr. Bao. The reporting person disclaims beneficial ownership of the shares beneficially owned by the other parties to the Stockholders Agreement (as defined herein) except to the extent of his pecuniary interest therein.

[2] The calculation of the foregoing percentage is based on dividing Row 11 by the sum of (a) 4,917,222 shares of Issuer Common Stock outstanding as of September 15, 2015 according to the definitive proxy statement filed on September 16, 2015, (b) the 3,013,193 shares of Issuer Common Stock issued to Mr. Bao as agent for Mr. Feng, Mr. Zhang, High Nature Holding Limited and Mandra Forestry Limited and (c) 1,434,720 Exchangeable Shares issued to Mr. Bao and Ms. Brenner.

CUSIP No. **74051E102**

| 1. | Names of Reporting Persons. I.R.S. Identification Nos. of above persons (entities only). **Nancy Brenner** | | |
|----|----|----|----|
| 2. | Check the Appropriate Box if a Member of a Group (See Instructions) (a)                   **X** (b) | | |
| 3. | SEC Use Only | | |
| 4. | Source of Funds (See Instructions)  **OO** | | |
| 5. | Check if Disclosure of Legal Proceedings Is Required Pursuant to Items 2(d) or 2(e) | | |
| 6. | Citizenship or Place of Organization **United States** | | |
| Number of Shares Beneficially by Owned by Each Reporting Person With | 7. | Sole Voting Power  **0** | |
| | 8. | Shared Voting Power **0** | |
| | 9. | Sole Dispositive Power **162,726** | |
| | 10. | Shared Dispositive Power **0** | |
| 11. | Aggregate Amount Beneficially Owned by Each Reporting Person  **162,726** | | |
| 12. | Check if the Aggregate Amount in Row (11) Excludes Certain Shares (See Instructions) X[1] | | |
| 13. | Percent of Class Represented by Amount in Row (11)  **1.7%**[2] | | |
| 14. | Type of Reporting Person (See Instructions) **IN** | | |

[1] At the Closing, Ms. Brenner received (a) 162,726 Exchangeable Shares, which are exchangeable for 162,726 shares of Issuer Common Stock pursuant to the terms of such shares and that certain Support Agreement entered into between the Issuer and Exchangeco at the Closing, and (b) one share of a separate class of stock of the Issuer (the "**Class 2 Special Voting Stock**") that provides for voting rights in the Issuer equal to the number of Exchangeable Shares held by Ms. Brenner. The amount reported in Row 11 excludes the share of Class 2 Special Voting Stock held by Ms. Brenner. The reporting person disclaims beneficial ownership of the shares beneficially owned by the other parties to the Stockholders Agreement (as defined herein) except to the extent of her pecuniary interest therein.

[2] The calculation of the foregoing percentage is based on dividing Row 11 by the sum of (a) 4,917,222 shares of Issuer Common Stock outstanding as of September 15, 2015 according to the definitive proxy statement filed on September 16, 2015, (b) the 3,013,193 shares of Issuer Common Stock issued to Mr. Bao as agent for Mr. Feng, Mr. Zhang, High Nature Holding Limited and Mandra Forestry Limited and (c) 1,434,720 Exchangeable Shares issued to Mr. Bao and Ms. Brenner.

CUSIP No. **74051E102**

| | |
|---|---|
| 1. | Names of Reporting Persons.<br>I.R.S. Identification Nos. of above persons (entities only).<br>**Lange Feng** |
| 2. | Check the Appropriate Box if a Member of a Group (See Instructions)<br>(a)              **X**<br>(b) |
| 3. | SEC Use Only |
| 4. | Source of Funds (See Instructions)  **PF** |
| 5. | Check if Disclosure of Legal Proceedings Is Required Pursuant to Items 2(d) or 2(e) |
| 6. | Citizenship or Place of Organization<br>**China** |

| Number of Shares Beneficially by Owned by Each Reporting Person With | | |
|---|---|---|
| | 7. | Sole Voting Power  **0** |
| | 8. | Shared Voting Power **0** |
| | 9. | Sole Dispositive Power **669,643** |
| | 10. | Shared Dispositive Power **0** |

| | |
|---|---|
| 11. | Aggregate Amount Beneficially Owned by Each Reporting Person  **669,643** |
| 12. | Check if the Aggregate Amount in Row (11) Excludes Certain Shares (See Instructions) [1] |
| 13. | Percent of Class Represented by Amount in Row (11)  **7.2%** [2] |
| 14. | Type of Reporting Person (See Instructions)<br>**IN** |

[1] The reporting person disclaims beneficial ownership of the shares beneficially owned by the other parties to the Stockholders Agreement (as defined herein) except to the extent of his pecuniary interest therein.

[2] The calculation of the foregoing percentage is based on dividing Row 11 by the sum of (a) 4,917,222 shares of Issuer Common Stock outstanding as of September 15, 2015 according to the definitive proxy statement filed on September 16, 2015, (b) the 3,013,193 shares of Issuer Common Stock issued to Mr. Bao as agent for Mr. Feng, Mr. Zhang, High Nature Holding Limited and Mandra Forestry Limited and (c) 1,434,720 Exchangeable Shares issued to Mr. Bao and Ms. Brenner.

CUSIP No.  **74051E102**

| | | |
|---|---|---|
| 1. | Names of Reporting Persons.<br>I.R.S. Identification Nos. of above persons (entities only).<br>**Jihe Zhang** | |
| 2. | Check the Appropriate Box if a Member of a Group (See Instructions)<br>(a)                              **X**<br>(b) | |
| 3. | SEC Use Only | |
| 4. | Source of Funds (See Instructions)      **PF** | |
| 5. | Check if Disclosure of Legal Proceedings Is Required Pursuant to Items 2(d) or 2(e) | |
| 6. | Citizenship or Place of Organization<br>**China** | |

| Number of Shares Beneficially by Owned by Each Reporting Person With | | |
|---|---|---|
| | 7. | Sole Voting Power  **0** |
| | 8. | Shared Voting Power **0** |
| | 9. | Sole Dispositive Power **446,429** |
| | 10. | Shared Dispositive Power **0** |

| | | |
|---|---|---|
| 11. | Aggregate Amount Beneficially Owned by Each Reporting Person  **446,429** [1] | |
| 12. | Check if the Aggregate Amount in Row (11) Excludes Certain Shares (See Instructions) | |
| 13. | Percent of Class Represented by Amount in Row (11)    **4.8%** [2] | |
| 14. | Type of Reporting Person (See Instructions)<br>**IN** | |

[1] The reporting person disclaims beneficial ownership of the shares beneficially owned by the other parties to the Stockholders Agreement (as defined herein) except to the extent of his pecuniary interest therein.

[2] The calculation of the foregoing percentage is based on dividing Row 11 by the sum of (a) 4,917,222 shares of Issuer Common Stock outstanding as of September 15, 2015 according to the definitive proxy statement filed on September 16, 2015, (b) the 3,013,193 shares of Issuer Common Stock issued to Mr. Bao as agent for Mr. Feng, Mr. Zhang, High Nature Holding Limited and Mandra Forestry Limited and (c) 1,434,720 Exchangeable Shares issued to Mr. Bao and Ms. Brenner.

CUSIP No. **74051E102**

| | | |
|---|---|---|
| 1. | Names of Reporting Persons.<br>I.R.S. Identification Nos. of above persons (entities only).<br>**High Nature Holding Limited** | |
| 2. | Check the Appropriate Box if a Member of a Group (See Instructions)<br>(a)                    **X**<br>(b) | |
| 3. | SEC Use Only | |
| 4. | Source of Funds (See Instructions)    **PF** | |
| 5. | Check if Disclosure of Legal Proceedings Is Required Pursuant to Items 2(d) or 2(e) | |
| 6. | Citizenship or Place of Organization<br>**British Virgin Islands** | |

| Number of Shares Beneficially by Owned by Each Reporting Person With | | |
|---|---|---|
| | 7. | Sole Voting Power  **0** |
| | 8. | Shared Voting Power **0** |
| | 9. | Sole Dispositive Power **1,116,071** |
| | 10. | Shared Dispositive Power **0** |

| | | |
|---|---|---|
| 11. | Aggregate Amount Beneficially Owned by Each Reporting Person  **1,116,071** [1] | |
| 12. | Check if the Aggregate Amount in Row (11) Excludes Certain Shares (See Instructions) | |
| 13. | Percent of Class Represented by Amount in Row (11)    **11.9%** [2] | |
| 14. | Type of Reporting Person (See Instructions)<br>**CO** | |

[1] The reporting person disclaims beneficial ownership of the shares beneficially owned by the other parties to the Stockholders Agreement (as defined herein) except to the extent of its pecuniary interest therein.

[2] The calculation of the foregoing percentage is based on dividing Row 11 by the sum of (a) 4,917,222 shares of Issuer Common Stock outstanding as of September 15, 2015 according to the definitive proxy statement filed on September 16, 2015, (b) the 3,013,193 shares of Issuer Common Stock issued to Mr. Bao as agent for Mr. Feng, Mr. Zhang, High Nature Holding Limited and Mandra Forestry Limited and (c) 1,434,720 Exchangeable Shares issued to Mr. Bao and Ms. Brenner.

CUSIP No. **74051E102**

| 1. | Names of Reporting Persons. I.R.S. Identification Nos. of above persons (entities only). **Mandra Forestry Limited** | | |
|---|---|---|---|
| 2. | Check the Appropriate Box if a Member of a Group (See Instructions) (a)                    **X** (b) | | |
| 3. | SEC Use Only | | |
| 4. | Source of Funds (See Instructions)  **1** | | |
| 5. | Check if Disclosure of Legal Proceedings Is Required Pursuant to Items 2(d) or 2(e) | | |
| 6. | Citizenship or Place of Organization **British Virgin Islands** | | |
| Number of Shares Beneficially by Owned by Each Reporting Person With | 7. | Sole Voting Power  **0** | |
| | 8. | Shared Voting Power **0** | |
| | 9. | Sole Dispositive Power **781,250** | |
| | 10. | Shared Dispositive Power **0** | |
| 11. | Aggregate Amount Beneficially Owned by Each Reporting Person  **781,250 2** | | |
| 12. | Check if the Aggregate Amount in Row (11) Excludes Certain Shares (See Instructions) | | |
| 13. | Percent of Class Represented by Amount in Row (11)    **8.3% 3** | | |
| 14. | Type of Reporting Person (See Instructions) **CO** | | |

---

[1] We have requested on numerous occasions but not received confirmation from Mandra Forestry Limited.

[2] The reporting person disclaims beneficial ownership of the shares beneficially owned by the other parties to the Stockholders Agreement (as defined herein) except to the extent of its pecuniary interest therein.

[3] The calculation of the foregoing percentage is based on dividing Row 11 by the sum of (a) 4,917,222 shares of Issuer Common Stock outstanding as of September 15, 2015 according to the definitive proxy statement filed on September 16, 2015, (b) the 3,013,193 shares of Issuer Common Stock issued to Mr. Bao as agent for Mr. Feng, Mr. Zhang, High Nature Holding Limited and Mandra Forestry Limited and (c) 1,434,720 Exchangeable Shares issued to Mr. Bao and Ms. Brenner.

**Item 1. Security and Issuer**

This statement on Schedule 13D ("**Schedule 13D**") relates to the shares of common stock, par value $0.0001 per share ("**Issuer Common Stock**"), of Premier Exhibitions, Inc., a Florida corporation, (the "**Company**" or the "**Issuer**"), as well as shares of 1032403 B.C. Ltd., a wholly-owned subsidiary of the Issuer ("**Exchangeco**"), which are exchangeable for Issuer Common Stock pursuant to the terms of such shares and that certain Support Agreement entered into between the Issuer and Exchangeco at the Closing (as defined herein). The address of the principal executive office of the Issuer is 3340 Peachtree Road N.E., Suite 900, Atlanta, Georgia 30326.

**Item 2. Identity and Background**

This Schedule 13D is being filed jointly by the following persons (collectively, the "**Reporting Persons**"):

| Name | Address | Employment/Address | Citizenship |
|---|---|---|---|
| Daoping Bao | C/O Premier Exhibitions, Inc., 3340 Peachtree Road NE, Suite 900 Atlanta, GA 30326 | Exec. Chairman, Pres. and CEO<br><br>Premier Exhibitions, Inc. 3340 Peachtree Rd. N.E. Ste. 900 Atlanta, GA 30326 United States | Canada |
| Nancy Brenner | 1828 Lilac Drive., #18 Surrey, British Columbia V4A 5C9 Canada | Managing Director Premier Exhibitions, Inc. 3340 Peachtree Rd. N.E,. Ste. 900 Atlanta, GA 30326 | United States |
| Lange Feng | 15953 107 Avenue Surrey, British Columbia V4N 5N7 Canada | Chief Financial Officer Henan Yixue Waterproofing Engineering Co., Ltd. 901, Unit 1, Building 1, Zhenghongqi, No. 260 Dongming Road North, Agricultural Road, Jinshui District, Zhenrgzhou City, Henan Province, China | China |
| Jihe Zhang | Suite 2606, Building A Full Shuangzi Towers, No. 59 Dongsanhuan Zhonglu Chaoyang District, Beijing China | Chairman of Beijing AO Jie Kai Industry & Trading Co., LTD Room 2606 Fuli Twins Tower A Building No. 59 Mid East 3rd Ring Road China | China |
| Name | Address | Principal Business | Organization |
| High Nature Holding Limited | Unit 8, 3rd Floor Qwomar Trading Complex Blackburne Road Port Purcell, Road Town Tortola, British Virgin Islands VG1110 | Biorefineries | British Virgin Islands |

| Mandra Forestry Limited | C/O Portcullis TrustNet (BVI) Ltd.<br>Portcullis TrustNet Chambers<br>P.O. Box 3444<br>Road Town, Tortola<br>British Virgin Islands | Investment Holding Company | British Virgin Islands |
|---|---|---|---|

The name, residence or business address, and present principal occupation or employment of each director, executive officer and controlling person of High Nature Holding Limited and Mandra Forestry Limited are listed on Schedule I to this Schedule 13D.

Information in this Schedule 13D with respect to each of the Reporting Persons is given solely by such Reporting Person, and no Reporting Person assumes responsibility for the accuracy or completeness of information provided by another Reporting Person.

During the past five years, none of the Reporting Persons (or, to the knowledge of the Reporting Persons, any of the persons listed on Schedule I hereto) (i) has been convicted in any criminal proceeding (excluding traffic violations or similar misdemeanors) or (ii) was a party to a civil proceeding of a judicial or administrative body of competent jurisdiction and as a result of such proceeding was or is subject to a judgment, decree or final order enjoining future violations of, or prohibiting or mandating activities subject to, federal or state securities laws or finding any violation with respect to such laws. Notwithstanding the foregoing to the contrary, the Reporting Persons have requested on multiple occasions but not received confirmation with respect to the matters discussed in this paragraph from Mandra Forestry Limited.

**Item 3. Source and Amount of Funds or Other Consideration**

Pursuant to the merger agreement entered into as of April 2, 2015 by and among the Company, Dinoking Tech Inc. ("**Dinoking**"), Exchangeco, and Mr. Bao and Ms. Brenner (the "**Merger Agreement**"), on November 1, 2015 (the "**Closing**"), the Company acquired all of the outstanding shares of Dinoking for total consideration of 1,434,720 shares of Exchangeco ("**Exchangeable Shares**"). The Exchangeable Shares are exchangeable for an aggregate of 1,434,720 shares of Issuer Common Stock pursuant to the terms of such shares and that certain Support Agreement entered into between the Company and Exchangeco at the Closing. At the Closing, Mr. Bao received 1,271,994 Exchangeable Shares and Ms. Brenner received 162,726 Exchangeable Shares, which they can exchange on a one-for-one basis into shares of the Issuer's Common Stock at any time, and Mr. Bao received one share of Class 1 Special Voting Stock and Ms. Brenner received one share of Class 2 Special Voting Stock, which provides them with voting rights in the Company equal to the number of Exchangeable Shares they hold.

In connection with the Merger Agreement, the Company also issued a convertible promissory note (the "**Convertible Note**") to Mr. Bao, as agent for Mr. Lange Feng, Mr. Jihe Zhang, High Nature Holding Limited and Mandra Forestry Limited (the "**Former Convertible Note Holders**"). The Convertible Note automatically converted pursuant to the terms of the Convertible Note into 3,013,393 shares of Issuer Common Stock on October 30, 2015 (i.e., the first business day after the special meeting at which the Company's shareholders approved certain proposals necessary to consummate the transactions contemplated by the Merger Agreement).

**Item 4. Purpose of Transaction**

The information set forth or incorporated in Item 3 is incorporated herein by reference.

The Reporting Persons intend to review their investment in the Company on an ongoing basis. Depending on their review and evaluation of the business and prospects of the Company, and subject to applicable securities laws and the price level of the Issuer Common Stock, or such other factors as they may deem relevant, the Reporting Persons may (a) acquire additional shares of Issuer Common Stock or other securities of the Company; (b) sell all or any part of their Issuer Common Stock, which potential sales may be made pursuant to Rule 144, in privately negotiated transactions or in sales registered or exempt from registration under the Securities Act of 1933, as amended (the "**Securities Act**") (or, with respect to Mr. Bao and/or Ms. Brenner, subject to their exchange of the Exchangeable Shares for Issuer Common Stock, in sales pursuant to a resale registration statement that the Company is required to file with the U.S. Securities and Exchange Commission (the "**SEC**") within 30 business days after the Closing and cause to be declared effective as soon as practicable thereafter under the Registration Rights Agreement (as defined herein); (iii) distribute Issuer Common Stock to various of their partners, members or shareholders or may engage in any combination of the foregoing.

Subject to applicable law, the Reporting Persons may enter into derivative transactions, hedging transactions or alternative structures with respect to the Issuer Common Stock. Any open market or privately negotiated purchases, sales, distributions or other transactions may be made at any time without additional prior notice. Any alternative that the Reporting Persons may pursue will depend upon a variety of factors, including, without limitation, current and anticipated future trading prices of the Issuer Common Stock, the financial condition, results of operations and prospects of the Company, general economic, financial market and industry conditions, other investment and business opportunities available to the Reporting Persons, tax considerations and other factors.

At the Closing, the Company, Mr. Bao and Ms. Brenner, entered into the Corporate Governance Agreement, dated as of November 1, 2015, pursuant to which the Reporting Persons collectively had the right as of the Closing to appoint up to four members of the Company's board of directors, which was then required to be composed of seven members. If their beneficial ownership in the Company falls to between 10% and 30%, then the Reporting Persons will have the right to appoint up to 30% of the members of the board of directors. If the Reporting Persons beneficially own in the aggregate less than 10% of the Issuer Common Stock, then they will no longer be entitled to appoint members of the Company's board of directors. These board appointment provisions also apply to each subsidiary of the Company. The Corporate Governance Agreement also required the Company's board of directors to appoint Mr. Bao as the Executive Chairman of the board of directors and President of the Company, and each subsidiary of the Company, as of the Closing.

As a result of the Reporting Persons' continuous review and evaluation of the business of the Company, the Reporting Persons may communicate with the board of directors of the Company, members of management and/or other shareholders from time to time with respect to operational, strategic, financial or governance matters or otherwise work with management and the board of directors of the Company with a view to maximizing shareholder value.

Other than as described in this Item 4 and the Future Contingent Payments under the Success Payment Agreement section described in Item 6 below, none of the Reporting Persons, nor to the knowledge of each Reporting Person, any individuals listed in response to Item 2 hereof, has any current plans or proposals that relate to or that would result in any of the transactions or other matters specified in clauses (a) though (j) of Item 4 of Schedule 13D; provided, that the Reporting Persons may, at any time, review or reconsider their position with respect to the Issuer and reserve the right to develop such plans or proposals.

**Item 5. Interest in Securities of the Issuer**

The information contained on the cover pages to this Schedule 13D and the information set forth or incorporated in Items 2, 3, 4 and 6 hereof are incorporated herein by reference.

(a) As of the Closing, following the consummation of the transactions contemplated by the Merger Agreement, each Reporting Person may be deemed to beneficially own 4,448,113 shares of Issuer Common Stock (excluding one share of Class 1 Special Voting Stock and one share of Class 2 Special Voting Stock held by Mr. Bao and Ms. Brenner, respectively, that provide for voting rights in the Company equal to the number of Exchangeable Shares held by Mr. Bao and Ms. Brenner, respectively, and including 1,434,720 Exchangeable Shares, which are exchangeable for Issuer Common Stock) representing approximately 47.5% of the outstanding Issuer Common Stock. The calculation of the foregoing percentage is based on the sum of (a) 4,917,222 shares of Issuer Common Stock outstanding as of September 15, 2015 according to the definitive proxy statement filed on September 16, 2015, (b) the 3,013,193 shares of Issuer Common Stock issued to Mr. Bao as agent for Mr. Feng, Mr. Zhang, High Nature Holding Limited and Mandra Forestry Limited and (c) 1,434,720 Exchangeable Shares issued to Mr. Bao and Ms. Brenner. Each Reporting Person disclaims beneficial ownership of the shares beneficially owned by the other Reporting Persons except to the extent of his, her or its pecuniary interest therein.

(b) Pursuant to the Stockholders Agreement described in Item 6 below, Mr. Bao has the right to vote (and a right of first refusal with respect to) the Issuer Common Stock and Exchangeable Shares held by the other Reporting Persons. Accordingly, Mr. Bao has the sole power to vote or direct the vote of all shares reported by the Reporting Persons on the cover pages to this Schedule 13D. Each Reporting Person has the sole power to dispose the number of shares listed in Row 9 of its respective cover page to this Schedule 13D. No Reporting Person has shared voting or shared dispositive power with respect to any of the shares reported in this Schedule 13D.

(c) Other than the matters referred to herein, there have been no other transactions in the Issuer Common Stock effected by the Reporting Persons during the past sixty days.

(d) No other person is known to have the right to receive or the power to direct the receipt of dividends from, or any proceeds from the sale of, securities of the Issuer beneficially owned by the Reporting Persons.

(e) Not applicable.

**Item 6. Contracts, Arrangements, Understandings or Relationships with Respect to Securities of the Issuer**

The information set forth or incorporated in Items 3 and 4 is incorporated herein by reference.

*Stockholders Agreement*

Pursuant to that certain Stockholders Agreement, dated April 2, 2015, among the Reporting Persons (as amended, the "**Stockholders Agreement**"), Mr. Bao has the power to vote (and a right of first refusal with respect to) each of the shares in the Company beneficially owned by the other Reporting Persons.

*Corporate Governance Agreement*

See the description in Item 4 hereof.

*Support Agreement*

The Company and Exchangeco also entered at the Closing into that certain Support Agreement, which sets forth terms related to the Exchangeable Shares and contains certain covenants governing the relationship between the Company and Exchangeco so long as Exchangeable Shares are outstanding.

Among other things, pursuant to the Support Agreement, the Company will not, without the prior approval of Exchangeco and the holders of the Exchangeable Shares, take certain actions unless the same or an economically equivalent change shall simultaneously be made to, or in the rights of, the holders of Exchangeable Shares. Such actions include (i) issuing or distributing shares of the Issuer Common Stock to holders of the common stock by way of stock dividend or other distribution; (ii) issuing or distributing rights, options, warrants, or property to holders of the Issuer Common Stock entitling them to subscribe for or to purchase shares of the Issuer Common Stock; (iii) issuing or distributing to holders of shares or securities of the Company of any other class of capital stock of the Company or any rights, options, or warrants to purchase the same, evidences of indebtedness of the Company, or assets of the Company; (iv) subdividing, redividing, or changing the then outstanding shares of the Issuer Common Stock into a greater number of shares; (v) reducing, combining, or consolidating or changing the then outstanding shares of the Issuer Common Stock into a lesser number of shares; or (vi) reclassifying or otherwise changing the shares of the Issuer Common Stock or effecting an amalgamation, merger, reorganization, or other transaction affecting the Issuer Common Stock.

*Registration Rights Agreement*

In addition, at the Closing, the Company, Mr. Bao and Ms. Brenner entered into that certain Registration Rights Agreement (the "**Registration Rights Agreement**"), pursuant to which the Company is required to register with the SEC the shares of Issuer Common Stock held by Mr. Bao and Ms. Brenner and their permitted assigns upon demand at any time after the Closing.

*Success Payment Agreement*

In connection with the Closing, the Company, Mr. Bao and Ms. Brenner entered into a Success Payment Agreement, dated April 2, 2015 (the "**Success Payment Agreement**"), which outlines the requirements by which Mr. Bao and Ms. Brenner may receive Future Contingent Payments (as defined herein).

Mr. Bao and Ms. Brenner have the right to receive from the Company future contingent payments payable in either cash or shares of Issuer Common Stock (the "**Future Contingent Payments**"). The Company has agreed to make Future Contingent Payments to Mr. Bao and Ms. Brenner of up to $8,562,715 payable in either cash or shares of Issuer Common Stock upon the satisfaction of conditions precedent relating to the execution of specified exhibition and joint venture agreements with third-parties meeting the requirements set forth in the Success Payment Agreement. Assuming all of the conditions are satisfied that would trigger the three separate Future Contingent Payments provided for under the Success Payment Agreement, the Company will be required to issue a minimum of 1,309,162 shares of Issuer Common Stock to Mr. Bao and Ms. Brenner. The Reporting Persons, however, are unable to provide an exact estimate of the number of shares that the Company may issue in connection with Future Contingent Payments due to the fact that certain conditions must be triggered to satisfy such payments and the value of the shares to be paid out will be determined based upon a formula that takes into account the volume weighted average trading price of the Company's common stock during the 60-day period prior to the date of the applicable triggering event. The Reporting Persons estimate that if all of the conditions to the Future Contingent Payments are satisfied and the Mr. Bao and Ms. Brenner elect to receive shares of Issuer Common Stock as payment for the Future Contingent Payments, that the Company would issue up to a maximum of 856,271,455 shares of Issuer Common Stock in connection therewith, assuming that the Company's stock price was $0.01 based on the 60-day volume weighted average price ending immediately prior to the date of each of the three separate triggering events.

The foregoing summaries of the agreements described above do not purport to be complete and each is qualified in its entirety incorporated by reference to the complete text of such agreement attached hereto or incorporated by reference.

**Item 7. Materials to be Filed as Exhibits**

| Exhibit Number | Description of Exhibits |
|---|---|
| 1. | Joint Filing Agreement and Power of Attorney, dated November 6, 2015, by and among Messrs. Daoping Bao, Lange Feng and Jihe Zhang, Ms. Nancy Brenner, High Nature Holding Limited and Mandra Forestry Limited. |
| 2. | Stockholders Agreement, dated April 2, 2015, by and among Mr. Daoping Bao, Ms. Nancy Brenner, Mr. Lange Feng, Mr. Jihe Zhang, 1030443 B.C. Ltd. and High Nature Holding Limited, as amended. |
| 3. | Joinder Agreement, dated April 2, 2015 by Mandra Forestry Limited. |

4.     Joinder Agreement, dated April 2, 2015 by Jihe Zhang.

5.     Merger Agreement, dated April 2, 2015, by and among Premier Exhibitions, Inc., Dinoking Tech Inc., 1032403 B.C. Ltd., Mr. Daoping Bao and Ms. Nancy Brenner (incorporated by reference to Exhibit 2.1 to Premier Exhibitions, Inc.'s Current Report on Form 8-K filed April 8, 2015).

6.     Corporate Governance Agreement, dated November 1, 2015, by and among Premier Exhibitions, Inc., Mr. Daoping Bao and Ms. Nancy Brenner (incorporated by reference to Exhibit 10.1 to Premier Exhibitions, Inc.'s Current Report on Form 8-K filed November 4, 2015).

7.     Support Agreement, dated November 1, 2015, by and among Premier Exhibitions, Inc. and 1032403 B.C. Ltd. (incorporated by reference to Exhibit 10.2 to Premier Exhibitions, Inc.'s Current Report on Form 8-K filed November 4, 2015).

8.     Registration Rights Agreement, dated November 1, 2015, by and among Premier Exhibitions, Inc., Mr. Daoping Bao and Ms. Nancy Brenner (incorporated by reference to Exhibit 10.3 to Premier Exhibitions, Inc.'s Current Report on Form 8-K filed November 4, 2015).

9.     Success Payment Agreement, dated April 2, 2015, by and among Premier Exhibitions, Inc., Mr. Daoping Bao and Ms. Nancy Brenner (incorporated by reference to Exhibit 10.2 to Premier Exhibition, Inc.'s Current Report on Form 8-K filed April 8, 2015).

10.    Amended and Restated Secured Promissory Note and Guarantee, dated April 2, 2015, by and among Premier Exhibitions, Inc., as obligor, Premier Merchandising, LLC, RMS Titanic, Inc., Premier Exhibition Management LLC and Arts and Exhibitions International, LLC, as obligors, and Mr. Daoping Bao, for and on behalf of the lenders thereunder.

**Schedule I**

The names of the shareholders of High Nature Holding Limited, their business address and citizenship are set forth below. Each occupation set forth opposite an individual's name refers to Anhui Geyi Biorefineries Industrial Park Ltd.

| Name | Position | Business Address | Citizenship |
|------|----------|------------------|-------------|
| Haiping Zou | Chairman & President | Anhui Geyi Biorefineries Industrial Park Ltd. Chuangye Avenue, Yanliu, Shou County, Anhui Province P.R. China | China |
| Xiao Bai | CFO | Anhui Geyi Biorefineries Industrial Park Ltd. Chuangye Avenue, Yanliu, Shou County, Anhui Province P.R. China | China |

The Reporting Persons have requested on multiple occasions but not received the information necessary to complete this Schedule I with respect to Mandra Forestry Limited.

## SIGNATURES

After reasonable inquiry and to the best of my knowledge and belief, I certify that the information set forth in this statement is true, complete and correct.

**DAOPING BAO**

By:      /s/ Samuel C. Schlessinger, Attorney-in-fact

**HIGH NATURE HOLDING LIMITED**

By:      /s/ Samuel C. Schlessinger, Attorney-in-fact, on behalf of
         High Nature Holding Limited

**JIHE ZHANG**

By:      /s/ Samuel C. Schlessinger, Attorney-in-fact

**LANGE FENG**

By:      /s/ Samuel C. Schlessinger, Attorney-in-fact

**MANDRA FORESTRY LIMITED**

By:      /s/ Samuel C. Schlessinger, Attorney-in-fact, on behalf of
         Mandra Forestry Limited

**NANCY BRENNER**

By:      /s/ Samuel C. Schlessinger, Attorney-in-fact

Dated: March 31, 2016

**Exhibit 1**

### JOINT FILING AGREEMENT AND POWER OF ATTORNEY

Pursuant to and in accordance with the Securities Exchange Act of 1934, as amended (the "**Exchange Act**"), and the rules and regulations promulgated thereunder, each undersigned party hereby agrees to the joint filing, on behalf of such undersigned party with respect to the common stock, par value $0.0001 per share, of Premier Exhibitions, Inc. (the "**Company**"), a Florida corporation, of any and all forms, statements, reports, and/or documents required to be filed by such undersigned party under Section 13(d) and/or Section 16 of the Exchange Act (including any amendments, supplements, and/or exhibits thereto) with the U.S. Securities and Exchange Commission (the "**SEC**") (and, if such security is registered on a national securities exchange or national securities association, also with such exchange or association as may be required by applicable laws, rules and regulations), and each undersigned party further agrees that this Joint Filing Agreement and Power of Attorney may be included as an Exhibit to such joint filing.

Know all by these presents, that the undersigned hereby constitutes and appoints each of Laing Henshall, Catherine Wade, Samuel Schlessinger, Emily Yuen, Danielle Moore Burton, Tina Bingham and Brian A. Wainger or any of them acting as the true and lawful attorney-in-fact and agent of such undersigned party with full power and authority and full power of substitution and resubstitution, for, in the name of, and on behalf of such undersigned party, place and stead, in any and all capacities to:

      1.    execute any and all forms, statements, reports, and/or documents required to be filed by such undersigned party under Section 13(d) and/or Section 16 of the Exchange Act (including any and all amendments, supplements and/or exhibits thereto), for, in the name of, and on behalf of such undersigned party;

      2.    do and perform any and all acts for, in the name of, and on behalf of such undersigned party which said attorney-in-fact determines may be necessary or appropriate to complete and execute any and all such forms, statements, reports, and/or documents, any and all such amendments, supplements, and/or exhibits thereto, and any and all other documents in connection therewith;

      3.    file such forms, statements, reports, and/or documents, any and all such amendments, supplements, and/or exhibits thereto, and any and all other documents in connection therewith with the SEC (and, if such security is registered on a national securities exchange or national securities association, also with such exchange or association as may be required by applicable laws, rules and regulations); and

      4.    perform any and all other acts that said attorney-in-fact or agents determines may be necessary or appropriate in connection with the foregoing that may be in the best interest of or legally required by such undersigned party, granting unto said attorney-in-fact and agent full power and authority to do and perform each and every act and thing requisite or necessary to be done in and about the premises, as full to all intents and purposes as said attorney-in-fact and agents might or should do in person, hereby ratifying and confirming all that said attorney-in-fact and agent shall do or cause to be done by virtue hereof.

The undersigned hereby grants to each such attorney-in-fact full power and authority to do and perform any and every act and thing whatsoever required, necessary or proper to be done in the exercise of any of the rights and powers herein granted, as fully to all intents and purposes as the undersigned might or could do if personally present, with full power of substitution or revocation, hereby ratifying and confirming all that such attorney-in-fact, or such attorney-in-fact's substitute or substitutes, shall lawfully do or cause to be done by virtue of this Joint Filing Agreement and Power of Attorney and the rights and powers herein granted.

The undersigned acknowledges that the foregoing attorney-in-fact, in serving in such capacity at the request and on the behalf of the undersigned, is not assuming, nor is the Company assuming, any of the undersigned's responsibilities to comply with, or any liability for the failure to comply with, any provision of Section 16 of the Exchange Act.

This Joint Filing Agreement and Power of Attorney shall remain in full force and effect until the undersigned is no longer required to file such forms, statements, reports, and/or documents in accordance with Section 13(d) and/or Section 16 of the Exchange Act with respect to the undersigned's holdings of and transactions in securities issued by the Company, unless earlier revoked by the undersigned in a signed writing delivered to the foregoing attorney-in-fact.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the undersigned has executed this Joint Filing Agreement and Power of Attorney as of this 6th day of November, 2015.

**DAOPING BAO**

By:     /s/ Daoping Bao                    

**HIGH NATURE HOLDING LIMITED**

By:     /s/ Haiping Zou                   
          Name:  Haiping Zou
          Title:  President

**JIHE ZHANG**

By:     /s/ Jihe Zhang                    

**LANGE FENG**

By:     /s/ Lange Feng                   

**MANDRA FORESTRY LIMITED**

By:     /s/ Zhang Songyi                 
          Name: Zhang Songyi
          Title:  Director

**NANCY BRENNER**

By:     /s/ Nancy Brenner                 

**Exhibit 2**

## STOCKHOLDERS AGREEMENT

This Stockholders Agreement (this "**Agreement**"), dated as of April 2, 2015, is entered into by Daoping Bao, an individual residing in the Province of British Columbia, Canada ("**Bao**"), Nancy Brenner, an individual residing in the Province of British Columbia, Canada (collectively with Bao, the "**DK Shareholders**"), Lange Feng, an individual residing in the Province of British Columbia, Canada), 1030443 B.C. Ltd., a corporation existing under the laws of the Province of British Columbia, and High Nature Holding Limited, a corporation existing under laws of the British Virgin Islands (collectively, the "**DK Investor Group**") each of which is sometimes hereinafter referred to individually as a "**Party**" and collectively as the "**Parties**".

### RECITALS

**WHEREAS**, the DK Shareholders own all of the share capital in Dinoking Tech Inc. have entered into that certain Merger Agreement of even date herewith (the "**Merger Agreement**"); capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Merger Agreement);

**WHEREAS**, under the Merger Agreement the DK Shareholders have agreed to exchange their shares of Dinoking Tech Inc. for a combination of shares of (i) Common Stock, par value US$0.0001 per share ("**Common Stock**") of Premier Exhibitions Inc., a Florida company (the "**Company**"), (ii) an indirect ownership represented by shares exchangeable into the Company's Common Stock ("**Exchangeable Shares**"), and (iii) the right to direct the voting of the Company's Common Stock represented by newly created special voting shares of the Company at a price of US$100 per share (the "**Special Voting Shares**", and collectively with the Common Stock and Exchangeable Shares, the "**Merger Shares**") to be issued on the closing of the transactions under the Merger Agreement, representing in the aggregate approximately 24% of the shares of the Company's Common Stock on a fully diluted basis. The Special Voting Shares will have attached thereto voting rights equivalent to the number of the Company's Common Stock for which the Exchangeable Shares received by the DK Shareholders can be exchanged;

**WHEREAS**, the DK Investor Group has entered into an Assignment and Assumption Agreement of even date herewith (the "**Assignment and Assumption Agreement**") with each of PWCM Master Fund Ltd. and Pentwater Credit Opportunity Fund Ltd. under which the DK Investor Group has taken an assignment of the promissory notes issued to them by the Company as replaced by the Note (as defined below);

**WHEREAS,** the Company has issued an Amended and Restated Promissory Note of even date herewith (the "**Note**") having a principal amount of up to US$13.5 million of which US$8 million is outstanding (which amount was owed by the Company under the promissory notes assigned to the DK Investor Group under the Assignment and Assumption Agreement) and under which the DK Investor Group has agreed to advance up to an additional US$5.5 million to the Company, under specified conditions;

**WHEREAS**, the Note automatically converts into Common Stock of the Company upon the completion of the transaction contemplated by the Merger Agreement;

**WHEREAS**, immediately following the consummation of the transactions contemplated by the Merger Agreement, the DK Shareholders will own, directly or indirectly, and have direct or indirect ownership and voting rights to shares of the Company's Common Stock (including through the holding of Exchangeable Shares together with the Special Voting Shares) representing approximately 24% of shares of the Company's Common Stock on a fully diluted basis;

**WHEREAS**, the DK Shareholders may also receive an additional ownership and voting rights to shares of the Company's Common Stock or Exchangeable Shares in the aggregate representing approximately 6% of the shares of the Company's Common Stock on a fully diluted basis (the "**Additional Payments**"), relating to matters providing additional value to the Company and that arise after the execution of the Merger Agreement;

**WHEREAS**, immediately following the conversion of the Note, the DK Investor Group will own, directly or indirectly, shares of the Company's Common Stock representing approximately 23% of shares of the Company's Common Stock on a fully diluted basis and the Parties, assuming the Additional Payments are made, will own in the aggregate, directly or indirectly, shares of Common Stock representing up to approximately 53% of the Company's Common Stock or a fully diluted basis; and

**WHEREAS**, in connection with their entry into the Merger Agreement by the DK Shareholders and the consummation of the transactions contemplated thereby, and the entry into the Assignment and Assumption Agreement by the DK Investor Group and the consummation of the transactions contemplated thereby, the Parties have agreed to enter into this Agreement, which sets forth certain terms and conditions relating to, among other things, the ownership, transfer and voting of the shares of the Company's Common Stock owned by the Parties.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows

2

## ARTICLE I
### VOTING

Section 1.01    **Parties' Covenants to Vote.**

(a) Each Party hereby agrees to vote or cause to be voted, or consent or cause to be consented, with respect to all matters submitted to a vote or consent, as the case may be, of the Company's stockholders at any time during the term of this Agreement, whether the matter is brought before any meeting of the stockholders of the Company however called, proposed to be taken by written consent of the stockholders of the Company or otherwise, all Merger Shares owned or held by the Parties, directly or indirectly, (the "**Party Shares**"), as directed by the Representative of the Parties. For the avoidance of doubt, the term "**Party Shares**" shall include all Merger Shares owned or held by the Parties, directly or indirectly, as of the date hereof (after giving effect to the transaction contemplated by the Merger Agreement and on the conversion of the Note) and all such Party Shares and rights subsequently acquired by any Party by any means, including, without limitation, upon exercise of any stock option, warrant or similar purchase right. The term "**Representative of the Parties**" or "**Parties' Representative**" shall mean Bao or, if applicable, an entity under his majority control, in each case in his or its capacity as Representative of the Parties.

(b) In furtherance of the voting agreement of the Parties contained in Section 1.01(a), each Party hereby constitutes and appoints as the proxy of such Party, and hereby grants a power of attorney to, the Representative of the Parties, with full power of substitution, with respect to all matters submitted to a vote or consent of the Company's stockholders as contemplated by the foregoing Section 1.01(a). Each of the proxy and power of attorney granted pursuant to the immediately preceding sentence is given in consideration of the agreements and covenants of the Parties in connection with the transactions contemplated by the Merger Agreement, the Note and this Agreement, including the agreements to vote set forth in this Article I, and, as such, each is coupled with an interest and shall be irrevocable unless and until this Agreement terminates pursuant to Article IV and for greater certainty shall be an enduring power of attorney as defined in the *Power of Attorney Act* (British Columbia) under which the attorney may exercise authority both (i) while the adult person granting such power is capable, and (ii) while such adult is incapable, of making decisions about the grantor's financial affairs, and the authority of the attorney continues despite the grantor's incapacity, regardless of any Transfer or assignment of the Party Shares of the Party and despite any Transfer by will, or devolution or otherwise at law to another person on the death of such Party.

3

(c)   Each Party hereby revokes any and all previous proxies or powers of attorney with respect to the Party Shares owned or controlled by it and shall not hereafter, unless and until this Agreement terminates pursuant to <u>Article IV</u>, purport to grant any other proxy or power of attorney with respect to any of the Party Shares owned or controlled by it, deposit any of the Party Shares owned or controlled by it into a voting trust or enter into any agreement (other than this Agreement), arrangement or understanding with any person or entity, directly or indirectly, to vote, grant any proxy or give instructions with respect to the voting of any of the Party Shares.

(d)   Each Party shall indemnify and hold harmless the Representative of the Parties from, against and in respect of any loss, liability, claim, damage, cost, fine, deficiency, judgment, award, settlement and expense (including, without limitation, interest, penalties, costs of investigation and defense and the reasonable fees and expenses of attorneys and experts) (collectively, "**Indemnifiable Expenses**") incurred directly by the Representative of the Parties in connection with any claim asserted by an unaffiliated third party against the Representative of the Parties based upon the voting of the Party's Shares by the Representative of the Parties or its designee pursuant to the proxy and power of attorney granted under <u>Section 1.01(b)</u>. In addition, for the avoidance of doubt, the indemnification contemplated by this <u>Section 1.01(d)</u> shall not apply to any Indemnifiable Expenses incurred in connection with such Representative of the Parties capacity as a director, officer or employee of the Company.

## ARTICLE II
### TRANSFER

**Section 2.01    General Restrictions on Transfer of Party Shares.**

(a)   Except as otherwise expressly permitted pursuant to this <u>Article II</u>, no Party shall Transfer (as hereinafter defined) any of its Party Shares without the prior written consent of the Parties' Representative, which consent may be granted or withheld in the sole and absolute discretion of the Parties' Representative.

(b)   For all purposes of this Agreement, the term "**Transfer**" means, as a noun, any direct or indirect, voluntary or involuntary transfer, sale, pledge, encumbrance, assignment, hypothecation, gift, or other disposition and, as a verb, to voluntarily or involuntarily, directly or indirectly, transfer, sell, assign, pledge, encumber, hypothecate, give, or otherwise dispose of, any of the Party Shares. In addition, with respect to any Party that is an entity, any Transfer by any equity holder of such entity of his or its equity interests in such entity, or the issuance of any additional equity interests in such entity, shall be deemed to be a Transfer for purposes of this Agreement.

4

### Section 2.02    Permitted Transfers.

A Party shall be free at any time (without the consent of the Parties' Representative but, in the case of clauses (i) or (ii) of this sentence, upon at least five business days advance written notice to the Parties' Representative) to Transfer all or any portion of its Party Shares: (i) in the case the transferring Party is a natural person, to a trust or estate, limited liability company, limited partnership or similar vehicle owned or controlled by such Party; and (ii) in the case of a transferring Party that is not a natural person, to (A) such Party's equity holders on dissolution of such Party, or (B) a wholly owned subsidiary of such Party. Party Shares owned or held by a Party who is a natural person may also be Transferred upon such Party's death or involuntarily by operation of law. In addition, Party Shares may be Transferred pursuant to a merger, consolidation or other business combination involving the Company's Common Stock that has been approved by the Company's Board of Directors and otherwise in compliance with all applicable laws, rules and regulations. Notwithstanding the foregoing, in the case of any Transfer permitted under this Section 2.02 (other than a permitted Transfer pursuant to the preceding sentence of this Section 2.02), it shall be a condition to such Transfer that such transferee agrees, by executing a joinder agreement in substantially the form attached hereto as Exhibit A (y) to be bound by this Agreement as a Party with respect to all of the Party Shares Transferred to such transferee, and (z) that all of the Party Shares Transferred to such transferee remain subject to this Agreement and all of the terms, conditions and restrictions hereof as Party Shares.

### Section 2.03    Right of First Refusal.

(a)    If a Party (such Party, an "**Offering Stockholder**") receives a bona fide offer (the "**Offer**") from any unaffiliated third party (a "**Third Party Purchaser**") to purchase any or all of the Party Shares owned by such Party (the "**Offered Shares**") and the Offering Stockholder desires to Transfer the Offered Shares to the Third Party Purchaser pursuant to such Offer, then the Offering Stockholder must first make an offering of the Offered Shares to the other Parties in accordance with the provisions of this Section 2.03.

(b)    The Offering Stockholder shall, within five business days after receipt of the Offer from the Third Party Purchaser, give written notice (the "**Offering Stockholder Notice**") to the Parties' Representative stating that it has received a bona fide offer from a Third Party Purchaser and specifying:

(i)    the number of Offered Shares proposed to be Transferred by the Offering Stockholder;

5

(ii)  the identity of the Third Party Purchaser;

(iii) the per share purchase price and the other material terms and conditions of the Offer, including a description of any non-cash consideration in sufficient detail to permit the valuation thereof; and

(iv) the proposed date, time and location of the closing of the Offer, which shall not be less than 60 days from the date of the Offering Stockholder Notice.

(c)  The Offering Stockholder Notice shall constitute the Offering Stockholder's offer to Transfer the Offered Shares to each ROFR Purchaser (as hereinafter defined), which offer shall be irrevocable for the ROFR Notice Period (as hereinafter defined).

(d)  Upon receipt of the Offering Stockholder Notice, each of the Parties and, if applicable, their respective assignees under this Section 2.03 (the "**ROFR Purchaser**") shall have 45 days (the "**ROFR Notice Period**") to elect, in its sole discretion, to purchase its pro rata share or such additional number as it would purchase in the event that any Party does not provide an ROFR Notice in respect of their pro rata share of the Offered Shares, on the terms specified in the Offering Stockholder Notice (subject to the right of the ROFR Purchaser pursuant to Section 2.03(e) below to pay the purchase price solely in cash), by delivering a written notice of such election (a "**ROFR Notice**") to the Offering Stockholder. Any ROFR Notice shall be binding upon delivery and irrevocable by the ROFR Purchaser. If not all Offered Shares are the subject of an ROFR Notice, any ROFR Purchaser that has delivered an election to purchase more that its pro rata share shall be entitled to purchase Offered Shares in excess of the number of Offered Shares which represent its pro rata share of Offered Shares on a pro rata basis with all other Parties who have so elected. For the purposes of this Section a "pro rata" share shall mean the number of Party Shares a Party owns divided by the aggregate of the number of Party Shares owned by all of the Parties or for which the Parties have sent an ROFR Notice, as applicable.

6

(e)  If the ROFR Purchasers elect to purchase all, but not less than all, of the Offered Shares pursuant to this <u>Section 2.03</u>, the ROFR Purchasers and the Offering Stockholder shall take all actions as may be reasonably necessary to consummate the purchase and sale of such Offered Shares, including entering into agreements and delivering certificates and instruments and consents as may be deemed necessary or appropriate, and making all payments in connection therewith, within 30 days after delivery of the ROFR Notice (or if such 30 day period expires during a period in which "insiders" of the Company are prohibited from purchasing or selling securities of the Company and such prohibition applies to the exercise of the ROFR Purchaser's rights hereunder, within 10 days following the expiration of such restricted period). Notwithstanding anything to the contrary contained herein, if all or any portion of the consideration proposed to be paid by the Third Party Purchaser for the Offered Shares as set forth in the Offering Stockholder Notice is other than cash, the ROFR Purchaser shall have the option exercisable in its sole discretion by specifying the same in the ROFR Notice to pay the purchase price solely in cash, in which case the fair market value of the proposed non-cash consideration shall be determined in good faith by the disinterested members of the Company's Board of Directors. All cash payments shall be paid by certified check or by wire transfer of immediately available funds to an account designated in writing by the Offering Stockholder to the ROFR Purchaser.

(f)  If the ROFR Purchaser does not elect in an ROFR Notice delivered during the ROFR Notice Period to purchase all, but not less than all, of the Offered Shares, (i) the Party and, if applicable, ROFR Purchaser shall be deemed to have waived their rights to purchase the Offered Shares under this <u>Section 2.03</u>, and (ii) the Offering Stockholder may, during the 60-day period immediately following the expiration of the ROFR Notice Period and subject to <u>Section 2.03(g)</u>, transfer to the Third Party Purchaser all but not less than all of the Offered Shares on terms and conditions no more favorable to the Third Party Purchaser than those set forth in the Offering Stockholder Notice. If the Offering Stockholder does not Transfer the Offered Shares within such period, the rights provided under this <u>Section 2.03</u> shall be deemed to be revived and the Offered Shares shall not be Transferred to the Third Party Purchaser or otherwise pursuant to this <u>Section 2.03</u> unless the Offering Stockholder sends a new Offering Stockholder Notice in accordance with, and otherwise complies with, this <u>Section 2.03</u>.

**Section 2.04    Condition to Transfer of Party Shares.**

For so long as the Parties are required to have in place the power of attorney in favour of Bao or his nominee in accordance with <u>Section 1.01</u> (such period, the "**Restricted Period**"), it shall be a condition to any Transfer of a Party's Shares that the transferee agrees, by executing a joinder agreement in substantially the form attached hereto as <u>Exhibit A</u>, (i) to be bound by this Agreement as a Party with respect to all of the Party's Shares Transferred to such transferee, and (ii) that all of the Party's Shares Transferred to such transferee remain subject to this Agreement and all of the terms, conditions and restrictions hereof as the Party's Shares.

7

## Section 2.05    Drag-Along and Tag-Along Rights.

(a)    If a Party holding in excess one-third (1/3) of the total number of Party Shares (the "**Transferor**") elects to sell (either in a single or a series of related transactions) shares representing 50% or more of the Party's Shares (such Party's Shares desired to be so Transferred, the "**Transferor Shares**")) to an unaffiliated third party (a "**Drag-Tag Buyer**"), then, at least 30 days prior to the date upon which the Party intends to consummate such Transfer, the Transferor shall give written notice thereof which notice shall set forth the consideration to be paid by the Drag-Tag Buyer, and the other material terms and conditions of such transaction (such notice, the "**Transferor Notice**") to each Party and the Parties' Representative that the Transferor desires (the "**Drag-Along Right**") that each such Party Transfer in the transaction the percentage of its Party Shares equal to the percentage of the Transferor Shares being Transferred in the transaction compared to all of Party Shares owned by the Party at that time (the "**Ratable Percentage Shares**") and on the same terms and conditions, including price, upon which the Transferor is Transferring the Transferor Shares. The Parties shall, subject to the provisions of this Section 2.05, consent to and raise no objections against such Transfer by the Party and, if requested to do so by the Transferor in the Transferor Notice, Transfer their respective Ratable Percentage Shares, subject to the provisions of this Section 2.05, on the same terms and conditions upon which the Transferor is Transferring the Transferor Shares.

(b)    If the Transferor proposes to sell Transferor Shares pursuant to any transaction or series of related transactions as to which the Transferor would be entitled to exercise the Drag-Along Right but the Transferor does not so elect to exercise the Drag-Along Right, then, as a condition to such Transfer, each Party shall have the right (the "**Tag-Along Right**") to sell to the Drag-Tag Buyer, at such Party's option, such Party's Ratable Percentage Shares (as calculated in the same manner as set forth in Section 2.05(a)), on the same terms and conditions and at the same price as are applicable to the Transferor Shares. In the event that the Tag-Along Right applies with respect to a proposed Transfer of Transferor Shares, then (i) the Transferor shall provide notice thereof in the Transferor Notice and (ii) each Party shall have 30 days following receipt of the Transferor Notice to elect to sell all or a portion of such Party's Ratable Percentage Shares. The failure of a Party to notify the Transferor of its election of the Tag-Along Right within such 30 day period shall be deemed to constitute a waiver of such Party's Tag-Along Right with respect to such Transfer. If the Drag-Tag Buyer is unwilling to purchase the Transferor Shares and all of the Party Shares desired to be sold by Parties exercising the Tag-Along Right, then, at the Transferor's sole option, either (i) the transaction shall not be consummated or (ii) each of the Transferor Shares and the Party Shares desired to be sold in the transaction by Parties exercising the Tag-Along Right shall be ratably reduced to equal an amount of shares determined by multiplying the Transferor Shares or the applicable Party Shares, as the case may be, by a fraction, the numerator of which is the total number of shares which the Drag-Tag Buyer agrees to purchase in the transaction and the denominator of which is the total number of Transferor Shares and Party Shares desired to be sold in the transaction.

8

(c)   If the Transferor exercises the Drag-Along Right, each Party shall, and each Party who exercises the Tag-Along Right shall, take such actions as reasonably necessary to consummate the applicable transaction, including, without limitation, to execute and deliver a definitive purchase and sale (or other similar) agreement, in substantially the same form and substance as the definitive agreement executed and delivered by the Transferor; provided, that (i) if the Transferor exercises the Drag-Along Right, no Party will be required to provide representations and warranties other than several (and not joint) representations and warranties, and indemnities with respect thereto, substantially similar in scope and substance (other than to conform the same to the applicable transaction) to the representations and warranties made by the DK Shareholders in the Agreement, and (ii) if the Tag-Along Right is exercised, (A) the representations and warranties relating specifically to a Party participating in the transaction shall be made only by such Party and any indemnification provided by any Party participating in the transaction with respect to the Company, if any, shall be based on the shares being Transferred by each of them *vis a vis* all of the shares in the Company being Transferred in the transaction, on a several, not joint, basis, (B) no Party shall be required to provide any indemnity in such transaction that provides for liability to such Party in excess of the amount of proceeds actually received by such Party in such transaction, and (C) each of the Transferor and each Party participating in the transaction shall bear its pro rata share of the costs of the transactions based on the net proceeds to be received by each such person in connection with the transaction to the extent such costs are incurred for the benefit of persons selling shares in the transaction and are not paid by the Drag-Tag Buyer.

(d)   The Transferor shall have 120 days following the date of the Transferor Notice in which to consummate a transaction subject to this Section 2.05 on the terms set forth in the Transferor Notice (which 120-day period shall be extended for a reasonable time to the extent reasonably necessary to obtain any regulatory approvals or if necessary to enable the Transferor and any Party as an insider of the Company to engage in a transaction in the securities of the Company). If at the end of such period, the Transferor has not completed the transaction other than as a result of any action or inaction by a Party in breach of this Agreement, the Transferor may not then effect a transaction subject to this Section 2.05 without again fully complying with the provisions of this Section 2.05.

9

## ARTICLE III
### REPRESENTATIONS AND WARRANTIES

Section 3.01    **Representations and Warranties.** Each Party, severally and not jointly, represents and warrants to each of the other Parties, severally and not jointly, that:

(a)    if such Stockholder is not a natural person, such Stockholder is duly organized and validly existing in good standing under the laws of the jurisdiction in which it is formed, and has the requisite power and authority to own its properties and to carry on its business as now being conducted;

(b)    if such Stockholder is a natural person, such Stockholder is under no impairment or other disability, legal, physical, mental or otherwise, that would preclude or limit the ability of the Party to enter into this Agreement or perform his obligations hereunder;

(c)    such Stockholder has the requisite power and authority to enter into and perform its or his obligations under this Agreement;

(d)    the execution and delivery of this Agreement by such Stockholder have been duly authorized and, except for filings required under the Exchange Act, no further filing, consent, or authorization is required;

(e)    this Agreement has been duly executed and delivered by such Stockholder, and constitutes the legal, valid and binding obligation of such Stockholder, enforceable against such Stockholder in accordance with the terms hereof, except as such enforceability may be limited by general principles of equity or applicable bankruptcy, insolvency, reorganization, moratorium, liquidation or similar laws relating to, or affecting generally, the enforcement of applicable creditors' rights and remedies;

(f)    the execution, delivery and performance of this Agreement and the consummation by such Stockholder of the transactions contemplated hereby do not and will not: (i) if such Stockholder is not a natural person, result in a violation of the organizational documents of such Stockholder; (ii) conflict with, or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of, any agreement, indenture or instrument to which such Stockholder is a party or by which such Stockholder is bound or to which any of its or his assets or properties are subject; or (iii) result in a violation of any Law applicable to such Stockholder or by which any of his or its assets or properties is bound or affected; and

10

(g)  except for this Agreement, the Merger Agreement, the Note and any agreements or arrangements that were terminated prior to the consummation of the transactions contemplated by the Merger Agreement, such Stockholder has not entered into or agreed to be bound by any other agreements or arrangements of any kind with any other party with respect to the shares of the Company's Common Stock or any conversion rights in respect of the Note owned or held by such Stockholder, including agreements or arrangements with respect to the acquisition or disposition of such shares or any interest therein or the voting of such shares.

## ARTICLE IV
### TERM AND TERMINATION

**Section 4.01     Termination.** The term of this Agreement shall commence on the date hereof and shall terminate upon the earliest of (a) such time, if any, as no Party Shares remain subject to this Agreement, (b) the dissolution, liquidation, or winding up of the Company, (c) such time, if any, as the holder(s) of a majority of all of the Party Shares elect to terminate this Agreement by providing written notice of such termination to the Parties, (d) the fifth anniversary of the date hereof; provided, however, that solely in the case of clause (d), if any period for giving notice or exercising a right or option under, or otherwise complying with the provisions of or completing a transaction (or, if applicable, series of related transactions), under, Sections 2.03, 2.04 or 2.05 is in effect on the fifth anniversary of the date hereof, then solely with respect to such transaction (or, if applicable, series of related transactions), the provisions of Sections 2.03, 2.04 and 2.05, as the case may be, and the Parties' respective obligations thereunder shall survive the termination of this Agreement in accordance with their terms.

## ARTICLE V
### MISCELLANEOUS

**Section 5.01     Expenses; Prevailing Party.** Each Party shall pay his or its own expenses (including attorneys' fees) incident to this Agreement and the transactions contemplated herein. Notwithstanding the foregoing, in the event that any Party institutes any action or suit to enforce this Agreement or to secure relief from any default hereunder or breach hereof, the prevailing party shall be reimbursed by the losing party or parties for all costs and expenses, including reasonable attorneys' fees and expenses, incurred in connection therewith and in enforcing or collecting any judgment rendered therein.

11

**Section 5.02    Notices.**  Any and all notices or other communications or deliveries required or permitted to be provided under this Agreement shall be in writing and shall be deemed given and effective on the earliest of (a) the business day following the date of mailing, if sent by nationally recognized overnight courier service, specifying next business day delivery, (b) the third business day following the date of mailing, if sent by certified mail, return receipt requested, postage prepaid, or (c) upon actual receipt by the Party to whom such notice is required to be given if delivered by hand. The address for such notices and communications shall be as follows:

(a)    If to Daoping Bao:
5790 126A Street
Surrey, British Columbia V3X 3H6
Canada

Attention:    Daoping Bao
Facsimile:    (604) 277-1617
Email:        daoping@dinosaursunearthed.com

with a copy to:

Dentons Canada LLP
20th Floor, 250 Howe Street
Vancouver, British Columbia V6C 3R8
Canada

Attention:    Catherine Wade
Facsimile:    (604) 683-5214
Email:        Catherine.Wade@dentons.com

(b)    If to Nancy Brenner:
18 - 1828 Lilac Drive
Surrey, British Columbia V4A 5C9
Canada

Attention:    Nancy Brenner
Facsimile:    (604) 277-1617
Email:        nancy@dinosaursunearthed.com

with a copy to:

Dentons Canada LLP
20th Floor, 250 Howe Street
Vancouver, British Columbia V6C 3R8
Canada

Attention:    Catherine Wade
Facsimile:    (604) 683-5214
Email:        Catherine.Wade@dentons.com

12

(c)      If to DK Investor Group:
Dinoking Tech Inc.
c/o Daoping Bao
#110 - 11188 Featherstone Way
Richmond, British Columbia V6W 1K9
Canada

Attention:    Daoping Bao
Facsimile:    (604) 277-1617
Email:        daoping@dinosaursunearthed.com

with a copy to:

Dentons Canada LLP
20th Floor, 250 Howe Street
Vancouver, British Columbia V6C 3R8
Canada

Attention:    Catherine Wade
Facsimile:    (604) 683-5214
Email:        Catherine.Wade@dentons.com

or, in each case or in the case of a subsequently admitted Party to this Agreement, to such other address as may be designated in writing hereafter, in the same manner, by such Party by prior notice to the other Party or Parties, as the case may be, in accordance with this Section 5.02.

    **Section 5.03    Governing Law; Waiver of Jury Trial**. All questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by and construed and enforced in accordance with the internal Laws of the State of Florida, without regard to the principles of conflicts of law thereof. Each Party agrees that all legal proceedings concerning the interpretation, enforcement and defense of this Agreement or the transactions contemplated by this Agreement (whether brought against a Party hereto or his or its respective Affiliates, directors, officers, securityholders, members, employees or agents) shall be commenced exclusively in the state or federal courts sitting in Florida. Each Party hereto hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in Florida for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein (including with respect to the interpretation or enforcement of this Agreement), and hereby irrevocably waives, and agrees not to assert in any Proceeding, any claim that it is not personally subject to the jurisdiction of any such court or that such Proceeding is improper. Each Party hereto hereby irrevocably waives personal service of process and consents to process being served in any such Proceeding by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such Party at the address in effect for notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any manner permitted by applicable Law.

13

**TO THE FULLEST EXTENT PERMITTED BY LAW, THE PARTIES HERETO HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS TRANSACTION. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT RELATE TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.**

        **Section 5.04    Titles and Headings.** The titles and headings in this Agreement are for reference purposes only, and shall not in any way affect the meaning or interpretation of this Agreement.

        **Section 5.05    Severability.** Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. If any court of competent jurisdiction determines that any term or provision hereof, or any part of any such term or provision is invalid or unenforceable, such term or provision, or part thereof, shall be enforced to the full extent permitted by such court, and all other terms and provisions shall not thereby be affected and shall be given full effect, without regard to the invalid provisions or portions.

        **Section 5.06    Entire Agreement.** This Agreement, the Merger Agreement, the Note and the other documents being executed by the parties in connection with the Merger Agreement constitute the entire agreement of the Parties with respect to the subject matter contained herein and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.

        **Section 5.07    Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective heirs, successors, legal representatives, and permitted assigns and, to the extent set forth herein, transferees.

        **Section 5.08    No Third Party Beneficiaries.** Nothing expressed or implied in this Agreement is intended, or shall be construed, to confer upon any person or entity other than the Parties hereto and their respective heirs, successors, legal representatives, and permitted assigns and, to the extent set forth herein, transferees, any rights or remedies under or by reason of this Agreement.

14

**Section 5.09    Amendment and Modification; Waiver.** This Agreement may only be amended, modified or supplemented by an agreement in writing signed by the holder(s) of a majority of the Party Shares then subject to this Agreement. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the Party so waiving. No waiver by any Party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**Section 5.10    Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original agreement, but all of which together shall constitute one and the same instrument. This Agreement may be transmitted by facsimile or electronically, and it is the intent of the parties that the facsimile copy (or a photocopy or PDF copy) of any signature printed by a receiving facsimile machine or computer printer shall be deemed an original signature and shall have the same force and effect as an original signature.

**Section 5.11    Further Assurances.** The Parties hereto shall from time to time execute and deliver all such further documents and instruments and do all acts and things as the other Parties (in particular, the party or parties whose rights and privileges may be affected or at issue) may reasonably request or require to effectively carry out or better evidence or perfect the full intent and meaning of this Agreement.

**Section 5.12    Equitable Remedies.** Each Party hereto acknowledges that the other Party or Parties hereto would be irreparably damaged in the event of a breach or threatened breach by such Party of any of its obligations under this Agreement and hereby agrees that in the event of a breach or a threatened breach by such Party of any such obligations, each of the other Parties hereto shall, in addition to any and all other rights and remedies that may be available to them in respect of such breach under this Agreement, at law or in equity, be entitled to an injunction from a court of competent jurisdiction (without any requirement to post bond) granting specific performance by such Party of its obligations under this Agreement.

**Section 5.13    Legend on Stock Certificates.**

(a)    In addition to any legends required by applicable Law, (i) each stock certificate representing any Party Shares shall bear a legend in substantially the form set forth in paragraph (b) below for so long as this Agreement remains in effect.

15

(b)  The restrictive legend referenced in paragraph (a) above shall be in substantially the following form:

"THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THAT CERTAIN STOCKHOLDERS AGREEMENT, DATED APRIL 2, 2015, AND ALL AMENDMENTS THERETO, COPIES OF WHICH ARE ON FILE AT THE PRINCIPAL OFFICE OF THE COMPANY, AND VOLUNTARY OR INVOLUNTARY SALE, PLEDGE, ASSIGNMENT, HYPOTHECATION, GIFT, OR OTHER DISPOSITION OR TRANSFER (AS DEFINED IN SUCH STOCKHOLDERS AGREEMENT) OF THE SHARES REPRESENTED BY THIS CERTIFICATE OR ANY INTEREST THEREIN SHALL BE SUBJECT TO THE TERMS OF SUCH STOCKHOLDERS AGREEMENT AND THE SHARES REPRESENTED HEREBY SHALL REMAIN SUBJECT TO THE TERMS OF SUCH STOCKHOLDERS AGREEMENT NOTWITHSTANDING ANY SUCH TRANSFER."

(c)  The Parties hereby agree to immediately submit to the Company the stock certificates held by each of them representing the Party Shares, as the case may be, for inscription of the aforesaid restrictive legend thereon.

(d)  Notwithstanding the foregoing or anything to the contrary contained herein, the enforceability of this Agreement, including, without limitation, the proxy granted hereby, shall not be affected by the fact that the stock certificates representing any Party Shares have not been delivered as provided for herein or that such stock certificates may not bear any legend with respect to the provisions of this Agreement.

**Section 5.14    Construction; Interpretation**.

(a)  This Agreement shall be interpreted and construed without regard to any rule or presumption requiring that this Agreement be interpreted or construed against the party causing this Agreement to be drafted.

(b)  Whenever the context of this Agreement permits, the masculine or neuter gender shall include the feminine, masculine and neuter genders, and any reference to the singular or plural shall be interchangeable with the other.

(c)  For the avoidance of doubt, the terms "**Common Stock**," and "**Party Shares**" as used throughout this Agreement shall refer to the Company's Common Stock or shares thereof, as the context may require, and any other securities into which the Company's Common Stock may be converted during the term of this Agreement.

[SIGNATURE PAGE FOLLOWS]

16

IN WITNESS WHEREOF, the parties hereto have executed or caused this Agreement to be executed as of the date first written above.

HIGH NATUREI HOLDING LIMITED
高 然 集 团 有 限 公 司

By: _____
                        *Authorized Signature(s)*

Witness _____

By: _____
Name: Zou, Maiping
Title   President

Witness _____

By: _____
Name:
Title:

Witness _____

Daoping Bao

Witness _____

Nancy Brenner

Witness _____

_____

[Signature page to the Stockholders Agreement]

17

IN WITNESS WHEREOF, the parties hereto have executed or caused this Agreement to be executed as of the date first written above.

By: _____
   Name:
   Title

Witness _____

By: _____
Witness _____
   Name:
   Title:

Witness _____
Daoping Bao

Witness _____
Nancy Brenner

Witness _____
Lange Fang

[Signature page to the Stockholders Agreement]

**EXHIBIT A**

Form of Joinder Agreement

Reference is hereby made to that certain Stockholders Agreement, dated as _____, 2015 (as amended from time to time, the "**Stockholders Agreement**"), by the DK Shareholders and the DK Investor Group, as defined therein, and the other Stockholders which may have become a party thereto from time to time.

Pursuant to and in accordance with Sections 2.02 and 2.04 of the Stockholders Agreement, the undersigned hereby agrees that upon the execution of this Joinder Agreement, (a) the undersigned shall become a party to the Stockholders Agreement as a Party, (b) the undersigned shall be fully bound by, and subject to, all of the covenants, terms and conditions of the Stockholders Agreement as a Party as though an original party thereto, and (c) the shares of the Company's Common Stock acquired on the date hereof by the undersigned from _____ shall be deemed to be [Party] Shares for all purposes of the Stockholders Agreement.

Capitalized terms used herein without definition shall have the meanings ascribed to such terms in the Stockholders Agreement.

IN WITNESS WHEREOF, the undersigned has executed this Joinder Agreement as of _____.

[Transferee Stockholder Name]

By _____

Name:

Title:

Address: _____

_____

_____

_____

**Exhibit 3**

## JOINDER AGREEMENT

Reference is hereby made to that certain Stockholders Agreement, dated as April 2, 2015 (as amended from time to time, the "**Stockholders Agreement**"), by the DK Shareholders and the DK Investor Group, as defined therein, and the other Stockholders which may have become a party thereto from time to time.

The undersigned confirms that it is a part of the DK Investor Group and will be advancing funds under the Note, as defined in the Stockholders Agreement and hereby agrees that upon the execution of this Joinder Agreement, (a) the undersigned shall become a party to the Stockholders Agreement as a Party, (b) the undersigned shall be fully bound by, and subject to, all of the covenants, terms and conditions of the Stockholders Agreement as a Party as though an original party thereto.

Capitalized terms used herein without definition shall have the meanings ascribed to such terms in the Stockholders Agreement.

**IN WITNESS WHEREOF**, the undersigned has executed this Joinder Agreement as of April 2, 2015.

**MANDRA FORESTRY LIMITED**

By:      /s/ ZHANG SONG-YI
Name:    ZHANG SONG-YI
Title:

Address:   c/o Porticullis TrustNet (BVI) Limited

Porticullis TrustNet Chambers, PO Box 3444

Road Town, Tortola
British Virgin Islands

https://www.sec.gov/Archives/edgar/data/796764/000114420416091888...

**Exhibit 4**

## JOINDER AGREEMENT

Reference is hereby made to that certain Stockholders Agreement, dated as April 2, 2015 (as amended from time to time, the "**Stockholders Agreement**"), by the DK Shareholders and the DK Investor Group, as defined therein, and the other Stockholders which may have become a party thereto from time to time.

The undersigned confirms that it is a part of the DK Investor Group and will be advancing funds under the Note, as defined in the Stockholders Agreement and hereby agrees that upon the execution of this Joinder Agreement, (a) the undersigned shall become a party to the Stockholders Agreement as a Party, (b) the undersigned shall be fully bound by, and subject to, all of the covenants, terms and conditions of the Stockholders Agreement as a Party as though an original party thereto.

Capitalized terms used herein without definition shall have the meanings ascribed to such terms in the Stockholders Agreement.

IN WITNESS WHEREOF, the undersigned has executed this Joinder Agreement as of June 2015.

_____
JIHE ZHANG

Address: Suite 2606, Building A, Fuli Shuangzi
Towers, No. 59 Dongsanhuan
Zhonglu, Chaoyang District, Beijing

15674537_1|NATDOCS

# Exhibit D

# PREMIER EXHIBITIONS, INC.

## PLAN TERM SHEET

### January [__], 2018

The following is a summary (the "Term Sheet") of certain principal terms and provisions of a pre-arranged chapter 11 plan of reorganization (the "Plan") for the Company (as defined below) to be supported by the Plan Sponsors (as defined below). This Term Sheet does not constitute an offer of securities or a solicitation or offer to purchase securities, nor is it an offer or solicitation for any chapter 11 plan, and is being presented for discussion with the Company and settlement purposes only. No party shall have any obligation, express or implied, to negotiate with respect to the transactions contemplated by this Term Sheet or to negotiate or enter into any definitive agreement. The terms of this Term Sheet set forth below are intended to provide a framework for a proposed transaction and do not constitute a binding agreement with respect to the specific transaction structure contemplated herein, and the transactions contemplated by this Term Sheet are subject to further terms and conditions to be set forth in the Plan and other related definitive documents.

THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY AND/OR OTHER APPLICABLE LAWS.

THIS TERM SHEET DOES NOT ADDRESS ALL TERMS THAT WOULD BE REQUIRED IN CONNECTION WITH ANY POTENTIAL RESTRUCTURING AND ENTRY INTO OR THE CREATION OF ANY BINDING AGREEMENT IS SUBJECT TO THE EXECUTION OF DEFINITIVE DOCUMENTATION IN FORM AND SUBSTANCE CONSISTENT WITH THIS TERM SHEET AND OTHERWISE ACCEPTABLE TO THE COMPANY AND THE PLAN SPONSORS. THIS TERM SHEET HAS BEEN PRODUCED FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY AND IS SUBJECT TO THE PROVISIONS OF RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND OTHER SIMILAR APPLICABLE STATE AND FEDERAL RULES.

**THIS TERM SHEET AND THE INFORMATION CONTAINED HEREIN IS STRICTLY CONFIDENTIAL, INTENDED FOR REVIEW BY THE COMPANY AND ITS ADVISORS ONLY, AND SHALL NOT BE SHARED WITH ANY OTHER PARTY ABSENT THE PRIOR WRITTEN CONSENT OF COUNSEL TO THE AD HOC EQUITY GROUP, EXCEPT AS REQUIRED BY LAW.**

1

#5600385



EXHIBIT
11
GlassRatner

## I.    Purpose

This Term Sheet sets forth the principle terms of a restructuring of the Company pursuant to a pre-negotiated Plan that would be supported and funded by the Plan Sponsors.  The proposed restructuring is designed to enable the Company to emerge from chapter 11 expeditiously with a new capital structure that provides future optionality as determined by the Reorganized Company's board of directors.

The Plan Sponsors believe confirmation of this Plan, supported by the requisite stakeholders, would provide significant value and improved certainty for the Company and its stakeholders as compared to a fire-sale 363 auction process.

## II.    Parties

| | |
|---|---|
| **Debtors:** | Premier Exhibitions, Inc. ("PRXI"), RMS Titanic, Inc. (RMST), Premier Merchandising, LLC ("MERCH"), Premier Exhibitions Management, LLC ("PEM"), Arts and Exhibitions International, LLC ("AEI"), Premier Exhibitions NYC, Inc. ("PENYC"), Premier Exhibitions International, LLC ("PEI"), and Dinosaurs Unearthed Corp. ("Dinosaurs") (collectively, the "Company" or the "Debtors"). |
| **Pre-Petition Lenders' Claims:** | The $3,000,000 in the aggregate secured loan made by Jihe Zhang, Haiping Zou and Lange Feng to the Debtors prior to the commencement of the Chapter 11 cases (such obligations, in the aggregate, as of the date of the filing of the Plan, the "Lenders' Claims"). |
| **Creditors' Committee:** | The Official Committee of Unsecured Creditors appointed on August 24, 2016 by the United States Trustee for the Middle District of Florida (the "U.S. Trustee"), consisting of (i) TSX Operating Co., LLC; (ii) Dallian Hoffen Biotechnique Co. Ltd., and (iii) B.E. Capital Management Fund LP. |
| **DIP Lender:** | Bay Point Capital Partners LP, lender under that certain DIP Loan Agreement, dated as of May 18, 2017, by order of the Court entered on a final basis on July 12, 2017 [Dkt. No. 650], as amended by order of the Court on July 27, 2017 [Dkt. No. 686] (the "Obligations" thereunder, the "DIP Lender's Claim"). |
| **General Unsecured Claims:** | Any unsecured claim against the Company that is not an administrative claim, priority tax claim, other priority claim, professional compensation claim, Lender's Secured Claim, DIP Lender's Claim or other secured claim, and which is not subject to bona fide dispute (collectively, the "General Unsecured Claims"). |
| **Equity Holders:** | Holders of common shares in PRXI. |

2

GLASS000185

| Plan Sponsors: | The members of the Ad Hoc Group of Equity Holders, related third parties and [certain other Equity Holders].[1] |

## III.    Transaction Overview

- The Plan Sponsors would agree to purchase [100]% of the equity interests of reorganized PRXI (the "Reorganized Equity") (subject to dilution for the Management Incentive Plan (as defined below)) for $[the sum of the Allowed (as defined below): (1) DIP Lender's Claim, (2) Lender's Claim, (3) Administrative Expense, Priority Tax and other Priority Claims; (4) Other Secured Claims; and (5) General Unsecured Claims, pursuant to the terms set forth in Section IV below, plus (6) $[___] million. (the "Plan Consideration").

- The Plan Consideration would be distributed to stakeholders in accordance with the priorities as set forth herein and as pursuant to the Bankruptcy Code and applicable law.

- The Reorganized Company would be capitalized on a go-forward basis with existing cash on its balance sheet plus $[___] million of cash from the Plan Sponsors.

- The Plan Sponsors' investment would be subject to a definitive restructuring support agreement (the "RSA") to be agreed with the Debtors on customary terms for such transactions. The RSA shall provide that all of the material documents relating to the Plan will be satisfactory to the Plan Sponsors in their sole discretion. A customary and reasonably acceptable "fiduciary out" will be included for the Company.

## IV.    Plan Treatment of Claims and Interests

| Administrative Expense, Priority Tax, and Other Priority Claims | On or as soon as reasonably practicable after the effective date of the Plan (which shall be the first date after confirmation of the Plan that all conditions to effectiveness of the Plan shall have been satisfied or waived (the "Effective Date") or such later date as agreed to by any such holder, each holder of an Allowed (as defined herein) administrative expense, priority tax, other priority claim, and professional compensation claim will receive (i) payment of the full amount of its allowed claim, (ii) other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, or (iii) such other treatment as agreed to among the holder and the Company, subject to the consent of the Plan Sponsors. Notwithstanding anything to the contrary herein, administrative expense claims (inclusive of the Obligations and related fees and expenses, cure costs, claims for |

---

[1] In the event insider-affiliated Equity Holders are interested in participating as Plan Sponsors, the percentage of ownership will be TBD but will be based on a capital contribution from each party that is mutually agreeable.

3

#5600385

GLASS000186

| | compensation or expense reimbursement by any professionals, and trade claims payable in the ordinary course of business after the Effective Date) shall not exceed $[    ], absent the prior written consent of the Plan Sponsors. |
|---|---|
| **Lenders' Claims** | On or as soon as reasonably practicable after the Effective Date, Allowed Lenders' Claims shall receive, at the option of the Company, in consultation with the Plan Sponsors, (i) payment in full in cash or (ii) reinstatement or such other treatment sufficient to be unimpaired pursuant to section 1124 of the Bankruptcy Code. The aggregate amount of Lenders' Claims shall not exceed $[___], absent the prior written consent of the Plan Sponsors. |
| **Other Secured Claims** | On or as soon as reasonably practicable after the Effective Date or such later date as agreed to by any such holder, all Allowed prepetition secured claims other than Lenders' Claims ("Other Secured Claims") shall receive, at the option of the Debtors, in consultation with the Plan Sponsors, (i) payment in full in cash, (ii) reinstatement or such other treatment sufficient to be unimpaired pursuant to section 1124 of the Bankruptcy Code, or (iii) the return of the applicable collateral in satisfaction of the Allowed amount of such Secured Claim. The aggregate amount of Other Secured Claims shall not exceed $[___] absent the prior written consent of the Plan Sponsors. |
| **DIP Lender's Claim** | The DIP Lender's Claim shall be allowed in the amount of $[___]. On or as soon as reasonably practicable after the Effective Date, the holders of Allowed DIP Lender's Claim shall receive payment in full in cash. |
| **General Unsecured Claims** | On or as soon as reasonably practicable after the Effective Date, holders of Allowed General Unsecured Claims will receive payment in full in cash of their Allowed claims [with interest at the federal judgment rate.] |
| **Intercompany Claims** | All intercompany claims between and among the Debtors shall be reinstated or compromised by the Reorganized Company, as applicable, consistent with its business plan and subject to the consent of the Plan Sponsors. |
| **Equity Interests** | All existing shares of stock, options, warrants, preferred equity interests, and common equity interests in the Company shall be extinguished as of the Effective Date, except equity of PRXI in its subsidiaries and affiliates may be retained to preserve the existing organizational structure of the Company as of the Effective Date. |

4

#5600385

GLASS000187

## V.    Governance of the Reorganized Company

| Corporate Organizational Documents | TBD, but to be acceptable to the Plan Sponsors, in consultation with the Company. |
|---|---|
| Majority Shareholder Protections | TBD, but to be acceptable to the Plan Sponsors, in consultation with the Company. |
| Minority Shareholder Protections | TBD, but to be acceptable to the Plan Sponsors, in consultation with the Company. |
| Board of Directors of the Reorganized Company | TBD, but to be acceptable to the Plan Sponsors, in consultation with the Company.  The President and CEO of the Debtors will be one of the members of the Board of Directors of the Reorganized Company. Plan Sponsors will have the right to nominate additional members of the Board of Directors and decide on the appropriate number of total Board members. |
| Management Incentive Plan | A management incentive plan (the "**Management Incentive Plan**") will be implemented after the Effective Date that provides some combination of cash, options, and/or other equity-based compensation to management of the Reorganized Company in an amount to be determined by the Board of Directors of the Reorganized Company, and which shall dilute all of the Reorganized Equity otherwise contemplated to be issued by this Term Sheet. |

## VI.    Implementation

| Tax Matters | The restructuring will be implemented by the Debtors in consultation with the Plan Sponsors, in a tax efficient manner. |
|---|---|
| Reincorporation | Reorganized PRXI will be reincorporated in Delaware |
| Objections to Claims and Equity Interests: | Prior to the Effective Date, the Debtors shall have the right and authority, in consultation with the Plan Sponsors, to file, settle, compromise, withdraw, or litigate to judgment any objections to claims or interests. From and after the Effective Date, the Reorganized Company shall have the right to pursue, object to, compromise or settle any and all claims and interests and commence any proceedings relating to the allowance of claims and interests. |
| Retention of Causes of Action: | In accordance with section 1123(b)(3) of the Bankruptcy Code, all causes of action and litigation rights (the "Litigation Rights") of Debtors not otherwise settled or released under the Plan shall be transferred to the Reorganized Company and nothing contained in the |

#5600385

| | Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any such Litigation Rights. The Reorganized Company may (but is not required to) enforce all Litigation Rights and all other similar claims arising under applicable state laws, including fraudulent transfer claims, if any, and all other causes of action of a trustee and debtor-in-possession under the Bankruptcy Code. |
|---|---|
| **Preservation of Insurance** | Any discharge or release provisions of the Plan shall not diminish or impair the enforceability of any of the Debtors' insurance policies, including any that may cover Claims against the Debtors or the Reorganized Company, and their current and former officers and directors, or any other person or entity. |
| **Exculpations** | The Debtors and the Plan Sponsors, and each of their respective current and former officers and directors, professionals, advisors, accountants, attorneys, investment bankers, consultants, employees, agents and other representatives (each solely in its capacity as such), shall be exculpated from liability for their actions in connection with the Debtors' chapter 11 cases, with customary carve-outs for gross negligence and willful misconduct, to the extent permitted by law. |
| **Releases** | The Plan shall include standard and customary mutual releases and third party releases from holders of claims or interests to the extent permitted by law. |
| **Discharge** | A full and complete discharge shall be provided in the Plan |
| **Injunction** | Ordinary and customary injunction provisions shall be included in the Plan. |

## VII.   Terms and Conditions

| | |
|---|---|
| **Milestones** | The Debtors shall implement the restructuring on the following timeline: |
| | • No later than [____], the Debtors and the Plan Sponsors shall agree to the RSA. In addition, to a customary "fiduciary out" for the Debtors, the RSA shall contain customary bidding protections for the Plan Sponsors in the event the Debtors determine to pursue an alternative restructuring transaction. In the RSA, each Plan Sponsor will agree to support the Plan and to vote its shares, and any shares of its affiliates or shares otherwise under its control, in favor of the Plan. |
| | • no later than [____], the Debtors shall file with the Bankruptcy Court a motion seeking approval of the RSA (the "RSA Approval Motion"); |

6

GLASS000189

|  |  |
|---|---|
|  | • no later than [___], the Debtors shall file with the Bankruptcy Court: (i) the Plan; (ii) a disclosure statement related thereto; and (iii) a motion (the "Disclosure Statement and Solicitation Motion") seeking, among other things, (A) approval of the disclosure statement, (B) approval of procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan, and (C) to schedule the hearing to consider confirmation of the Plan (the "Confirmation Hearing"); <br><br> • no later than [___], the Bankruptcy Court shall have entered an order authorizing the Debtors' entry into the RSA; <br><br> • no later than [___], (i) the Bankruptcy Court shall have entered an order approving the disclosure statement and the relief requested in the Disclosure Statement and Solicitation Motion and (ii) no later than three (3) days after entry of the order approving the Disclosure Statement and Solicitation Motion, the Debtors shall have commenced solicitation on the Plan by mailing the Solicitation Materials to parties eligible to vote on the Plan; <br><br> • no later than [___], the Bankruptcy Court shall have commenced the Confirmation Hearing; <br><br> • no later than [___], the Bankruptcy Court shall have entered an order confirming the Plan (a "Confirmation Order"); and <br><br> • the Effective Date shall be no later than [___], it being understood that the satisfaction of the conditions precedent to the Effective Date (as set forth in the Plan and this Term Sheet) shall be conditions precedent to the occurrence of the Effective Date. |
| **Other Conditions** | The restructuring shall also be subject to, among other things, (i) the execution of Definitive Plan Documentation (to be defined in the RSA) mutually acceptable to the parties to the RSA, which definitive documents shall contain terms, conditions, representations, warranties, and covenants, each customary for the transactions described herein consistent with the terms of this Term Sheet; (ii) the Confirmation Order becoming a Final Order; (iii) all actions, documents and agreements necessary to implement the Plan shall have been effected or executed and, to the extent required, filed with the applicable governmental units in accordance with applicable laws; and (iv) the Debtors shall have received all authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions or documents that are determined by the Debtors and the Plan Sponsors to be necessary to implement the Plan and that are required by law, regulation, or order. |

7

GLASS000190

| Conditions to Confirmation of the Plan | Confirmation of the Plan shall be subject to:<br><br>• The Bankruptcy Court having entered an order in form and substance acceptable to the Plan Sponsors approving the disclosure statement related to the Plan as containing adequate information within the meaning of section 1125 of the Bankruptcy Code and<br><br>• The Plan and all documents contained in any Plan supplement, including any exhibits, schedules, amendments, modifications or supplements thereto, having been filed in substantially final form and in form and substance acceptable to the Plan Sponsors. |
|---|---|
| Conditions Precedent to Consummation of the Plan | Unless waived in writing by the Debtors, on the one hand, and the Plan Sponsors, on the other hand, the occurrence of the Effective Date shall be subject to the satisfactions of such conditions precedent agreed upon by the Plan Sponsors and the Debtors, including, without limitation, the following:<br><br>• The RSA shall have been approved pursuant to an order of the Bankruptcy Court and shall not have been terminated in accordance with its terms.<br><br>• Negotiation, execution and delivery of Definitive Plan Documentation, in form and substance acceptable to the Plan Sponsors and the Debtors, and otherwise consistent with the terms and conditions described in this Term Sheet and/or the RSA, as applicable.<br><br>• The Bankruptcy Court shall have entered a Confirmation Order in form and substance acceptable to the Plan Sponsors and the Confirmation Order shall be a Final Order.<br><br>• The Plan shall have been supported by the Creditors' Committee, the Equity Committee, and all Equity Holders subject to the RSA as well as insider and insider-affiliated Equity Holders. |
| Expense Reimbursement | All reasonable and documented fees and expenses of counsel to the Ad Hoc Equity Group and the Plan Sponsors associated with the Debtors' chapter 11 cases and the Plan and implementation thereof (the amount of such fees and expenses as of the Effective Date, the "Sponsor Expense Reimbursement Amount") shall be paid by the Company on the Effective Date. |

8

GLASS000191

## VIII.   Additional Definitions and Terms

| | |
|---|---|
| **Other Provisions** | The Plan shall contain such other terms and conditions as agreed by the Debtors and the Plan Sponsors. |
| **Allowed** | Shall have the same meaning set forth in section 502 of the Bankruptcy Code and as further defined in the Plan. |
| **Final Order** | "Final Order" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, re-argument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice. |
| **Issuance of New Common Stock; Execution of Plan Documents** | On the Effective Date, the Reorganized Company shall issue and execute all securities, notes, instruments, certificates, and other documents required to be issued and executed in accordance with the Plan. |
| **Executory Contracts** | [All executory contracts and unexpired leases not expressly rejected shall be deemed assumed pursuant to the Plan. In consultation with the Plan Sponsors, the Debtors may reject executory contracts and unexpired leases.][2] |
| **No Registration under the Securities Act** | The offer and sale of the Reorganized Equity will not be registered under the Securities Act and the offering and issuance of the Reorganized Equity shall be exempt from registration under the Securities Act pursuant to Section 4(2) of the Securities Act and Regulation D thereunder or pursuant to section 1145 of the Bankruptcy Code. |
| **No Admission** | Nothing in this Term Sheet is or shall be deemed to be an admission of any kind as to the extent, validity, or priority of any claims or interests held by any parties hereto. |

---

[2] Existing employment arrangements for the Debtors' management team TBD, with the intention that management remain employed on terms consistent with their current employment arrangements.

#5600385

GLASS000192

# Exhibit E

1

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION


In re:

RMS TITANIC, INC., et al.,    CASE NO:  3:16-bk-02230-PMG

        Debtors.
_____/


TRANSCRIPT OF PROCEEDINGS

DATE TAKEN:      July 25, 2018

TIME:            1:30 p.m. - 3:25 p.m.

PLACE:           United States Courthouse
                 300 North Hogan Street
                 Courtroom 4A
                 Jacksonville, Florida 32202

BEFORE:          The Honorable Paul M. Glenn
                 U.S. Bankruptcy Judge


This cause came on to be heard at the time and place
aforesaid, when and where the following proceedings
were transcribed by:

**Cindy Danese, Notary Public**
**STATEWIDE REPORTING SERVICE**
**233 East Bay Street, Suite 912**
**Jacksonville, Florida  32202**
**(904) 813-9280**

2

1                       A P P E A R A N C E S

2

3          DANIEL F. BLANKS, ESQUIRE
           HARRIS WINSBERG, ESQUIRE
           MATT BROOKS, ESQUIRE
4          BRIAN A. WAINGER, ESQUIRE
           WILLIAM POYNTER, ESQUIRE (via telephone)
5
               Attorneys for Debtors
6

7          JAY BROWN, ESQUIRE
           KATIE FACKLER, ESQUIRE
8          PETER GURFEIN, ESQUIRE

9              Attorneys for the Equity Committee

10

11         TIMOTHY GRAULICH, ESQUIRE
           PATRICIA REDMOND, ESQUIRE
           JACOB WEINER, ESQUIRE (via telephone)
12
               Attorneys for Trustees of the National
13             Maritime Museum

14

15         JEFFREY CHUBAK, ESQUIRE
           RICHARD THAMES, ESQUIRE
           ROBERT A. HEEKIN, JR., ESQUIRE
16
               Attorneys for the Unsecured Creditors
17             Committee

18

19         JASON BURNETT, ESQUIRE
           ASHLEY EDWARDS, ESQUIRE

20             Attorneys for 417 Fifth Avenue South and Luxor
               Hotel and Casino
21

22

23         JENNIFER FELDSHER, ESQUIRE
           STEVEN BUSEY, ESQUIRE
           DAVID LAWTON, ESQUIRE (via telephone)
24
               Attorneys for Alta Fundamental, Apollo
25             Global

1                    APPEARANCES (CONTINUED)

2

3        SCOTT GROSSMAN, ESQUIRE

4             Attorney for HaiPing Zou, Jihe Zhang and
              Lange Feng, and PacBridge Capital Partners
5

6

7        JOHN ISBELL, ESQUIRE

8             Attorney for Bay Point Partners

9

10       MATTHEW TROY, ESQUIRE

11            Attorney for USDOJ and NOAA

12

13       STEVEN FOX, ESQUIRE

14            Attorney for Cedar Bay

15

16       ROBERT CHARBONNEAU, ESQUIRE

17            Attorney for Premier Equity Committee

18

19       HOWARD SIEGEL, ESQUIRE (via telephone)

20            Attorney for Euclid Claims Recovery, LLC

21

22       DAWN MCCARTY, ESQUIRE (via telephone)

23            Attorney for Bloomberg, LP

24

25       MIRIAM SUAREZ, ESQUIRE

              Attorney for the U.S. Trustee

1      covenants and conditions required all of the

2      artifacts to remain in one collection.  And the

3      Debtor filed a pleading in which, frankly, was a

4      pleading that I thought could have been filed by

5      the Equity Committee, noting that in fact the

6      language in the covenants with respect to a single

7      collection were precatory and aspirational, but

8      that the French artifacts are clearly not within

9      the jurisdiction of the district court.

10          And you have to wonder why, if the Debtor is

11     selling to a third party and will no longer be

12     involved in the artifacts, why the Debtor is

13     concerned about shoring up the identity of the

14     French artifacts as not being within the

15     jurisdiction of the district court.

16          If the proposed purchasers have an intention

17     to sell the French artifacts in the future, they

18     would be realizing upon the value that the Equity

19     Committee believes should be realized upon now

20     while the assets are before Your Honor.  And if

21     they have no intention of selling the French

22     artifacts separately, perhaps we can talk about

23     impressing a trust upon those artifacts, so if at

24     some time in the future they are sold, creditors

25     who are not made whole, and Equity, who is not in a

1       position to realize on that value, will be able to

2       realize upon those values in the future.

3           These are all things that we can talk to the

4       Debtors about, talk to the Creditors Committee

5       about, talk over the next 30 days or so.

6           It would be our request, Your Honor, coming

7       out of this status conference, that we do set a

8       timeline.  We believe that the Debtor should be

9       operating under a plan at this late date in the

10      case disposing of all of the assets so that

11      stakeholders will have a direct opportunity to have

12      a voice in that decision.

13          The Debtors already have a plan on file that

14      they withdrew that could be modified readily, and

15      they have two disclosure statements from which to

16      work to shore that up.

17          Within two weeks, three weeks, we should be

18      able to have a disclosure statement that we all can

19      agree upon and have a hearing some 30 days out, 40

20      days out, to determine whether the disclosures are

21      appropriate, adequate and sufficient.  Let a ballot

22      be created that can go out to all of the stake-

23      holders for their vote so that Your Honor will have

24      the benefit, at least, of their views.  30 to 45

25      days past that, we're into late September, early

60

1      wants to take the financial risk of these assets,

2      Your Honor.  This company has been in bankruptcy

3      for two years.  It's been shopped for essentially

4      all two years.  Nobody has stood up and put their

5      money where their mouth is.

6           And now Mr. Gurfein suggests that they'd be

7      happy to take a free ride on any upside that the

8      only party who's willing to put any money at risk

9      is going to ever see from the transaction.  That's

10     the definition of unfairness, and I don't care what

11     state you're from.

12          So, Your Honor, I believe everybody's had

13     ample time.  I believe this Debtor has had ample

14     time.  I believe that the Debtor is telling you

15     they are out of time, and we see that as well from

16     our diligence into the Debtors, and we are very

17     concerned that we will not be able to buy this

18     asset as a going concern, which is what we want to

19     do.

20          We understand the lure for the Debtors of

21     giving the parties and the museum a little more

22     time to raise their money.  We don't agree with it,

23     obviously, but some of that is a bit self-serving

24     for us, but we understand that lure.

25          But we ask Your Honor to set a hearing for the