## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | |
|---|---|
| In re<br><br>RMS TITANIC, INC., *et al.*,[1]<br><br>Debtors. | Case No. 3:16-bk-02230-PMG<br><br>**Chapter 11**<br>**(Jointly Administered)** |

### REPLY OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, THE TRUSTEES OF THE NATIONAL MARITIME MUSEUM, THE BOARD OF TRUSTEES OF THE NATIONAL MUSEUMS AND GALLERIES OF NORTHERN IRELAND, AND RUNNING SUBWAY PRODUCTIONS, LLC IN RESPONSE TO THE DEBTORS' DISCLOSURE STATEMENT OBJECTION

The Official Committee of Unsecured Creditors ("**Creditors' Committee**"), the Trustees of the National Maritime Museum ("**NMM**"), the Board of Trustees of the National Museums and Galleries of Northern Ireland ("**NMNI**" and, together with NMM, the "**Museums**"), and Running Subway Productions, LLC ("**Running Subway**" and, together with the Creditors' Committee and the Museums, the "**Plan Proponents**") hereby submit this reply in response to the *Objection of the Debtors to the Disclosure Statement to Accompany the Joint Chapter 11 Plan of Reorganization Proposed by the Official Committee of Unsecured Creditors, the Trustees of the National Maritime Museum, the Board of Trustees of National Museums and Galleries of Northern Ireland, and Running Subway Productions, LLC* (the "**Objection**").[2]

---

[1] The Debtors are: RMS Titanic, Inc.; Premier Exhibitions, Inc.; Premier Exhibitions Manage, LLC; Arts and Exhibitions International, LLC; Premier Exhibitions International, LLC; Premier Exhibitions NYC, Inc.; Premier Merchandising, LLC; and Dinosaurs Unearthed Corp.

[2] Capitalized terms not defined herein shall have the meanings ascribed to such terms in the Plan Proponents' first amended chapter 11 plan (as amended, supplemented, or modified, the **"Plan")**, and the accompanying disclosure statement (as amended, supplemented, or modified, the **"Disclosure Statement")**, both filed contemporaneously herewith.

As set forth in detail below or as stated in <u>Exhibit A</u> ("**Response Chart**"), it is respectfully submitted that each objection has been addressed by additional disclosure, is without merit, or presents issues more properly addressed at confirmation. Accordingly, the Objection should be overruled and the Disclosure Statement should be approved as fully complying with section 1125 of the Bankruptcy Code.

## INTRODUCTION

1.      Of the three proposed liquidating sale transactions pending before the Court, the Plan provides the greatest recovery for unsecured creditors, and the best chance of being approved by the U.S. District Court for the Eastern District of Virginia (the "**District Court**"). To ensure that the creditors may finally exercise their right to decide which of the three proposals best meets their interests, however, the Plan Proponents, through this Reply and the *Creditors' Committee's Limited Objection to the Debtors' Sale Motion* (Docket No. 1168), respectfully request that this Court:

- Approve the Disclosure Statement and overrule the Objection;

- Schedule a combined hearing to consider (i) the confirmation of the Plan or (ii) the approval of the Debtors' proposed sale to the Stalking Horse Purchaser (or the prevailing bidder at auction);

- Direct the Debtors to timely provide the Museums with the Seller Disclosure Letter and the Plan Proponents with such other reasonable and necessary due diligence requested by them; and

- Order certain limited amendments to the proposed bidding procedures order annexed to the Debtors' sale motion (Docket No. 1055 ("**Sale Motion**")) to ensure: (i) entry of said order will not preclude or otherwise affect the subsequent solicitation, confirmation, or consummation of the Plan, or (ii) no bidding protections shall be paid to the proposed stalking horse purchaser **("Stalking Horse Purchaser"**) if a transaction with the Museums and Running Subway is ultimately consummated.

#91216978v9

2.      Granting this relief in the best interests of the Debtors' estates and the public's interest in the historical, archeological, scientific, and cultural aspects of the artifacts salvaged from the R.M.S. *Titanic* wreck.

## BACKGROUND

3.      On June 29, 2018, the Plan Proponents filed their initial plan and disclosure statement, which contemplated a private sale of substantially all of the Debtors' assets to the Museums and Running Subway for $19.2 million.

4.      On July 18, 2018, the Debtors filed the Objection.  That Objection was joined in the same day by Lange Feng, Jihe Zhang, Haiping Zou, High Nature Holdings Ltd., PacBridge Capital Partners (HK) Ltd. ("**PacBridge**"), and the so-called ad hoc equity group, all of whom are contemplated owners of the Stalking Horse Purchaser (Docket Nos. 1124, 1126).

5.      This Court subsequently entered a Status Conference Order (Docket No. 1147) scheduling a joint hearing for August 30, 2018 to consider (i) entry of the Debtors' proposed bidding procedures order, and (ii) the adequacy of the disclosure statements filed by the Plan Proponents and the Equity Committee.  The Order provides: "[i]t is appropriate to schedule a single hearing on the Bidding Procedures and Disclosure Statements to enable creditors and stakeholders to make informed choices regarding the three proposals for liquidation of the Debtor's assets." (*Id.* p.5.)

6.      Additionally, the Status Conference Order provided that the Debtors, the Plan Sponsors, and the Equity Committee "should move in [the District Court] for any approvals or determinations required by the District Court to complete the proposed transactions." (*Id.*)  On August 17, 2018, the Museums moved to intervene in the District Court proceeding and attached to

#91216978v9

its motion a proposed complaint seeking declaratory judgment that the Museums are Qualified Institutions under the terms of the Revised Covenants and Conditions.[3]

7.      On August 27, 2018, creditor Euclid Claims Recovery LLC filed an omnibus response (Docket No. 1169) which requests that the Court "[a]pprove both Disclosure Statements and set a schedule that provides for prompt concurrent solicitation of votes for each Plan and prompt concurrent confirmation hearings."  No other creditor has submitted a written response in respect of the Disclosure Statement.

8.      On August 28, 2018, the Plan Proponents filed an amended Plan and Disclosure Statement.  As described herein, many of the amendments to the same were made to address the Debtors' objections.

## ARGUMENT

9.      The Debtors' objections fall into three categories, with several appearing in multiple categories.

10.     First, the Debtors have challenged the adequacy of information in the Disclosure Statement.  The Plan Proponents have addressed (i) all such objections of merit by revising the Disclosure Statement, as described in the annexed Response Chart, and (ii) all non-meritorious

---

[3] At a status hearing in the District Court on August 21, 2018, the Debtors took the position that this Court did not, through the Status Conference Order, encourage the Plan Proponents and the Equity Committee to intervene in the District Court proceeding:

> [W]e don't read the [Status Conference Order] at all, Your Honor, as directing or mandating intervention by these other parties.  In fact, and I don't want to get the cart too much in front of the horse here, but in terms of that, we believe it would be premature for either the museum/unsecured creditors or the equity committee to move in this case at this point in time.

(Ex. B. at 9.)  Instead, the Debtors interpret the language in the section of the Status Conference Order titled "The parties should take the steps that are necessary for approval by the District Court" as merely "set[ting] forth that [this Court] was going to follow the Chapter 11 procedures and policies set forth in the bankruptcy code."  (*Id.*)  Annexed hereto as Exhibit B is an excerpt of the transcript of that hearing.

#91216978v9

objections as described below and in the Response Chart.  As a result, all such objections should be overruled.

11.   <u>Second</u>, the Debtors have asserted that certain Plan provisions render it unconfirmable, and solicitation would therefore be pointless.  The Plan Proponents disagree. These objections raise quintessential confirmation issues not properly considered at the Disclosure Statement hearing, and none come close to establishing the Plan is unconfirmable. Simply put, the Plan is well-constructed, well within the bounds of the Bankruptcy Code, and ready for solicitation.

12.   <u>Third</u>, the Debtors have asserted that the Disclosure Statement is deficient because it does not include the Acquisition Agreements and the Schedule of Assumed Contracts and Leases.  As discussed below, the Plan Proponents have been unable to finalize such documentation because the Debtors have refused, despite numerous requests from the Plan Proponents, to provide the Museums and Running Subway with certain reasonable and necessary due diligence, including the Seller Disclosure Letter.[4]  Although the Debtors' failure to provide due diligence to date does not impact the adequacy of Disclosure Statement, it is respectfully submitted that the Debtors should be directed to timely provide the Museums and Running Subway with reasonable and necessary due diligence so that the Plan Proponents may file the Acquisition Agreements and the Schedule of  Assumed Contracts and Leases with the Plan Supplement prior to confirmation.

---

[4] Footnote 2 to the Sale Motion states that the Seller Disclosure Letter and the schedules attached thereto "will be made available to Contact Parties (as defined in the Bid Procedures) and other interested parties following the execution of a confidentiality agreement with the Debtors."  As described herein, GlassRatner has been directed to not provide the Museums with the Seller Disclosure Letter even though they have proposed to acquire, with Running Subway, substantially all of the Debtors' assets and are willing to execute a confidentiality agreement.

## I.    THE DISCLOSURE STATEMENT MEETS SECTION 1125'S REQUIREMENTS

13.    Section 1125(b) requires that solicitation cannot commence prior to court approval of a disclosure statement containing "adequate information" that would permit parties to make an informed judgment as to the accompanying plan.  "Adequate information" is defined in subdivision (a)(1) as:

> [I]nformation of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical reasonable investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan.

14.    The adequacy of information in a disclosure statement is determined on a case-by-case basis. *See, e.g.*, *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 979 (Bankr. N.D.N.Y. 1988) ("What constitutes adequate information is to be determined on a case-specific basis under a flexible standard that can promote the policy of chapter 11 towards fair settlement through a negotiation process between informed interested parties.").  In construing section 1125, courts have articulated a number of categories of information that generally should be included in a disclosure statement.  Such factors include:

(1)    the events which led to the filing of a bankruptcy petition;
(2)    a description of the available assets and their value;
(3)    the anticipated future of the company;
(4)    the source of information stated in the disclosure statement;
(5)    a disclaimer;
(6)    the present condition of the debtor while in Chapter 11;
(7)    the scheduled claims;
(8)    the estimated return to creditors under a chapter 7 liquidation;
(9)    the accounting method utilized to produce financial information and the name of the accountants responsible for such information;
(10)    the future management of the debtor;

#91216978v9

(11)  the chapter 11 plan or a summary thereof;

(12)  the estimated administrative expenses, including attorneys' and accountants' fees;

(13)  the collectability of accounts receivable;

(14)  financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the Chapter 11 plan;

(15)  information relevant to the risks posed to creditors under the plan;

(16)  the actual or projected realizable value from recovery of preferential or otherwise voidable transfers;

(17)  litigation likely to arise in a nonbankruptcy context;

(18)  tax attributes of the debtor; and

(19)  the relationship of the debtor with its affiliates.

*In re Metrocraft Pub. Servs., Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984) (*citing In re A. C. Williams Co.*, 25 B.R. 173 (Bankr. N.D. Ohio 1982) for categories (1) through (11), *In re William F. Gable Co.*, 10 B.R. 248 (Bankr. N.D. W. Va. 1981) for categories (12) and (13), and *In re Adana Mortgage Bankers, Inc.*, 14 B.R. 29 (Bankr. N.D. Ga. 1981) for categories (14) and (15), and adding (16) through (19) in response to objections raised in that proceeding). Disclosure of all listed categories of information is not necessary in every case.  *See*, *e.g.*, *In re Phoenix Petroleum*, 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001) ("[I]t is well understood that certain categories of information which may be necessary in one case may be omitted in another; no one list of categories will apply in every case.").

15.    The Disclosure Statement provides ample information of the kind bankruptcy courts have held to constitute "adequate information," and thus fully satisfies the requirements of section 1125.

## II.   OBJECTIONS TO THE DISCLOSURE STATEMENT'S ADEQUACY HAVE BEEN ADDRESSED OR ARE MERITLESS

16.    The Debtors have asserted that the initial disclosure statement lacks adequate information in certain respects; however, none of these objections render it inadequate.  The Plan Proponents have addressed the vast majority of these alleged deficiencies by filing an amended Disclosure Statement, and those not addressed should be overruled as meritless.  The Response

7

Chart contains detailed responses to each objection.   Certain objections, those considered meritless by the Plan Proponents, are discussed below.

### A.   Failure to Include a List or Description of Scheduled Claims Against the Debtors or the Impact of Their Allowance or Disallowance

17.   The Debtors have objected to the adequacy of information in the Debtors' initial disclosure statement on the ground that it does not include a list or description of the scheduled claims against the Debtors or the impact of such claims being allowed or disallowed.  (Objection ¶23.)  The inclusion of such a list of claims against the Debtors is not a condition precedent for the adequacy of a disclosure statement.  *Phoenix Petroleum*, 278 B.R. 385 at 393 ("[I]t is also well understood that certain categories of information which may be necessary in one case may be omitted in another; no one list of categories will apply in every case.").   The legislative history to section 1125 further "emphasizes that the adequacy of disclosure is dependent upon various factors including: the size and complexity of the chapter 11 case, the type of plan proposed, the type of creditors and claims impaired by the proposed plan, and the access by impaired creditors to relevant information from other sources."  *In re Monroe Well Serv., Inc.*, 80 B.R. 324, 330 (Bankr. E.D. Pa. 1987).

18.   In response to this objection, the Plan Proponents added a new section to the Disclosure Statement titled "Bar Dates and Claims Filed" which directs creditors to the Debtors' schedules of assets and liabilities and statements of financial affairs.  (Disclosure Statement Art. V.C.)   The Disclosure Statement also directs creditors to the website of the statutory committees, where creditors may access the docket without charge.  (*Id.* at Art. IX.)  As a result, the Plan Proponents believe that the creditors have access to lists and descriptions of the scheduled claims.

#91216978v9

19.     Additionally, the Plan Proponents provided the Debtors' estimates of Claims against the estates in Exhibit C to the Disclosure Statement and have disclosed that the Plan Proponents anticipate the general unsecured claim asserted by PacBridge will not be allowed because it is on account of services rendered to DinoKing Tech, Inc., a non-debtor affiliate of the Debtors.  (*Id.* at Art. V.Q.)

20.     For these reasons, the Parties believe this objection is rendered moot and without merit.

> **B.      Failure to Include a Mechanism or Instrument that Requires the Museums and Running Subway to Acquire the Debtors' assets at a Threshold Amount**

21.     The Debtors have objected to the adequacy of information in the Debtors' initial disclosure statement on the ground that it does not include a mechanism or instrument that would require the Museums and Running Subway to acquire the Debtors' assets at a threshold amount. (Objection ¶18.)  Such a mechanism or instrument is not necessary.  It is a condition precedent to the Plan's effectiveness that the Museums raise the full $19.2 million needed to consummate the contemplated transaction.   (Plan § XI.B.5 (consummation of sale is condition precedent to consummation.))  The $19.2 million purchase price is, therefore, the very "threshold amount" that the Debtors assert does not exist in the Plan.  This objection is accordingly premature.

## III.    CONSIDERATION OF CONFIRMATION OBJECTIONS AT THIS STAGE WOULD BE PREMATURE

22.     The Debtors have challenged approval of the initial disclosure statement on the ground that the accompanying plan is patently unconfirmable.  Such objections are strategically couched in such terms in an attempt to circumvent the well-settled rule that confirmation objections are not the proper subject of a disclosure statement hearing. *See In re Adell*, 325 B.R. 883, 886 (Bankr. M.D. Fla. 2005) ("[C]onfirmation issues should be considered at the

confirmation hearing and not the hearing on Disclosure Statement."); *In re Cardinal Congregate I*, 121 B.R. 760, 764 (Bankr. S.D. Ohio 1990) ("Where objections relating to confirmability of a plan of reorganization raise novel or unsettled issues of law, the Court will not look behind the disclosure statement to decide such issues at the hearing on the adequacy of the disclosure statement."); *Copy Crafters*, 92 B.R. at 980 ("[C]are must be taken to ensure that the hearing on the disclosure statement does not turn into a confirmation hearing, due process considerations are protected and objections are restricted to those defects that could not be cured by voting").

23.     Only in the most extreme circumstances, when a plan is patently unconfirmable, is it appropriate for a bankruptcy court to consider threshold confirmation issues at the disclosure statement hearing.  *See In re Spanish Lake Assocs.*, 92 B.R. 875, 877 (Bankr. E.D. Mo. 1988) ("If the Court can determine from a reading of the plan that it does not comply with . . . the Bankruptcy Code, then it is incumbent upon the Court to decline approval of the disclosure statement.").   However, if a bankruptcy court exercises its discretion to consider threshold confirmation issues, such issues should not impede approval of the disclosure statement unless it is established that the plan is "so fatally flawed that confirmation is impossible." *Cardinal Congregate I*, 121 B.R. at 764.

24.     None of the Debtors' objections come close to establishing any such incurable defects.   Indeed, their objections merely note that there are <u>conditions</u> that have yet to be satisfied.   Therefore, these objections are not the proper subject of a disclosure statement objection and should be overruled.  The parties nevertheless briefly respond to these objections below.

### A.      The Museums Lack Sufficient Funds Today to Consummate the Plan

25.     The Debtors have alleged that the "feasibility of the Joint Plan" remains suspect because the Museums "do not have sufficient resources to consummate the plan they proposed."

#91216978v9

(Objection ¶7.)    Objections to plan feasibility because of a financing contingency are not appropriate for consideration at a disclosure statement hearing and, as such, should be overruled. *In re Coastal Realty Investments, Inc.*, No. 12-20564, 2013 WL 214235, at *2 (Bankr. S.D. Ga. Jan. 17, 2013) ("[A]s long as the disclosure statement adequately provides creditors with enough information to assess the plan, the disclosure statement has fulfilled its purpose.  Judgments about whether the plan is feasible based on those assessments are issues reserved for plan confirmation.").

26.    In addition, the Disclosure Statement expressly states the Museums' intention to raise the purchase price through a global fundraising campaign, as well as to obtain financing from governmental sources.    (Disclosure Statement Art. IV.I.)    The Plan Proponents have supplemented Article IV.I with additional information about the Museums' fundraising record and added a new section disclosing the risk that the Museums fail to raise the Purchase Price. (*Id.* Art. VII.B.1.) Bankruptcy courts have approved disclosure statements that rely on outside fundraising.  *See*, *e.g.*, *In re Charles St. African Methodist Episcopal Church of Boston*, Case No. 12-12292 (Bankr. D. Mass. July 10, 2017) (Docket No. 1054) (approving disclosure statement that relied on voluntary donations from debtors' members); *In re Archdiocese of Saint Paul & Minneapolis*, Case No. 15-30125 (Bankr. D. Minn. Dec. 29, 2016) (Docket No. 903) (same).

27.    The Debtors' feasibility objection is a quintessential confirmation objection, and should therefore be overruled at this point.  The Museums will be prepared to demonstrate the Plan's feasibility come confirmation.

> **B.    The Plan Makes it "Impossible" to Determine When the Effective Date Will Occur, if Ever**

28.    The Debtors have asserted that the Plan accompanying the Debtors' initial disclosure statement is unconfirmable on the ground that it is "impossible to determine from the

face of the Joint Plan when the Effective Date will occur, if ever." (Objection ¶8.) In support, the Debtors note that the Plan does not include a "timeline, outside date, or . . . expected sale date" and does not include the Acquisition Agreements, which contain conditions precedent to the consummation of the Sale. The Plan Proponents have since filed an amended Disclosure Statement to clarify that the conditions precedent in the Acquisition Agreements to the consummation of the Sale will be substantially similar to those in the Stalking Horse APA, and that the Acquisition Agreements will include the same "Outside Date" as the Stalking Horse APA (i.e. seventy calendar days following entry of an order by the Admiralty Court approving the sale). (Disclosure Statement Art. IV.I.3.)

29.    The Plan Proponents have requested that the Confirmation Hearing be scheduled for October and, if the Confirmation Order is entered, anticipate the Plan's becoming effective shortly after entry of the Confirmation Order and an order of the Admiralty Court approving the sale.

30.    For these reasons, the Debtors' objection that the Plan is patently unconfirmable because it does not set an effective date should be overruled.

## IV.    THE DEBTORS SHOULD NOT BE REWARDED FOR THEIR CONTINUED REFUSAL TO FURNISH INFORMATION NEEDED TO FINALIZE THE ACQUISTION AGREEMENTS AND SCHEDULE OF ASSUMED CONTRACTS AND LEASES

31.    The Debtors have asserted that the Disclosure Statement is deficient because it does not include the Acquisitions Agreements and the Schedule of Assumed Contracts and Leases. (Objection ¶¶8, 22-23.) As is usual many other chapter 11 cases, the Plan Proponents intend to file these documents with a Plan Supplement prior to the Confirmation Hearing and, in any event, it is not a requirement of the Bankruptcy Code or Rules to file these documents with the Disclosure Statement. To date, however, the Debtors' refusal to provide reasonable and

necessary due diligence to the Museums and Running Subway despite their numerous requests until the Museums raise the full $19.2 million[5] has prevented them from properly finalizing the Acquisitions Agreements and the Schedule of Assumed Contracts and Leases.

32.    This continued refusal has also led to a charade of sorts, in which the Debtors refuse to furnish the Plan Proponents with information necessary to finalize the Acquisition Agreements and the Schedule of Assumed Contracts and Leases, preventing them from including such documents in their Disclosure Statement, and then go on to object to the Disclosure Statement because such documents are not annexed to it.  This situation should not be permitted to continue.

33.    The Plan Proponents respectfully submit that the Disclosure Statement is more than adequate, despite the Debtors' stonewalling.  However, to assist in the finalization of the Acquisitions Agreements and the Schedule of Assumed Contracts and Leases prior to confirmation, the Plan proponents request that this Court direct the Debtors to timely provide the Seller Disclosure Letter and such other reasonable and necessary due diligence as the Plan Proponents request from time to time.

---

[5] At the July 25, 2018 status conference before this court, the Debtors' lawyers said that they would provide the Museums with due diligence only after the Museum raises the full $19.2 million: "[W]e haven't provided [the Seller Disclosure Letter] to the museum. Should the museum come up with the money, we'll provide it to them. It's as simple as that."  *See* Transcript of Proceedings (Docket No. 1143), at 68.

#91216978v9

## CONCLUSION

34.    For the foregoing reasons, the Court should: (i) approve the Disclosure Statement and overrule the Objection; (ii) schedule a combined hearing to consider confirmation of the Plan and the Debtors' proposed sale to the Stalking Horse Purchaser (or the prevailing bidder at auction); (iii) direct the Debtors to timely furnish the Seller Disclosure Letter and such other reasonable and necessary due diligence to the Plan Proponents; and (iv) grant such other and further relief as the Court deems just and proper.

Dated: August 28, 2018

Jeffrey Chubak (admitted pro hac vice)
**STORCH AMINI PC**
140 East 45th Street, 25th Floor
New York, New York 10017
(212) 490-4100
(212) 490-4208 (Facsimile)
jchubak@storchamini.com

- and -

**THAMES MARKEY & HEEKIN, P.A.**

*/s/ Richard R. Thames*
By: _____
    Richard R. Thames
    Robert A. Heekin
Florida Bar No. 0718459
Florida Bar No. 652083
50 North Laura Street, Suite 1600
Jacksonville, Florida  32202
(904) 358-4000
(904) 358-4001 (Facsimile)
rrt@tmhlaw.net
rah@tmhlaw.net

Attorneys for the Official Committee of
Unsecured Creditors

#91216978v9

**DAVIS POLK & WARDWELL LLP**
Timothy Graulich (admitted pro hac vice)
James I. McClammy (admitted pro hac vice)
450 Lexington Avenue
New York, NY 10017
(212) 450-4000
timothy.graulich@davispolk.com
james.mcclammy@davispolk.com

- and –

**STEARNS WEAVER MILLER WEISSLER
    ALHADEFF & SITTERSON, P.A.**
Patricia Ann Redmond
Florida Bar No. 303739
Museum Tower
150 West Flagler Street
Suite 2200
Miami, FL 33130
Telephone: (305) 789-3200
predmond@stearnsweaver.com

Attorneys for the Trustees of the
National Maritime Museum

15

## <u>CERTIFICATE OF ELECTRONIC FILING AND SERVICE</u>

I hereby certify that on August 28, 2018, a true and correct copy of the foregoing was served via CM/ECF electronic transmission upon those parties who are registered with the Court to receive electronic notifications in the matter.

Dated: August 28, 2018

*/s/ Richard R. Thames*

By: _____

Richard R. Thames

16

## EXHIBIT A

### Response Chart

| Alleged Deficiency | Response |
|---|---|
| The Museums lack sufficient financial resources to consummate the Plan, making feasibility suspect.<br><br>(¶7) | As discussed in greater detail in the Reply, the Debtors' feasibility objection is premature, and consideration of the same should not be considered prior to confirmation. The Disclosure Statement adequately discloses the Museums' intention to raise the purchase price through a global fundraising campaign, as well as to obtain financing from governmental sources. (Disclosure Statement Art. IV.I.) Article IV.I of the Disclosure Statement has been supplemented with additional information about the Museums' fundraising record and a new section has been added disclosing the risk that the Museums fail to raise the Purchase Price. (*Id.* Art. VII.B.1.) Additionally, as noted above, bankruptcy courts have approved disclosure statements where the plan depends on fundraising from outside sources. (Reply ¶24.) |
| Failure to (i) disclose timeline of when the sale transaction is expected to close and when the Effective Date is expected to occur, and (ii) include the Acquisition Agreements, the consummation of the transactions in which is a condition precedent to the Effective Date.<br><br>(¶¶8, 20) | As discussed in the Reply, language has been added to Article IV.I.3 of the Disclosure Statement to clarify that the terms of the Acquisition Agreements will be substantially similar to the terms of the Stalking Horse APA (including with respect to conditions precedent), and further will include an identical "Outside Date" (i.e. seventy calendar days following entry of an order by the Admiralty Court approving the sale):<br><br>    The Plan Sponsors anticipate that the terms of their Asset Purchase Agreement (the "Plan Sponsors' APA") will be substantially similar to the terms of the Stalking Horse APA, including an identical outside date of 70 days from the Admiralty Court Order Entry Date (as defined in the Stalking Horse APA).<br><br>As a result, the Plan Proponents anticipate Plan consummation occurring on a substantially similar timeline as any consummation of a sale pursuant to the Debtors' bidding and auction procedures. Additionally, as discussed in the Reply, the Plan Proponents have requested that the Confirmation Hearing be scheduled for October and, if the Plan is confirmed, anticipate its consummation soon after entry of the Confirmation Order and an order of the Admiralty Court approving the sale. |
| Failure to disclose the composition of the Creditors' Committee and that the CEO of Running Subway, LLC, James Sanna, is also the CEO of a member of the Creditors' Committee. | The following language has been added to Article IV.I of the Disclosure Statement disclosing the composition of the Creditors' Committee and that the CEO of Running Subway, LLC, James Sanna, is also the CEO of a member of the Creditors' Committee:<br><br>    These months of discussions culminated in the signing of the PSA on June 27, 2018 by the Plan Proponents and certain holders of Claims against the Debtors. Under the PSA, the Plan Sponsors, the Creditors' Committee, and each of the three members of the Creditors' Committee in their |

| Alleged Deficiency | Response |
|---|---|
| (¶¶15-16) | capacity as creditors agreed to, among other things, support and take all steps reasonably necessary to support the Sale and not take any action that is inconsistent with, or is intended or is reasonably likely to interfere with, consummation of the Sale.  Significantly, James Sanna, the CEO of both Running Subway and of TSX Operating Co., LLC (a creditor in the Chapter 11 Cases and a member of the Creditors' Committee), recused himself from, and did not participate in, the Creditors' Committee's deliberations concerning, or vote on the decision to support, the Plan.  Rather, that decision was made by the Creditors' Committee's two other remaining members—B.E. Capital Management Fund LP and Dallian Hoffen Biotechnique Co., Ltd.  In fact, if the Creditors' Committee were presented with a proposal superior to the Sale and Plan, section 6(b) of the PSA authorizes the two other members of the Creditors' Committee to terminate the Creditors' Committee's support for the Plan without Mr. Sanna's involvement. |
| Failure to include detail about the global fundraising campaign, including:<br><br>• whether the campaign has begun,<br><br>• who will be conducting the global fundraising campaign on behalf of, or in conjunction with, NMM, NMNI, and Titanic Belfast, or<br><br>• where the parties are at in their fundraising efforts.<br><br>(¶17) | Language has been added to Article IV.I.2 disclosing (1) that the global fundraising campaign began on July 24, 2018 and will be conducted by NMM and Titanic Belfast, with the assistance of the National Geographic Society and Ireland Funds, among others and (2) in addition to the fundraising efforts, Royal Museums Greenwich is in advanced discussions for an unsecured loan from the United Kingdom Department for Digital, Culture, Media and Sport for a substantial portion of the Purchase Price:<br><br>The purchase price for the Purchased Assets is $19,200,000 (the "Purchase Price").  NMM, NMNI, and Titanic Belfast intend to raise the full amount of the Purchase Price from and with the support and assistance of government sources from the United States, United Kingdom, and Northern Ireland, high net worth individual and corporate donors, and a public campaign backed by certain high profile endorsements.<br><br>Over the past year, NMM and Titanic Belfast have conducted a campaign to build support among government officials, certain key individuals connected to the R.M.S. Titanic, and high net worth individual and corporate donors for the acquisition of the Artifact Collection.  The support is led by the National Geographic Society, and by Dr. Ballard, who led the 1985 expedition that located the Titanic.  Together, NMM and Titanic Belfast have developed a comprehensive fundraising campaign that launched with a media event on July 24, 2018, in Belfast, Northern Ireland, at which Dr. Ballard was the keynote speaker and at which James Cameron, director of the 1997 Titanic film, provided a video address.  Titanic Belfast has secured the support of the National Geographic Society to act as a publicity platform from which to promote the fundraising efforts, as well as the support and assistance of the Ireland Funds, a global philanthropic network that has raised over $600 million to promote and support peace, culture, education and community |

#91216978v9

| Alleged Deficiency | Response |
|---|---|
| | development throughout Ireland.<br><br>In addition to the fundraising efforts, RMG is in advanced discussions with the United Kingdom Department for Digital, Culture, Media and Sport for support of up to £7.5 million (approximately $9.7 million) in the form of an unsecured loan, repayable by RMG over an extended period.<br><br>NMM and Titanic Belfast remain confident that by the Confirmation Hearing, they will have received the remaining contributions to reach the full amount of the Purchase Price.<br><br>The Plan Proponents may provide updates as Plan Supplements from time to time describing the amount of funds raised.  As discussed in the Reply, the Museums will be prepared to demonstrate the Plan's feasibility at the confirmation hearing. |
| Failure to disclose the risk factors regarding the fundraising campaign.<br><br>(¶17) | A new Article VII.B.1 has been added to the Disclosure Statement disclosing the risk that the Museums fail to raise the full purchase price:<br><br>*The Museum Plan Sponsors May Not Be Able To Raise the Purchase Price*<br><br>The Plan Sponsors have agreed to purchase substantially all of the Debtors' assets and assume certain liabilities for $19.2 million.  NMM, NMNI, and Titanic Belfast intend to raise the full amount of the Purchase Price from and with the support and assistance of government sources from the United States, United Kingdom, and Northern Ireland, high net worth individual and corporate donors, and a public campaign backed by certain high profile endorsements.  Although the Plan Proponents are confident, based on the strong fundraising records of NMM, NMNI, and Titanic Belfast and discussions with certain government sources and high net worth individual and corporate donors, that NMM, NMNI, and Titanic Belfast will successfully raise the Purchase Price, there is no guarantee that NMM, NMNI, and Titanic Belfast will be able to raise the full amount.  If the campaign fails to raise the full Purchase Price, then the Sale and consummation of the Plan would not occur. |
| Failure to include a mechanism or instrument that requires the Museums and Running Subway to acquire the Debtors' assets at a threshold amount. | As described in the Reply, a mechanism or instrument that requires the Museums and Running Subway to acquire the Debtors' assets at a threshold amount is not necessary.  It is a condition precedent to the effectiveness of the Plan that the Plan Sponsors raise the full $19.2 million purchase price needed to consummate the Sale.  *See* Plan Art. XI.B.5 (requiring consummation of the Sale as a condition precedent to the effectiveness of the Plan).  The $19.2 million purchase price is, therefore, the very "threshold |

#91216978v9

| Alleged Deficiency | Response |
|---|---|
| (¶18) | amount" that the Debtors assert does not exist in the Plan. |
| Failure to disclose that approval of the Disclosure Statement would trigger a default under the Stalking Horse APA.<br><br>(¶18) | Language has been added to Article IV.H of the Disclosure Statement disclosing that approval of the Disclosure Statement would trigger a default under the Stalking Horse APA:<br><br>Pursuant to section 7.4 of the Asset Purchase Agreement filed as Exhibit B to the Debtors' Sale Motion (the "Stalking Horse APA"), the Stalking Horse Purchaser may terminate the Stalking Horse APA if certain milestones are not achieved or if the Bankruptcy Court approves a disclosure statement with respect to a chapter 11 plan filed by any person other than the Debtors, including this Disclosure Statement. *See* Stalking Horse APA §§ 7.4(b), (d). As of the date hereof, two milestones were not achieved: (i) the Bankruptcy Court did not enter an order approving the bidding procedures associated with the Third Sale Motion prior to 9:00 p.m. (Eastern Time) on July 20, 2018, and (ii) the Bankruptcy Court did not approve the sale substantially all of the Debtors' assets pursuant to the Third Sale Motion prior to 9:00 p.m. (Eastern Time) on August 15, 2018. As of the date hereof, neither the Creditors' Committee nor the Museum Plan Proponents are aware of a notice of termination having been served by the Stalking Horse Purchaser upon the Debtors.<br><br>As discussed in the language above, several milestones have already not been achieved, so the Stalking Horse Purchaser is currently able to terminate the Stalking Horse APA according to its terms. |
| Failure to address the litigation risk and associated drain on estate resources that would result from competing plan process, including solicitation costs and legal fees that would be incurred by the Debtors and statutory committees. | Language has been added to Article V.Q of the Disclosure Statement disclosing that litigation risk and associated drain on estate resources that may result from a competing plan process, including as a result of legal fees incurred by the Debtors and the committees, and the cost of solicitation may impact creditor recoveries:<br><br>Delay in confirmation or consummation of the Plan, including as a result of litigation related to the Debtors' Third Sale Motion, the Plan, or the Equity Committee Plan, may result in reduced recoveries relative to those projected herein due to the continued accrual of interest on the DIP Loan and potentially additional administrative expenses, including professional fees of the Debtors, the Creditors' Committee, and the Equity Committee. Additionally, the Recovery Analysis does not account for any costs associated with solicitation, nor does it account for any savings associated with obviating the need for a follow-on liquidation plan process should the Debtors' Third Sale Motion be approved. |
| Failure to provide a timeframe in which | Language has been added to Article V.H of the Disclosure Statement to clarify that the initial distribution |

4

| Alleged Deficiency | Response |
|---|---|
| creditors can expect recovery.<br><br>(¶21) | to creditors will occur "on the Effective Date or as soon as reasonably practicable after the Effective Date." Additionally, as described above, the Acquisition Agreements will have an Outside Date of seventy calendar days after the Admiralty Court enters an order approving the transactions consummated therein. |
| Failure to provide creditors with an estimated return on their claims.<br><br>(¶21) | A recovery analysis providing creditors with an estimated return on their claims has been added as Exhibit C to the Disclosure Statement.  Additionally, creditors are provided with an estimated return on their claims on a Class-by-Class basis in Article I.C of the Disclosure Statement. |
| Failure to include forms of Acquisition Agreements which, as a result, provides creditors with "no way of comparing" the $19.2 million purchase price under the Plan and the $17.5 million purchase price under the Debtors' proposed sale to the Stalking Horse Purchaser.<br><br>(¶¶8, 22-23) | Language has been added to Article IV.I.3 clarifying that the Acquisition Agreements are "substantially similar" to the Stalking Horse APA and describing certain key differences:<br><br>The Plan Sponsors anticipate that the terms of their Asset Purchase Agreement (the "Plan Sponsors' APA") will be substantially similar to the terms of the Stalking Horse APA, including an identical outside date of 70 days from the Admiralty Court Order Entry Date (as defined in the Stalking Horse APA).  Certain terms of the Plan Sponsors' APA are expected to differ from the Stalking Horse APA, however, including in the following respects:<br><br>• *Absence of Certain Purchaser Protective Provisions*. Unlike the Stalking Horse APA, the Plan Sponsors' APA will not include (i) any termination fee payable to the Purchasers (as defined in the Stalking Horse APA) or (ii) the reimbursement by Sellers (as defined in the Stalking Horse APA) of the Purchasers' expenses incurred in connection with its due diligence investigation of Sellers and RMST and the negotiation of the Plan Sponsors' APA.  In fact, the attorneys representing NMM are doing so on a pro bono basis.<br><br>• *Fully-Refundable Good Faith Deposit*.  To accommodate the Plan Sponsors' institutional limitations, the Plan Sponsors' APA will require the Good Faith Deposit (as defined in the Stalking Horse APA) to be refunded in the event the closing of the acquisition does not occur.<br><br>• *Materiality Qualification of Representations and Warranties*.  The Stalking Horse APA requires the representations and warranties of Sellers and RMST contained therein to be true and correct in all respects as a condition to Purchasers' obligation to close the acquisition—a standard that substantially detracts from the Debtors' certainty that closing will occur.  In particular, such a condition to closing would mean the Stalking Horse Purchaser would not be required to close the acquisition if any aspect of any of the |

5

| Alleged Deficiency | Response |
|---|---|
| | Debtors' representations or warranties was incorrect.  By contrast, the Plan Sponsors' APA will provide that the Purchasers will not be permitted to invoke a breach of, or inaccuracy in, the Sellers' representations or warranties to avoid closing the acquisition unless, (i) for fundamental representations, such representations and warranties are not true other than in de minimis respects and (ii) for non-fundamental representations, such representations and warranties are untrue such that it would cause a Seller Material Adverse Effect (as defined in the Plan Sponsors' APA), which is an extremely high standard.<br><br>• *Fundraising Condition*.  The Plan Sponsors' APA will contain a representation from the relevant Plan Sponsors that they have a fundraising plan designed to raise the full purchase price.  In addition, the relevant Plan Sponsors will covenant to use their reasonable best efforts to complete the fundraising plan prior to the closing date.  Due to the nature of the Museum Plan Sponsors' business, the successful completion of the fundraising plan will be a condition to the closing, however, the Museum Plan Sponsors are very confident of their ability to raise the necessary funds. |
| Failure to disclose which executory contracts and/or unexpired leases are to be assumed as part of the Plan.<br><br>(¶ 22-23) | As discussed in the Reply, the Plan Proponents intend to file a Schedule of Assumed Contracts and Leases as a Plan Supplement.  However, language has been added to Article V.F of the Disclosure Statement confirming that "[a]ll or substantially all of the executory contracts and unexpired leases of the Debtors will be assumed and assigned to certain of the Plan Proponents" and that cure payments shall be paid by the party assuming the contract or lease—not by the Debtors. |
| Failure to include a list or description of the scheduled claims against the Debtors or the impact of such claims being allowed or disallowed.<br><br>(¶ 22-23) | As described in the Reply, the inclusion of a list of claims against the Debtors is not a condition precedent for the adequacy of a disclosure statement.  In response to this objection, however, the Plan Proponents added a new Article V.C to the Disclosure Statement titled "Bar Dates and Claims Filed" which directs creditors to the Debtors' schedules of assets and liabilities and statements of financial affairs.  Article IX of the Disclosure Statement also directs creditors to the website of the Creditors' Committee and Equity Committee, where creditors may access the docket without charge.<br><br>Additionally, Exhibit C to the Disclosure Statement provides the Debtors' estimates of Claims against the estates, and Article V.Q of the Disclosure Statement discloses that the Plan Proponents anticipate that the general unsecured claim asserted by PacBridge Capital Partners (HK) Ltd. will not be allowed. |

#91216978v9

| Alleged Deficiency | Response |
|---|---|
| Failure to include a liquidation analysis.<br><br>(¶ 23) | A liquidation analysis is not required by the Bankruptcy Code.  Article IV.D discusses why the Museum Plan Proponents believe that the recoveries available to creditors in a chapter 7 liquidation would be significantly less than the recoveries that will be achieved by consummation of the Plan:<br><br>Because the Plan is a liquidating plan, the "liquidation value" in the hypothetical chapter 7 liquidation analysis for purposes of the "best interests" test is substantially similar to the estimates of the results of the chapter 11 liquidation contemplated by the Plan.  However, the Plan Proponents believe that in a chapter 7 liquidation, there would be additional costs and expenses that the Estates would incur, and additional claims due to, among other things, the rejection of executory contracts, as a result of liquidating the Estates in a chapter 7 case. Additionally, the Debtors have proposed a sale to the Stalking Horse Purchaser for a purchase price that is $1.7 million less than the Purchase Price proposed under the Plan and, as evidenced in the Recovery Analysis, the sale to the Stalking Horse Purchaser would result in a lower recovery for unsecured creditors.<br><br>Conversion of the Chapter 11 Cases to chapter 7 at this stage would likely result in significantly reduced creditor recoveries, relative to the recoveries that would likely be achieved if the Sale contemplated hereby were consummated. The costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a chapter 7 trustee, as well as the costs of counsel and other professionals retained by the chapter 7 trustee, and additional accrued interest obligations under the DIP Loan. The Plan Proponents believe such amount would exceed the amount of expenses that would be incurred in implementing the Plan and winding up the affairs of the Debtors. Appointment of a chapter 7 trustee would result in the abrupt shutdown of the Debtors' exhibition business, as the chapter 7 trustee would be prohibited from operating the same absent Court authorization pursuant to Bankruptcy Code section 721 and would likely lack the experience and expertise to operate said business. Such a shutdown would likely result in the incurrence of significant additional administrative expenses, such as rent obligations under the Debtors' assumed or postpetition exhibition leases. A chapter 7 trustee would likely also incur significant costs marshalling the Debtors' assets, from geographically dispersed permanent and traveling exhibition locations, particularly if his or her appointment results in key personnel departures. In addition, appointment of a chapter 7 trustee would also likely result in the establishment of a new Claims Bar Date pursuant to Bankruptcy Rule 1019 and payment of an otherwise avoidable statutory commission to the chapter 7 trustee under section 326 of the Bankruptcy Code.<br><br>As such, the distributions to creditors will likely be larger under the Plan. Additionally, |

#91216978v9

| Alleged Deficiency | Response |
|---|---|
| | distributions to creditors contemplated by the terms of the Plan will be made more quickly than any likely distribution that would be made by a chapter 7 trustee because a chapter 7 trustee will need an undetermined period of time to investigate and comprehend the assets, liabilities, and asserted Claims against the Estates. |

**EXHIBIT B**

**Transcript of Proceedings**

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF VIRGINIA
 2                      Norfolk Division

 3

 4   - - - - - - - - - - - - - - - - - -
                                        )
 5   R.M.S. TITANIC, INC.,              )
     SUCCESSOR IN INTEREST TO           )
 6   TITANIC VENTURES, LIMITED          )
     PARTNERSHIP,                       )
 7                                      )    CIVIL ACTION NO.
              Plaintiff,                )    2:93cv902
 8                                      )
        v.                              )
 9                                      )
     THE WRECKED AND ABANDONED          )
10   VESSEL, ETC.,                      )
                                        )
11            Defendant.                )
     - - - - - - - - - - - - - - - - - -
12

13

14                  TRANSCRIPT OF PROCEEDINGS

15                     Norfolk, Virginia

16                     August 21, 2018

17

18   BEFORE:  THE HONORABLE REBECCA BEACH SMITH
              Chief United States District Judge

19

20   APPEARANCES:

21           KALEO LEGAL
             By:  Brian A. Wainger
22                   And
             McGUIRE WOODS LLP
23           By:  Robert W. McFarland
                  Counsel for R.M.S. Titanic

24

25
```

```
1
    APPEARANCES CONTINUED:
2

3              UNITED STATES ATTORNEY'S OFFICE
               By:  Kent Porter
4                   Assistant United States Attorney
                    Counsel for Amicus United States
5
               THE NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION
6              By:  Jackie Rolleri
                        And
7              DEPARTMENT OF JUSTICE
               By:  Matt Troy
8                   Counsel for NOAA

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE COURT:  As I understand what's coming up on

2    August 30th, from my reading of the orders and the

3    materials, is the Court is going to, first of all, consider

4    the competitive bidding procedures.  That's something that

5    the Court is going to look at that had been proposed by the

6    debtors.

7          MR. McFARLAND:  Correct.

8          THE COURT:  Then the Court is going to look at the

9    disclosure statement that's been filed by the equity

10   committee regarding their proposed plan?

11         MR. McFARLAND:  Correct.

12         THE COURT:  The disclosure statements filed by the

13   museum regarding their proposed plan?

14         MR. McFARLAND:  As part of the unsecured creditors,

15   yes, Your Honor, that's correct.  So two other plans will be

16   reviewed and the bidding procedures.

17         THE COURT:  That is what is supposed to occur on

18   August 30th before the bankruptcy court?

19         MR. McFARLAND:  Correct.

20         THE COURT:  This may be getting ahead a bit, but

21   the bankruptcy court invited or ordered the other two

22   entities, the equity committee, and I'll just call them the

23   museum, to intervene in this action?

24         MR. McFARLAND:  We don't read the bankruptcy's

25   Court order as inviting them to.  What the bankruptcy court

1  did there is it, number one, set forth that it was going to

2  follow the Chapter 11 procedures and policies set forth in

3  the bankruptcy code.

4         THE COURT:  I understand that, as well it should,

5  and it will, I feel positive of that.

6         MR. McFARLAND:  Right.  Then it rejected the idea

7  of a joint jurisdictional plan, essentially, that had been

8  offered by the equity committee, and this Court ruling

9  piecemeal or earlier than the bankruptcy court on the key

10  rulings, and what it said is, parties should go to the

11  District Court, to the extent necessary, for the approvals

12  necessary.

13         But we don't read the bankruptcy court's order at

14  all, Your Honor, as directing or mandating intervention by

15  these other parties.  In fact, and I don't want to get the

16  cart too much in front of the horse here, but in terms of

17  that, we believe it would be premature for either the

18  museum/unsecured creditors or the equity committee to move

19  in this case at this point in time.

20         THE COURT:  Well, I'm quoting from the bankruptcy

21  court's August 3rd order where the bankruptcy court directed

22  the parties to, "Move in the District Court for any

23  approvals or determinations required by the District Court

24  to complete the proposed transactions."  I think both courts

25  are in agreement that there are respective jurisdictions.

1    Obviously, the bankruptcy court has its jurisdiction.

2    Regardless of any approval of any sale of the assets, you

3    are subject to the covenants and conditions and the order of

4    this Court.  So, ultimately, there is going to have to be

5    some approval from this Court of something.  You can't just

6    move these assets out to another entity without following a

7    previous order of the Court.

8            This Court had jurisdiction and entered that order,

9    and that's a final order of this Court.  It's going to have

10   to be followed.  I think both the bankruptcy court and this

11   Court recognize that.  This Court has no desire to get into

12   the bankruptcy proceedings and direct any approvals there.

13   That's up to the bankruptcy court in their Chapter 11

14   proceedings.

15           On the other hand, this Court does have to approve

16   any transfer of all of these assets to be sure that it is

17   following this Court's order of the covenants and conditions

18   to keep everything together and subject to the jurisdiction

19   of this Court.

20           MR. McFARLAND:  We agree, Your Honor.  To the

21   extent there would be another purchaser other than the

22   Stalking Horse Purchaser, where there would be a transfer of

23   assets of R.M.S.T., we agreed, under the covenants and

24   conditions, that would be required.  Under the Asset

25   Purchase Agreement that has presently been presented to the

1    bankruptcy court, this will be, as to R.M.S.T., a stock of

2    acquisition, a hundred percent of the stock of R.M.S.T.

3          So I don't think that directly implicates the

4    covenants and conditions, as we set forth in our motion and

5    memorandum.  What we do know and state to the Court that the

6    prospective purchaser in the Asset Purchase Agreement

7    directed and mandated that this Court have approval of that,

8    and that's under the Asset Purchase Agreement.  So we agree

9    with that aspect, Your Honor.

10         THE COURT:  Your position is that the Court really

11   doesn't need to approve your Asset Purchase Agreement

12   because it's a transfer of stock.  On the other hand, you've

13   asked for this Court to approve it because the purchaser is

14   requiring it.  So, in effect, this Court would have to

15   approve it.

16         MR. McFARLAND:  Absolutely, Your Honor.  We would

17   come to this Court for that approval after the bankruptcy

18   court's proceeding on August 30th and then when the other

19   proceedings proceed.  So, for example, if the bankruptcy

20   court sets the bidding procedures, and there is an auction

21   scheduled, the other option would be a private sale, but we

22   would prefer an auction because we think that will bring a

23   higher return.

24         Then there is an auction set with a date, a public

25   auction is held, et cetera, then the winning bidder at the

1  auction, we would then have to come to the Court and say

2  here's what is the auction qualified bidder and ask for the

3  Court's approval at that point time.

4          But at this point in time, we don't know.  It is

5  the company's position that we think the best and really

6  only viable option that's out there right now is the Asset

7  Purchase Agreement with the Stalking Horse Bidder.  That is

8  the only thing that we see as viable right now.  But things

9  may change between now and when the auction is scheduled.

10         At this point, Your Honor, it would be premature,

11 and we wouldn't ask the Court and couldn't ask the Court to

12 approve anyone today because there is really no one at this

13 juncture for this Court to approve.  But we do hope to come

14 back before the Court, and we would, if the timetable goes a

15 little quicker than it did, which brings us here today, we

16 are hoping to be back before the Court, obviously with the

17 Court's permission and schedule, in mid-October or so.

18         THE COURT:  There is something in here about a

19 September date.

20         MR. McFARLAND:  Your Honor, in the original Asset

21 Purchase Agreement, that is going to have to be amended.

22 There is no way we are going to get before Your Honor by

23 September 7th.  We acknowledge that.  They didn't move as

24 quickly in the bankruptcy court as we would have hoped.

25 That's just sometimes, as the Court is well aware, that