UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

IN RE:

RMS TITANIC, Inc., *et al.*,[1]

CHAPTER 11

Case No. 3:16-bk-02230-PMG

Debtors.

**OMNIBUS REPLY (I) IN FURTHER SUPPORT OF DEBTORS' MOTION
FOR ENTRY OF AN ORDER (A) APPROVING COMPETITIVE BIDDING
AND SALE PROCEDURES; (B) APPROVING FORM AND MANNER OF
NOTICES; (C) APPROVING FORM OF ASSET PURCHASE AGREEMENT;
(D) APPROVING BREAK UP-FEE AND EXPENSE REIMBURSEMENT;
(E) SCHEDULING AUCTION AND HEARING TO CONSIDER FINAL
APPROVAL OF SALE, INCLUDING REJECTION OR ASSUMPTION
AND ASSIGNMENT OF RELATED EXECUTORY CONTRACTS AND
UNEXPIRED LEASES; (F) AUTHORIZING SALE OF THE TRANSFERRED
ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES,
AND INTERESTS; AND (G) APPROVING SETTLEMENT WITH THE
PACBRIDGE PARTIES; AND (H) GRANTING RELATED RELIEF AND
(II) TO THE OBJECTIONS AND RESPONSES IN OPPOSITION THERETO**

RMS Titanic, Inc. ("RMST") and certain of its affiliates, as Debtors and Debtors in

Possession in the above-captioned case (collectively, the "Debtors"), by and through their

undersigned counsel, hereby file this omnibus reply (the "Reply") (i) in further support of

*Debtors' Motion for Entry of an Order (A) Approving Competitive Bidding and Sale*

---

[1] The Debtors in the Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include: RMS Titanic, Inc. (3162); Premier Exhibitions, Inc. (4922); Premier Exhibitions Management, LLC (3101); Arts and Exhibitions International, LLC (3101); Premier Exhibitions International, LLC (5075); Premier Exhibitions NYC, Inc. (9246); Premier Merchandising, LLC (3867); and Dinosaurs Unearthed Corp. (7309). The Debtors' service address is 3045 Kingston Court, Suite I, Peachtree Corners, Georgia 30071.

*Procedures; (B) Approving Form and Manner of Notices; (C) Approving Form of Asset Purchase Agreement; (D) Approving Break Up-Fee and Expense Reimbursement;(E) Scheduling Auction and Hearing to Consider Final Approval of Sale, Including Rejection or Assumption and Assignment of Related Executory Contracts and Unexpired Leases; (F) Authorizing Sale of the Transferred Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests; and (G) Approving Settlement with the PacBridge Parties; and (H) Granting Related Relief* [D.E. 1055] (the "Sale Motion");[2] and (ii) to (A) the response of the Official Committee of Equity Security Holders (the "Equity Committee") in opposition to the Motion [D.E. 1170] (the "EC Objection"); (B) the limited objection of the Official Committee of Unsecured Creditors (the "Creditors' Committee") to the Motion [D.E. 1168] (the "CC Objection" and, together with the EC Objection, the "Committee Objections"); and (C) the objection of Euclid Claims Recovery LLC ("Euclid") to the Motion [D.E. 1109] (the "Euclid Objection"). In support of this Reply, the Debtors respectfully represent the following:

## PRELIMINARY STATEMENT

The amended plans and disclosure statements recently filed by the Equity Committee and Creditors' Committee confirm one inescapable truth: the APA executed by and among the Debtors and the Stalking Horse Purchaser is the only fully-funded transaction before the Court. In an attempt to deflect attention from this material fact, the Committee Objections inaccurately suggest the APA is a sweetheart deal negotiated in secret, providing for a private

---

[2] Capitalized terms used but not otherwise defined herein, shall have the meaning ascribed to such terms in the Sale Motion.

transfer of assets at bargain prices to the detriment of creditors and stakeholders.   To the contrary, the APA offers the Debtors' creditors and stakeholders both (i) a substantial recovery, by way of a firm purchase price, and (ii) the value-maximizing potential of higher and better offers at a public auction – in which anyone can participate, subject only to reasonable bid qualifications.   Critically, the APA is the only transaction to do so.

Nevertheless, the Committees continue to balk at the APA in favor of their own, competing Chapter 11 plans, both of which lack sufficient, committed funding (and, therefore, feasibility).   Indeed, both Committees filed scattershot objections to the Sale Motion, accusing the Debtors of, among other things, withholding access to diligence and attempting to consummate an insider transaction.   The Committee Objections are largely misleading, grossly inaccurate in some instances, and should be overruled for two primary reasons.

First, the APA is not an insider transaction.   The Stalking Horse Purchaser does not fall within any of the subcategories which make up the definition of "insider" under the Bankruptcy Code – a point that the Committees have yet to refute.   In addition, the shareholders of the Stalking Horse Purchaser do not exercise managerial control over the Debtors.   And, more importantly, even if the Stalking Horse Purchaser were an insider, the Bankruptcy Code does not forbid insider transactions; it simply subjects them to heightened scrutiny – a standard the proposed transaction unquestionably meets.   The APA was heavily negotiated by the Debtors' professionals at arm's length, and the Committees have no evidence to the contrary.

Second, contrary to the Committee Objections, the proposed bid procedures are fair, customary, and designed to maximize value to creditors through a competitive bidding process.  The CC Objection argues that the equity holders of the Stalking Horse Purchaser have somehow colluded in an effort to stifle competitive bidding and exclude the Museums from an auction process.  Nothing could be further from the truth.  The Debtors' professionals have repeatedly invited the Museums to participate in the competitive auction process and submit a topping bid.  The Museums have refused to do so, in each instance referring to their "unique" circumstances and purported inability to post a non-refundable deposit.  In reality, the Museums simply are unwilling to have any skin in the game – a decision which more appropriately reflects their own fundraising concerns rather than any legitimate grievances with the Debtors' proposed bidding procedures.

Likewise, the EC Objection falls flat and, in fact, presents a completely erroneous interpretation of the bidding procedures.  Specifically, the Equity Committee argues that, from June 14, 2018 (the date of the APA execution) through the conclusion of the proposed auction, the APA prohibits the Debtors from initiating contact with, soliciting officers from, or otherwise facilitating discussions or negotiations with, parties interested in submitting a competing transaction.  Much like the arguments presented in the CC Objection, nothing could be further from the truth.  Section 5.12 of the APA is clear that any prohibition against actively soliciting competing offers is limited to: (i) the time between the APA execution and the date the bidding procedures order is entered by the Court and (ii) after the date that the auction is closed.  Following the entry of the order approving the bidding procedures and until the auction is closed, there is no prohibition against the Debtors soliciting offers for a

competing transaction.  In fact, the proposed bidding procedures expressly provide that the Debtors intend to actively solicit offers for a competing transaction.  Thus, the EC Objection is simply wrong and, stripped of its erroneous interpretation of the APA, the Equity Committee lacks any legitimate argument that the bidding procedures were "strategically designed to limit competition and chill bidding."

In sum, the Committee Objections provide no legitimate basis on which to deny or otherwise modify the Sale Motion, APA, or any other supporting document.  For these reasons and as set forth more fully below, the Committee Objections should be overruled in their entirety and the Sale Motion should be approved.

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b).  Venue is proper in this district under 28 U.S.C. §§ 1408 and 1209.

## RELEVANT BACKGROUND

2.      On June 14, 2016 (the "Petition Date"), each of the Debtors filed a voluntary petition in this Court for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code").

3.      The Debtors continue to manage and operate their business as debtors in possession under Bankruptcy Code sections 1107 and 1108.

4.      On August 24, 2016, the United States Trustee appointed the Creditors' Committee and the Equity Committee (collectively, the "Committees") [D.E.  166, 167].

5.      On June 1, 2018, the Equity Committee filed a *Chapter 11 Plan of Reorganization Proposed by the Official Committee of Equity Security Holders of Premier Exhibitions, Inc.* (the "EC Plan") [D.E. 1045] and accompanying disclosure statement ("EC Disclosure") [D.E. 1044].

6.      On June 15, 2018, the Debtors filed the Sale Motion seeking approval of, *inter alia*, competitive bidding and sale procedures, the form of an APA, certain protections for the designated Stalking Horse Purchaser, a settlement with the PacBridge Parties, and authorization for the Debtors to sell the Transferred Assets to a Prevailing Bidder free and clear of all liens, claims, encumbrances and interests.

7.      On June 29, 2018, the Creditors' Committee filed a *Joint Chapter 11 Plan of Reorganization Proposed by the Official Committee of Unsecured Creditors, the Trustees of the National Maritime Museum, the Board of Trustees of National Museums and Galleries of Northern Ireland, and Running Subway Productions, LLC* (the "CC Plan") [D.E. 1085] and accompanying disclosure statement (the "CC Disclosure") [D.E. 1084].

8.      On July 25, 2018, the Court conducted a status conference during which it heard from all interested parties regarding proposed dispositions of the Debtors' assets.  And, on August 2, 2018, the Court entered its *Order on Status Conference* [D.E. 1147] (the "Status Conference Order"), pursuant to which it set a hearing for August 30, 2018 to consider the Sale Motion along with the adequacy of the EC Disclosure and CC Disclosure.

9.      On August 24, 2018 the Creditors' Committee filed its CC Objection; and, on August 27, 2018, the Equity Committee filed its EC Objection.  The Committee Objections both seek substantially the same relief – denial of the Debtors' Sale Motion.[3]

10.      On August 28, 2018, the Creditors' Committee filed a First Amended Joint Plan of Liquidation [DE 1176] and accompanying Disclosure Statement [DE 1177] (collectively, the "Amended CC Plan Documents").

11.      On August 29, 2018, the Equity Committee filed an Amended Chapter 11 Plan of Reorganization [DE 1182-1] and Amended Disclosure Statement [DE 1181-1] (collectively, the "Amended EC Plan Documents").

12.      The Amended EC Plan Documents and the Amended CC Plan Documents show that both Committees lack adequate, committed funding for their proposed transactions.

## REPLY

13.      The Committee Objections,[4] to a large extent, implicate the same two themes:[5] (i) the Debtors' proposed asset sale was unduly influenced by insiders and (ii) the proposed bidding procedures will stifle competitive bidding.  Accordingly, Sections (I) and (II) of this

---

[3] Although, facially, the CC Objection requests modification of the relief sought in the Sale Motion (rather than outright denial), the modifications the Creditors' Committee seeks would eviscerate the Sale Motion.  The CC Objection, therefore, functionally seeks denial of the Sale Motion.

[4] As noted above, Euclid filed an objection; however, its bases for objecting are subsumed entirely by the Committee Objections.  Thus, while the Debtors intend for this Reply to serve as a response to the substance of the Euclid Objection, there is no separate reference to it.

[5] Notably, both Committee Objections contain similar omissions regarding the Admiralty Court.  The CC Objection, for example, states that "the Museums and the Equity Committee have moved to intervene in the [Admiralty Court] action" but neglects to note that Judge Smith has agreed with the Court's jurisdictional analysis in the August 2, 2018 Scheduling Order.  *See* Transcript of Proceedings, dated August 21, 2018, attached hereto as **Exhibit 1**.

Reply respond to the themes shared among the Committee Objections, while the balance of the Reply addresses objection-specific allegations or contentions.

## I.    **INSIDER ALLEGATIONS**

14.    The Committee Objections both allege that the Debtors' APA is a sale to, or influenced by, insiders of the Debtors.  *See* EC Objection, at 13 (alleging that the APA was "negotiated by and among insiders of the Debtors."); CC Objection, at ¶ 9 fn. 4 ("[t]he parties disagree concerning whether the secured lender members are insiders by virtue of their having contributed their shares to a voting trust . . . controlled by the Debtors' CEO.").[6] The Committees' arguments miss the mark for several reasons.

15.    First, the proposed transaction under the APA is not a sale to an insider of the Debtor.[7]  An "insider" includes, in relevant part: (1) a director of the debtor; (2) an officer of the debtor;[8] (3) a person in control of the debtor; (4) a partnership in which the debtor is a general partner; (5) a general partner of the debtor; (6) a relative of a general partner,

---

[6] Both Committee Objections inaccurately assert that Mr. Bao controls a "voting trust" made up of shares contributed by, among others, the Secured Lenders.  The agreement, entitled a "Stockholders Agreement," is a fully revocable power of attorney designating Mr. Bao as the participants' agent.  It does not, in other words, affect a stock transfer and sever the participants' beneficial interests from the subject shares.  *Cf., e.g.*, *In re Morse*, 247 N.Y. 290, 297 (1928) ("[a] voting trust agreement confers on voting trustees the right to vote on stock transferred to them for such purpose, irrevocably for a definite period.  Stock transferred under such an agreement is canceled and trust certificates are issued by the trustees to the stockholders.  The right to vote is thereby separated from the beneficial ownership of the stock.").  Thus, the agreement does not create a voting trust.

[7] As an initial matter, an assessment of insider status is more appropriately reserved for preference actions under Section 547 of the Bankruptcy Code rather than asset sales under Section 363 of the Bankruptcy Code.  *Compare* 11 U.S.C. § 547(b)(4)(B) (prescribing different preference lookback periods for "insider[s]") *with* 11 U.S.C. § 363 (no use of the word "insider.").

[8] The CC Objection cites the erroneous testimony of Mr. McFarland, one of Debtors' counsel appearing before the Admiralty Court, for the proposition that Mr. Bao "may have a financial interest" in Apollo Global Management, LLC.  Mr. McFarland inadvertently misspoke – Mr. Bao does not now hold, nor has he ever held, an interest in Apollo.  Mr. McFarland has since corrected the record.  *See* Periodic Report of R.M.S. Titanic Inc [D.E. 1172-1].

director, officer, or person in control of the debtor; (7) an affiliate, or insider of an affiliate as if such affiliate were the debtor; or (8) a managing agent of the debtor.  11 U.S.C. § 101(31).  The Stalking Horse Purchaser unequivocally does not fall into any of the foregoing categories and is not, therefore, an "insider" within the meaning of the Bankruptcy Code.[9] And the shareholders of the Stalking Horse Purchaser do not exercise actual managerial control over the Debtors.

16.    More importantly, even assuming the Stalking Horse Purchaser fits within the definition of "insider" – and it does not – the Debtors' APA still surpasses the heightened scrutiny sometimes reserved for insider transactions.  The Bankruptcy Code does not delineate the boundaries of heightened scrutiny; however, certain courts have characterized it as requiring a showing that the "transaction is the result of bonafide [*sic*] arm's length transactions" and "that the assets are being sold for the highest price attainable."  *In re Tidal Constr. Co.*, 446 B.R. 620, 624 (Bankr. S.D. Ga. 2009).  Here, the Debtors will make that showing at the August 30, 2018 hearing to consider approval of the Sale Motion.

17.    Indeed, the APA is the <u>only</u> fully funded, committed offer for the Debtors' assets, notwithstanding over a years'-worth of extensive marketing efforts by the Debtors and their financial advisor, GlassRatner.  This alone supports a finding that the purchase price is the "highest price attainable."  *See id.* ("[b]ecause [the assets] have been exposed to

---

[9] The EC Objection states that the Secured Lenders are insiders because "each was a 'person in control of the Debtor' under 11 U.S.C. § 101(31)."  EC Objection, at 15.  This is both legally incorrect and logically inconsistent with the Equity Committee's later representation that "those shares are in a voting trust controlled by Daoping Bao."  EC Objection, at 19.  *See also Shubert v. Lucent Techs. Inc (In re Winstar Communs., Inc.)*, 554 F.3d 382, 396 n.5 (3d Cir. 2009) ("person in control" requires a finding of "day-to-day control, rather than some monitoring or exertion of influence regarding financial transactions in which the creditor has a direct stake.").

the market for an extended period of time without being purchased, I am convinced that the [debtor's] collateral is being transferred . . . for the highest price reasonably attainable. As such, this sale meets the higher scrutiny due insider sales."). Nonetheless, the APA remains subject to higher and better offers at an auction – thereby ensuring the highest purchase price possible.

18.     Further, the Debtors have been open and honest about the APA and its participants, fully disclosing all known relationships among parties. *See* Sale Motion, at ¶ 32. Finally, the APA was marketed through GlassRatner, negotiated by and between counsel for the Debtors and counsel for the APA counterparties, and approved by the Board of Directors of the Debtor.[10] The negotiations were extensive – covering virtually all material deal points, including purchase price, contingencies, bid protections, and the possible bankruptcy filing of certain Canadian entities – and entirely arm's-length.

19.     Altogether, this is more than adequate to withstand even heightened scrutiny. *See, e.g.*, *Mission Products Holdings, v. Old Cold LLC (in re Old Cold LLC)*, 558 B.R. 500 (B.A.P. 1st Cir. 2016) (upholding a sale of virtually all of the debtor's assets to the majority owner of the debtor's outstanding shares, where, among other things, the assets had been marketed by a financial advisor and the majority shareholder had recused himself from the sale process, been designated as the staking horse bidder, and later was the highest bidder at the auction). Accordingly, to the extent the Committee Objections rely on an allegation or finding of insider status, they should be overruled.

---

[10] Mr. Bao, an officer who also sits on the Board, was excluded from the vote on the APA to avoid even the appearance of any impropriety.

II.    **COMPETITIVE BIDDING**

20.    The Equity Committee asserts its first objection on the basis of perceived bid solicitation limitations or restrictions.  Specifically, the EC Objection quotes § 5.12 of the APA to create the impression that the APA prohibits the Debtors from soliciting competing bids for the majority of the sale process.  *See* EC Objection, at § A.i. ("[u]nder the APA the Debtors agreed that between the date of entry into the APA, June 14, 2018, through the conclusion of the auction, the **Debtors would not** '(A) *initiate contact with, or solicit or encourage submission of any inquiries* . . .") (emphasis in original).  This characterization of the APA is wrong.

21.    The APA does <u>not</u> prohibit the Debtors from soliciting inquiries, proposals, etc. "between the date of entry into the APA . . . through the conclusion of the auction." Instead, the APA – by its clear terms – prohibits the Debtors from soliciting only "between the date of [the APA] and the date the Bid[] Procedures Order is entered by the Bankruptcy Court" and then again "from and after the date the auction is declared closed."  APA, at § 5.12(a)(i), (ii).  The Debtors, in other words, are free to solicit between the entry of the Bid Procedures Order and the proposed auction – which dovetails with the entire purpose of having a sale subject to higher and better offers.  In fact, the Bid Procedures expressly contemplate that the Debtors will actively solicit offers for a competing transaction.  *See* Bidding Procedures, § III.A. ("[f]ollowing approval of the Bidding Procedures and until the Bid Deadline (as defined below), the Debtors intend to contact the Contact Parties to explore their interest and may initiate contact with, or solicit or encourage submission of any Qualified Bids by any person or otherwise facilitate any effort or attempt to make a Qualified

Bid."). The EC Objection's characterization of the solicitation provisions under the APA is inaccurate.

22.    Subsection (ii) of the EC Objection consists of substantially similar misrepresentations. The Equity Committee argues that "the Bid[] Procedures permit the Debtors to limit solicitation of bidders only to those potential bidders who have previously conducted due diligence *and been invited by the Debtors to bid*. *See* Sale Motion, at ¶ 36." EC Objection, at 10 (emphasis in original). Again, the Equity Committee's characterization of the Bid Procedures is wrong.[11] The Bid Procedures do <u>not</u> "limit solicitation of bidders to only those bidders who have previously conducted due diligence . . . ." Rather, the Bid Procedures provide that the Debtors may "contact the Contact Parties to explore their interest" <u>and</u> "may initiate contact with, or solicit or encourage submission of any Qualified Bids by any person or otherwise facilitate any effort or attempt to make a Qualified Bid." Sale Motion, Ex. A – 1, Bid Procedures, at § III.A.

23.    "Contact Parties" is defined in the APA as "parties whom the Debtors believe may potentially be interested in consummating, and whom the Debtors reasonably believe would have the financial resources to consummate, a competing transaction to that of the Stalking Horse Purchaser," and it includes approximately 140 parties, identified with the advice and input from both Committees.[12]  Sale Motion, Ex. A – 1, Bid Procedures, at §

---

[11] As an initial matter, paragraph 36 of the Sale Motion has very little to do with specific solicitation procedures – it is a charted summary of the Bid Procedures and, in any event, does not reference an invitation-only bid solicitation.

[12] *See* Deposition of Marshall Glade, dated August 24, 2018 (hereinafter, the "<u>Marshall Depo.</u>") at 16:21 – 17:4 ("in conjunction with the equity and the Debtor and the creditor's committee we developed a target list of – of potential buyers . . . I think we reached out to slightly more than 140 potential parties."). The Marshall Depo is attached hereto as **<u>Exhibit 2</u>**.

III.A. While the Equity Committee concludes that the "Debtors should be required to cast a wider net," it is difficult to imagine how the Debtors' net could be wider than "any person." Even so, the Debtors welcome input from the Equity Committee and its professionals regarding interested parties that are not already included within the list of Contact Parties – a list for which both Committees provided advice and input.

24.    There is, consequently, no basis to sustain the EC Objection on the basis of "restrictions on solicitation of competing bids," particularly in light of the fact that the actual language of the APA, Sale Motion, and supporting exhibits directly contradicts the Equity Committee's reading of it.

25.    In a similar vein, the CC Objection suggests that the equity holders of the Stalking Horse Purchaser have partnered to stymie competitive bidding and exclude the Museums from an auction process. *See* CC Objection, at ¶ 11. The Creditors' Committee offers no evidence or substantive argument in support of its theory. Contrary to the CC Objection, the Bid Procedures are quite customary and were designed to encourage a competitive bidding process rather than an exclusory one.[13]

26.    The CC Objection, essentially asks the Court to rewrite the bid procedures so that the Museums can purchase the Debtors' assets without any of the attendant risks or capital requirements of an interested bidder – that is, without participating in the auction process. Under the scheme the CC Objection proposes in conjunction with the CC Plan, the Museums can pursue the Debtors' assets via the CC Plan and yet (i) evade payment of the

---

[13] The Creditors' Committee's allegations regarding bid procedures designed to "stifl[e] competitive bidding" are particularly perverse considering the CC Plan would eliminate bid procedures altogether in favor of a private sale.

Good Faith Deposit that is otherwise required from bidders; (ii) avoid the break-up fee/expense reimbursement in the event its purchase is consummated; and (iii) use plan confirmation to ultimately trump any competing sale – even one for a higher purchase price. *See generally* CC Objection.  And if, for whatever reason, the Museums later fail to close the contemplated transaction, they are free to walk away without pecuniary harm.  The fact that the Museums find themselves in the "unique" circumstance of refusing to provide a non-refundable deposit or evidence of their financial ability to close a competing transaction is telling – the problem lies not with the bidding procedures but with the Museums' confidence in their ability to fund and close a deal.  In sum, the CC Objection seeks an order granting to the Museums the benefits of a transaction without the burdens and should be overruled.

## III.   SPECIFIC EQUITY COMMITTEE OBJECTIONS

### A.   Diligence Access.

27.    The Equity Committee's objections to the access requirements for the diligence room are unsupported by both law and fact and should be overruled.  Specifically, the Equity Committee objects to the Biding Procedures' requirement that potential bidders "present evidence of financial wherewithal *before* being admitted to the [diligence room]," opining that such a requirement is "contrary to typical procedure" and bid-chilling.  EC Objection, at 10 (emphasis in original).  Far from being "contrary to typical procedure," a requirement to show financial means prior to admission to a diligence room is commonplace. *See, e.g.*, *In re N. Am. Techs. Grp., Inc.*, Nos. 10-20071, 10-20072, 10-20073, 2010 Bankr. LEXIS 5976, at *19 (Bankr. E.D. Tex. July 21, 2010) (approving bid procedures that, among other things, restricted data room access to parties who provided "[s]atisfactory financial

information that demonstrates the person or entity's ability to close the purchase and perform all ongoing obligations associated therewith."). Moreover, GlassRatner registered two new users to the diligence room <u>after</u> the Debtors filed their Sale Motion – hardly evidence of a chilled bidding procedure.[14] Thus, there are no "due diligence limitations" that, in any way, support a legitimate objection.

### B.    *De Minimis* Typographical Errors Have been Corrected.

28.    The Equity Committee asserts further objections based on alleged "unreasonable financial protections" and "uniformity." As noted by the Equity Committee, the Debtors inadvertently included two different breakup fee calculations in the Bid Procedures: one as the greater of $500,000 or 3% of the Purchase Price; the other as the greater of $500,000 or 3% of the Purchase Price "set forth in any Prevailing Bid." After discovering the error, the Debtors promptly removed the language "set forth in any Prevailing Bid," as reflected in the Revised Bid Procedures Order[15] and the Redlined Revised Bid Procedures Order.[16] Other than the (now-corrected) inclusion of the additional language "set forth in any Prevailing Bid," the Equity Committee has not pointed to any further differences between the APA, Sale Motion, and supporting exhibits, and the Debtors are not aware of any. The Equity Committee's assertion that "there are significant differences among the" APA, Sale Motion, and supporting exhibits, such that they "have created confusion as to what procedure the Debtors seek to have approved" is therefore misplaced.

---

[14] *See* Diligence Room Record Excerpt attached hereto as **Exhibit 3**.
[15] The Revised Bid Procedures Order and all exhibits are attached hereto as **Exhibit 4**.
[16] The Redlined Revised Bid Procedures Order and all exhibits are attached hereto as **Exhibit 5**.

EC Objection, at 13.  Accordingly, there is no basis to sustain the EC Objection on account of perceived "unreasonable financial protections" or lack of "uniformity."

### C.    The APA Was Solicited, Negotiated, and Executed in Good Faith.

29.    The Equity Committee's final substantive objection accuses the Stalking Horse Purchaser and its equity holders, and possibly the Debtors, as lacking good faith in entering into and executing the APA.  The basis for this objection appears to be the document referred to by the Equity Committee as the "Private Equity Term Sheet."  *See* EC Objection, at 16. The "Private Equity Term Sheet" was a term sheet submitted by the Ad-Hoc Group in confidence to GlassRatner.  It lacked any financials (*i.e.*, no purchase price, or any other figure) but included the language, "[i]n the event insider-affiliated Equity Holders are interested in participating as Plan Sponsors, the percentage of ownership will be TBD but will be based on a capital contribution from each party that is mutually agreeable."  "Private Equity Term Sheet," at 3 fn.1 (emphasis added).  Relying on that language, the Equity Committee asserts that "Private Equity Funds specifically requested assistance from the Debtors to put them in touch with 'insider-affiliated Equity Holders' so that they might solicit them to be plan sponsors with the Private Equity Funds' plan to acquire the Debtors to the exclusion of all 'outside' equity holders."  EC Objection, at 16.

30.    Besides the fact that the Equity Committee's analysis is not even remotely supported by the text in footnote 1 of the "Private Equity Term Sheet," GlassRatner forwarded notice of the "Private Equity Term Sheet" to the Equity Committee's financial

advisors a mere two days after receipt.[17]    And, soon thereafter, counsel for the Equity Committee contacted the Debtors' counsel, Jeffrey Cavender,  to "get on a conference call to discuss the Apollo and Alta proposal [the "Private Equity Term Sheet"]."[18] Mr. Gurfein, in other words, had full knowledge of the "Private Equity Term Sheet" shortly after its inception – there is thus no discernable basis for the Equity Committee's suggestion that the document is now, somehow, evidence of foul play.

31.    Finally, and as discussed above, the arm's-length nature of every transaction involved in the APA is unimpeachable.  After GlassRatner conducted the marketing and drew the parties together, the parties – through counsel – spent a tremendous amount of time negotiating and drafting the terms of the APA.  Each side was represented by counsel who advocated zealously for his or her respective client, with the parties to the APA extensively negotiating the terms of the proposed transaction.  And, when the time came for the Board of Directors of the Debtors to vote on the APA, Mr. Bao was excluded from the vote.  There is, in other words, no evidence of anything but a good-faith, arm's-length transaction before the Court.  That the Equity Committee has "questions" regarding the formation of the Stalking Horse Purchaser is evidence of nothing – particularly considering that the Equity Committee has obtained significant discovery regarding the APA, term sheet, and sale process, including a four-hour deposition of Marshall Glade, the Debtors' financial advisor

---

[17] *Compare* Correspondence between Gilbert Li and Marshall Glade *et al.*, attached hereto as **Exhibit 6** *with* Correspondence between William McCaleb and Brendan Murphy, *et al.*, attached hereto as **Exhibit 7**.

[18] Correspondence between P. Gurfein and J. Cavender, attached hereto as **Exhibit 8**.

employed by GlassRatner.  The Equity Committee's objections based on good faith should,
therefore, be overruled.

## IV.    SPECIFIC CREDITORS' COMMITTEE OBJECTIONS

32.    Although styled as a "limited" objection, the CC Objection is anything but a
limited objection.  The CC Objection and accompanying proposed Order seek, among other
things, to strip the Stalking Horse Purchaser of its bid protections in the APA and force the
Debtors to provide the Seller Disclosure Letter to the Museums.  *See* CC Objection, at ¶
16(c), (d).  In addition, the CC Objection seeks to subjugate any asset sale to a Chapter 11
plan.  *See* CC Objection, Ex. 1 at ¶ 25 ("[t]o the extent that any chapter 11 plan confirmed
in these cases . . . alters, conflicts with or derogates from the provisions of this Bid[]
Procedures Order, the provisions of the order confirming the chapter 11 plan shall control.").

33.    Even more troubling, however, are the allegations in the CC Objection that
"the Debtors have refused to provide the Museums and Running Subway with reasonable
and necessary due diligence until the Museums fundraise the $19.2 million."  CC Objection,
at ¶ 6.  The contention that the Museums and Running Subway have been denied access to
the diligence in the Seller Disclosure Letter is patently false.  Likewise, the Museums'
statements, both in the CC Objection and in prior hearings before the Court, that they are
"willing to execute a confidentiality agreement," are misleading.  Entirely absent from the
CC Objection and prior statements made by the Museums' counsel is that the Museums
already have executed a non-disclosure agreement – over one year ago, on June 28, 2017.[19]

---

[19] *See* Confidentiality Agreement by and between Premier Exhibitions, Inc. and Royal Museums Greenwich,
dated as of June 28, 2017, attached hereto as **Exhibit 9**.

Moreover, the Museums have been accessing substantial diligence materials in a data room maintained by GlassRatner for some time. Dr. Fewster was granted access to the data room on July 4, 2017, and several members of the Museums' counsel subsequently requested and were granted access to the data room in September 2017.[20] In fact, GlassRatner's records reflect that counsel for the Museums downloaded a significant number of documents (approximately 500) in the data room on July 13, 2018.[21] Further, the Debtors' professionals have not been contacted by the Museums or any other plan proponent identifying a single diligence item that they were unable to locate in the data room.

34.    Thus, the Museums and Running Subway do not <u>need</u> the Seller Disclosure Letter to fully diligence their proposed transaction; they <u>want</u> the Seller Disclosure Letter to avoid the time and expense of sifting through diligence documents. All the while, the Museums refuse to provide a non-refundable deposit or participate in an auction process and, instead, seek to deny bid protections to the Stalking Horse Purchaser.

## CONCLUSION

Although both Committee Objections purport to provide various reasons in support of (i) denying the Sale Motion and (ii) allowing the EC Plan and CC Plan to go forward, neither has confronted the fact that there is only one transaction in front of the Court with adequate, confirmed funding: the APA. And, more to the point, the Debtors have affirmatively shown that the APA is a good-faith, arm's-length transaction, which is subject

---

[20] *See* Correspondence between GlassRatner and Davis Polk, and Correspondence between GlassRatner and Dr. Fewster, both attached hereto as **Exhibit 10.**

[21] *See* Diligence Room Record Excerpt, attached hereto as **Exhibit 11** (showing access to the diligence room by Davis Polk).

to higher and better offers through a public auction.  There is, therefore, no basis to jeopardize the only confirmed source of creditor recovery.

WHEREFORE, the Debtors seek entry of an Order: (i) overruling the Euclid Objection; (ii) overruling the CC Objection; (iii) overruling the EC Objection; (iv) granting the Debtors' Sale Motion; and (v) granting the Debtors such other and further relief as is right and just.

NELSON MULLINS RILEY
& SCARBOROUGH LLP


By        */s/ Daniel F. Blanks*
Daniel F. Blanks (FL Bar No. 88957)
Lee D. Wedekind, III (FL Bar No. 670588)
50 N. Laura Street, Suite 4100
Jacksonville, FL 32202
(904) 665-3656 (direct)
(904) 665-3699 (fax)
daniel.blanks@nelsonmullins.com
lee.wedekind@nelsonmullins.com

20

and

TROUTMAN SANDERS LLP
Harris B. Winsberg (GA Bar No. 117751)
Matthew R. Brooks (GA Bar No. 378018)
600 Peachtree Street NE, Suite 5200
Atlanta, GA 30308
(404) 885-3000 (phone)
(404) 962-6990 (fax)
harris.winsberg@troutmansanders.com
matthew.brooks@troutmansanders.com

*Counsel for the Debtors and Debtors in Possession*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using CM/ECF on August 30, 2018. I also certify that the foregoing document is being served this day on the following counsel of record via transmission of Electronic Filing generated by CM/ECF:

Jay B. Verona, Esq.
Shumaker, Loop & Kendrick, LLP
101 E. Kennedy Blvd., Suite 2800
Tampa, FL 33602
(813) 229-7600
jverona@slk-law.com
*Attorneys for George F. Eyde*
*Orlando, LLC and Louis J. Eyde*
*Orlando, LLC*

Jill E. Kelso, Esq.
Miriam G. Suarez, Esq.
Office of the United States Trustee
400 W. Washington Street, Suite 1100
Orlando FL 32801
(407) 648-6301 ext. 137
jill.kelso@usdoj.gov
Miriam.g.suarez@usdoj.gov
*Attorneys for Guy G. Gebhardt,*
*Acting U.S. Trustee for Region 21*

Scott M. Grossman, Esq.
Greenberg Traurig
401 East Las Olas Boulevard, Suite 2000
Fort Lauderdale, FL 33301
(954) 768-5212
grossmansm@gtlaw.com
*Attorneys for Lang Feng, Haiping Zou,*
*Jihe Zhang, and High Nature Holdings*
*Limited*

Ari Newman, Esq.
Greenberg Traurig, P.A.
333 S.E. 2nd Avenue, Suite 4400
Miami, FL 33131
(305) 579-0500
newmanar@gtlaw.com
*Attorneys for Lang Feng, Haiping Zou,*
*Jihe Zhang, and High Nature Holdings*
*Limited*

Jason B. Burnett, Esq.
GrayRobinson, P.A.
50 N. Laura Street, Suite 1100
Jacksonville, FL 32202
(904) 598-9929
jason.burnett@gray-robinson.com
*Attorneys for 417 Fifth Avenue Real*
*Estate, LLC*

Andrew T. Jenkins, Esq.
Bush Ross, P.A.
P.O. Box 3913
Tampa, FL 33601-3913
(813) 224-9255
ajenkins@bushross.com
*Attorneys for Bank of America, N.A.*

Matthew J. Troy, Esq.
U.S. Dept. of Justice
1100 L Street NW, Suite 10030
Washington, DC 20005
(202) 514-9038
matthew.troy@usdoj.gov
*Attorneys for the United States Department
of Commerce, National Oceanic and
Atmospheric Administration*

Kathy A. Jorrie, Esq.
Pillsbury Winthrop Shaw Pittman LLP
725 S. Figueroa Street, Suite 2800
Los Angeles, CA 90017
(213) 488-7251
Kathy.jorrie@pillsburylaw.com
*Attorneys for AEG Presents, LLC*

Brian D. Equi, Esq.
Goldberg Segalla, LLP
121 S. Orange Avenue, Suite 1500
Orlando, FL 32801
(407) 458-5608
bequi@goldbergsegalla.com
salamina@goldbergsegalla.com
sherndon@goldbergsegalla.com
*Attorneys for Structure Tone, Inc.*

J. Ellsworth Summers, Jr., Esq.
Burr Forman, LLP
50 N. Laura Street, Suite 3000
Jacksonville, FL 32202
(904) 232-7200
esummers@burr.com
*Attorneys for Michael J. Little*

Norman P. Fivel, Esq.
Assistant Attorney General
Office of the New York State
Attorney General
Civil Recoveries Bureau,
Bankruptcy Litigation Unit
The Capitol
Albany, NY 12224-0341
(518) 776-2264
norman.fivel@ag.ny.gov
*Attorneys for New York Dept. of Taxation
and Finance*

D. Marcus Braswell, Jr., Esq.
Sugarman & Susskind, P.A.
100 Miracle Mile, Suite 300
Coral Gables, FL 33134
(305) 529-2801
mbraswell@sugarmansusskind.com
*Attorneys for Theatrical Protective Union,
Local No. One, IATSE*

Chris Broussard, Esq.
Suzy Tate, P.A.
14502 N. Dale Mabry Highway, Suite 200
Tampa, FL 33618
(813) 264-1685
cbrouss@suzytate.com
*Attorneys for The Armada Group GP, Inc.*

Richard R. Thames, Esq.
Thames Markey & Heekin, P.A.
50 N. Laura Street, Suite 1600
Jacksonville, FL 32202
(904) 358-4000
rrt@tmhlaw.net
*Attorneys for Official Committee of
Unsecured Creditors*

Avery Samet, Esq.
Jeffrey Chubak, Esq.
Storch Amini & Munves PC
140 East 45th Street, 25th Floor
New York, NY 10017
(212) 490-4100
asamet@samlegal.com
jchubak@samlegal.com
*Attorneys for Official Committee of
Unsecured Creditors*

Peter J. Gurfein, Esq.
Roye Zur, Esq.
Landau Gottfried & Berger LLP
1801 Century Park East, Suite 700
Los Angeles, CA 90067
(310) 557-0050
pgurfein@lgbfirm.com
rzur@lgbfirm.com
*Attorneys for Official Committee of Equity Security
Holders of Premier Exhibitions, Inc.*

Jacob A. Brown, Esq.
Katherine C. Fackler, Esq.
Akerman LLP
50 N. Laura Street, Suite 3100
Jacksonville, FL 32202
(904) 798-3700
jacob.brown@akerman.com
katherine.fackler@akerman.com
*Attorneys for the Official Committee of
Equity Security Holders of Premier
Exhibitions, Inc.*

Skyler M. Tanner, Esq.
Lane Powell PC
601 SW Second Avenue, Suite 2100
Portland, OR 97204
tanners@lanepowell.com
beldingt@lanepowell.com
docketing-pdx@lanepowell.com
*Attorneys for Oregon Museum of Science and
Industry*

T. David Mitchell, Esq.
Brenner Kaprosy Mitchell, L.L.P.
30050 Chagrin Blvd., Suite 100
Pepper Pike, OH 44124
(216) 292-5555
tdmitchell@brenner-law.com
*Attorneys for CRI Properties, Ltd.*

Howard Siegel, Esq.
945 McKinney Street, PMB 434
Houston, TX 77002
(713) 984-4801
howard@eucinv.com
*Attorney for Euclid Investments, LP
And Euclid Claims Recovery LLC*

Susan R. Sherrill-Beard, Esq.
U.S. Securities and Exchange Commission
Office of Reorganization
950 East Paces Ferry Road, N.E.
Suite 900
Atlanta, GA 30326
(404) 842-7626
sherrill-beards@sec.gov
atlreorg@sec.gov
*Attorneys for U.S. Securities and
Exchange Commission*

Garrett A. Nail, Esq.
John F. Isbell, Esq.
Thompson Hine LLP
3560 Lenox Road, Suite 1600
Atlanta, GA 30326
(404) 541-2900
garrett.nail@thompsonhine.com
john.isbell@thompsonhine.com
*Attorneys for Bay Point Capital Partners, LP*

Steven R. Fox, Esq.
Fox Law Corporation
17835 Ventura Blvd., Suite 306
Encino, CA 91316
srfox@foxlaw.com
*Attorneys for Titanic Entertainment Holdings*

Stephen D. Busey, Esq.
Asghar A. Syed, Esq.
Smith Hulsey & Busey
225 Water Street, Suite 1800
Jacksonville, FL 32202
(904) 359-7700
busey@smithhulsey.com
asyed@smithhulsey.com
*Attorneys for the Ad Hoc Group of Equityholders*

Jennifer Feldsher, Esq.
David L. Lawton, Esq.
Bracewell LLP
1251 Avenue of the Americas
New York, NY 10020
(212) 508-6100
Jennifer.feldsher@bracewell.com
David.laweton@bracewell.com
*Attorneys for the Ad Hoc Group of Equityholders*

Patricia Ann Redmond, Esq.
Stearns Weaver, et al.
150 West Flagler Street, Suite 2200
Miami, FL 33130
(305) 789-3200
predmond@stearnweaver.com
*Attorneys for the Trustees of the National Maritime Museum*

Timothy Graulich, Esq.
James I. McClammy, Esq.
Mara Theophila, Esq.
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
(212) 450-4000
Timothy.graulich@davispolk.com
James.mcclammy@davispolk.com
Mara.theophila@davispolk.com
*Attorneys for the Trustees of the National Maritime Museum*

Jason B. Burnett, Esq.
Ashlea A. Edwards, Esq.
GrayRobinson, P.A.
50 N. Laura Street, Suite 1100
Jacksonville, FL 32202
(904) 598-9929
jason.burnett@gray-robinson.com
ashlea.edwards@gray-robinson.com
*Attorneys for Ramparts, Inc. d/b/a Luxor Hotel and Casino*

Steven Z. Szanzer, Esq.
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
(212) 450-4000
Steven.szanzer@davispolk.com
*Attorneys for Royal Museum Greenwich*

**Via U.S. Mail**

A-1 Storage and Crane
2482 197th Avenue
Manchester, IA 52057

A.N. Deringer, Inc.
PO Box 11349
Succursale Centre-Ville
Montreal, QC H3C 5H1

Broadway Video
30 Rockefeller Plaza
54th Floor
New York, NY 10112

Dentons Canada LLP
250 Howe Street, 20th Floor
Vancouver, BC V6C 3R8

Expedia, Inc.
10190 Covington Cross Drive
Las Vegas, NV 89144
Gowlings
550 Burrard Street
Suite 2300, Bental 5
Vancouver, BC V6C 2B5

Kirvin Doak Communications
5230 W. Patrick Lane
Las Vegas, NV 89118

Morris Visitor Publications
543 Broad Street
Augusta, GA 30901

National Geographic Society
1145 - 17th Avenue NW
Washington, DC 20036

ABC Imaging
5290 Shawnee Road, Suite 300
Alexandria, VA 22312

ATS, Inc.
1900 W. Anaheim Street
Long Beach, CA 90813

CBS Outdoor/Outfront Media
185 US Highway 48
Fairfield, NJ 07004

Enterprise Rent-A-Car Canada
709 Miner Avenue
Scarborough, ON M1B 6B6

George Young Company
509 Heron Drive
Swedesboro, NJ 08085
Hoffen Global Ltd.
305 Crosstree Lane
Atlanta, GA 30328

MNP LLP
15303 - 31st Avenue
Suite 301
Surrey, BC V3Z 6X2

NASDAQ Stock Market, LLC
805 King Farm Blvd.
Rockville, MD 20850

NYC Dept. of Finance
PO Box 3646
New York, NY 10008

PacBridge Limited Partners
22/F Fung House
19-20 Connaught Road
Central Hong Kong

Screen Actors Guild
1900 Broadway
5th Floor
New York, NY 10023

Sophrintendenza Archeologica
di Napoli e Pompei
Piazza Museo 19
Naples, Italy 80135

Time Out New York
405 Park Avenue
New York, NY 10022

TSX Operating Co.
70 West 40th Street
9th Floor
New York, NY 10018

WNBC - NBC Universal Media
30 Rockefeller Center
New York, NY 10112

United States Attorney's Office
Middle District of Florida
300 N. Hogan Street, Suite 700
Jacksonville, FL 32202


B.E. Capital Management Fund LP
Thomas Branziel
228 Park Avenue South, Suite 63787
New York, NY 10003
***Creditor Committee***

Pallet Rack Surplus, Inc.
1981 Old Covington Cross Road NE
Conyers, GA 30013

Seaventures, Ltd.
5603 Oxford Moor Blvd.
Windemere, FL 34786

Syzygy3, Inc.
231 West 29th Street
Suite 606
New York, NY 10001

TPL
3340 Peachtree Road
Suite 2140
Atlanta, GA 30326

Verifone, Inc.
300 S. Park Place Blvd.
Clearwater, FL 33759

Jonathan B. Ross, Esq.
Gowling WLG (Canada) LLP
550 Burrard Street, Suite 2300, Bentall 5
Vancouver, BC V6C 2B5
Christine R. Etheridge, Esq.
Bankruptcy Administration
Wells Fargo Vendor Financial Services, LLC
PO Box 13708
Macon, GA 31208

TSX Operating Co., LLC
c/o James Sanna
70 W. 40th Street
New York, NY 10018
***Creditor Committee***

Dallian Hoffen Biotechnique Co., Ltd.
c/o Ezra B. Jones
305 Crosstree Lane
Atlanta, GA 30328
***Creditor Committee***

AEG Presents LLC
c/o Managing Member
800 W. Olympic Blvd.
Suite 305
Los Angeles, CA 90015

AEG Presents LLC
c/o CT Corporation System,
Registered Agent
ATTN: Amanda Garcia
818 West Seventh Street
Suite 930
Los Angeles, CA 90017

AEG Presents LLC
c/o Managing Member
5750 Wilshire Blvd.
Suite 501
Los Angeles, CA 90036-3638

AEG Presents LLC
c/o Managing Member
425 W. 11th Street
Los Angeles, CA 90015-3459

*/s/ Daniel F. Blanks*
Attorney

~#4850-3589-9761 ~