## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## <u>JACKSONVILLE DIVISION</u>

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 3:16-bk-2230-PMG |
|  | ) | Chapter 11 |
| RMS TITANIC, INC., *et al.*,[1] | ) | Jointly Administered |
| Debtors. | ) |  |
|  | ) | Re: ECF Nos. 1275-76 |

## CREDITORS' COMMITTEE'S OBJECTION TO
## LANDAU GOTTFRIED & BERGER LLP'S AND AKERMAN LLP'S
## <u>FIFTH INTERIM FEE APPLICATIONS</u>

The Official Committee of Unsecured Creditors ("<u>Creditors' Committee</u>") objects

to the fifth interim fee applications of Landau Gottfried & Berger LLP ("<u>LGB</u>") and

Akerman LLP ("<u>Akerman</u>"), both counsel for the Official Committee of Equity Security

Holders ("<u>Equity Committee</u>"), and states:

## <u>INTRODUCTION</u>

1.      During these cases the Equity Committee repeatedly represented that its

constituency was the "real stakeholder" because, for example, "the Debtors' assets … far

exceed the claims filed in the case" [ECF No. 380, ¶¶15, 26-28; ECF No. 407, ¶11].

2.      By now it is clear that equity is out of the money.[2]  That much should have

been clear to the Equity Committee, at the latest, when PacBridge Capital Partners (HK)

---

[1] The Debtors, and the last four digits of their respective Federal tax identification numbers, are: RMS Titanic, Inc. (3162); Premier Exhibitions, Inc. (4922); Premier Exhibitions Management, LLC (3101); Arts and Exhibitions International, LLC (3101); Premier Exhibitions International, LLC (5075); Premier Exhibitions NYC, Inc. (9246); Premier Merchandising, LLC (3867); and Dinosaurs Unearthed Corp. (7309).  The Debtors' mailing address is 3045 Kingston Court, Suite I, Peachtree Corners, Georgia 30071.

[2] *E.g.*, July 25, 2018 Hr'g Tr. 13:21-24 [ECF No. 1153] (explaining why a transaction would have to clear $24 million before there could be a distribution to equity); Aug. 30, 2018 Hr'g Tr. 26:7-9 [ECF No. 1196] (testimony of Marshall Glade, placing threshold at $22.5-$24.5 million).  The purchase price under the PAHL transaction is $19.5 million.  The Equity Committee projects

Ltd. ("PacBridge") walked away from the sale process after the Equity Committee leveled baseless allegations of insider misconduct in October 2017, GlassRatner Advisory & Capital LLC ("GlassRatner") was unable to line up a substitute transaction in the months that followed, and the February 2018 mediation (attended by PacBridge and the ad hoc equity group) did not yield an agreed sale transaction.

3.      The Equity Committee sought to address its out of the money status by committing significant resources to the following strategies:

(a)      further injecting itself into the sale process in the hope it would improve the result, notwithstanding the Equity Committee's atrocious track record;

(b)      investigating and prosecuting a D&O action against the Debtors' CEO Daoping Bao ("Bao") and other directors and officers which action, at best, is premised on a damages theory that incorrectly presumes that equity is in the money, and at worst, is being advanced in furtherance of a personal vendetta by the Equity Committee's chairman Andrew Shapiro against Bao and directors who ignored a loan proposal made by Mr. Shapiro prior to the Debtors' November 2015 merger with DinoKing Tech Inc. ("DinoKing"); and

(c)      terminating its commitment under the plan support agreement, dated May 17, 2017 [ECF No. 587-1] ("PSA") to support a sale of the stock of Debtor RMS Titanic ("RMST") and substantially all of the Debtors' remaining assets, and instead proposing a plan that contemplated an auction sale of the so-called French artifacts, notwithstanding language in the Covenants and Conditions (reported at 742 F. Supp. 2d

---

proceeds of $2-$4 million from the D&O action [ECF No. 1179-3]. This is likely overly optimistic as discussed below, but still does not result in a distribution to equity except in the unlikely event that the very upper end of the range is achieved.

809-24) ("C&Cs") requiring that the French and American artifact collections be curated and conserved together.

4.      LGB and Akerman also billed an extraordinary amount of time to keeping Mr. Shapiro and other committee members apprised of their efforts in prosecuting these strategies.

5.      Fees for time devoted to the foregoing during the fifth and prior interim fee periods have not yielded a single benefit to the estate and are not compensable under Bankruptcy Code sections 330 and 328. Given the amount of non-compensable time on account of which the Equity Committee's attorneys have already been paid pursuant to the interim compensation order [ECF No. 141], notwithstanding that the Court stopped entering orders on interim fee applications in mid-2017, LGB's and Akerman's fifth interim fee applications should be denied to the extent fees and expenses covered thereby have not already been paid.  Alternatively, consideration of said interim fee applications should be deferred until final fee applications are filed.

## BACKGROUND

### I.      THE DEBTORS' CAPITAL STRUCTURE

6.      These cases were filed June 14, 2016 due to an "incredibly unprofitable" lease the Debtors entered into for their "Saturday Night Live: The Experience" exhibition in New York, which opened May 2015 [ECF No. 8, ¶23].

7.      The Debtors incurred $3 million in prepetition secured debt, pursuant to three separate $1 million secured promissory notes.

8.      The Debtors project allowed unsecured claims of around $12 million. *E.g.*, July 25, 2018 Hr'g Tr. 13:9-15.  The New York landlord has an allowed $5.5 million claim [ECF No. 973].

9.      Debtor Premier Exhibitions, Inc. ("PRXI"), the corporate parent of the other Debtors, has 9,373,116 outstanding shares which trade publicly under ticker symbol PRXIQ.

10.     In connection with PRXI's prepetition merger with DinoKing, 1,271,994 shares were awarded to Bao and 162,726 shares were awarded to Nancy Brenner (13.6% and 1.7%, respectively).  Bao also has voting control over 3,013,193 shares (32.1%) owned by the secured lenders, and Ms. Brenner's shares (together with his own shares, 47.5%). (Schedule 13D, an excerpt of which is annexed hereto as Ex. 1.) 1,520,662 additional shares (16.2%) are owned by funds managed by Alta Fundamental Advisers LLC and Apollo Global Management LLC [ECF No. 862, Ex. A], both members of Premier Acquisition Holdings LLC ("PAHL"), the purchaser of PRXI's shares in RMST and substantially all of the Debtors' assets.  Accordingly, Bao, Alta, and Apollo collectively own and/or control 64% of outstanding shares.

11.     On August 24, 2018, the Equity Committee was formed [ECF No. 167].

12.     Lawndale Capital Management LLC, whose principal is Mr. Shapiro, the Equity Committee's chairman, owns 253,683 shares (2.7%) [ECF No. 423, Ex. D]. The Equity Committee's remaining four members collectively own 266,073 shares (2.8%). (*Id.*)

## II.      THE EQUITY COMMITTEE'S CONDUCT IN THESE CASES

### A.      First and Second Interim Fee Period: September 2016-April 2017

13.     The Debtors' initial sale strategy was to sell a limited number of the so-called French artifacts recovered in the 1987 expedition, and pay creditors from proceeds of the same [ECF No. 28, ¶24].

4

14.     After the official committees were formed, which followed the objection of the U.S. Department of Commerce to the above-described sale [ECF No. 73], the Court's decision on the Debtors' initial sale motion [ECF No. 102], and RMST's commencement of the associated action against the Republic of France (No. 3:16-ap-183), both official committees advised the Debtors that an alternative to a limited, French artifact sale should be considered; namely, a sale of substantially all of the Debtors as a whole.

15.     The Debtors represented as early as October 2016 that they were seeking to employ GlassRatner as financial advisor to help formulate and execute said alternative. Oct. 25, 2016 Hr'g Tr.  10:5-11:8 [ECF No. 321].

16.     The Debtors also emphasized then, and at the subsequent January 9, 2017 exclusivity hearing, that their underlying exhibition business simply was not profitable enough to pay professional fees and expenses in these cases and *RMST v. The Wrecked and Abandoned Vessel*, No. 2:93-cv-902 pending in the U.S. District Court for the Eastern District of Virginia.

17.     Now, both official committees objected to an exclusivity extension prior to the January 9, 2017 hearing [ECF No. 380, 402], on the ground that the Debtors were not then doing enough to pursue the so-called "Plan B."

18.     The Equity Committee's conduct, however, went well beyond that and it inappropriately sought to inject itself into all aspects of these cases.  Among other things, the Equity Committee: (a) opposed the Debtors' employment of GlassRatner as financial advisor [ECF No. 286], even as the Debtors represented that they were looking to GlassRatner to help it implement a Plan B; (b) moved to intervene in the French adversary proceeding [Adv. Pro. ECF No. 19], notwithstanding that the proceeding was commenced

in furtherance of a strategy that contemplated a sale of just French artifacts (not Plan B); (c) moved to extend the bar date so it could file a claim, notwithstanding that official committees exist by virtue of Bankruptcy Code section 1102 and are not creditors [ECF No. 295, later withdrawn]; (d) filed multiple, lengthy additional exclusivity objections in addition to that cited above [ECF Nos. 266, 284, 407]; (e) added an extra $25,000/month to the professional fee burn through employment of its own financial advisor [ECF Nos. 313, 351-1, 371, 612, 652]; (f) (ironically) objected to the Debtors' professional fees [ECF No. 375]; and (g) took substantial document discovery principally concerning the Debtors' prior attempt to auction the Titanic artifacts and in connection with its D&O investigation [*e.g.*,ECF Nos. 397-98, 459-60, 467, 577, 611] (document subpoenas).

19.    It was not until the Debtors and the official committees agreed to enter into the PSA in May 2017 that the Equity Committee permitted the Debtors to run a marketing and sale process permitting a sale of RMST's stock and substantially all of the Debtors' remaining assets.

20.    For services rendered from September 2016-April 2017, LGB sought allowance of $534,703 in fees and $6,046.92 in expenses, and Akerman sought allowance of $368,928 in fees and $4,049.10 in expenses [ECF Nos. 383-84, 609-10].  Their interim fee applications were granted in full [ECF Nos. 495, 507, 658, 664] and the requested fees and expenses paid.

### B.    Third and Fourth Interim Fee Periods: May 2017-December 2017

21.    Notwithstanding that by the PSA the Debtors and official committees agreed to support a marketing and sale process for a "Complete Sale" of the Debtors' assets (defined as the "sale of (a) the common shares of RMST or the entire artifact collection held by [it], and (b) the operations of PRXI and its subsidiaries … in accordance with …

the Complete Sale Term Sheet" annexed to the PSA) that would be run by GlassRatner, the Equity Committee's attorneys managed to accrue substantial sale-related legal spend by injecting themselves into virtually every aspect of the process. Said involvement in the sale process destroyed an extraordinary amount of value, as described below.

22.    The milestones set forth in the PSA were extended on consent of the parties because no workable letter of intent had been submitted by the July 21, 2017 deadline under the PSA for submission of the same.

23.    On October 3, 2017—roughly two weeks after a stalking horse was supposed to be designated under the PSA's contemplated timetable—a revised sale term sheet was submitted by PacBridge, the financial advisor to Dinoking, which had merged into PRXI less than a year before the petition date, and two of the Debtors' secured lenders. The term sheet contemplated a sale of all of the Debtors' assets, in exchange for $30 million less a credit bid in the amount of the value of the purchasers' secured claims (inclusive of postpetition interest and attorneys' fees) and PacBridge's $1.2 million unsecured claim. It also provided for cancellation of the secured lenders' 3,013,193 PRXI shares and Bao's 1,271,991 shares (together, 46% of the outstanding float), and for Debtors' cash on hand to be excluded from the purchased assets. Lastly the transaction would be made subject to higher and better offers. A copy of the term sheet is annexed hereto as Ex. 2. Marshall Glade of GlassRatner testified "the implied value [of this offer] was something around $40 million provid[ing] a recovery to the equity." Aug. 30, 2018 Hr'g Tr. 35:17-19.

24.    Notwithstanding the outsized size of the Equity Committee's attorneys' interim fee applications covering the period September 2016-October 2017, a transaction

at that level would have resulted in enough cash to pay all claims in full, including all professional fees and expenses.

25.     By letter to Debtors' counsel, sent October 11, 2017, the Equity Committee accused Bao and PacBridge of misconduct, because the term sheet included a Footnote stating that the purchaser contemplated issuing equity to Bao and a secured lender.  The subject letter, and follow-up correspondence, were annexed as Ex. B to the Debtors' prior motion to reconsider [ECF No. 1114-2].

26.     PacBridge reacted by pulling out of the sale process.  Aug. 30, 2018 Hr'g Tr. 35:20-39:3 (testimony of Marshall Glade) (Q: "Did you have any discussion with PacBridge about why they rescinded the offer?" A: "Yes.  They said they did not -- they were concerned about any bad press that they may receive regarding this and were not interested in lengthy litigation"); Oct. 18, 2018 Hr'g Tr. 30:15-32:10 (testimony of Giovani Wong, PacBridge's principal) ("As foreign investors, we do not understand the Chapter 11 process.  We did not understand that, and we were not prepared to quantify and understand the risk [of moving forward in the face of the Equity Committee's demands/threats] and we decided to step back"), annexed hereto as Ex. 3.[3]  *See also* ECF No. 1114-2, pp.16-17 of 18 (E-mail of Stephen Roach, then of Troutman Sanders) ("Scott Grossman, counsel for PacBridge, informed us today that PacBridge is not interested in pursuing the stalking horse designation at this time.  Scott said they are not comfortable with the process and indicated

---

[3] Mr. Wong also testified that following transmission of the Equity Committee's letter to the Debtors, "We also had a call with the chair of the Equity Committee [Mr. Shapiro], which represented to us that if we were ultimately the winners of the stalking horse process, the auction process, that he would pursue other legal action against us."  Oct. 18, 2018 Hr'g Tr. 31:15-19.

that the source of their concerns is the Equity Committee's letter raising issues with the sale process").

27.     Mr. Glade further testified that he knew the Equity Committee's allegations were unfounded because Debtors' counsel "Mr. Cavender ran an internal investigation of the company.   Additionally, my personal knowledge of the marketing process and conversations with the potential buyer indicated none of those actions [insider misconduct] existed."   Aug. 30, 2018 Hr'g Tr. 37:20-38:2.  *See also* ECF No. 1114-2, pp.16-17 of 18 (E-mail of Jeffrey Cavender) (describing the Equity Committee's letter as "baseless accusations"); Oct. 18, 2018 Hr'g Tr. 31:24-32:1 (testimony of Giovani Wong that there was no truth to the Equity Committee's allegations).

28.     The Equity Committee's conduct effectively reset the sale process and damaged Debtors' unsecured creditors, in addition to its own constituency, as none of the other "around five" (Aug. 30, 2018 Hr'g Tr. 34:25) letters of intent then submitted contemplated a purchase price anywhere near that PacBridge had proposed.

29.     That is how, at the end of October 2017—after the Debtors were  supposed to have secured entry of a bid procedures order and proposed a liquidating plan and disclosure statement under the PSA's timetable—it became necessary to move to sell the Debtors' assets without a stalking horse in place [ECF No. 811], and then proceed to mediation when the motion was withdrawn [ECF No. 863] in December 2017 after the National Maritime Museum moved to withdraw the reference of and transfer the resulting sale proceeding [ECF Nos. 853-54].

30.     For services rendered from May 2017-December 2017, LGB sought allowance of $382,875 in fees and $12,441.41 in expenses, and Akerman sought allowance

of $170,322.50 in fees and $7,870.05 in expenses [ECF Nos. 759-60, 948-49]. No order on those interim fee applications was entered.[4] Notwithstanding this, pursuant to the interim compensation order LGB and Akerman have been paid 80% of fees and 100% of expenses requested for said period. Accordingly, of the fees and expenses sought for said period LGB has already been paid $318,741.41 and Akerman has already been paid $144,128.05.

### C.   Fifth Interim Fee Period: January 2018-October 2018

31.   The Equity Committee tried to dig itself out of the hole it created principally through three strategies: further injecting itself into the sale process; prosecuting claims against directors and officers; and prosecuting confirmation of a plan premised on a postconfirmation auction sale of the French artifacts. Of the $547,492.10 in fees sought by LGB for the fifth interim fee period, $404,611.10 (74%) was billed to task codes associated with those strategies. Of the $283,361.50 in fees sought by Akerman for said period, $194,056.50 (68%) was billed to associated task codes. $119,924.50 (52%) of the $232,186 balance (total fees sought by LGB and Akerman ($830,853.60) less time billed under the referenced task codes) was billed to communications with the Equity Committee, principally its chairman Mr. Shapiro, concerning the foregoing, and to a much lesser degree other shareholders.

---

[4] The Creditors' Committee did not object, as doing so would have required disclosure of details concerning the precarious state of the sale process which the committee preferred remain nonpublic for a variety of reasons, and interim fee awards are subject to disgorgement. *E.g.*, *In re CHC Indus., Inc.*, No. 03-20775, 2006 WL 4968122, at *4 (Bankr. M.D. Fla. Sept. 5, 2006) (Glenn, J.) (quoting *In re Mariner Post-Acute Network, Inc.*, 257 B.R. 723, 730 (Bankr. D. Del. 2000)) ("all professional fees which are paid under sections 328, 330 or 331 are subject to the Bankruptcy Court's inherent authority to order disgorgement"), motion to reconsider denied, 381 B.R. 385 (Bankr. M.D. Fla. 2007).

32.  Of the $547, 492.10 in fees and $16,615.92 in expenses sought by LGB for the fifth interim fee period, LGB has been paid $159,332.10 pursuant to the interim compensation order.  Of the $283,361.50 in fees and $16,958.05 in expenses sought by Akerman for said period, Akerman has been paid $81,202.35.

      1.    Asset Disposition

33.  LGB billed $111,618 and Akerman billed $89,120.50 under the Asset Disposition task code.

34.  Some of this time was devoted to monitoring the docket, reviewing letters of intent, conferring the Equity Committee's financial advisor, and reviewing the Debtors' sale motion and marking up the then-proposed bid procedures, fees that are customarily allowable.

35.  However, that is not how over $200,000 in sale-related fees accrued.  LGB states in its interim fee application that it incurred sale related fees principally by: (a) directly engaging with potential purchasers and voicing (unfounded) concerns about how GlassRatner was running the sale process; and (b) taking discovery on how GlassRatner was running the sale process and PAHL's good faith (which also resulted in accrual of a nearly $40,000 indemnification claim, ECF No. 1273, and would not have changed the purchase price even had the Court denied PAHL Bankruptcy Code section 363(m)-(n) findings); (c) opposing the sale motion so as to support the Equity Committee's plan (discussed below); and (d) moving to intervene in the Virginia District Court action, which motion was withdrawn a week after the hearing to consider bid procedures and the official committees' respective disclosure statements.  (LGB Interim Fee App. ¶¶37-40.)  Time detail annexed to said application confirms as much.

36.     Akerman does not even articulate what sale-related services it rendered in its interim fee application.    Rather, the description of time billed under the Asset Disposition task code simply identifies events that transpired during the interim fee period. (Akerman Interim Fee App. ¶¶56-65.)   Time detail from March 2018 on, however, shows it devoted considerable resources to sale-related discovery and objections.   Its services duplicated those of LGB in contravention of 330(a)(4)(A) (or vice versa).

2.     Plan and Disclosure Statement

37.     LGB billed $266,099.10 and Akerman billed $60,023 under the Plan and Disclosure Statement task code.

38.     The Court is well aware of issues surrounding the Equity Committee's proposed chapter 11 plan, having denied approval of the disclosure statement on multiple grounds, including that the plan was not likely to "result in a sale that may be approved by the [Virginia] District Court" [ECF No. 1199, p.2].

39.     Significantly, the Equity Committee knew its plan would have violated the C&Cs well before it proposed the same.  Its sole argument why the plan was confirmable insofar as the C&Cs are concerned is that "the Fourth Circuit has held, in Titanic 2006 [reported at 435 F.3d 521], that the District Court does not have jurisdiction over the French Artifacts" [ECF No. 1179, p.16 of 60].

40.     This argument was unworkable from the start. The referenced 2006 decision held the Virginia District Court lacked constructive in rem jurisdiction over the French artifacts.   However, the C&Cs—under which RMST agreed "to the maximum extent possible and consistent with reasonable collections management practices" to curate and conserve the French and American collection "together … as an integral whole" (C&C § III.A)—were negotiated and approved two years later. *RMST v. Wrecked and Abandoned*

*Vessel*, 742 F. Supp.2d 784, 793 n.10 and accompanying text (E.D. Va. 2010) (C&Cs were negotiated by RMST and NOAA and agreed to in 2008 in a process overseen by District Judge Smith).

41.    Significantly, by the C&Cs RMST submitted to the Virginia District Court's in personam jurisdiction "for the purpose of oversight of compliance with" the C&Cs and agreed said court would retain jurisdiction over "[a]ny controversy or claim arising out of or relating to" the C&Cs.  (C&C §§ V.F.2, VIII.B.)  It is difficult to understand how that does not constitute consent to jurisdiction for purposes of enforcing the above-quoted C&C clause requiring that the two collections be kept together.  *E.g.*, *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932 (2015) ("Adjudication by consent is nothing new").  If it were determined that RMST consented to jurisdiction then it would be impossible to avoid the requirements of C&C § III.A (quoted above), given the existence of a prior proposal for keeping the French and American collections together—the Asset Purchase Agreement with PAHL.[5]

42.    Indeed, that is why the Equity Committee advocated for, and agreed in the May 2017 PSA to support, a sale process that contemplated a sale of the entire Titanic artifact collection, prior to the Equity Committee's blowing up the sale process in October 2017.  The Equity Committee only proposed its plan when it became apparent that the post-October 2017 sale and marketing process would not yield a transaction that would generate proceeds sufficient to yield a distribution to equity.

43.    The Court also found the Equity Committee's plan unworkable because it lacked adequate funding, and support from the New York landlord [ECF No. 1199, p.3].

---

[5] The Creditors' Committee's plan would have resulted in the two collections remaining together.

Well over $300,000 in interest had accrued on the fully-drawn $5 million DIP loan by the disclosure statement hearing.  The Equity Committee's plan budgeted just $500,000 to $1 million for "Incremental Legal Fees (e.g. Contested Right to Sell)" "in the event that the right to sell certain French artifacts is challenged" [ECF No. 1179-3].  This estimate is astonishingly low given fees billed to date by the Equity Committee; that District Judge Smith previously made clear she would enforce the C&Cs, meaning success, if achievable, would need to be reached on appeal; and NOAA previously represented it would challenge and seek a stay of any auction sale of the French artifacts [ECF No. 1120], and further would not need to post a bond under Rule 65.

3.    D&O Investigation/Action

44.    LGB billed $15,424.50 under the Asset Analysis and Recovery task code (analysis of D&O claims) and $11,469.50 under the Litigation/Adversary Proceeding task codes (attention to D&O adversary proceeding).  Akerman billed $44,913 under the task code Investigation and Pursuit of Securities and Other Litigation Claims (also relating to D&O investigation and action).[6]

45.    The results of the investigation were the Complaint filed by the Equity Committee (No. 3:18-ap-64).

46.    The Complaint alleges, in substance, that Mark Sellers, who owned and managed Sellers Capital, a hedge fund that owned nearly one-third of the outstanding pre-

---

[6] During the first and second interim fee periods, LGB and Akerman billed $51,398.50 and $95,185, respectively, to the same D&O investigation, and were paid 100% of the same, as noted above. During the third and fourth interim fee periods, LGB and Akerman billed $44,038.50 and $52,401.50, respectively, to said investigation, and were paid 80% of the same.  Naturally these amounts exclude time devoted by the Debtors in responding to the Equity Committee's many discovery requests and GlassRatner's indemnification claim.

merger PRXI shares, breached his fiduciary duty by rejecting loan proposals made by two hedge funds (Brevet and Twin Haven) because he wanted PRXI to have a clean balance sheet while he sought to sell his shares. This, in turn, necessitated that PRXI later take out a more onerous loan from another hedge fund (Pentwater). That loan was made September 30, 2014 and was scheduled to mature six months later. Two weeks after the loan was extended, Armada Group GP, Inc. agreed to buy the subject shares.[7] To satisfy the Pentwater loan, the Debtors consummated a merger with DinoKing, a component of which was assumption of the Pentwater loan by members of the DinoKing group. However, the Complaint alleges PRXI shareholders were shortchanged by the merger (i.e., too much PRXI stock was given to DinoKing group members, to the detriment of PRXI shareholders) because of errors in DinoKing's pre-merger financial statements which went uncorrected post-merger.

47.     The Complaint asserts breach of fiduciary duty claims against Mr. Sellers, Sellers Capital, and Bao, and aiding and abetting and gross negligence claims against PRXI directors during this period.

48.     In other words, by the Complaint the Equity Committee asserts Mr. Sellers' efforts to sell his hedge fund's PRXI shares while the company had a clean balance sheet was the proximate cause of PRXI shareholders not affiliated with DinoKing getting shortchanged in the merger, and that Bao and PRXI directors at the time should be made liable.

---

[7] Armada defaulted on the agreement to buy the PRXI shares, resulting in entry of judgment against it in the amount of $6 million by the United States District Court for the Northern District of Illinois (No. 15-7644, ECF No. 113) (Complaint ¶59), which judgment remains unsatisfied.

49.     That theory is rich, not just because equity is out of the money, meaning there are no damages even had there been a technical loyalty breach, but because equity might have actually been in the money but for the Equity Committee's interference with the sale process and incurring extraordinary professional fees.

50.     Significantly, the likely principal motivation for committing estate resources to the subject D&O investigation and action is disclosed in Complaint ¶64: prior to the DinoKing merger, PRXI's directors had "decided to move forward with the DinoKing offer [in order to satisfy the Pentwater loan] without even hearing a competing offer for long-term convertible debt from a group led by Andrew Shapiro," the chairman of the Equity Committee.  Advancing Mr. Shapiro's personal vendetta against Bao for receiving too much equity in connection with the merger and PRXI's directors for ignoring his pre-merger loan proposal is not an appropriate use of estate resources.

## III.    POST-FIFTH INTERIM FEE PERIOD EVENTS

51.     On November 21, 2018, NOAA filed a status report in the Virginia District Court action [ECF No. 530] stating it has reached agreement with respect to a form of order approving the sale of shares in RMST to PAHL.

52.     Following a hearing held December 17, 2018 on RMST's motion to approve the sale and the National Maritime Museum's amended motion to intervene, District Judge Smith entered an order, a copy of which is annexed hereto as Ex. 4, holding the latter motion in abeyance and stating the Court "will rule on it, as appropriate, contingent on the closing of the transaction contemplated under the Asset Purchase Agreement" with PAHL.

53.     The Debtors project an 80% recovery for unsecured creditors in the event the PAHL sale closes.  Oct. 18, 2018 Hr'g Tr. 59:17-23.

54.     In addition, the Equity Committee has asked the Office of the United States Trustee to be disbanded, on terms whereby the contemplated liquidating trustee in these cases would substitute for the Equity Committee as Plaintiff in the D&O adversary proceeding.

## IV.    THE EQUITY COMMITTEE'S PROFESSIONAL FEES IN CONTEXT

55.     Ten legal and financial professionals are employed in these cases.  They are (1) Troutman Sanders, the Debtors' lead bankruptcy counsel, (2) Nelson Mullins, the Debtors' initial bankruptcy counsel and now Jacksonville counsel, (3)-(4) Debtors' counsel in the Virginia District Court action, McGuire Woods and Kaleo Legal (which is also Debtors' outside general counsel), (5) GlassRatner, the Debtors' financial advisor, (6)-(7) the undersigned, and (8)-(10) LGB, Akerman, and Lincoln International, the Equity Committee's financial advisor.

56.     Given the number of professionals employed, and the fact that interim compensation orders have not been entered in over a year, there are massive accrued holdbacks that have not yet been paid.  According to the Debtors' records outstanding payables as of December 11, 2018 are as follows:

| Professional | Payables |
| --- | --- |
| Troutman Sanders | $1,036,968.55 |
| Nelson Mullins | $260,610.84 |
| McGuire Woods | $84,494.74 |
| Kaleo Legal | $22,296 |
| GlassRatner | $67,442.06 |
| Storch Amini | $119,088.39 |
| Thames Markey & Heekin | $70,320.87 |
| Landau Gottfried & Berger | $481,350.92 |
| Akerman | $253,181.70 |
| Lincoln International | $223,481.08 |
| Total | $2,619,233.15 |

**ARGUMENT**

57.    Amounts requested by LGB and Akerman in this and prior interim fee periods, broken down by task code,[8] and amounts allowed and paid, or not allowed but paid under the interim compensation order, is attached as Ex. 5.

58.    By their fifth interim fee applications, LGB and Akerman seek allowance on an interim basis of $830,853 in fees and $33,573.97 in expenses, principally for non-compensable strategies (discussed above) pursued after the Equity Committee blew up the PacBridge sale proposal in October 2017.  Neither these strategies, nor any other services covered by the fifth interim fee applications (*e.g.*, keeping Mr. Shapiro in the loop), yielded any benefit to the Debtors' estates or PRXI shareholders. Approval of the Equity Committee's disclosure statement was denied on the ground that, inter alia, its plan was unconfirmable; the PAHL sale was approved over the Equity Committee's objection; and there has been no activity in the D&O adversary proceeding save scheduling a mediation. Even if evaluated prospectively, that is, without the benefit of hindsight, the subject services are not compensable under section 330(a).

59.    LGB's and Akerman's fifth interim fee applications should be denied to the extent fees and expenses covered thereby have not already been paid.  Alternatively, consideration of said interim fee applications should be deferred until final fee applications are considered.

---

[8] Task codes to which less than $5,000 was billed during a given compensation period have been omitted.

## I.    LEGAL STANDARD

60.    Bankruptcy Code section 1103(a) authorizes an official committee to employ attorneys "to represent or perform services for such committee."

61.    Section 330(a)(1) provides "subject to section … 328 [discussed below], the court may award to a … professional person employed under section 1103—(A) reasonable compensation for actual, necessary services rendered by [it] and (B) reimbursement for actual, necessary expenses."

62.    Section 330(a)(2) provides "[t]he court may … award compensation that is less than the amount of compensation that is requested." *See also In re Hillsborough Holdings Corp.*, 127 F.3d 1398, 1404 (11th Cir. 1997) ("The court has considerable discretion over the amounts awarded by ways of fees and expenses").

63.    Pursuant to section 330(a)(3), reasonableness under subsection (a)(1)(A) is determined by considering "the nature, the extent, and the value of such services, taking into account all relevant factors, including" those factors listed in subsections (A)-(F).  Said factors include, in addition time spent and rates charged (subsections (A)-(B)), "whether services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title" (subsection (C)) and "whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title" (subsection (F)). Courts also make adjustments to the lodestar analysis by applying the so-called *Johnson* factors.  *Grant v. George Schumann Tire & Battery Co.*, 908 F.2d 874, 879 (11th Cir.1990).[9]

---

[9] The twelve factors set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974) are: (1) The time and labor required; (2) the novelty and difficulty of the questions;

64.     Section 330(a)(4) further provides counsel to an official committee are not entitled to compensation for "unnecessary duplication of services" and "services that were not—(I) reasonably likely to benefit the debtor's estate; or (II) necessary to the administration of the case." *See also In re Blue Stone Real Estate*, 487 B.R. 573, 577 (Bankr. M.D. Fla. 2013) (professionals must "exclude any excessive, unnecessary, or redundant hours from their fee applications").

65.     For services by an official committee's attorneys to be compensable under section 330(a), they must be rendered in furtherance of the committee's duties under section 1103(c).  *E.g.*, *In re Pettibone Corp.*, 74 B.R. 293, 308 (Bankr. N.D. Ill. 1987) (to be compensable services must have been rendered in "furtherance of the committee's duties under section 1103(c)"); *see also* John T. Hansen, Pushing the Envelope of Creditors' Committee's Powers, 80 Am. Bankr. L. J. 89 (Winter 2006) ("§ 1103(c) defines a committee's job").

66.     The "three basic functions" of an official committee under section 1103(c), in turn, are: "(1) to monitor the Debtor's operations, (2) to investigate for potential insider causes of action where the facts warrant it, and (3) to negotiate on the plan."  *In re Cumberland Farms, Inc.*, 154 B.R. 9, 12 (Bankr. D. Mass. 1993).  Although section 1103(c)(5) permits an official committee to "perform such other services as are in the interest of those represented," that clause is not an unlimited catchall, but rather requires

---

(3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.  Some of these factors overlap with those considered under section 330(a)(3)(A)-(F).

that services rendered, for which counsel seeks compensation, actually advance its constituency's interests.

## II.    THE SUBJECT INTERIM FEE APPLICATIONS SHOULD BE DENIED TO THE EXTENT FEES AND EXPENSES COVERED THEREBY HAVE NOT ALREADY BEEN PAID; ALTERNATIVELY, CONSIDERATION OF SAID APPLICATIONS SHOULD BE DEFERRED

### A.    The Equity Committee's Attorneys Should be Denied Further Payments Because Their Conduct Yielded No Benefit

67.    As noted above, pursuant to section 330(a), professionals are entitled to reasonable compensation for actual, necessary services rendered and reimbursement of actual, necessary expenses.

68.    The reasonableness determination under section 330 is made principally based on results obtained.  As noted in *DLJ Secs. Corp. v. Nat'l Gypsum Co. (In re Nat'l Gypsum Co.)*, 123 F.3d 861, 862 (5th Cir. 1997), "Prior to 1978 the most able professionals were often unwilling to work for bankruptcy estates where their compensation would be subject to the uncertainties of what a judge thought the work was worth after it had been done.  That uncertainty continues under the present § 330 of the Bankruptcy Code" (emphasis added).  *See also In re Gherman*, 105 B.R 714, 719 (Bankr. S.D. Fla. 1989) (denying fee application where amount sought was "disproportionate to the results they have achieved"); *In re Allied Computer Repair, Inc.*, 202 B.R. 877, 887 (Bankr. W.D. Ky. 1996) ("The overwhelming majority of Courts have recognized that a 'reasonable' attorney fee for purposes of § 330 is one that is commensurate with the potential or actual value obtained") (citations and internal quotations omitted); *In re Village Apothecary, Inc.*, 586 B.R. 430, 433 (Bankr. E.D. Mich. 2018) (rule that results obtained is "major factor" in determining reasonableness of fee "in my view … is correct and is appropriate and does have roots in Section 330(a)"); *In re Haimil Realty Corp.*, 579 B.R. 19, 27 (Bankr.

S.D.N.Y. 2017) (courts consider results obtained in determining amount of reasonable compensation).

69.     Results achieved are also part of the lodestar calculation, and specifically identified as a *Johnson* factor (eighth factor, quoted above).  *See*, *e.g.*, *Allied Computer*, 202 B.R. at 884 (reducing fee based upon results achieved as part of the lodestar calculation).

70.     And as to equity committees specifically, virtually all courts to address the issue have held reasonableness of professional fees must be assessed with the benefit of hindsight.  The court in *In re Emons Indus., Inc.* held:

> If a plan is proposed and confirmed that provides nothing for shareholders, then it may well be that no fees and disbursements would be awarded to [committee counsel] because in light of the outcome the amounts were not reasonable nor reflective of actual, necessary services … The value of the services must be viewed with the benefit of hindsight.  There can be no doubt that counsel which takes on representation of the equity committee … takes a significant risk.

50 B.R. 692, 694 (Bankr. S.D.N.Y. 1985) (emphasis added).  *See also In re Pilgrim's Pride Corp.*, 407 B.R. 211, 217 (Bankr. N.D. Tex. 2009) ("professionals representing an equity committee may not be entitled to compensation if the subject case ultimately provides no return to equity"); *In re Heck's Props., Inc.*, 151 B.R. 739 (S.D. W. Va. 1992) (denying compensation to equity committee counsel for activities that proved "of little benefit to the estate"); *In re Wang Labs., Inc.*, 149 B.R. 1, 3 (Bankr. D. Mass. 1992) (going a step further and requiring equity committee professionals to demonstrate having made a substantial contribution in the first instance); Hansen, 80 Am. Bankr. L.J. 90, n.4 ("Courts have imposed some limitations on equity committees that often have no relevance to creditors' committees").

71.    Unless contingency counsel in the D&O adversary proceeding hits a home run, none of the services rendered by the Equity Committee's attorneys in the fifth interim fee period will have yielded any benefit, whether to the Debtors' estates or to their own constituency.  No further payments should be made to them.

**B.    Even if Evaluated Prospectively the Equity Committee's Attorneys' Conduct is Not Reasonable under Section 330(a)**

1.    Time Billed for Serving as Grand Overseer of the Sale Process is Not Compensable

72.    "Although committee functions are fairly broad and important, Section 1103 does not turn the Committee into some sort of 'Grand Overseer' over [the] Chapter 11 case." *Pettibone*, 74 B.R. at 309.  *See also In re Agriprocessors, Inc.*, No. 08-2751, 2009 WL 4823808, at *3 (Bankr. N.D. Iowa Dec. 8, 2009) (collecting cases); *Cumberland Farms*, 154 B.R. at 11 (applying percentage reduction where committee counsel "became overly involved" in matters "which are, and should be, handled only by" the debtor's professionals).

73.    That the Equity Committee's attorneys fashioned themselves grand overseers of the sale process is reflected by the public record, including amounts billed and time recorded under the Asset Disposition task code in these and prior interim fee applications. Their injecting themselves into the sale process destroyed the one potential transaction that would have paid creditors in full and yielded a distribution for the Equity Committee's constituents, and sent these cases into a tailspin.

74.    LGB and Akerman are not entitled to compensation for attempting to seize control of and disrupting the sale process.  Said conduct does not even fall within the scope of section 1103(c)(5)'s catchall provision as it provided no benefit to PRXI shareholders, and harmed creditors in the process.  To provisionally remedy their disrupting the sale

process and prolonging these cases by well over a year, no further payments should be authorized to them whether or not related to the sale process.

> ### 2. Time Billed for D&O Matters and the Equity Committee's Plan are Not Compensable

75.     That conducting an investigation and proposing a plan fall within the scope of a committee's powers and duties under section 1103(c) does not make time billed to those activities automatically compensable.  In this case said activities are not compensable for reasons set forth below.

> #### *(i)     The Equity Committee's Attorneys Failed to Use Reasonable Billing Judgment*

76.     Section 330(a) requires that professionals use reasonable billing judgment, which means electing not to invest estate resources in a matter whose expected return is not likely to exceed the resources invested.  *E.g.*, *In re Arnold*, 162 B.R. 775, 779 (Bankr. E.D. Mich. 1993) (citing *In re Great Sweats, Inc.*, 113 B.R. 240, 242 (Bankr. E.D. Va. 1990)) (counsel "must consider the amount in dispute and discount that by the likelihood of success in order to properly evaluate the worth of the litigation, and then owes a professional duty to the client to recommend that no action be commenced if the cost of the battle exceeds the value of the litigation"); *In re Keene Corp.*, 205 B.R. 650, 696 (Bankr. S.D.N.Y. 1997)) ("Once it becomes reasonably obvious that the prospective costs of commencing or continuing litigation will exceed any benefit to the estate, the attorney is duty bound to abandon the claim"); *Agriprocessors*, 2009 WL 4823808, at *3 ("A committee's attorneys must use reasonable billing judgment and consider if the costs of services would be disproportionately large in relation to the size of the estate or likelihood of success").

77.     The Equity Committee's attorneys invested extraordinary resources in their D&O investigation.  Pursuant to Agentis PLLC's employment order [ECF No. 1038], special counsel's fees will consume nearly half the net recovery, if any.  At a certain point, perhaps during the fourth interim fee period when the Equity Committee blew up the sale process, it should have been clear that the contemplated D&O claims might not have legs if equity were left out of the money.  Deciding to nevertheless continue committing resources to the D&O investigation, and prepare a complaint (and/or substitute memo articulating what a complaint would look like), reflected poor billing judgment, and creditors should not have to pay for the same now that the sale process has been completed and equity is out of the money.

78.     The Equity Committee also billed hundreds of thousands of dollars in connection with efforts to confirm its chapter 11 plan and seek approval of the associated disclosure statement.  That decision was not a reasonable exercise of billing judgment because, as the Court found, the plan was unconfirmable.

> (ii)    *Nonbankruptcy Clients Would Not Reasonably be Expected to Pay for the Subject Services*

79.     Another component in determining reasonableness under section 330(a) is that nonbankruptcy clients expect attorneys to reduce their bills so that fees charged are commensurate with results achieved.  11 U.S.C. § 330(a)(3)(F).  *E.g.*, *In re Busy Beaver Building Ctrs., Inc.*, 19 F.3d 833, 855-56 (3d Cir. 1994) (quoting *In re Manoa Fin. Co.*, 853 F.2d 687, 690 (9th Cir. 1988)) ("the court should review a fee application to ensure the applicant exercises the same 'billing judgment' as do non-bankruptcy attorneys by, for example, writing off [fees] for which … non-bankruptcy clients typically decline to pay"); *Village Apothecary*, 586 B.R. at 433-34 (clients do not expect proceeds of litigation to be

entirely consumed by attorneys' fees); *Allied Computer*, 202 B.R. at 886, 888 ("billable hours do not necessarily translate into compensable hours"; nonbankruptcy attorneys routinely deduct charges for services rendered on claims that have not been wholly successful, and adjust the bill to make the charge for a given service commensurate with the benefit to the client generated by that service; same thing should happen in bankruptcy). This dovetails with section 330(a)'s results-oriented approach, discussed above.

80.     As noted above, the D&O adversary proceeding is not likely to achieve results that come anywhere near that billed for the associated investigation and preparation of a complaint, and the Equity Committee's plan was unworkable from the start. Disallowing associated time entries on the fifth and prior interim fee applications would require disgorgement.  In lieu of directing disgorgement at this time[10] no further payments should be permitted to the Equity Committee's attorneys.

**C.     The "Improvident in Light of Developments Not Capable of Being Anticipated" Exception to Court-Approved Hourly Fee Arrangements in Section 328(a) Applies**

81.     Section 330(a) is "subject to" section 328(a), which permits an official committee to employ professionals "on any reasonable terms and conditions, including … on an hourly basis."  Section 328(a) also provides:

> Notwithstanding such terms and conditions, the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions.

---

[10] The Creditors' Committee reserves all rights.

82.    Prior approval of LGB's and Akerman's employment on an hourly basis proved to have been improvident in light of developments not capable of being anticipated when their respective fee arrangements were approved in 2016.  Specifically, it was not then capable of being anticipated that the Equity Committee would inject itself into the sale process, notwithstanding its having agreed said process would be run by GlassRatner, in a manner that would destroy the only transaction that would have yielded a distribution to equity, thereby sending these cases into a tailspin to the detriment of all stakeholders including creditors.  Had that possibility been capable of anticipation, the Creditors' Committee likely would have objected to employment of the Equity Committee's attorneys on an hourly basis.  The Court should accordingly allow compensation different from that requested by the Equity Committee's attorneys, pursuant to section 328(a).

## **CONCLUSION**

Had no Equity Committee existed these likely would have been solvent debtor cases.  The Debtors proved willing to pursue a "Complete Sale" transaction, and absent the Equity Committee's attorneys' litigious posture from the outset, such sale might have been achieved without the need for DIP financing.  Whether the sale closed at $30 million (as in the annexed PacBridge term sheet) or $19.5 million (PAHL sale), or $17.5 million (purchase price under APA annexed to sale motion, ECF No. 1055), proceeds likely would have been sufficient to pay prepetition secured and unsecured creditors in full and make a distribution to equity.  It was the Equity Committee's conduct that drove the need for a DIP loan, drove consumption of the same and additional administrative costs, and eliminated the possibility of these being solvent debtor cases to the detriment of all stakeholders.  As set forth in the annexed table, LGB's fees and expenses for the first through fifth interim

fee period are $1.5 million and Akerman's are $.75 million.[11]  LGB has already been paid

$1,009,451 and Akerman $491,372.  Unsecured creditors should not be required to bear

the cost of any further payments to them.

Dated: December 21, 2018             **THAMES MARKEY & HEEKIN, P.A.**
                                     Robert A. Heekin, Jr.
                                     Florida Bar No. 652083
                                     50 North Laura Street, Suite 1600
                                     Jacksonville, Florida  32202
                                     (904) 358-4000
                                     (904) 358-4001 (Facsimile)
                                     rah@tmhlaw.net

                                     - and -

                                     **STORCH AMINI PC**

                                     By: /s/ Jeffrey Chubak
                                     Jeffrey Chubak (admitted pro hac vice)
                                     140 East 45th Street, 25th Floor
                                     New York, New York 10017
                                     (212) 490-4100
                                     (212) 490-4208 (Facsimile)
                                     jchubak@storchamini.com

                                     Attorneys for the Official Committee
                                     of Unsecured Creditors

---

[11] In contrast, total legal fees for Storch Amini and Thames Markey & Heekin from September 2016-October 2018 has been $341,520 and $256,647, respectively, placing the Creditors' Committee's legal spend at approximately one-quarter of the Equity Committee's.

## CERTIFICATE OF SERVICE

I CERTIFY that on December 21, 2018 a true and correct copy of the foregoing was served by transmission of Notice of Electronic Filing generated by CM/ECF to all parties registered to receive the same in these cases, including Peter Gurfein (pgurfein@lgbfirm.com) and Jacob Brown (jacob.brown@akerman.com), both attorneys for the Equity Committee.

By: /s/ Jeffrey Chubak